238

1           IN THE UNITED STATES DISTRICT COURT.
         FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
2                  HARRISBURG DIVISION

3

UNITED STATES OF AMERICA          :   CASE NO.
4                                  :
           v.                      :   (Judge Connolly)
5                                  :
                                   :
6  KEITH THOMAS DOUGHERTY          :   1:19-CR-00140

7

8              TRANSCRIPT OF PROCEEDINGS
                 JURY TRIAL - DAY 2
9              (Pages 238 through 498)

10

         Held before the HONORABLE COLM F. CONNOLLY
11        December 1, 2021, commencing at 8:55 a.m.
     Courtroom No. 1, Federal Building, Harrisburg, Pennsylvania
12

13

14
   APPEARANCES:
15
   DAVID PERRI, ESQUIRE
16 United States Attorney's Office
   Federal Building U.S. Courthouse
17 1125 Chapline Street, Suite 3000
   Wheeling, WV 26003
18      For the United States

19 SHAWN ADKINS, ESQUIRE
   United States Attorney's Office
20 Federal Building U.S. Courthouse
   1125 Chapline Street, Suite 3000
21 Wheeling, WV 26003
        For the United States

22

23

24

25

239

1   APPEARANCES CONTINUED:

2

    KEITH THOMAS DOUGHERTY, PRO SE
3   #76873-067
    FDC-Philadelphia Federal Detention Center
4   P.O. Box 562
    Philadelphia, PA 19105
5       Defendant

6   THOMAS J. YOUNG, ESQUIRE
    Federal Defender of New Jersey
7   800-840 Cooper Street, Suite #350
    Camden, NJ 08102
8       Standby Counsel for the Defendant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

         Proceedings recorded by machine shorthand; transcript
23  produced by computer-aided transcription.

24  _____
                    Wendy C. Yinger, RMR, CRR
                     Official Court Reporter
25              wendy_yinger@pamd.uscourts.gov

240

INDEX TO WITNESSES

| FOR THE GOVERNMENT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Eric Hanna | (day 1) | 247 | 257 | -- |
| Christopher Conner | 267 | 311 | -- | -- |
| Michael Corricelli | 377 | -- | -- | -- |
| Christopher Cruz | 395 | 422 | 439 | -- |
| Pat Armor | 444 | 458 | -- | -- |
| (On Qualifications) | 439 | -- | -- | -- |

1          (Proceedings convened at 8:55 a.m.; without the

2           jury.)

3          THE COURT:  Let's talk about jury instructions real

4   quick.  I have reviewed the New Jersey case.  I went back and I

5   read carefully *Elonis* from the Supreme Court.  Is there a

6   specific proposal that the Defendant wants me to look at?

7          MR. YOUNG:  Judge, just -- so the office was closed

8   yesterday afternoon, they are open now.  There is someone who

9   is printing up the proposed instructions.  They're going to

10  come over here.  I'm going to give them to Mr. Dougherty to

11  look over although not all of them are applicable.  So maybe I

12  would just propose at a break?

13         THE COURT:  We'll do it at lunch.  That sounds great,

14  that's wonderful.  All right, we'll do that.  Then the limiting

15  instruction, the Government was going to think if there was any

16  other purpose that it thought that the April 30th clerk of

17  courts office altercation, I'm going to call it, that would be

18  admissible.

19         MR. PERRI:  Yes, Your Honor, thank you.  No.  The

20  reason that we stated yesterday is it.

21         THE COURT:  Which means that the limited purpose for

22  which the alleged altercation is to be admitted, the limited

23  purpose for which it is to be admitted is that it goes to Judge

24  Conner's understanding of the alleged threatening

25  communications.

242

1          MR. PERRI:  His perception of the danger posed by
2  this individual and the seriousness of the aggression, the
3  seriousness of the expression.
4          THE COURT:  Why is that relevant?  In other words,
5  why do we care what Judge -- what Chief Judge Conner thought as
6  opposed to -- I can understand the instruction calls for what a
7  reasonable person would have thought.  Obviously, I guess, his
8  testimony is -- his testimony is relevant in the sense that the
9  jury can decide whether it is indicative of what a reasonable
10 person thought.  But why his subjective intent?
11         MR. PERRI:  His subjective intent?
12         THE COURT:  His -- his subjective understanding?
13         MR. PERRI:  Well, Your Honor, he's the person that
14 this letter is directed to, and he's the one that's reading it.
15 He might have thought it was a joke, he might have thought it
16 was hyperbole or something like that, and he didn't.  And I
17 think it goes to the whole reasonable person standard.
18         THE COURT:  I guess what I'm getting at is, it seems
19 to me the issue is whether -- the words, the instruction, the
20 true threat instruction, which is the objective prong, the
21 Third Circuit is specific.  There's both an objective and a
22 subjective -- there are both subjective and objective
23 components or elements to the charges.  Do you agree with that?
24         MR. PERRI:  I do.
25         THE COURT:  Okay.  And the true threat instruction,

243

1  which I'm calling instruction number 7, which is the only

2  instruction that I modified, is the objective prong.  It goes

3  to the objective prong.  Correct?

4           MR. PERRI:  Yes, Your Honor.

5           THE COURT:  Okay.  All right.  What I'm thinking is,

6  I'm just wondering, is it not more accurate to say that the

7  limited purpose for which the court clerk's office altercation

8  is admitted is to go to what a reasonable, the context of the

9  subsequent communications, and whether a reasonable person, not

10 specifically Judge Conner, but whether a reasonable person

11 would view it as a threat?  Is that not the right standard?

12          MR. PERRI:  The instruction does talk about context

13 and circumstances, Your Honor.

14          THE COURT:  Right.  But what I'm getting at is, I

15 don't think we want the jury to decide whether or not Judge

16 Conner --

17          MR. PERRI:  I see your point.

18          THE COURT:  -- thought he was threatened.  It's

19 whether a reasonable person in Judge Conner's shoes would have

20 felt threatened.

21          MR. PERRI:  Exactly.  I didn't state that correctly.

22          THE COURT:  I just want to make sure I'm -- okay.

23 All right.  You disagree?

24          MR. DOUGHERTY:  Well, I just -- it brings up a

25 question that I brought up yesterday as to the facts of the

1  circumstance.  They are completely different from what is being

2  assumed to be accurate.

3          THE COURT:  Well, you're going to get a chance to

4  cross-examine him on that, and then, obviously, you can put on

5  your own evidence of it.  But the whole point is that it's

6  limited.  And you didn't object based on hearsay grounds.

7          MR. DOUGHERTY:  No.

8          THE COURT:  So it's in.  I mean, there was no

9  objection.

10          MR. DOUGHERTY:  Um-hum.

11          THE COURT:  So it's in.  And basically though,

12  because I do think that the manner in which it was

13  characterized could arguably be construed as wrongful

14  conduct --

15          MR. DOUGHERTY:  Yes.

16          THE COURT:  -- I think it should be given a limited

17  instruction.  That's what I'm trying to do, which I thought you

18  wanted.

19          MR. DOUGHERTY:  Yeah, that is fine.  I'm just saying

20  what I just heard.  In other words, we're characterizing this

21  as though it actually happened when, in fact --

22          THE COURT:  Oh, I'm saying, the evidence.  I'm not

23  telling the jury whether I think it happened or not.  I'm

24  saying, the testimony you heard is offered for the limited

25  purpose.

245

1          So when they come in, I'll clarify.  I'm going to

2   say, I just want to clarify the things I said yesterday.  The

3   testimony you heard from the deputy marshal about the April 7,

4   2015, letter was admitted for the limited purpose of deciding

5   whether the Defendant knew that the subsequent -- that

6   subsequent letters contained threats.

7          Is that right?

8          MR. PERRI:  Yes, Your Honor.

9          THE COURT:  Okay.  And then the testimony from the

10  deputy marshal about the April 30, 2015, incident in the

11  clerk's office was admitted for the limited purpose of deciding

12  whether a reasonable person in the shoes of Judge Conner would

13  view the subsequent communications that formed the basis of the

14  charges and whether they contained a true threat.

15         MR. PERRI:  Yes, Your Honor.

16         THE COURT:  Is that fair?

17         MR. PERRI:  Yes.

18         THE COURT:  Okay.  And, Mr. Dougherty, is okay with

19  that, too.  So that's great.  Okay, let's bring the jury in.

20         MR. ADKINS:  Judge, do you want Deputy Hanna in here

21  before the jury?

22         THE COURT:  Sure, you can do that.

23         (Complied.)

24         (Jury was brought in at 9:04 a.m.)

25         THE COURT:  Good morning.  Hope you all had a good

1 evening.  Anybody do any internet research or anybody get

2 contacted by anybody about the case?  No.  Wonderful.  And we

3 had to attend to some quick matters, that's why you're a little

4 bit late coming up.  I'll talk to you later in the day about

5 what you want to do about tomorrow, okay, what time we start

6 and that kind of thing.  Okay.  We're going to start though.

7          If you recall, it's Mr. Dougherty who was in the

8 middle of cross-examining.  Before I do that, I want to clarify

9 something I kind of said at the end of the last evening.  So

10 you've heard testimony from the deputy marshal about two things

11 that -- so one was the letter, we'll call it the April 7th,

12 2015, letter.

13          Now the testimony about that is being introduced by

14 the Government, and I'm allowing it in.  But it's for a limited

15 purpose.  As I said last night, the purpose of that is to help

16 you make an assessment as to whether or not the communications

17 that form the basis of the charges that occurred later in 2017

18 and '19, whether or not they contained a true threat, all

19 right, and whether or not the Defendant knew or intended that

20 they contained a true threat.  So it's for that limited

21 purpose.

22          And then you heard testimony about an April 30, 2015,

23 incident in the court clerk's office in this building.  And

24 that testimony is also being introduced by the Government, and

25 I'm allowing it, for a limited purpose.  And the limited

1  purpose is, again, for you to weigh and decide whether or not

2  the subsequent communications that form the basis of the

3  charges, whether they contained a true threat and whether the

4  Defendant knew or intended that they contain a true threat.

5          All right?  Okay.  Mr. Dougherty.

6          **ERIC HANNA, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN,**

7                      **RESUMED THE STAND**

8                **CROSS EXAMINATION (CONTINUED)**

9  BY MR. DOUGHERTY:

10 Q.   Thank you for your patience.  Once again, I just want to

11 clarify.  Every contact I've had with you, more than

12 professional, sir, and truly appreciative.  I just need to

13 clarify a few things we were discussing yesterday.  One of them

14 happens to be the link between the incident that occurred on

15 April 30th and the second visit to my property.  Okay.

16      And this was a report produced, I guess it's from William

17 Pugh, and you were part of it.  It references you.  So maybe

18 you could help bring some clarity to that.

19          MR. PERRI:  Judge, we don't mind the Defendant asking

20 the witness about these reports, but since they're not in

21 evidence, they probably shouldn't be shown to the jury on the

22 machine.

23          THE COURT:  Okay.  I mean, are you objecting -- are

24 you trying to introduce these reports into evidence?

25          MR. DOUGHERTY:  Yes, they will be introduced.  I

248

1    asked him earlier.  These are provided by the Government.

2            THE COURT:  Hold on.  But you want to introduce them?

3            MR. DOUGHERTY:  Yes.

4            THE COURT:  Does the Government object to them being

5    introduced?

6            MR. PERRI:  Well, we typically don't introduce --

7            THE COURT:  I know you typically don't, but if

8    somebody wants to.  My question is, do you object -- do you --

9    you might want them to be introduced.  I'm just -- what's your

10   position?  I know they're not normally introduced, I get that.

11           MR. PERRI:  Your Honor, we're trying to be

12   accommodating here.

13           THE COURT:  I know you are.  What I'm asking you is,

14   what's your preference?

15           MR. PERRI:  Let me -- may I see those reports again,

16   Mr. Dougherty?

17           (Complied.)

18           (Mr. Perri and Mr. Dougherty confer.)

19           THE COURT:  Mr. Dougherty, I overheard you speaking

20   with Mr. Perri.  You said, portions.  There is a rule of

21   evidence that if a party submits part of a document, the other

22   side get to submit the entire document.

23           MR. DOUGHERTY:  Yes.

24           THE COURT:  Okay.  I just want to make sure you

25   understood that rule.

249

1            MR. DOUGHERTY:  Just so you understand, these were

2   given to me by --

3            THE COURT:  Oh, I understand where they came from.

4   Mr. Perri is right, as a general rule, law enforcement reports

5   don't come into evidence.

6            (Mr. Perri and Mr. Dougherty confer.)

7            THE COURT:  So while the parties are talking, let me

8   tell you, you probably heard of the word hearsay.  So hearsay

9   is a statement made by somebody who's not in court.  And as a

10  general rule, it's not admissible.  But there's a lot of

11  exceptions.

12           So if somebody wrote up a report, and that person

13  isn't in court, that report generally, as Mr. Perri noted,

14  they're not admissible.  But there is exceptions.  And

15  sometimes they can be admitted, sometimes not.  And so -- I

16  know this takes a little bit of time, but this might move

17  things along faster.  So I'm thinking maybe I'll let the

18  parties confer.

19           But it's -- again, also remember I told you

20  objections are not to be viewed by you as evidence, and you

21  shouldn't hold it against a party because they object or

22  because I rule in their favor or against their favor.  There

23  are rules of evidence, and they have a purpose.

24           And so if a party wants to object based on hearsay,

25  they're absolutely entitled to object to it, and you should not

250

1  hold that against the party.

2          MR. PERRI:  We won't object, Your Honor.

3          THE COURT:  Okay.  So, Mr. Dougherty, do you want to

4  just identify those reports for the record?

5          MR. DOUGHERTY:  Identify them?

6          THE COURT:  Well, maybe -- yes, and mark them as an

7  exhibit.

8          MR. DOUGHERTY:  Okay.

9          (Complied.)

10          MR. DOUGHERTY:  Exhibit 1 would have two pages.  Do

11  you want them separately identified?

12          THE COURT:  Just identify what Exhibit 1 is, yes.

13  What is it?

14          MR. DOUGHERTY:  It is a report filed by the Marshals

15  Service on May 13th, 2015, by William Pugh.

16          THE COURT:  All right.  It's admitted.  What's the

17  next exhibit?

18          MR. DOUGHERTY:  This is page 2 of 3, the Marshal's

19  report by Matthew Hartman of 5/18/2015.

20          THE COURT:  Okay.  Now you've only got one page.  The

21  Government, do you want the entire document admitted or are you

22  content right now with that?

23          MR. PERRI:  We're content with that right now.

24          THE COURT:  Okay.  We'll mark that as Defendant's

25  Exhibit 2.  It's admitted.  Understand that if the Government

1  wants, it gets to introduce other parts of that report at a

2  later date and without objection.  All right.  They're

3  admitted.  You can now show them on the screen.

4          (Complied.)

5  BY MR. DOUGHERTY:

6  Q.   The paragraph I just want to go to real quickly is one,

7  two, three, fourth paragraph.  You see the last entry

8  CA123037517?

9  A.   Yes, sir.

10  Q.   Okay.  As you can see, this was referencing the

11  communication that I had with the deputy -- lead deputy from

12  the 5/8 second interview with the two of you's and where I

13  indicated that there was a filed complaint related to

14  interference with mail where it was an overnight mail package

15  mailed to the clerk's office, signed for in the clerk's office,

16  that never made it into the court docket, which would be a

17  crime separately under 18 U.S.C. 2706.  So that's what the

18  reference is.

19      And as you see, Mr. Pugh starts to indicate in the fourth

20  paragraph, you can see -- if I could maybe bring you right up

21  to speed, could you read for the jury the last paragraph on

22  that report?

23  A.   Yes, sir.  Dougherty did not make any threats during the

24  telephone conversation and his tone of voice was mostly calm.

25  During the course of the conversation, Dougherty's tempo of

252

1  conversation increased and became agitated when he surmised

2  that Pugh did not do his job ordered by Dougherty.

3  Q.   Okay.  So that is the general content.  This is the second

4  page of that report.  Going down to what is the third

5  paragraph, could you read, After the telephone call with

6  Dougherty, the follow-up with Pugh?

7  A.   Yes, sir.  Pugh contacted the clerk's office in district

8  court for the District of Columbia --

9  Q.   No, actually it would be the larger paragraph above that?

10  A.   After the telephone call?

11  Q.   Um-hum.

12  A.   Okay.  After the telephone call with Dougherty ended, Pugh

13  contacted the clerk's office in district court for the District

14  of Columbia and spoke with Mike Darby, who is the case

15  administrator.  Darby advised that Dougherty has one active

16  civil case, 15-CV-582, *Dougherty versus McKee*, and that summons

17  have been issued.  Darby advised that he has had contact with

18  Dougherty via phone, e-mail, and in-person and has not heard or

19  read anything threatening by Dougherty.  Pugh provided his

20  contact information to Darby, who agreed to notify Pugh of any

21  threatening demeanor exhibited by Dougherty.

22  Q.   Okay.  Now if you could then just read that final

23  paragraph?

24  A.   Yes, sir.  Pugh then contacted U.S. Postal Inspector Mike

25  Corricelli and requested any information pertaining to case

1  number CA123037517 that was provided to Pugh by Dougherty,

2  which allegedly pertains to the missing mailing to the district

3  court in the District of Columbia.

4  Q.   Okay.  So just briefly, the contact incident that you were

5  questioning about was the April 30th, 2015, was actually

6  related to this particular case, and it involved the service of

7  employees here in the building.  Were you aware of that?

8  A.   I was aware that it pertained to the April 30th incident,

9  yes.

10 Q.   And it was your understanding though, according to the

11 secondhand information that you had gotten, that was not

12 successful whenever it happened?

13 A.   Correct.

14 Q.   And they forwarded the service and consequently escorted

15 me from the building as a result of that?

16 A.   Yes, sir, that was my understanding.

17 Q.   Okay.  So then you had been improperly led to believe that

18 I was the one making service and that service was, in fact, not

19 successful and I was removed from the building?

20 A.   That was what I was informed of what happened in the

21 building.

22 Q.   Okay.  So as we were talking about, you know, yesterday or

23 the other day, I should say -- yesterday, that, in fact, is not

24 factual, and I'll be able to correct that later on.  Then you

25 also made brief reference to your concern about how the

254

1   foreclosure or financial difficulty would lead you to be
2   concerned that someone has a descending financial status, you
3   know, that sort of -- you know what I'm talking about?
4   A.   Yes, sir.
5   Q.   And that's a perfectly reasonable understanding.  But I
6   want to know a simple question.  Were you familiar during the
7   campaign of Donald Trump in 2016 when, in fact, he was
8   addressed about having filed bankruptcy four times during his
9   business career and, in fact, indicated tried to soften it by
10  saying he used the chapter laws?  Were you aware of that
11  concept?
12  A.   No, sir.
13  Q.   Well, if you could look at the Exhibit 2 that's up on the
14  screen now, that would be the eighth paragraph.  It's actually
15  7, you know, beneath number 7, second paragraph after number 7.
16  Okay.  And see -- could you read that for the jury?
17  A.   Bankruptcy Court queries determined that Dougherty filed a
18  bankruptcy Chapter 13 petition on October 15th, 2014.
19  Dougherty's bankruptcy case was dismissed on December 30th,
20  2014.
21  Q.   Okay.  So again, being a financial person, the concept of
22  bankruptcy is a cash flow thing.  And one of the laws of the
23  chapter available are Chapter 13.  Are you familiar with what
24  that involves?
25  A.   No, sir, not Chapter 13.

1   Q.   Okay.  Just to give us a little background showing why it

2   relates to --

3           THE COURT:  I can't let you do that.  You can't give

4   him background.  That's testimony.  You can ask him a question.

5           MR. DOUGHERTY:  Okay.

6   BY MR. DOUGHERTY:

7   Q.   So are you aware that this transaction was directly

8   related to 13-CV-857 Middle District of PA that originally had

9   been assigned to William Caldwell, which transferred then to

10  Judge Conner, who is victim 1 in this case, and then

11  inexplicably transferred to Joel Slomsky in the Eastern

12  District of Pennsylvania, and ultimately transferred to a

13  retired judge from Baltimore named Frederick Motz?  Are you

14  aware of those transactions?

15  A.   No, sir, I don't have any knowledge of your civil --

16  Q.   Okay.  But I'm saying, relative to this --

17  A.   Um-hum.

18  Q.   -- the device would be to take the 5 million dollars worth

19  of collection contracts and turn them over to the bankruptcy

20  trustee for the Middle District of Pennsylvania.

21          MR. PERRI:  Objection, Your Honor.

22          MR. DOUGHERTY:  Then everyone gets paid before --

23          THE COURT:  I'm going to sustain the objection.  He

24  already said he doesn't know anything about your filings.  Now

25  you're just getting into your testifying and we can't do that.

256

1  Not as a lawyer, you can't testify.

2          I don't let Mr. Perri get up there and tell the jury

3  all about background and what's going on and about the facts.

4  He gets to ask the questions, and I need to hold you to the

5  same standard.

6          MR. DOUGHERTY:  Fine.  I don't mean to overstep.

7  BY MR. DOUGHERTY:

8  Q.   So the point being that your perceptions are perfectly

9  legitimate based on the information that you've received even

10 if all of it happens to be completely inaccurate, taken out of

11 context.  So the question is, if, in fact, you were given facts

12 to the contrary, would that then all of a sudden change where

13 you thought that this was a reason to think someone was

14 threatening when, in fact, it was a device used through the

15 legal process to force the Court to accept the monies and the

16 payments that would otherwise be available?

17 A.   Can you rephrase that question with not so many words?

18 Q.   Yes.  Would you be willing to change your approach if you

19 wind up thinking something that you thought was originally bad

20 and meaning that the person's conduct is spiraling downward to

21 realize it was a device to free up 3 million dollars worth of

22 contracts that would pay everything?

23 A.   No.

24 Q.   It wouldn't change your --

25 A.   No, sir.

1  Q.   About -- okay.

2         MR. DOUGHERTY:  With that, I have no further.

3         THE COURT:  Okay.  Thank you.  Any redirect?

4         MR. PERRI:  Yes, Your Honor.

5         (Pause.)

6         THE COURT:  You have to understand, just as all the

7  participants don't normally practice in this courtroom, so they

8  have to -- this particular technology and whatnot is new.

9                    **REDIRECT EXAMINATION**

10 BY MR. PERRI:

11 Q.   Okay.  Deputy Marshal Hanna, you were asked some questions

12 in connection with a report that the marshal service generated

13 in connection with a May 13th, 2015, phone call, okay.  Now

14 just to give us an idea of the chronology here, you were

15 testifying yesterday that there were actually two visits to the

16 Defendant.  Correct?

17 A.   Yes, sir.

18 Q.   The first one was when?

19 A.   That was in April.

20 Q.   April 13th?

21 A.   April 13th.

22 Q.   In connection with the April 7th letter?

23 A.   The filing, yes, sir.

24 Q.   Okay.  And then you went to see him again, right?

25 A.   Yes, sir.

1  Q.   And that was May 8th?

2  A.   May 8th, yes.

3  Q.   2015.  How does this report pertain, if at all, to the May

4  8th visit?

5  A.   Do you mind if I look over it very shortly?

6  Q.   No.  Sure.

7          MR. PERRI:  May I approach, Your Honor?

8          THE COURT:  Yep.

9          MR. PERRI:  May I approach?

10          THE COURT:  Yes, please.

11  BY MR. PERRI:

12  Q.   This has been marked and admitted as Defendant's Exhibit

13  No. 1.

14  A.   Thank you.

15  Q.   And I apologize, we don't have it in our system, so we

16  can't show it.

17          THE COURT:  Well, you can put it on the elmo.

18          MR. PERRI:  Yes, when I get it back from him.

19          THE WITNESS:  Okay, sir.

20  BY MR. PERRI:

21  Q.   Does that refresh your recollection?

22  A.   It does.

23  Q.   Okay.  And you now have it fresh in your mind?

24  A.   Yes, sir.

25  Q.   Okay.  I'm going take that back from you so I can show it

1  on the machine.

2  A.   Thank you.

3  Q.   So what was the connection then between this phone call

4  and the May 8th visit?

5  A.   The phone call that was placed by JSI Pugh was in

6  reference to a mail filing that Dougherty asked JSI Pugh to

7  look into.

8  Q.   Okay.  So this report references the May 8th meeting,

9  correct?

10 A.   One sentence, yes, sir.

11 Q.   So who called who?  Can you just explain to us?

12 A.   Well, according to the report, Dougherty called in asking

13 for the lead deputy during that visit.

14 Q.   Who would have been?

15 A.   JSI Pugh, Bill Pugh.  And then JSI Bill Pugh called

16 Dougherty back.

17 Q.   So this report is about that phone conversation?

18 A.   Yes, sir.

19 Q.   Where your colleague, Deputy Marshal Pugh --

20 A.   Yes, sir.

21 Q.   -- calls Mr. Dougherty back?

22 A.   Yes, sir.

23 Q.   Okay.  And you have to memorialize these things, right?

24 A.   Yes, sir.

25 Q.   So that results in the generation of what?

1  A.   A field report.

2  Q.   A field report?

3  A.   Yes, sir.

4  Q.   Okay.  And this is standard procedure?

5  A.   Yes, sir.

6  Q.   All right.  So what does Mr. Dougherty, the Defendant,

7  what does he want from Deputy Marshal Pugh?

8  A.   He wants him to investigate what Dougherty alleges as mail

9  fraud for the conspirators for the -- through the postal

10  service of the mail either not getting delivered or not getting

11  delivered correctly.  Some kind of conspiracy through the mail

12  system.

13  Q.   Okay.  So it talks about -- in the report, it talks about

14  fraud; right?

15  A.   Yes, sir, mail fraud.

16  Q.   And what kind of crimes?

17  A.   RICO.

18  Q.   RICO crimes?

19  A.   Yes, sir.

20  Q.   All right.  And RICO crimes are basically?

21  A.   Organized crime.

22  Q.   Organized crime?

23  A.   Yes, sir.

24  Q.   So he wants Mr. Pugh to investigate this?

25  A.   Yes, sir.

1  Q.   And was it just he was just asked or was it stronger than

2  that?

3  A.   According to the report, Bill Pugh says he was ordered.

4  So to me, that's a demand.

5  Q.   Okay.  All right.  And in the course of this phone call,

6  did the Defendant come to a realization -- according to the

7  report, did the Defendant come to a realization about whether

8  or not Deputy Marshal Pugh was going to investigate these

9  alleged crimes as ordered?

10 A.   It says he became agitated when -- during the course of

11 the conversation.

12 Q.   And the next page, I want to refresh your recollection on

13 the next page?

14 A.   Please.

15 Q.   Same exhibit, Defense Exhibit No. 1, second page?

16 A.   Okay, thank you.  Okay, I see it, sir.

17 Q.   By the way, who's allegedly committing these RICO and mail

18 fraud crimes?

19 A.   According to Dougherty?

20 Q.   Yes.

21 A.   The Third Circuit.

22 Q.   The Third Circuit Court of Appeals?

23 A.   Court of Appeals, yes, sir.

24 Q.   Okay.  And have you had a chance to refresh your

25 recollection on that second page?

1  A.   Yes, sir.

2  Q.   Okay.  All right.  So my question then again is, did the

3  Defendant come to a realization during this phone call that

4  Deputy Marshal Pugh had not and did not appear like he was

5  going to investigate these crimes committed by the Third

6  Circuit Court of Appeals?

7  A.   Yes, sir, he did.

8  Q.   What did he say?

9  A.   He said, according to the report, that since he did not

10 investigate the mail fraud, Deputy Pugh did not investigate the

11 mail fraud, and RICO allegations, that he, Dougherty, is now --

12 or Pugh, excuse me, is now part of the conspiracy and will be

13 listed as a co-conspirator.

14 Q.   Listed as a co-conspirator.  Was there any further

15 discussion after that?

16 A.   No.  It says, Dougherty terminated the phone call.

17 Q.   Okay.  Now this stuff about this Darby person in the

18 District of Columbia, do you know anything about that?

19 A.   No, sir.

20 Q.   Were you investigating any kind of alleged threats by Mr.

21 Dougherty or anybody else involving this Darby person?

22 A.   No, sir.

23 Q.   And to be clear, Harrisburg is here in the Middle District

24 of Pennsylvania, and DC is over there?

25 A.   Yes, sir.

1  Q.   Okay.  Do you know -- I know you didn't write this report,
2  but since you were asked about it, do you happen to know what
3  this missing mailing refers to?
4  A.   No, I don't, sir.
5  Q.   And since you were asked again about the incident at the
6  clerk's office, could you please tell us again what was your
7  understanding from the reports and the accounts of your
8  colleagues, and I know you referenced several witnesses to that
9  event, what was your understanding of what happened there?
10 A.   My understanding from what I was told from my counter
11 parts was Mr. Dougherty and a male counterpart came into the
12 Federal Building, went to the 10th floor to the clerk's office
13 to try to file something with the clerk's office.  It did not
14 go the way Dougherty wanted it to go, and it got heated.
15 Voices got raised.
16     The court security officers tried to calm the situation
17 and remove him, you know, asked him to leave.  I don't know if
18 one of them or both of them refused, I don't know that
19 information.  But they did not leave, so the Marshals were
20 called and then they were escorted separately out of the
21 building.
22 Q.   Okay.  Do you know anything about transfers between judges
23 on civil cases?
24 A.   No, sir, no.
25 Q.   You're a deputy marshal, right?

1  A.    Yes, sir.

2  Q.    Do you have anything to do with the decision to transfer a

3  case from one judge to another?

4  A.    None.

5  Q.    So if the Defendant says to you in his question, and, in

6  fact, blah, blah, blah, and, in fact, blah, blah, blah, and do

7  you know if, in fact, that this happened, you don't know if

8  that's a fact, do you?

9  A.    No, sir, no.

10  Q.    Because you don't know anything about what he's talking

11  about?

12  A.    No, sir.

13  Q.    I'd like to show you what's been marked and admitted as

14  Defendant's Exhibit No. 2.  Please tell us what that is for the

15  record.  I know it's only one page.

16  A.    Sure.  It is the page 2 of 3 of a report filed by Deputy

17  U.S. Marshal Matthew Hartman.  The date of report is 5/18/2015.

18  The subject is Keith Dougherty.  And it appears to be just a

19  summarization of facts found during Matthew Hartman's accept of

20  the case.  It was transferred internally in our office.

21       It was transferred to Matthew Hartman after my initial

22  contact, two contacts with Keith Dougherty.  So this was his

23  just recap of what he has found in the investigation to start

24  his own, like the end of my investigation and beginning of his.

25  It's just a summary of what the facts are in the case so far.

1  Q.   Because you indicated in your previous testimony that

2  after your visits with him, it wasn't a done deal, the case

3  stayed open; right?

4  A.   Correct, sir.

5  Q.   Okay.  So this is just another deputy marshal assisting in

6  an ongoing investigation.  Is that fair?

7  A.   Yes, sir.  He actually took over as the lead for a little

8  bit.  He was -- he was another senior of mine.  He was much

9  more well-versed in threat cases.  And it was decided that this

10  was a good case for a more experienced investigator at the time

11  to take control of.

12  Q.   Okay.  Yesterday in your testimony, you gave some

13  information about the deterioration of the Defendant's personal

14  circumstances?

15  A.   Yes, sir.

16  Q.   Does that report talk about that?

17  A.   It does.

18  Q.   Okay.  So you're familiar with that report, and you're

19  aware of it, and it encompasses some of the information that

20  you gave yesterday?

21  A.   Yes, sir.

22        MR. PERRI:  May I have a moment, Your Honor?

23        THE COURT:  Sure.

24        (Pause.)

25  BY MR. PERRI:

266

1  Q.   Are you able to read that last paragraph there?

2  A.   Yes, sir.

3  Q.   Could you please read it?

4  A.   Yes, sir.  Although Dougherty has denied the intent to

5  cause physical harm to any USMS protectee, the strong language

6  used in this IC --

7  Q.   What's an IC?

8  A.   Initial contact, combined with Dougherty's probable

9  financial difficulties and his confrontational demeanor with

10 the USMS personnel, lead investigators to believe that further

11 protective investigations is needed.

12          MR. PERRI:  Thank you, Your Honor.  No further

13 questions.

14          THE COURT:  All right.  You may step down.  Thank

15 you.

16          MR. DOUGHERTY:  Do I?

17          THE COURT:  No.  We have direct, and we have cross,

18 and we have redirect, that's it.  Thank you.  All right.  Next

19 witness.

20          MR. PERRI:  Judge, at this time the United States

21 calls the Honorable Christopher Conner.

22          THE COURT:  Okay, thank you.

23    **CHRISTOPHER CHARLES CONNER, GOVERNMENT'S WITNESS, SWORN**

24          COURTROOM DEPUTY:  Please state your full name for

25 the record.

1          THE WITNESS:  My name is Christopher Charles Conner.

2                    **DIRECT EXAMINATION**

3    BY MR. PERRI:

4    Q.   Good morning.

5    A.   Good morning.

6    Q.   Sir, would you please state your name for the record?

7    A.   Yes.  Christopher Charles Conner.

8    Q.   And what is your occupation?

9    A.   I am a federal judge.

10   Q.   Okay.  How long have you been a judge?

11   A.   I received my commission on August 2nd, 2002, so I'm in my

12   20th year.

13   Q.   Okay.  And what's your work experience prior to that?

14   A.   I spent 20 years working in private practice for a law

15   firm in Harrisburg.

16   Q.   Judge, may I call you Judge?

17   A.   I answer to many things, that's fine.

18   Q.   In which district are you a judge?

19   A.   In this district.  My courtroom is actually right across

20   the hall.

21   Q.   Judge, do you do civil cases or criminal cases or both?

22   A.   I do both.  I have -- at any given time, I have somewhere

23   between 500 and 600 cases; about half are civil and half are

24   criminal.  I just checked, and I have about 280 civil cases

25   pending right now, and I have about 280 pending criminal

1  defendants.

2  Q.   Okay.  So, Judge, I want to ask you, going back to May of

3  2017.  Do you recall receiving a worrisome letter in the mail?

4  A.   I do.

5  Q.   Is it unusual for a judge to receive letters that are

6  threatening or have problematic language in them to raise your

7  concern?  Like how often does this happen?

8  A.   Very rarely.  It does happen.  I've probably received what

9  I would consider to be threatening communications on maybe a

10  half a dozen times in my 19 plus years on the bench.

11  Q.   Okay.  And how did this one come to your attention?  Like

12  practically speaking?

13  A.   This one was brought to me by my career law clerk,

14  Stefanie Mekilo.  And she handed it to me and said, you know, I

15  think you need to take a good hard look at this.

16  Q.   How do you spell Stefanie's last name?

17  A.   M-E-K-I-L-O.

18  Q.   Okay.  And based on either the letter or the envelope

19  itself, who was this letter apparently from?

20  A.   Mr. Keith Dougherty.  And I believe the address was in New

21  Jersey.

22  Q.   Okay.

23  A.   The return address.

24  Q.   Okay.  Based on what you saw on the envelope?

25  A.   Correct.

1  Q.   Okay.  Judge, is this one where, you know, somebody opens

2  your mail and just tells you, hey, you know, we received this,

3  or did you actually read it yourself?

4  A.   Oh, no, I read it myself.  I am a reader.  I read just

5  about everything that is filed in my cases, and it's just

6  something that I do.  I endeavor to read just about everything

7  that's presented.

8  Q.   Okay.  All right.

9       MR. PERRI:  Your Honor, may I approach?

10      THE COURT:  Yes.

11 BY MR. PERRI:

12 Q.   Judge, I'd like to show you what's been marked for

13 identification purposes as United States Exhibit 1-A and United

14 States Exhibit 1-B.  Could you please take a moment and look at

15 these?

16 A.   Sure.

17 Q.   And flip through them.  And I'm going to ask you if you

18 recognize them?

19 A.   Yes.  This is the correspondence I received in May of

20 2017.

21 Q.   Do those appear to be fair, accurate, and correct copies

22 of what you received and reviewed in your chambers?

23 A.   It is.

24 Q.   Okay.  I want to ask you some questions first about the

25 photocopy of the envelope, that's United States Exhibit 1-A?

270

1  A.    Okay.

2  Q.    Okay.  Does it indicate on there the sender?

3  A.    Yes.  The sender is Keith Dougherty at 1134 South Black

4  Horse Pike, Number 113, Blackwood, New Jersey, 08012.

5  Q.    Okay.  And what kind of envelope was this?  Was this like

6  one of those cardboard Express Mail type things?

7  A.    Correct.

8  Q.    Priority Mail perhaps?

9  A.    Correct.

10  Q.    Okay.

11         MR. PERRI:  Your Honor, at this time we would move

12  for the admission of United States Exhibit 1-A, the envelope,

13  and United States Exhibit 1-B, which is the letter on which

14  Count 1 is based.

15         MR. DOUGHERTY:  No objection.

16         THE COURT:  No objection, they're admitted.

17  BY MR. PERRI:

18  Q.    Could we please publish 1-A?  Could you turn it around,

19  please?  Judge, you probably understand this technology a lot

20  more than I do, but I'm going to circle a few things and you

21  can circle stuff also by using your finger and touching the

22  screen?

23  A.    All right.

24  Q.    So could you please indicate the address and name of the

25  sender?

271

1   A.   You want me to read it or --

2   Q.   If you could circle it?

3   A.   Circle it.  (Complied.)

4   Q.   Can we expand that, please?  Okay.  And thank you.  And

5   then can we also show the address?

6   A.   I thought you wanted me to circle it.

7   Q.   I did.  Okay.  Is that you, Judge?

8   A.   It is.

9   Q.   And is that your address here at the Federal Building?

10  A.   It is.

11  Q.   And mail sent to that address, where does it go exactly?

12  Does it go to your chambers?

13  A.   Yeah, it will eventually find its way to my chambers.  But

14  first it goes through a screening process.  Ever since the

15  anthrax issues came up, all of our mail is screened, x-rayed,

16  and checked for any potential harmful issues or contents.

17  Q.   Okay.  Thank you, all right.  Judge, so you had a chance

18  to read that letter?

19  A.   I did.

20  Q.   And what was your reaction?

21  A.   I thought it was incredibly disturbing.  I thought it was

22  a direct threat and a threat that needed immediate attention.

23  Q.   Did you take it seriously?

24  A.   Very.

25  Q.   Did you take any steps based on your impression of the

272

1  letter?

2  A.   I did.

3  Q.   Okay.  Could you tell us about that?

4  A.   Well, first I have to say, specifically I believed it to

5  contain specific threats of death to various judicial officers.

6  And when you get communication like that, and I've never gotten

7  one like this one before, my first reaction was, I need to

8  notify the marshal service right away.

9  Q.   Okay.

10  A.   I don't know if I had -- if I asked my career clerk to

11  contact the marshal service or if I did it directly.  But I

12  know in short order, I met with the marshal service and our

13  judicial security officer to discuss this the very day I

14  received it.

15  Q.   So it's not like you put it aside and attended to other

16  things for a week or two or something like that?

17  A.   No.  This had my full attention immediately and for the

18  better part of the day.

19  Q.   For the better part of that same day?

20  A.   Yes.

21  Q.   Okay.  And is there a procedure in place for when this

22  kind of thing happens or did you just start with the Marshals

23  and hoped that they would take it from there?

24  A.   Well, there really isn't a procedure in place, it happens

25  so rarely.  But in this particular situation, because of the

1  circumstances, I did several things.  First, I communicated
2  with the marshal service.  We talked about who needed to be
3  notified about this communication.  And that included a variety
4  of officials.
5      I also communicated with my colleagues, specifically the
6  colleagues who were named in the letter, who I thought may have
7  received a similar correspondence or some similar
8  communication.  And so I immediately contacted all of the
9  judicial officers that were identified in this communication
10 who work in this courthouse and asked them, you know, what did
11 they know, did they receive any similar communication.
12 Q.  Okay.  If I could just stop you there, please.  May we see
13 the last page of the letter?  1-B.  That's going to be page
14 number 15 of the letter.  Okay.  Could we highlight that bottom
15 part there?  All right.
16     Judge, you were just talking about how you made some phone
17 calls to other judges.  How did you understand this cc here?
18 What did you understand that to mean?
19 A.  Well, these are basically state and federal judges that
20 I'm assuming received this communication.  And I immediately
21 contacted those in this building, which are on the cc;
22 Caldwell, Jones, and Carlson.
23     Caldwell is William Caldwell, he's a deceased judge from
24 this district.  Jones is John E. Jones, III, who is a retired
25 judge from this district.  And Carlson is Martin Carlson, who

274

1   is a magistrate judge in this district.

2   Q.   Okay.  And how did you understand that check mark next to

3   your name there?

4   A.   I assumed that this was my copy of that particular

5   communication.  And the same thing is true in 1-B I received.

6   There's a -- the communication I received, the death threat

7   that I received had a check mark next to my title, which at the

8   time was Chief Judge of the Middle District of Pennsylvania.

9   Q.   Okay.  Are you familiar with some of these other names;

10  Simandle, Donio, Rendell, all of these others?  Can you tell us

11  who they are?

12  A.   Yes.  Simandle is Jerry Simandle, who was formerly a

13  district judge in New Jersey and, unfortunately, passed away.

14  I don't know who Donio is.  Rendell is Marjorie Rendell, a

15  senior Third Circuit judge.  Jordon, I believe, is misspelled,

16  it should be J-O-R-D-A-N, but that's a reference, I believe, to

17  Kent Jordan, who is an active judge on the Third Circuit Court

18  of Appeals.

19       Scirica is Tony Scirica, who is also on the Third Circuit

20  Court of Appeals.  Chasanow, I'm not familiar with.  Motz is a

21  reference to, I believe, J. Frederick Motz, who is a senior

22  judge out of Maryland, who was assigned some of the litigation

23  that was generated by Mr. Dougherty.  Ebert is, I believe, a

24  reference to Judge -- former Judge Skip Ebert, who was a trial

25  judge, I believe, at the time in Cumberland County Court of

1  Common Pleas.

2      Eby, I believe, is a reference to Robert Eby, who is a

3  senior judge in Lebanon County, he may be retired now, I'm not

4  sure.  Linebaugh is a Common Pleas judge, I believe, in York

5  County.  And Ragonese, I don't recognize.

6  Q.   Okay.  How about Chief Judge Smith?  Do you recognize that

7  name?

8  A.   I do.  Chief Judge Smith is a reference to Judge -- Chief

9  Judge Brooks Smith, who is just about to end his term as Chief

10  of the Third Circuit Court of Appeals.  And the brackets around

11  the word McKee is a reference to Ted McKee.  Ted was the Chief

12  Judge prior to Brooks Smith taking over that position.

13  Q.   Okay.  Thank you.  All right.  So you made these phone

14  calls and you got in touch with the Marshals.  And you actually

15  had a face-to-face meeting with the Marshals?

16  A.   I'm certain I did.  I don't have a specific recollection

17  of it, but I am certain I did.

18  Q.   And you think it would have been the same day?

19  A.   Absolutely.

20  Q.   Okay.

21  A.   As I said, this was the day.  It was all about what to do

22  as a result of this correspondence.

23  Q.   Okay.  And, Judge, I want to ask you, did you take any

24  precautions personally?

25  A.   I did.

276

1  Q.   In terms of your personal life, after having received --
2  as a result of having received this letter?
3  A.   I did.  The marshal service is, in addition to many of
4  their roles to capture fugitives, to transport prisoners, they
5  also are in charge of protecting the federal judiciary.  And
6  through the marshal service, through my meeting with the
7  marshal service, we made contact with the Harrisburg City
8  Police Department, which is -- I was living in the City of
9  Harrisburg at the time in the Shipoke neighborhood, and I had
10  -- I had a concern about possibly being located in that
11  neighborhood.  And so I asked the City police department to
12  keep an eye out in that particular vicinity.  And they did.
13  Q.   Judge, what about within your family?  Did you take any
14  precautions within your family?
15  A.   I did.  As I've said, I've received a number of threats in
16  not what I would describe as urgent or direct threats, but
17  that's what I considered this to be.  And out of the other
18  threats that I received, this is the only one where I notified
19  my kids that a threat had been received.
20      And I notified them specifically of who made the threats
21  and what whatever identification information I had at the time;
22  license plate numbers for any cars that Mr. Dougherty may have
23  been driving, that I probably received, I'm sure, from the
24  marshal service.
25  Q.   So you've been a judge for quite a long time.  How many

1  times in the past have you had to do that?

2  A.   Never.

3  Q.   Judge, you indicated that this letter appeared to be from

4  a Keith Dougherty.  Correct?

5  A.   Correct.

6  Q.   Did you recognize that name?

7  A.   I did.

8  Q.   How?

9  A.   Mr. Dougherty was known to me.  And interestingly enough,

10  I did not have any of his cases.  But he was known to me -- I

11  shouldn't say that.  I had cases that were initially assigned

12  to me that were reassigned out of our district because of

13  conflicts that were created when he filed other litigation that

14  my colleagues had been handling.

15       And so I never issued a substantive order in any case that

16  Mr. Dougherty filed in our district.  The only basis for his

17  communications to me, as far as I could tell, had to do with my

18  role as Chief Judge at that time.

19       But he was known to me because of an altercation, a verbal

20  altercation that took place while I was Chief Judge on the 10th

21  floor of our courthouse.  And the marshal service alerted me to

22  that.  And I was aware that from my colleagues that he was a

23  pro se litigant that had created a number of conflicts for our

24  court, which is why the matters had to be transferred out of

25  our district because of claims against individual judicial

278

1  officers.

2       And the theory is that if you're a judicial officer who is

3  being sued in your court, it's not a matter that you can handle

4  that.  That's not always true, but in this particular case,

5  there were so many claims that he was raising, we felt it

6  prudent to send it out of district.  And my predecessor Chief

7  Judge started that process.

8  Q.  And what was that judge's name?

9  A.  Judge Yvette Kane.  And my -- I looked at the dockets.

10 There are four cases that Mr. Dougherty filed in our district

11 that my name was associated with.  Two of them were transferred

12 out of district before I became Chief Judge.  One was

13 transferred after I became Chief Judge.  As I said, I never

14 issued an order, a substantive order in any of those cases.

15 The fourth case, the fourth case, I was named as a Defendant.

16 And, of course, that was also transferred out of the Middle

17 District.

18 Q.  So you never made any rulings against this individual

19 personally?

20 A.  I did not.  Not to my knowledge.

21 Q.  You never had any personal dealings?  You had never met

22 him, right?

23 A.  I had not.

24 Q.  Okay.  But you were aware of an incident that occurred at

25 the clerk's office?

1    A.    I was.

2    Q.    So at the time you are reading this letter, is that in the

3    back of your mind?

4    A.    It is.  And I also knew from my colleagues that the

5    impression that I had as Chief Judge and the reason we were not

6    in a position to handle his litigation is that his rhetoric had

7    been becoming more aggressive.  And the sense was that he was

8    someone who really should be handled by a judge out of this

9    district.

10   Q.    Okay.

11   A.    Or judges out of this district.

12   Q.    Okay.  All right.  And the fact that you were aware that

13   he had been physically present in this building, your building,

14   in this incident at the clerk's office, how did that factor

15   into the situation, the circumstances?

16   A.    Well, it was a combination of factors, that being one of

17   them, that caused me concern about the nature of this

18   correspondence.  And as you go through it in more detail, it

19   became readily apparent to me that Mr. Dougherty intended to

20   communicate a direct threat because he was disgruntled with the

21   manner in which his claims and his cases had been handled in

22   our court and in other courts.

23   Q.    So what does he want from you?  Did you get a sense of

24   what it was that he wanted from you such that --

25   A.    In general?

280

1  Q.   Such that he's sending you this letter?

2  A.   In general, he has a misconception of the role of Chief

3  Judge.  I have no authority as Chief Judge -- or I had no

4  authority, my term ended in 2020, it's a seven-year term.  I

5  have no authority over the cases that other judges are

6  handling.

7       The authority of the Chief Judge -- and one of my late

8  dear colleagues described the role as Chief Judge as being

9  first among equals.  But cases are individually handled.  And

10 if there are any particular issues with an individual judge's

11 ruling, the Chief Judge has absolutely no power to change those

12 rulings.  That power comes from the appellate courts, that's

13 what an appeal is all about.  So these cases are individually

14 assigned.

15      The Chief Judge's role is simply administrative.  We

16 handle policy matters.  We handle personnel matters.  And we

17 represent the court in certain ceremonial proceedings and in

18 certain policy committees and conferences.

19      But ironically in this particular case, I think what Mr.

20 Dougherty wanted me to do, to answer your question, is to

21 somehow overrule the decisions he had received from my

22 colleagues and other judges and to chastise them or sanction

23 them for the behavior that led to their decisions.

24 Q.   Do you happen to know if there was a judge in the Western

25 District of Pennsylvania named Joy Flowers Conti that was

1  handling any of Mr. Dougherty's cases?

2  A.    I do.

3  Q.    Now we kind of touched on this already, but why would a

4  judge in the Western District of Pennsylvania -- that's

5  Pittsburgh, right?

6  A.    Correct.

7  Q.    Be handling a case from here?

8  A.    Well, the same reason that Judge Motz was handling some of

9  Judge -- Judge Motz, Judge Conti, and I believe for a brief

10 period of time Joel Slomsky, a judge out of the Eastern

11 District, handled litigation.

12      And that is when you're requesting that another judge out

13 of district handle a matter, the Chief Judge of the District

14 Court goes to the Chief Judge of the Circuit and requests an

15 out-of-District assignment.  And it's up to the Chief Judge to

16 decide where that case goes.

17      And typically they'll call up the chief judges of the

18 various district courts and find out who is really swamped and

19 who is capable of handling some additional litigation.  And

20 they basically ask the Chief Judge to randomly assign the

21 matter, and then the case is transferred.

22 Q.    Okay.

23 A.    Now if it goes out of Circuit, which is the case of

24 transfer to Judge Motz, I think that requires the -- actually

25 requires action by the U.S. Supreme Court.  And I think those

282

1  out-of-Circuit assignments go through the Administrative Office
2  of U.S. Courts from the Court of Appeals and actually requires
3  designation by the Supreme Court.
4  Q.   So that's how Judge Conti ended up working on a case
5  involving this Defendant?
6  A.   Correct.
7  Q.   Okay.  Judge, was there anything about the writing style
8  that caught your attention as you read this letter?
9  A.   Well, everything caught my attention.  If you want me to
10 go through it, I certainly can.  But in terms of the writing
11 style, what I found disturbing, I guess, beyond the actual
12 death threats, was the back and -- the manner in which it's
13 written.  There are quotation marks everywhere.  There are
14 ellipsis.  There are citations to biblical verses and
15 constitutional amendments and sound bytes from cases.  And it's
16 very difficult to tell what is Mr. Dougherty's writing, what is
17 actually a quote, and what is maybe just a paraphrase.
18 Q.   Were you able to ascertain a cogent progressive thought
19 process that developed and ran through the writing?
20 A.   Honestly, no.
21 Q.   Okay.  Was that in and of itself a concern for you?
22 A.   It was.
23 Q.   Why?
24 A.   Well, I didn't find it -- I didn't find it to be the
25 product of someone who was capable of understanding the need

1  for accuracy in his communications and the need for a

2  substantive communication.  I receive letters all the time from

3  pro se litigants.  As I said, I'm a reader, I read what I

4  receive.

5      And typically, they're asking for something that you can

6  either grant or deny, but at least you know precisely what it

7  is that they want as a result of the correspondence.  This

8  correspondence, I got the gist of it, and I think the gist of

9  it, I described, that he wanted me to overrule other decisions.

10  But it's a varied stream of consciousness communication is

11  probably the best way I could describe it.

12  Q.   Judge, at this point now I'd like to show the letter on

13  the screen and kind of go through it with you and ask you about

14  individual parts so that we can understand the situation that

15  was presented?

16  A.   Sure.

17  Q.   Can we highlight the top, the caption sort of there?

18          THE COURT:  You all doing all right?  Do you need any

19  restroom breaks or anything?  Just indicate, okay?

20          (Technological issues.)

21          THE COURT:  Okay, let's do that, let's take our

22  mid-morning break then.  We'll hope we can be back in maybe 10

23  minutes.  All right, thank you very much.

24          COURTROOM DEPUTY:  All rise.

25          (Jury left for a recess at 10:16 a.m.)

1          THE COURT:  We'll take a mid-morning break so we can

2    go through lunchtime.  Can the U.S. Attorney's office, can you

3    practice on the machine?  I know it's new equipment.  But maybe

4    take the lunch break as well to go over and practice, because

5    we need to kind of scoot things along.  All right?  Mr. Young?

6          MR. YOUNG:  Judge, I don't mean to change anything,

7    but would it make sense for us to briefly talk to Mr. Dougherty

8    before cross examination begins to see if he wishes to maybe

9    take a different direction by any chance?

10          THE COURT:  You mean with counsel?

11          MR. YOUNG:  No, not with counsel.  I mean, making a

12    decision about changing where he's headed with this?  Just to

13    ask, you know, just briefly.  It's to go over his options.

14          THE COURT:  It's probably a very good idea.  So we'll

15    do that.  Okay, Wendy, we'll take a break.

16          (Recess was taken at 10:18 a.m. and proceeding

17            reconvened at 10:32 a.m.)

18          THE COURT:  Mr. Dougherty, I just feel obligated, as

19    a judicial officer, because we've been through many, many, many

20    hearings together, and I don't know if you had a chance to

21    speak with Mr. Young or just to have some thoughts, but there's

22    repercussions, obviously, for turning down the plea offer that

23    was offered to you by the Government.  That's behind us.

24          But going full through a trial has potential

25    repercussions.  You have every right in the world, you have a

285

1   constitutional right to a trial by jury.  But obviously, if you

2   were to be convicted, a concern or a consideration at

3   sentencing, obviously, is what you've put the Government

4   through and you've put the Court through.

5           And so I just want to make sure you had a full

6   opportunity to discuss with Mr. Young the implications of

7   continuing forward with the trial.  Did you have that

8   opportunity?

9           MR. DOUGHERTY:  Yes, I did.

10          THE COURT:  Okay.  All right.  All right.  Let's

11  proceed.  Judge, do you want to come back up.

12          (The witness resumed the stand.)

13          (Jury was brought in at 10:35 a.m.)

14          THE COURT:  You may be seated.  Mr. Perri.

15                   **DIRECT EXAMINATION (CONTINUED)**

16  BY MR. PERRI:

17  Q.   May we see the first page of United States Exhibit 1, the

18  letter to Judge Conner?  Okay.  Judge, before we took the

19  break, we were starting to discuss the letter itself.  And I

20  was going to ask you some questions about the wording and the

21  language in the letter itself.

22          Could we start at the top, please, and highlight that?

23  Okay.  And also the whole top of the page, please.  So who's

24  this letter addressed to, at least by the caption there, Judge?

25  A.   Satanopher Conner, Chief Judge, Middle District of

286

1  Pennsylvania.  The check mark is the mark that I indicated
2  earlier.
3  Q.   AND how did you understand the name Satanopher?
4  A.   Satanopher.  I assumed that what he was -- what Mr.
5  Dougherty was doing was removing the C-H-R-I-S-T from
6  Christopher and plugging in Satan instead of Christ.  And I
7  wasn't necessarily troubled by that -- that's the first thing
8  that I read.
9       I wasn't necessarily troubled by that, I've been called
10 worse.  And it's sort of the nature of the job that we have as
11 federal judges, that you're gonna upset some people in your
12 decisions.  You can't make everybody happy.  And I learned
13 early on that you have to have a relatively thick skin.  So I
14 wasn't necessarily troubled by that.
15      I did note it and I thought it was, obviously, at least in
16 the first instance, disrespectful.
17 Q.   Okay.  But he seems to have gotten your title right, is
18 that correct?
19 A.   He did.
20 Q.   Chief Judge, Middle District of Pennsylvania.  And the
21 check mark that you referred to.  Who is Ebert?
22 A.   That is Judge Ebert from the Court of Common Pleas of
23 Cumberland County.  And Eby is, as I mentioned earlier, Robert
24 Eby, who I believe is a -- I believe that to be a reference to
25 the trial judge in Lebanon County.

1  Q.   Okay.  And then what does it say next as kind of like a

2  heading?

3  A.   It says, Re:  Execution orders, in quotation marks,

4  pending.

5  Q.   Okay.  And how did you understand that?

6  A.   I wasn't sure when I first read it.  After I read the

7  letter, I had a very clear interpretation of what that meant.

8  But at the time, execution orders, the word execution can mean

9  several different things.  But in this particular context,

10 after reading Satanopher and then seeing execution orders, my

11 concern was that it was a reference to execution as in

12 execution by death.  That was my concern.

13 Q.   How about the date?  Is that relatively close to when you

14 would have actually opened the envelope and read the letter?

15 A.   Yeah, I believe I received this on May 11th, because my

16 recollection is, that is the day I met with the marshal

17 service.  So I probably received this within the week of the

18 date.

19 Q.   Okay.  Can we show the whole page now, please?  All right.

20 Would you enlarge paragraph number 1?  And paragraph number 2?

21 Together.  Judge, there's some terms here.  What does mandamus

22 refer to?

23 A.   Mandamus is a procedure or a process by which you require

24 someone to act.  And so you seek a writ of mandamus.  And it's

25 typically to require that an official, a government official or

288

1  a judicial officer take appropriate steps to execute their

2  duties and responsibilities.

3  Q.   And what connection does that bear in light of the larger

4  context of the letter and your role as Chief Judge?  Does that

5  have any significance for you?

6  A.   Well, it did not at the very first instance.  Now I know

7  that this apparently is some reference to perhaps what he

8  perceived to be my authority to require other judicial officers

9  to conform to what he believes the law to be.

10  Q.   And this reference to *Marbury versus Madison*, does that

11  ring a bill bell for you, Judge?

12  A.   It sure does.  That's a seminal Supreme Court decision

13  that had to do with the right of review, judicial review.  And

14  it was basically the opinion that allowed the federal judiciary

15  to review acts of Congress executive orders for their

16  compliance with the constitutional provisions; in other words,

17  a view of congressional statutes to determine if they were, in

18  fact, constitutional.

19  Q.   And I'm embarrassed to say, but my memory is lacking as to

20  the date of that decision.  That goes back to like the very

21  early 1800's, doesn't it?

22  A.   It does.

23  Q.   Okay.  All right.  Can we see the full page again, please?

24  A.   And if I could make one other observation?  You've skipped

25  over, the basis is as follows.  I've learned after reading the

289

1  entire correspondence that my view of this and the subject

2  matter, execution orders pending, was that this was his

3  justification for his threat.

4  Q.   So that's how you --

5  A.   In other words, that this was his basis for communicating

6  death threats.

7  Q.   Okay.  So you interpreted that as him laying out his

8  reasons or his justifications for what he wants?

9  A.   Correct.

10 Q.   Okay.  May we see and an enlarged version of Number 3?

11 Judge, would you please read this paragraph?

12 A.   When as in the writ of cert a Petitioner can demonstrate,

13 he exhausted his remedies, when referencing the inferior

14 tribunals, the second amendment is authorization to execute any

15 judge or judges who have voided the petition clause,

16 especially, or e-s-p, in stand your ground law states.

17 Q.   Judge, what did that mean to you?

18 A.   I viewed it as a disturbed justification for executing

19 judges who, in the minds of the Petitioner, has not employed

20 appropriate efforts to enforce the petition clause or to

21 protect the petition clause.

22 Q.   Judge, are you familiar with the phrase exhaustion of

23 remedies?

24 A.   I am.

25 Q.   And what's the basic understanding of that?

1  A.   Well, exhaustion of remedies typically applies in
2  situations where you have administrative remedies.  In certain
3  situations, it comes up a lot in the prisoner litigation, they
4  are required to exhaust administrative remedies, which means
5  they have to go through the Bureau of Prisons administrative
6  review process if they have complaints about particular matters
7  before filing a civil claim in federal court.
8       Exhaustion of remedies in this particular case, honestly,
9  I don't know why that is in there.  It is a bit of a non
10 sequitur to me.  By that, I mean illogical reference.
11 Q.   So is it fair to say that exhaustion of remedies means you
12 have to go through these steps first before you can take this
13 measure there?
14 A.   Correct.
15 Q.   All right.  May we see the full page again?
16 A.   It's essentially a pre-condition to taking the next step
17 in the litigation process.
18 Q.   And then in paragraph 4, can we see that?  There's a
19 reference to a militia.  Correct, Judge?
20 A.   Yes.  This is essentially a quote of the second amendment.
21 And it states that, A well-regulated militia being necessary to
22 the security of a free state, the right of the people to keep
23 and bear arms, shall not be infringed.
24      And I believe that to be an accurate quote of the second
25 amendment.

1  Q.   May we see paragraph number 5?  Now that paragraph kind of

2  continues onto the next page.  But, Judge, would you please

3  read that for sentence?

4  A.   The security of a free state requires the death of any

5  judge who will not honor the constitution.

6  Q.   And then the Defendant inserts like kind of a quote,

7  correct?  Do you recognize where that might be from?

8  A.   I'm sorry, which quote are you talking about?

9  Q.   The one that's --

10 A.   The biblical reference?

11 Q.   Deuteronomy?

12 A.   Yeah, Deuteronomy.  I'm assuming this is a reference to a

13 biblical passage in the book of Deuteronomy.  He references the

14 New King James version.  And I found this to be disturbing

15 because now we have a reference to a militia, then a

16 justification that the security of a free state requires the

17 death of any judge who will not honor the constitution.  And

18 then we're in a biblical passage.  And those connections are,

19 in my mind, a clear threat.

20 Q.   Does this language, which may or may not be a quote from

21 the Bible, suggest to you at all or to any extent that this

22 person, this author, feels a religious -- that he would be

23 justified from a religious point of view in doing this?

24 A.   I think you could -- I think you can -- I took this entire

25 correspondence as justification for what Mr. Dougherty wanted.

1  And that includes references to what a militia can do or what

2  he believes a militia can do.  Everything is about what Mr.

3  Dougherty believes.

4       And the use of quotation marks here and there, it's really

5  unclear as to whether they are actual quotes or not actual

6  quotes, whether they're taken out of context, or they're

7  accurate quotations.

8       And this biblical passage together with all of the other

9  references that he has in the correspondence, to me, are his

10 justification that he can, in fact, direct his militia to

11 execute federal judges who did not abide by what he believes to

12 be appropriate constitutional principles.

13 Q.   Okay.  And so the record is clear as to what we're

14 referring to, would you please read the sentence that starts

15 with, 12 now.  And it goes to the next page?

16 A.   12 now the man who acts presumptuously and will not heed,

17 who stands to minister there before the Lord your God, or the

18 judge, that man shall die.

19 Q.   Thank you.  All right, so --

20 A.   I would also note that throughout this correspondence,

21 there's profanity and there's hate speech.  And so when you

22 asked me earlier what, you know, what all raised my eyebrows,

23 what caused me concern, what made me spend a day trying to

24 address what I considered to be a very serious security threat,

25 it's a combination of all of those things.  And the biblical

1  passages or portions of biblical passages, the death threats,
2  and the hate speech all led me to believe that this was a
3  clearly intended threat.
4  Q.   Okay.  Have you -- let's see the entire page.  All right.
5  Judge, I don't want to go into a lot of detail, but what did it
6  appear to you that he was doing there on the rest of that page?
7  A.   I really honestly did not follow this page particularly
8  well.  There's a reference to Hobby Lobby stores, *Sebelius*.
9  There is an opinion that involved Gorsuch, Kelly, and
10 Tymkovich, who I recognize as being 10th Circuit Court of
11 Appeals judges.
12     And then there's some sort of reference to Mother Brady,
13 Sara, and Larry, II.  And I frankly did not follow all of this
14 page.  I really did not -- I did not understand it to be
15 communicating anything directly to me.  It just seemed to be
16 part of that stream of consciousness approach that his writings
17 tend to have.
18 Q.   Okay, thank you.  May we see the next page?  And again,
19 here just generally, what appears -- what is it that he has
20 sort of cut and pasted into this writing?
21 A.   Well, at the end of the prior page, there was a reference
22 to, I thought it was Judge Ebert.  And this appears to me to be
23 a cut and paste of part of a transcript.  And --
24 Q.   Involving one of his cases?
25 A.   Involved one of his cases.  But there are inserts.  So

294

1  when he references President Judge Hess, who was the President
2  Judge of the Court of Common Pleas of Cumberland County in
3  Carlisle, he said something to the effect of where President
4  Judge Hess dismissed some frivolous motion.
5       Then there is in brackets, Hess is a lush who could not
6  spell his name after lunch on most days.  So clearly, that's
7  not part of the transcript.  That's his insertion, his being
8  Keith Dougherty's insertion.
9  Q.   Would you please expand that bracketed sentence there
10 towards the bottom?
11 A.   Yes, this is the sentence I was just referencing.
12 Q.   All right.  May we move to the next page, please, page 4?
13 And again, Judge, just generally, so we can understand the
14 situation presented to you, what did it appear that is going
15 on, on that page generally to the best that you could tell?
16 A.   Well, the first part of that page, I believe, is still a
17 reference to apparently a transcript of a case that was pending
18 in Cumberland County Court of Common Pleas.  And then there's
19 some reference to Exhibit A.  I did not follow this part.
20      But it appears as though it's his recitation of case law
21 that he believes somehow is relevant to what he wants from me.
22 And I honestly found it to be a series of non sequiturs and not
23 logically followed.
24      If anyone has played a musical instrument, some of the
25 approach of his various verses and citations are almost like a

1 staccato.  That's what it reminds me of.  It's just a series of

2 sound bytes.

3 Q.   Okay.  And does he appear to be referencing some prior

4 litigation issues that have involved him?

5 A.   Yeah.  I believe that the transcript had something to do

6 with his efforts to represent one of his friends or one of his

7 debtors or family members in litigation.  And the gist that I

8 got was that there were problems in him representing or ghost

9 writing on behalf of his friend in Cumberland County.

10 Q.   Just as far as you could tell, just someone who's just

11 picking this up for the first time not having been involved in

12 any of his prior cases or prior dealings or business concerns,

13 that's just how it appeared to you?

14 A.   Correct.

15 Q.   The next page, please, page 5.  Okay.  Judge, I'd like to

16 direct your attention to the sentence starting with the word

17 the, towards the top there.

18 A.   This was some of his use of profanity and manner in which

19 he approached or described judicial actions that he disagreed

20 with.

21      And this is, pardon my language, I'll quote it, it's an

22 insult to Judge Ebert, The fucking idiot Ebert and his idiot

23 sidekick Smith told a dying man he could not sue for

24 preliminary injunction and declaratory judgment.

25      And there are quotation marks at various locations in that

1  highlighted sentence.

2  Q.   So would this be an example of the profanity that you were

3  talking about earlier?

4  A.   It is.

5  Q.   And could we see down towards the bottom, the sentence

6  that starts with, whereas?  Would you read that one, too,

7  please, Judge?

8  A.   Whereas the inferior tribunals are unaccountable to the

9  people they must be executed for constitutional treason

10 according to ex parte Young.

11 Q.   Judge, would this be another example of what you were

12 saying earlier in terms of this entire letter sort of laying

13 out justification?

14 A.   It is.  I mean, he has come up with this term of

15 constitutional treason, which, you know, I take it at face

16 value that he believes that in any sort of violation by a

17 federal judge of his constitutional rights, as he perceives

18 them to be, is treason punishable by death.

19 Q.   So what if, for example, you, as Chief Judge, refuse to

20 take Judge Conti to task over her erroneous decision?  Do you

21 run afoul of that?

22 A.   That was my impression.  And that that was my fate, that I

23 would be executed, that what he essentially is doing in this

24 correspondence is saying, you have two choices.  You can take

25 these judges to task or you can suffer what is justified.  And

1  that is execution.  And it goes on in a few pages in some
2  detail about that.
3  Q.   Okay.  Thank you.  May we see page 6?  Could you expand
4  the large paragraph there in the middle?  And actually the next
5  one, too, please?
6  A.   Could I just see the prelude to that?  There's a phrase
7  that --
8  Q.   Yes.  Would you please --
9  A.   Yeah.
10 Q.   Okay.  Judge, you were indicating that there was some hate
11 speech.  I was wanting to ask you if, by chance, there is an
12 example of that here in this paragraph, the large paragraph?
13 A.   There is.  There's an unfortunate reference to Judge Motz,
14 which he -- where he refers to him as, that fucking scumbag Jew
15 Motz, that gave me great concern.
16      I remember reading that, and I remember thinking, this is
17 someone who is quite agitated and who is not bound by the norms
18 of society, someone who is just acting out of pure hatred.  And
19 I considered that to be a very clear indication of hate speech,
20 and it was certainly problematic in reviewing this mailing.
21 Q.   Does he characterize any of the other judges in the next
22 paragraph that starts with e-g?
23 A.   Yeah.  And by the way, that prelude, that first sentence,
24 the common law calls that a continuing trespass.  And this goes
25 back to what I was saying earlier of my perception that Mr.

1  Dougherty believes that there is this, by judicial officers,

2  there's this continuing trespass of his constitutional rights.

3       And obviously, the opposite is the case.  Our role as

4  judges is to, you know, balance society's need for order and

5  individual liberties.  And that's a very delicate balance.

6  But, obviously, the constitution is our governing document.

7  Q.   First of all, Judge, what was your take on what he was

8  talking about in that next paragraph, e-g?

9  A.   I guess -- let me just take another look at this.

10 Q.   Or in other words, what does it have to do with?

11 A.   I believe this is directed specifically to me.  And it

12 refers to our corrupt enclave as being, I'm assuming, the

13 judges of this district court and an initial reaction or

14 description of my former Judge William Caldwell, whose portrait

15 is actually hanging above the jury box, and has passed away

16 about two years ago, your corrupt enclave initially assigned.

17 And then there's a docket number identified, which I believe to

18 be a Dougherty complaint, to none other than the criminal

19 William Caldwell.

20      And then, He then punked out and assigned it to you,

21 meaning me, and you had your idiot flunky Blewitt, that's a

22 reference to Magistrate Judge Thomas Blewitt, concoct a

23 confused caption defense, this was transferred to the Eastern

24 District of Pennsylvania to the criminal number 1 Slomsky,

25 that's a reference to Joel Slomsky, who is a judge out of the

1  Eastern District who I said had just for a very brief period of
2  time handled some of Mr. Dougherty's litigation, who punked
3  out, and then the Chief McKee, that's a reference to then Chief
4  Judge Ted McKee, recruited the criminal number 2 Motz, a
5  reference to J. Frederick Motz, who is also the reference in
6  the hate speech in the preceding paragraph, and then that
7  criminal Jordan, and the rest is history.
8      And I'm assuming that criminal Jordan is a reference to
9  the Court of Appeals Judge Kent Jordan, who I'm assuming may
10 have led a panel decision on the appeal by Mr. Dougherty in one
11 of his decisions that was not in his favor.
12 Q.  May we see page 7, please?  All right.  Judge, what's your
13 general sense of what's being talked about on this page?
14 A.  This is some sort of recitation of the history of his
15 litigation woes and problems that he has had.  And I have no
16 doubt that he had problems in litigation.  I never handled any
17 of his cases, but he had quite a few complaints that were
18 filed.  He was a very active litigant in our court and, I'm
19 assuming, other courts.  So I have a feeling this is sort of a
20 rehashing of his other cases and what he believed to be the
21 wrongful results of those cases.
22     And then there's a reference at the bottom of page 7 to
23 unadulterated corruption and my interference, I interfered with
24 Keith Dougherty's declaratory judgment filed in Court of Common
25 Pleas in January 2014.

1      And so I'm not quite sure what that is a reference to.

2  And I just simply don't recall having interfered with his

3  declaratory judgment action.  I'm not sure what that is a

4  reference to.

5  Q.   Okay.  And the next page, please, page 8.  Judge, does

6  this appear to be a continuation of his recounting of his

7  litigation woes?

8  A.   It does.

9  Q.   Are there also some references to the judges in that large

10  paragraph there?

11  A.   There are.

12  Q.   Would you expand that, please?  How does he characterize

13  those judges?

14  A.   Criminals, idiots, and it seemed to be that that was just

15  consistent with the ten or of his communication.

16  Q.   Can we move to page 9?  Would you please read, Judge, the

17  paragraph at the top of page 9, as soon as she expands it?

18  A.   Keith Dougherty filed the paperwork to establish a

19  well-regulated militia, and at the appropriate time will order

20  the death of three state court judges by bashing of skulls,

21  three district court level judges and magistrates by ISIS style

22  beheading, and three circuit court level judges by AR-15s to

23  ensure the most just, speedy, and inexpensive determination as

24  to habeas corpus related to the 2nd and 14th amendments in pari

25  materia with qualified immunity and assault gun issues.

1  Q.   Judge, did it mean anything to you that he had described

2  different ways of killing different judges?

3  A.   Well, I guess I should say at the outset, this, to me, was

4  a very direct threat.  He's indicated he's filed paperwork so

5  that there's some thought associated with an organized or

6  formal creation of a militia, his own militia, which I think

7  later is referred to as Docsan or Doscon, something like

8  that -- Doscon, I believe it is, the Doscon militia.  So he's

9  communicating that he's done what needs to be done in order to

10  create a militia.

11      And then he's thought that at the appropriate time, he's

12  thought about how he will direct his militia to execute the

13  state court judges, separately execute the district court level

14  judges and magistrate judges, and the circuit court level

15  judges.

16      So, to me, that demonstrated clear intent because this

17  wasn't just a general sort of broad, I think we should -- the

18  first thing we should do, we should kill all the judges, no, he

19  thought this through.  He knows how he wants these actions to

20  take place.

21  Q.   May we see the next paragraph, please?  Judge, I want to

22  draw your attention to the first three words of that sentence.

23  A.   In the alternative.

24  Q.   How did you take that?

25  A.   This was all part of the threat.  I can either do what he

1  wants me to do or he's going to execute through his or via his
2  militia.
3  Q.   When he talks about entering a default, what does that --
4  how do you understand that?
5  A.   Well, I took the sentence as a whole, that my only other
6  option was to order a preliminary injunction relating to some
7  request that he had, I guess, in one of his cases for a default
8  judgment, and that in order for me to avoid these death threats
9  or the action of his militia, I had to enter that order and
10 make sure that he received the result he wanted.
11 Q.   Okay.  So this is something -- did you interpret this as
12 something that you can do in order to save your life?
13 A.   Correct.
14 Q.   All right.  And on this page, he also makes some more
15 references to judges; correct?
16 A.   Yeah.  And again, I have to emphasize that the irony of
17 all of this is, I had no authority to do what he was asking me
18 to do.  That just simply wasn't within my power or
19 jurisdiction.
20 Q.   Could you please expand this sentence here?
21 A.   Tell Caldwell, Carlson, and Jones to prepare for the
22 worst.  In the event their execution is ordered by militia,
23 there is no appeal.
24 Q.   How did you understand that, Judge, in the context of the
25 entire letter?

303

1  A.    It's just a continuation of the threat that, you know,

2  this is coming, so prepare for it.  And I'm not sure if this is

3  some sort of black humor, dark humor about there is no appeal,

4  meaning that once you're dead, you cannot appeal.

5        But I thought this was just his continuation of

6  threatening my colleagues and myself and that, you know, his

7  intent was clear.  You've got two options, do what I want you

8  to do or I am justified in directing my militia to carry out my

9  orders.

10 Q.    May we see the top of the first page again?  No, the very

11 first page of the letter?  Would you please -- that's it, yes.

12 Judge, would you read again what it says after the Re?

13 A.    Execution orders pending.  And this goes back to what I

14 said in the beginning.  At first blush, I wasn't quite sure

15 what that meant.  Having read the rest of the correspondence,

16 it was clear to me what that meant.  His execution orders were

17 pending and he was ready to, in stark terms, pull the trigger

18 if he didn't get what he wanted.

19 Q.    And page 10, the top of page 10.  Would you expand the

20 first sentence, please?  Would you read that sentence, please,

21 Judge?

22 A.    Where Caldwell and his idiots say all we have to do is say

23 Keith Dougherty is vexatious, and he is not protected by the

24 common law.

25 Q.    Judge, does the Defendant talk a lot about the common law

1  in this letter?  Is that something that came out or that you

2  noticed?

3  A.   He does.

4  Q.   Okay.

5  A.   And I think he believes that my authority as Chief Judge

6  is under the common law and that, therefore, I can do what he

7  thinks -- therefore, I am capable of doing what he is asking me

8  to do.  And that is just plain wrong.

9  Q.   All right.  The next paragraph, please.  Judge, did you

10 ever -- do you notice anything about the way the Defendant

11 refers to himself?  Does he use the first person?

12 A.   No, he refers to himself as Keith Dougherty.  He doesn't

13 use the pronoun I.

14 Q.   Did that strike you at all, at least in the context in the

15 sense that it's a letter?

16 A.   It did.  I just found it to be odd and sort of consistent

17 with someone who felt as though he was above the law.

18 Q.   Can we skip over to page 12?  Judge, I want to direct your

19 attention to the top of that page, the first sentence.  Would

20 you read that one, please?

21 A.   William Caldwell et al are only attempting to say the PA

22 Bar from Keith Dougherty, and is willing to die in his efforts.

23 Q.   Who's willing to die in his efforts?

24 A.   Well, you know, we all take an oath when we become federal

25 judges, and we're supposed to support and defend and protect

1   the Constitution of the United States.  I don't think anyone
2   would believe that there is -- that execution is a potential
3   consequence of failing to do your job appropriately.
4   Q.   So even if he had that issue with Judge Caldwell, and even
5   if by some chance there was some legitimacy to that claim, it
6   would still not be an appropriate resolution?
7   A.   Of course not.  I mean, there are courts of appeals if you
8   have a problem with a judge's ruling.  Your remedy is with the
9   Court of Appeals.  If you believe the judge is acting
10  inappropriately, there is misconduct, there is also a
11  misconduct complaint that is available on every public website
12  of the judiciary, and it's certainly available on the Third
13  Circuit website, which is where those complaints are
14  investigated and disposed of.
15       And there's certainly no impression on the part of judges
16  when they assume office that some negligent act on their part
17  is going to result in their execution.
18  Q.   Would you please highlight the large paragraph there and
19  the small one that's indented after it?  Judge, could I ask you
20  to please read that paragraph, the first one?
21  A.   The criminals in the Middle District of PA are responsible
22  for the death of Jean Brady, Sara Runk, and Larry Runk, II, and
23  Satanopher says just give him a kiss on the cheek and teach
24  them all a lesson, everyone needs at least two attorneys, and
25  now McKee is no longer Chief, question mark.  You have to watch

1   mullahs of the west at the end, if the constitution is
2   illegitimate, unenforceable, join a revolution, I say kill all
3   of the inferior tribunals with qualified immunity, and
4   President Trump will appoint new ones, then go before a sixth
5   amendment jury, if asked, and then a seventh amendment jury,
6   easy peasy.
7   Q.   Judge, how did you understand the reference to the sixth
8   amendment jury and the seventh amendment jury in the context of
9   the carrying out of this possible threat?
10  A.   Honestly, I didn't know.  I was sort of -- I guess at face
11  value, it sounds, to me, like he believes he can commit these
12  acts of violence and death with qualified immunity and then
13  could go before a jury, both criminal jury and civil jury, and
14  defend himself.
15  Q.   Qualified immunity means you get away with it?
16  A.   Correct.
17  Q.   So no consequences?
18  A.   Correct.
19  Q.   And then after that, we have what?  Is it correct it
20  appears to be another quote from the Bible?
21  A.   Correct.  Psalm 144, Blessed be the Lord, my rock 1A Psalm
22  of David.  Blessed be the Lord, my rock, who trains my hands
23  for war, and my fingers for battle.  My loving kindness and my
24  fortress, my stronghold and my deliverer, my shield and he in
25  whom I take refuge, who subdues my people under me.

1  Q.   Can we skip over to page 14?  Would you please expand the
2  heading at the top and the first paragraph?  Judge, is this
3  another example of something you testified about earlier here
4  today?
5  A.   It is.  This is some sort of attempt at formal notice, at
6  least that was my perception, formal notice.  Once the militia
7  orders the execution of any judge for constitutional treason,
8  there's that reference again to constitutional treason, there
9  will be no further appeal possible; in other words, the militia
10 rules.  And when there's a determination that a judge should be
11 executed, that's it.
12 Q.   And the next page, please, the last page.  Is there
13 another reference to the second amendment and the phrase that
14 talks about militias?
15 A.   There is.  And at the top, there's that reference to
16 Docson members.  That, I believe, is a reference to his
17 militia, what he has described as his militia.
18 Q.   And the next paragraph then?
19 A.   And that his actions taken in support of the constitution
20 once having complied with AEDPA's Exhaustion Doctrine shall be
21 with qualified immunity.  In other words, once he's taken
22 whatever administrative steps are necessary, he'll have
23 complete immunity.
24       In other words, you get your warning, and if you don't do
25 what I want you to do, then you'll suffer the consequences, and

1   I won't be responsible because I'll have qualified immunity.

2   Q.   And at the bottom, Judge, I think you touched on this

3   earlier, what does that cc signify to you?

4   A.   Yeah, that was -- the check mark is just indicating, I

5   believe, that this is my copy of the correspondence.  I assume,

6   but I'm not certain, that other members, other judges received

7   the same correspondence.

8        And I can't recall at this juncture, having talked to

9   Judges Carlson, Jones, and Caldwell, I'm reasonably certain I

10  also spoke with the Chief Judge of the Circuit, which at the

11  time was Brooks Smith, I believe, I can't recall if they

12  confirmed that they had actually received their copies of this

13  correspondence.

14       But, of course, I circulated the correspondence to my

15  colleagues.  That was another step in the communication process

16  when I received it, so that they would be aware of the nature

17  of the communication and could take appropriate steps because

18  there are other members of the bench that were also the subject

19  of this threat.

20  Q.   Judge, going back to how this letter was addressed, it was

21  addressed to Satanopher Conner.  Is this the first time that

22  you had been referred to in that way or received some sort of

23  document that used that particular name from this particular

24  individual?

25  A.   No.  I believe I received a communication before then

1    where he suggested that I change my name legally to Satanopher.

2              MR. PERRI:  Your Honor, may I approach?

3              THE COURT:  Um-hum.

4    BY MR. PERRI:

5    Q.   Judge, I'd like to show you what's been marked for

6    identification purposes as United States Exhibit No. 8.  It's a

7    two-page document.  It appears to be a fax.  Would you please

8    look at it and tell me if you recognize that?

9    A.   I do.

10   Q.   And looking at the first page, who does it appear, based

11   on the transmission sheet, the cover sheet, if you will, for

12   faxes, who does it appear to be from?

13   A.   Keith Dougherty.

14   Q.   Is there a date associated with the transmission there at

15   the top?

16   A.   September 29th, 2016.

17   Q.   And who's it -- does it indicate who it's addressed to or

18   being sent to, since it's a fax?

19   A.   Yes.  (Pause.)  I'm sorry, what were you saying?  What was

20   your question?

21   Q.   Just still looking at the cover sheet on the first page?

22   A.   Yeah.

23   Q.   Who is it to?

24   A.   To me, Chief Conner is the designation.

25   Q.   And what's the company?

1  A.    MDPA, Middle District of Pennsylvania.

2  Q.    All right.  And so you received this on 9/29 of 2016?

3  A.    I believe so.  I'm not certain of the date.  And I'll note

4  that the fax number is our Scranton fax number.  We have

5  courthouses in Williamsport, Wilkes-Barre, Scranton, and

6  Harrisburg.

7        This appears to me to be the fax number for Scranton.  So

8  it was probably sent to -- which our headquarters of the Middle

9  District are in Scranton.  So this was sent to the main clerk's

10 office in Scranton, I believe that's their fax number.  And

11 then, obviously, it was forwarded to me.

12 Q.    Okay.  But you remember seeing this?

13 A.    I do.

14 Q.    Okay.

15        MR. PERRI:  Your Honor, we move for the admission of

16 United States Exhibit No. 8.

17        MR. DOUGHERTY:  No objection.

18        THE COURT:  All right.  It's admitted.

19 BY MR. PERRI:

20 Q.    Could we please see that, the first page, the cover sheet

21 that we've been talking about?  Would you expand that heading,

22 please?  All right.  Would you show us, please, the next page?

23 It's only two pages.  Would you please expand that?  Judge, is

24 this the passage that you were referring to?

25 A.    It is.

1  Q.   Could you read it, please?

2  A.   Christopher Conner, as Chief of the Middle District of

3  Pennsylvania.  I would advise your seeking a name change

4  legally to Satanopher, or Satanopher, as you have dishonored

5  your name's entomology, better to die professionally than to

6  lose one's soul.

7  Q.   Do you perceive a typo in there, Judge?

8  A.   I think there's some reference to entomology.  I'm pretty

9  sure that's the study of insects.  I think the correct term

10 that he's looking for is etymology, E-T-Y-M-O-L-O-G-Y, which is

11 the study of words.  I'm not an expert in those terms, but I

12 believe that this is a misspelling.

13 Q.   So to be clear, this pre-dates and precedes the letter you

14 received in May of 2017?

15 A.   Correct.

16 Q.   Thank you.

17         MR. PERRI:  May I have a moment, Your Honor?

18         THE COURT:  Sure.

19         (Pause.)

20         MR. PERRI:  Judge, I have no further questions.

21 Thank you very much.

22         THE COURT:  Thank you.  Cross examination.

23                      **CROSS EXAMINATION**

24 BY MR. DOUGHERTY:

25 Q.   Judge Conner, pleasure to finally meet you.  As you had

1 been discussing with the prosecutor, I just want to clarify a

2 few things.  It may take a bit of time, but I'd like to go

3 through it, what would be procedurally.  In the original cover

4 of the letter that one must continually refer to, it actually

5 has the check mark next to you as Chief Judge Middle District

6 of Pennsylvania.  Correct?

7 A.    And you're referencing which exhibit?  Exhibit 1-B?

8 Q.    Yes, that would be the Government's Exhibit 1-B?

9 A.    Correct, Chief Judge Middle District of PA.

10 Q.    And in that recognition, there is a separate title and

11 process for, you know, a judge, for instance, as referenced in

12 that, for instance, at page 4 in that exhibit, there is a

13 citation to a Supreme Court case at about the fourth paragraph

14 down referencing *Forrester v. White.*

15        And in that Supreme Court opinion, it lays out the various

16 levels of immunity a judge has based on the role that they are

17 playing in any particular proceedings.  Are you familiar with

18 the case?

19 A.    I am not familiar with the specific facts of *Forrester v.*

20 *White.*  I am familiar with the concept of judicial immunity and

21 that it applies in most circumstances.  But there are

22 circumstances where judges are not immune from suit.

23 Q.    Okay.  So if you could, right there beneath Exhibit A,

24 down to the indent, it starts, dot dot dot in the same case,

25 would you please read that for the jury?

313

1  A.   In the same case, we held that judges acting to enforce

2  the bar code would be treated like prosecutors, and thus would

3  be amenable to sue for injunctive and declaratory relief, Id.

4  at 446 U.S. 734-737.  Cf. *Pulliam v. Allen*, 466 U.S. 522

5  (1984).  Once again, it was the nature of the function

6  performed, not the identity of the actor who performed it, that

7  informed our analysis or our immunity analysis.  Id. Pp 228-29,

8  *Forrester v. White*, 484 U.S. 219 (1988).

9  Q.   Thank you for that.  So in the concept of those kinds of

10 discussions when we're talking about immunity analysis, we're

11 talking about there are actually being definable different

12 roles, and there is no such thing as a legal nobility.  In

13 fact, Article I, Section 9 and Article I, Section 10 of the

14 United States Constitution prohibit any form of immunity, is

15 that correct?

16 A.   I'm not sure what you're referencing.  You're talking

17 about nobility?

18 Q.   In the United States Constitution, Article I, Section 9,

19 and also in Article I, Section 10, it actually prohibits any

20 establishment of immunity within our governmental system.  Are

21 you familiar with that?

22 A.   I am generally familiar with it, yes.

23 Q.   So the concept being that we're supposed to treat all

24 parties equally, and, in fact, we want to make sure that that

25 is done by establishing that there is no actual immunity in our

314

1  country, rather we are all citizens all accountable to the law.

2  So in this particular communication, you had made some

3  references at one point that it wasn't referencing you, and

4  then in other times it was.  So --

5  A.   It was difficult to tell at times.

6  Q.   Pardon me?

7  A.   It was difficult to tell at times.

8  Q.   Okay.  And I don't disagree with that.  In fact, I do

9  believe that your staccato comment was very accurate.  In fact,

10  that's what it was.  Now if you were to refer to page 2 of the

11  document, Exhibit 1-B, as it were, it brings us to the comments

12  that, in fact, caused you some confusion, I guess, or whatever

13  it was.  So let me just --

14          MR. PERRI:  We can put up page 2 on the screen,

15  Judge.

16          THE COURT:  All right, thank you.

17          MR. PERRI:  If Mr. Dougherty wants to say --

18          THE COURT:  He just said he would, and thank you very

19  much.  I appreciate that.  Would you do that, please?

20          (Complied.)

21  BY MR. DOUGHERTY:

22  Q.   And you were accurate in your reference in this particular

23  portion of the letter as well where it indicates --

24          THE COURT:  Mr. Dougherty, we talked about this.

25  You're acting as a lawyer right now, so you're not supposed to

315

1  be testifying.  So we don't -- you should not be saying what
2  you think is right or wrong.  This is your opportunity as a
3  lawyer to ask questions.  Okay.
4  BY MR. DOUGHERTY:
5  Q.   Okay.  May I ask you to do me the favor on page 2 of
6  reading the second paragraph, Gorsuch, joined by Kelly?
7  A.   Sure.  Gorsuch, joined by Kelly --
8  Q.   No, the second paragraph?
9  A.   I'm sorry?
10 Q.   The second paragraph.  In other words, not that beginning
11 paragraph.  It says, All of us face?
12 A.   Okay.  All of us face the problem of complicity, by
13 knowledge and acquiescence, they stood by and watched Mother
14 Brady, Sara, and Larry, II, die.  All of us must answer for
15 ourselves whether and to what degree we are willing to be
16 involved in the wrongdoing of others.  For some, religion
17 provides an essential source of guidance both about what
18 constitutes wrongful conduct and the degree to which those who
19 assist others in committing wrongful conduct themselves bear
20 moral culpability, some of us are just born warriors.  The
21 Green family, and Keith Dougherty, sole member Docson
22 Consulting, LLC, members are among those who seek guidance from
23 their faith on these questions.  Understanding that is the key
24 to understanding this case.
25 Q.   So in that regard, how did you take the reference to stood

1  by and watched Mother Brady, Sara, and Larry, II, die?  Were

2  you able to make any reference or follow that at all?

3  A.    No.  I have no idea what that references.

4  Q.    And if we move then to the next page, page 3.  There is

5  accurately, as you had described, a transcript of a hearing, in

6  fact, there and makes some reference to me personally.  And at

7  the bottom of the page, the last paragraph, if you could read

8  that for me for the jury?  Thank you.

9  A.    There is a presumption of assignability of contractual

10  rights and duties in Pennsylvania.  Absent an express provision

11  against assignment, the rights and duties under an executory

12  bilateral contract which does not -- and I believe it continues

13  onto the next page.

14  Q.    Yes.  If you could continue onto the next page and read

15  the rest of that, if possible?

16  A.    Involve personal skill, trust, or confidence may be

17  assigned without the consent of the other party so long as it

18  does not materially alter the other party's duties and

19  responsibilities.

20        And do you want me to give the case citations?

21  Q.    No, not really.  Other than the -- after, page 595, if you

22  could give the identification of the federal case?

23  A.    *Kalian at Poconos v. Saw Creek Estates Community*, 275

24  F.Supp.2d 578 (MD PA 2003).

25  Q.    Are you familiar with that case?

317

1  A.   I don't know if that's one of my cases or not.

2  Q.   It's not yours, but it was your predecessor Chief Judge in

3  the Middle District of Pennsylvania.

4         THE COURT:  Okay, again, see, you can ask questions.

5  This is not your opportunity to provide testimony.

6  BY MR. DOUGHERTY:

7  Q.   Okay.  So in that case, it actually references --

8         THE COURT:  All right, again, I got to be patient

9  with you, I'm trying to be patient with you, but you can't

10  testify.  You can ask a question.  The witness has said he

11  doesn't know whether he authored the opinion or not.  So do you

12  have a question?

13  BY MR. DOUGHERTY:

14  Q.   So back to page 3.  When it comes to the reference to

15  assignability, contractual rights, and duties in Pennsylvania,

16  if, in fact, you were to be making a decision on that case, are

17  you familiar with the reference in the case to where this

18  subject, whether or not the case has been assigned or, in fact,

19  someone else would be appropriate, it is not appropriate to be

20  dealt with in a motion to dismiss.  Is that your understanding?

21  A.   I don't understand your question.

22  Q.   That normally the idea of the assignability, whether the

23  assignment itself was, in fact, proper or whatever the case may

24  be, this is normally a subject that would not be acceptable to

25  be ruled on in a motion to dismiss under Federal Rule 12(b)(6).

318

1   Is that your understanding?

2   A.   Assignment of what?

3   Q.   Of the contract rights?

4   A.   What contract rights?  The devil is in the details.  If

5   you have a hypothetical you want me to answer, I'd be happy to

6   try, but it's not clear to me what you're referencing.

7   Q.   In this particular case, it was the *Saw Creek* case that I

8   had asked you to reference that you said you're not really

9   familiar with the case, it makes reference to the laws or the

10  rule.

11          MR. PERRI:  Objection, Your Honor, as to what the

12  case says.

13          THE COURT:  Yeah, it's a fair objection.  I'm going

14  to let this one question -- if there's a question coming,

15  there's a predicate you want to give, I'll let you do this in

16  this one instance, and we'll see.  But it's not going to be a

17  lengthy testimonial speech.

18  BY MR. DOUGHERTY:

19  Q.   Let me just kind of jump ahead a little bit and say, if in

20  this particular case, involving certain governmental and

21  certain private transactions, there were a RICO allegation, are

22  you familiar with the requirements in terms of what RICO would

23  be before you could actually proceed, say, against a

24  governmental agency that wasn't performing its job correctly?

25  A.   Well, I'm not sure if RICO would apply to a governmental

319

1  agency.  It usually is -- RICO is for racketeering and corrupt

2  organizations, and it's an action.  Charging RICO can either be

3  civil or criminal.  I'm assuming you're referring to the civil

4  form.  Is that correct?

5  Q.   In this particular case, yes.  So would it surprise you --

6  A.   I don't think you can bring a RICO action against the

7  federal government.  Is that what you're suggesting?

8  Q.   No, I'm not suggesting that.  I'm saying in this

9  particular case, the RICO action indicated that an extortion

10  would be a part --

11          MR. PERRI:  Objection, Your Honor, as to what the

12  actions --

13          THE COURT:  I'm going to sustain the objection, Mr.

14  Dougherty.

15          MR. DOUGHERTY:  Let's just move on.  I'll address

16  that in later fashion with myself.

17  BY MR. DOUGHERTY:

18  Q.   So then, if you would come to page 5 in the exhibit?  And

19  this brings up a question.  The jury, I'm wondering if they may

20  or may not be aware, you were a part of the efforts in the

21  State of Pennsylvania to redraw the federal districts.  And you

22  were part of a three-judge panel that handled that case where,

23  in fact, the Supreme Court of Pennsylvania had seized power to,

24  in fact, redraw those lines.  Do you recall being on the panel

25  with Judge Jordan and former Chief Judge Simandle?

1  A.    I do.

2  Q.    Do you remember the basis for the decision in that case?

3  A.    I remember the case.  I'm not sure what the relevance is

4  to this correspondence.  But, yes, Judge Jordan, Judge

5  Simandle, and I sat as a three-judge panel, and we were charged

6  with responsibility of under statute for reviewing the

7  redistricting that came out of the General Assembly of

8  Pennsylvania.

9  Q.    And again, in that instance, it had been redrawn by the

10  Supreme Court of Pennsylvania.  So that was the challenge?

11  A.    It was state court litigation, correct.

12  Q.    Yes.  But it was about the federal guidelines.  But I'm

13  asking, do you remember, I should say, what the reason for

14  determining the case that you were on, what was the reason it

15  was used?

16  A.    You know, honestly, I'm not sure I recall that.  There

17  were standing issues, I know that.  Is that what you're getting

18  at?

19  Q.    That's exactly my point.  So if you do recall, then it

20  wouldn't surprise you to say that you had determined, the

21  three-judge panel did, that the Republican senators lacked

22  standing?

23  A.    Correct.

24  Q.    So are you also familiar with a Federal Statute 28 U.S.C.

25  1652 in terms of judicial responsibilities?

321

1  A.   No.  But if you show it to me, I'm sure it will jive my

2  memory.  I'm familiar with most of our duties and

3  responsibilities by statute.

4  Q.   Is there a way I would be able to obtain a copy of that

5  statute?

6          THE COURT:  Well, I gave you a book yesterday.  Do

7  you have that book?

8          MR. DOUGHERTY:  I had to return it.

9          COURTROOM DEPUTY:  I returned it to Judge Wilson.

10         THE WITNESS:  Well, if you can tell me what that

11 statute says, I can --

12         MR. DOUGHERTY:  That will be perfectly fine.  I

13 didn't want to testify.

14         THE COURT:  Let's do this.  Hold on one second.

15 Based on experience, I think it will be quicker if I get a copy

16 of the book.

17         THE WITNESS:  Okay.

18         (Complied.)

19         THE COURT:  Do you have it?

20         MR. ADKINS:  No, Your Honor, I think our --

21         THE COURT:  28 U.S.C. might be in there.

22         MR. ADKINS:  I have 28 U.S.C., but what was the --

23         THE COURT:  1652.

24         MR. DOUGHERTY:  1652.

25         THE COURT:  Here.

322

1              (Complied.)

2  BY MR. DOUGHERTY:

3  Q.   Are you able to read 1652?

4  A.   I am.  It says, The laws of the several states, except

5  where the Constitution or treaties of the United States or Acts

6  of Congress otherwise require or provide, shall be regarded as

7  rules of decision in civil actions in the courts of the United

8  States, in cases where they apply.

9  Q.   And was that action to challenge the authority of the

10  Supreme Court to redraw the line a civil action?

11              MR. PERRI:  Judge, I'm going to place an objection.

12              THE COURT:  I'm going to sustain.  Here's what I'm

13  going to do actually, but I'm going to have a proffer.  We're

14  going to do a sidebar where we put the white noise on.  We're

15  going to do the same thing.  Just be patient with me.  All

16  right.  Mr. Dougherty, get the ear phones.

17              (Sidebar discussion held:)

18              THE COURT:  Can you all hear?

19              MR. DOUGHERTY:  I can hear.

20              THE COURT:  You need to speak softly though.  Mr.

21  Perri, can you hear me?

22              MR. PERRI:  Yes, Your Honor.

23              THE COURT:  Mr. Dougherty, why is this relevant?

24              MR. DOUGHERTY:  I am about to address the paragraph

25  on page 5 related to when the declaratory relief is sought.

1          THE COURT:  Why would that be relevant?

2          MR. DOUGHERTY:  In regard to the letter, what was

3  being addressed was the declaratory judgment actions and

4  standing when, in fact, you were moving in a civil action that

5  is being referenced in some of these questions and

6  circumstances in the letter itself.

7          THE COURT:  Why is it relevant?

8          MR. DOUGHERTY:  Relevant because standing was the

9  issue that dismissed the case, and standing was the crux of my

10 argument with the --

11         THE COURT:  So standing -- what was done in a

12 particular case relating to redistricting?  I'm trying to

13 figure out why that's relevant to whether or not this letter is

14 a threatening communication, why it's relevant to the

15 credibility of the witness, why it is relevant to what this

16 judge decided in some other case.

17         MR. DOUGHERTY:  I'm just trying to establish the

18 circumstance where, in fact, the proper standard was, in fact,

19 the state law related to standing.  And, in fact, the case was

20 decided by dismissing as though the senators --

21         THE COURT:  Hold on one second.  You need to talk way

22 quieter.

23         MR. DOUGHERTY:  Okay.  I'm not trying to be

24 difficult.

25         THE COURT:  That's okay.  If you whisper, I can hear

1 you with the microphone.

2         MR. DOUGHERTY:  So the point is that -- what I'm

3 trying to get to is the perception that's being implied that

4 the, you know, the standing issue was, in fact, misstated in

5 the redistricting case as it's been misstated here in some of

6 these cases that I'm making reference to, to where --

7         THE COURT:  That doesn't make sense.  And what I'm

8 afraid you're doing is, you're trying to somehow bring up this

9 case, which has nothing to do with the merits of the case

10 before us, as if to distract people who may not like the ruling

11 in that case for all I know.  I'm just not -- I'll give you one

12 more chance.  I'm trying to be patient.  I don't think it's

13 relevant.  I think it's going to mislead the jury and send us

14 on a, you know, a chase into something that just has no bearing

15 on the facts or the legal issue here.

16         MR. DOUGHERTY:  This is just a simple illustration as

17 to the -- some of the conflicts in law, just like I intend to

18 refer to 1654 as well, that being the issue involving Keith

19 Dougherty either being under the investigation for the

20 unauthorized practice of law, as was referenced in the very

21 same transcript that was referred to by the prosecution, and

22 comparative to the language in the federal statute indicating

23 it is actually authorized.

24         THE COURT:  Okay.  And we can't -- just because the

25 letter is in doesn't mean that you get to try to educate the

1  jury about what you think a particular word says unless it

2  bears on the criminal charges in front of us.

3      MR. DOUGHERTY:  I was only doing it in reference to

4  the comments made about, once again, the unauthorized practice

5  of law and the potential criminality or, you know --

6      THE COURT:  The unauthorized practice of law.  What

7  reference are you referring to?  Mr. Perri, did you bring

8  anything out about --

9      MR. PERRI:  No, Your Honor.

10     MR. DOUGHERTY:  It was in the transcript.

11     THE COURT:  Just because it's in the transcript,

12 unless it bears on whether or not these are threatening

13 communications, it's not relevant.  Okay.  So I'm not going to

14 let you go further about the discussion of the redistricting

15 case.

16     MR. DOUGHERTY:  Okay.

17     THE COURT:  It sounds like you also want to ask

18 something about 1654.

19     MR. DOUGHERTY:  Yes.

20     MR. PERRI:  Judge, may I speak?

21     THE COURT:  Yes, please.

22     MR. PERRI:  Thank you, Your Honor.  Judge, I think

23 generally what the Defendant is attempting to do is relitigate

24 issues on which he received unfavorable rulings.  That's why

25 he's citing these cases, and that's why he's citing these

326

1  statutes and rules.

2          But that's not -- the outcome of those older matters

3  is not relevant to any of the issues in this case, but I think

4  there's another problem with it, Judge; that is, this witness

5  has testified he had nothing to do with any of those matters.

6          THE COURT:  Well, no, he actually testified he had

7  something to do with the redistricting case, so we were on

8  that.  But, yeah, I agree with you.

9          MR. PERRI:  The underlying litigation, this witness

10 had nothing to do with that.  So there's a lack of personal

11 knowledge, too.

12         THE COURT:  You mean underlying litigation involving

13 Mr. Dougherty?

14         MR. PERRI:  Yes.

15         THE COURT:  Oh, I agree with you on that.  So I don't

16 know exactly what the question -- what's the relevance of 1654?

17         MR. DOUGHERTY:  Again, it was the constant reference

18 in the Third Circuit about dismissing or not allowing me to

19 proceed in other civil matters even representing myself.

20         THE COURT:  Again, I would ask you, please speak more

21 quietly.  But that is not relevant and certainly is going to

22 confuse the jury.  I can't see any probative value.  I see a

23 lot of unfair -- I think attempting to introduce it for the

24 limited probative value it would have would be substantially

25 outweighed by the confusion and, frankly, a waste of time.  So

327

1  I'm going to sustain the objection on a Rule 403.  Okay.  Thank
2  you.
3         MR. DOUGHERTY:  All right.
4         THE COURT:  Okay.
5         (Sidebar discussion concluded.)
6         THE COURT:  Okay.  Thank you very much for being
7  patient.
8         MR. DOUGHERTY:  Thank you.
9         THE COURT:  Mr. Dougherty, you still have ear phones
10 in.
11        (Complied.)
12 BY MR. DOUGHERTY:
13 Q.   Moving onto the issue that I was specific interest.  As
14 you properly said, we have never actually had a situation where
15 you ruled judicially on any case of mine.  But I was curious
16 about the actual process behind the initial case involving your
17 participation in a case of *Keith Dougherty Investment and
18 Consulting versus Carlisle Tire and Wheel* that is identified as
19 13-CV-857.
20      How did it come about that that case was originally
21 assigned to William Caldwell, if you know?  What is the process
22 for assignment of cases to judges?
23 A.   It's random.
24 Q.   It's random?
25 A.   We have a random assignment process.  And that allows us

328

1  to make sure that, number one, that there's an equal

2  distribution of cases.  And we do that by -- it's a fairly

3  elaborate process, but we make sure that it goes like cards in

4  a deck.

5      And you each have a certain number of cards.  And when

6  your card is pulled, that's your case.  And that means you have

7  one less card in the deck from which your name can be pulled.

8  But it's still random as the case assignments go through.  The

9  method by which Judge Caldwell received the case initially was

10  simply a random assignment by virtue of our computer system.

11  Q.   And how many judges are in that assignment randomization?

12  A.   Well, I don't know.  At the time in 2015, we had six

13  active judges, and we probably had at least six senior judges.

14  So --

15  Q.   This was 2013.

16  A.   Yeah, I believe that's correct.

17  Q.   It was right before you took over as Chief?

18  A.   Yeah, I believe we had 12.  We might have had 13.  I'm not

19  sure.

20  Q.   So the question then was in the circumstance of the

21  matters in the court that you were talking about a number of

22  cases that would be randomized, 10-CV-1071 was assigned to

23  Judge Caldwell?

24  A.   Okay.

25  Q.   The next case that came about was 11-CV-1295.  And that

329

1  was assigned to the combination of Chief Magistrate Carlson and

2  District Judge Jones?

3  A.   Okay.

4  Q.   So all of that would have been random as well?

5  A.   Yes.  Now there are exceptions to the random case

6  assignment process.  If there are related cases, a case

7  involving essentially the same subject matter or some identity

8  of parties, then that may go back to the judge to whom the

9  matter was originally assigned randomly.

10      So there is a method by which you can flag on your, I

11 believe it's the civil case cover sheet if there is a related

12 case.  And then a determination is made whether it goes to the

13 judge that is already handling the other pending matter.

14 Q.   But that would indicate that there would normally need to

15 be some sort of relationship for the case to constantly be

16 reassigned to the same judge?

17 A.   Yeah.  If a case -- if a series of cases is assigned to

18 the same judge, it has to do with the similarity of the subject

19 matter.  For example, we had a series of prisoner lawsuits

20 arising out of an outbreak of salmonella at a prison, and all

21 of those cases were assigned to the same judge.  It's for

22 purposes of consistency and better use of resources and

23 expeditious resolution.

24 Q.   So then you have the next case that I had filed was

25 14-CV-447.  And it was assigned, once again, to Chief

330

1  Magistrate Carlson and District Judge Jones.  And that was

2  random assigned as well?

3  A.   I don't know if it was designated a related case to the

4  other case he had or if it was randomly assigned.  I don't

5  know.

6  Q.   Again, that's the question I'm getting to.  Is there any

7  way that this randomization would be set aside because of a

8  person, a litigant, whoever was involved as opposed to the

9  other connected cases that you were indicating where it would

10  be appropriate to link them together?  Like they were related

11  in some way, the parties are somehow related.

12      But this case was totally unrelated to the others that I

13  had mentioned, and yet once again, it was assigned to Chief

14  Magistrate Carlson and District Judge Jones?

15  A.   It's your assuming and it's your opinion they weren't

16  related.  I don't know if they were related or not.  That would

17  be a determination that was made at the clerk's office.  And

18  there should be a designation on the docket sheet as to whether

19  or not it's a related case.

20      Typically, we have the designation at the very top of the

21  docket sheet, I think on the left side, about whether there's a

22  related case or not.

23  Q.   Again, would it surprise you if I told you there were no

24  such designations?  There was not that kind of relationship?

25          MR. PERRI:  Objection -- okay.

1              THE WITNESS:  No, it wouldn't surprise me.  It would

2     just mean there was another designation.  The other aspect of

3     this is that you asked me about random assignment and to whom

4     matters may be assigned.  I should point out that that group of

5     judges becomes more limited because typically the judges to

6     whom the matter is assigned has to do with their duty station.

7              So if you are filing in one of the sort of southern

8     Central Pennsylvania counties, you're going to get a Harrisburg

9     judge.  If you're filing in the northern counties, you're going

10    to get a Scranton judge.  And if you are filing in the

11    northwestern area of our district, you're going to get a

12    Williamsport judge.

13    BY MR. DOUGHERTY:

14    Q.   Then that may be a partial explanation.  So all of these

15    cases were being filed here and, therefore, that would be

16    limited to how many judges that would be randomly assigned?

17    A.   Well, at the time, there were three active judges here and

18    two senior judges, so five probably.  And -- but you have to

19    understand there are also exceptions to having a judge from

20    Harrisburg handle a case that's filed in Harrisburg.

21         If that random case assignment process gets out of whack,

22    and one judge has too many assignments, simply because of where

23    the cases are assigned -- for example, we only have one judge

24    in Williamsport.  And if the Williamsport division of our court

25    gets too many cases, then judges from other portions of our

332

1  district will go in and take Williamsport cases to help him out
2  or her out.  In this case, it's a he.
3       So there are exceptions to various aspects of our case
4  assignment policy.  But the whole purpose is to try to avoid
5  forum shopping by attorneys and litigants to make sure that,
6  you know, no one single judge is getting all of a particular
7  company's cases.
8  Q.   And there's also a constitutional aspect to that, too, as
9  well; right?  Finding that the tribunal is impartial, neutral?
10 A.   Correct, yes, absolutely.
11 Q.   Okay.  So then the next case that was filed was 14-CV 480.
12 That case was assigned to Chief Magistrate Carlson and District
13 Judge Jones.  And that was supposedly random as well?
14 A.   I honestly don't know how that matter was assigned.
15 Q.   Then the next case was 14-CV-922, and your name was
16 assigned to it in that case as it had been back 13-CV-857.  And
17 that would have been random as well?
18 A.   To my knowledge, yes.
19 Q.   So then the question then arises, how was it then
20 13-CV-857 was designated to be transferred out of the Middle
21 District to a judge in the Eastern District, that being judge
22 Slomsky?
23            MR. PERRI:  Your Honor, may I object, please, at this
24 point?  I'm trying to foresee the relevance of this line of
25 questioning.  The Defendant is apparently trying to satisfy his

333

1  curiosity about how all of these different cases got
2  transferred and why.  But I don't see how that's relevant to
3  any material issue in this trial.
4           THE COURT:  So I generally agree with you.  And there
5  was some discussion in direct.  You brought out about the
6  process of assignments and reassignments, I think, to address
7  some issues that were raised yesterday.  But I generally agree.
8  So what I would say is, I'll permit this one question, and then
9  I'm at a loss to understand.  I don't think we need to go
10 through the litany of cases.
11          MR. DOUGHERTY:  We were talking about some of the
12 persons involved and some of the comments that I made.
13          THE COURT:  Right, so that's why I'm also allowing.
14 There was a reference to Judge Slomsky, so you're asking about
15 the case, if this witness knows.
16          MR. DOUGHERTY:  That's what I'm saying, yes.
17          THE COURT:  So go ahead, re-ask the question.
18 BY MR. DOUGHERTY:
19 Q.   So again, I was wondering if you had or knew any part of
20 the process that wound up having the case that was assigned to
21 you then designated as being properly assigned to Judge Slomsky
22 in the Eastern District of Pennsylvania?
23 A.   Well, I think I can sort of answer your question
24 generally, and maybe this will help.  The process of
25 reassigning cases out of district is based, first, on the

334

1   impression or observation or perspective of the judge that's

2   presiding over the matter that he or she has a conflict.

3        And that conflict can be created by the nature of the

4   litigation, the claims in the litigation, or perhaps the

5   indication that one of the litigants is going to name the judge

6   as a defendant.  I don't recall, because it's been too long, I

7   don't recall what created the conflict in the first instance.

8        I believe I indicated in response to Mr. Perri's questions

9   that my understanding was that your rhetoric had increased

10  significantly, that there were either claims against individual

11  judges or threats of claims against individual judges, and that

12  as a result of that, a decision was made more or less

13  district-wide that your complaints should be transferred out of

14  district.

15       That process started before I became Chief Judge.  I

16  believe that then Chief Judge Kane in 2013 had certain matters

17  transferred out.  And then I don't recall why there was some

18  delay, but then there were additional cases that were assigned.

19  And it may have had to do with whether or not the Circuit had

20  somebody lined up to take responsibility for those cases.

21       And there's an administrative process that takes some time

22  in order for a new judge to be assigned if that judge is not

23  within the original district of the jurisdiction of the

24  original district.

25       So to get assignment from visiting judges coming in

335

1  agreeing to take these cases, the process is the Chief Judge
2  asks the Chief Judge of the Court of Appeals, in this case, it
3  was either Ted McKee or Brooks Smith, Judge Ted McKee, Judge
4  Brooks Smith, and Judge Kane would have done that up through
5  September 1, 2013, at which point I became Chief Judge, and
6  then I would have made that same request.

7       Because this process started with Judge Kane, I think I
8  was just simply following form.  And if there was a general
9  perception that your litigation needed to be handled by a judge
10 out of district, then for the most part, I think that is what I
11 did.  I simply said to the Chief Judge of the Circuit at the
12 time, we have an additional case filed by a litigant whose
13 cases are being handled out of district, we continue to receive
14 those cases, we need more transfers out of district.

15      Now I think there was an exception to that.  And that was,
16 I think, that Judge Caldwell addressed some matters after these
17 transfers were made.  But I think that was in a post-judgment
18 stage on a motion for reconsideration.

19      Sometimes if it's gotten to the point where the case has
20 ended, except for post-judgment or post-decision motions for
21 reconsideration, the judge that issues the decision is asked to
22 reconsider, the judge that issues the decision is then required
23 to respond to the motion for reconsideration.  So that may be
24 the exception to the rule.

25      But generally speaking, by the time I became Chief Judge,

336

1  it was sort of understood that litigation filed by you would be
2  transferred out of district.
3  Q.   That explains a lot.  But in this particular case, there
4  was also a decision rendered by Magistrate Blewitt relative to
5  my seeking default against the Defendant.  And were you in any
6  way involved in that or is that something he would handle
7  independently?
8  A.   I don't believe I was involved in that.  But you can
9  correct my assumption if I'm wrong.
10 Q.   Again, that's my question.  In other words, this case,
11 before it was transferred out, was handled by a magistrate who,
12 I assume, was assigned to you as it normally is to do the
13 preliminary matters with the magistrate?
14 A.   Correct.
15 Q.   And then the more permanent or final solution, because of
16 limited jurisdiction of a magistrate, then it's turned over to
17 the assigned judge.  You were the assigned judge.  Magistrate
18 Blewitt was the one would handled the issue.  In fact, it was
19 after there was an effort to have default entered by the clerk.
20 Were you familiar with that or did you have anything to do with
21 Magistrate Blewitt's efforts in that matter?
22 A.   Typically not.  In this particular case, I don't recall,
23 but I don't believe so.  If he was handling pretrial management
24 of the case, then I let him do what he is responsible for
25 doing, and that is pretrial management.

1   Q.   Okay.   The next case happened to be directly related to

2   the one referenced in the letter, which is 14-CV-480.   That was

3   more or less the same parties.   It involved at that time *Keith*

4   *Dougherty and Larry Runk versus Cumberland County and Erie*

5   *Insurance*.   And in fact, that was assigned once again, as I had

6   indicated, to Chief Magistrate Carlson and District Judge

7   Jones.   And the primary defendants in that case also defaulted.

8        So my question is, is there some sort of communication

9   that you're aware of going from the clerk's office to

10  defendants that, in fact, the cases are going to be transferred

11  out of the district, so do not respond, or is there just

12  something going on with Keith Dougherty's opponents not being

13  able to respond?

14  A.   I don't know.   I have no idea.   But I can tell you that we

15  generally prohibit ex parte communications.   So that if the

16  clerk's office is going to communicate with somebody, they're

17  typically going to have both parties on the phone.

18  Q.   So then the next case that came up was 14-CV-922; again,

19  default by the defendants.   And in that case, you had actually

20  agreed to or allowed, however you use the term, pro hac vice

21  for the attorneys from Illinois and California.   And, in fact,

22  because of their lack of familiarity with the rules, they wound

23  up being defaulting as well.   I once again properly moved for

24  default, which the clerk was reluctant to do.

25       Now as the Chief Judge, do you have any interaction with

338

1   the Chief Clerk's refusal to enter default or any activities

2   with regard to that?

3   A.   No.

4   Q.   So is the Chief Judge -- excuse me, Chief Clerk of the

5   District Court, is he a direct employee of yours or does he

6   operate independently in many way?

7   A.   He's essentially the chief executive of the court staff

8   and is responsible and has some statutory reporting

9   requirements, takes care of a variety of accounting issues and

10  docket management issues.  There are a number of things that

11  the Clerk of Court does.

12        But in terms of as Chief Judge, do I control what he does?

13  I would say to a limited extent.  Probably he would come to

14  me -- in this particular case, it may have been Maria Elkin's,

15  I don't know if it was Peter Welsh -- but he or she would come

16  to me and ask me in a particular personnel situation, should we

17  terminate this employee?  Should we hire this employee?

18        In terms of policy, that's a board of judges matter, and

19  we would decide that among the active and senior judges as to

20  whether or not we should develop a mediation program or

21  something along those lines.

22        But in terms of default judgment, that's a ministerial act

23  of the clerk, and that is not something that would be

24  communicated to the Chief Judge, that would just be an act that

25  would take place.  There are, I think, two different ways to

339

1   enter a default judgment.  Number one is by the clerk entering
2   a default.
3   Q.   And again, I wasn't talking about default judgment.  I was
4   simply talking about the default being a two-step process.
5   First, there is default, and then there is default judgment.
6   But under those circumstances, where it seems that in each of
7   these cases, for whatever reason, they were defaulted and then
8   no action taken, and then that was where my question comes in
9   to where they are transferred out to first Joel Slomsky, and he
10  took no action in the Eastern District of Pennsylvania, and
11  then it was transferred to, as you properly indicated,
12  Frederick Motz.
13       And did you have any interaction with the process of
14  having these three cases transferred to that same judge?
15  A.   My recollection is, I did have communication with Chief
16  Judge Smith of the Court of Appeals of the Third Circuit about
17  additional cases that needed to be assigned out of district.
18  And at that point, it's up to the Chief Judge of the Circuit to
19  determine where those cases go.
20       And if you already had litigation with Judge Motz, and he
21  was familiar with some of the issues, I would say it would be
22  logical for Chief Judge Smith to contact Judge Motz and ask him
23  if he would be willing to handle some additional assignments.
24  Q.   And doesn't that smack of a situation where the tribunal
25  is predisposed to find against you?

1  A.   I don't believe so.

2  Q.   Well, again, if the issue that was at most concern, for

3  instance, with the judge in question, and it had to do with the

4  fact that the litigant insists on appearing pro se and that

5  judge disfavors pro se litigation, wouldn't that lead to that

6  all of the cases are going to be dismissed by virtue of this

7  one dispute related to self-representation?

8         MR. PERRI:  Objection, Your Honor.  It assumes facts

9  not in evidence as to what this judge has and a predisposition.

10         THE COURT:  I think it's all going to be answered

11  with one word.

12         THE WITNESS:  I don't know the answer, but the bottom

13  line is, I disagree with your premise.  I don't believe that

14  there was any bias or prejudice exhibited by a federal judicial

15  officer in any of your litigation.

16  BY MR. DOUGHERTY:

17  Q.   Again, if, in fact, there is -- maybe just rephrase --

18         THE COURT:  No, I'm not going to let you rephrase.

19  I've given you a lot of liberty.  You need to stop testifying,

20  and let's move on with the questions that are relevant to the

21  case.

22  BY MR. DOUGHERTY:

23  Q.   Okay.  In my person being in a situation where I, in fact,

24  move for certain action in the court and believe that I am not

25  receiving what is proper or fair treatment, you're saying to me

341

1   that I should just be comforted in your assurance that there

2   was no such concerns?

3   A.   No.   You have two options, and I mentioned them earlier.

4   You can file an appeal if you believe that the decision

5   rendered by the trial judge is inaccurate and improper or

6   incorrect for any reason, you can file an appeal.

7        And then alternatively, if you believe there is an actual

8   active judicial misconduct, if there is, you know, something

9   outrageous like a bribe or something like that going on, you

10  have the right to file misconduct complaint against that

11  judicial officer.   And all of those matters are taken

12  seriously.

13  Q.   And I take you at your word.   Now the concept being that

14  there are certain things that can be appealed and other things

15  that, in fact, were making reference to the letter as far as

16  mandamus is concerned, and one of the issues that I had was, in

17  fact, related to this concept of what is an appealable issue

18  and what, in fact, would be something that could be handled by

19  mandamus and, therefore, ordered by the Court of Appeals

20  related to the particular aspect.

21       So if you could just bring up Government Exhibit 004-A?

22            THE COURT:   Was this on direct?

23            MR. PERRI:   No, Your Honor, there was no discussion

24  of this.   It is beyond the scope.

25            THE COURT:   Yeah.   I mean, Mr. Dougherty, this is

1  beyond the scope of direct examination.

2          MR. DOUGHERTY:  I thought he made reference to

3  mandamus in *Marbury versus Madison*.

4          THE COURT:  That was not in an e-mail, I didn't

5  think.

6          MR. DOUGHERTY:  It was in the letter.

7          THE COURT:  Okay.  And you asked questions about

8  mandamus.  But now you're saying you want to show the witness

9  an e-mail.

10          MR. DOUGHERTY:  It has to do with mandamus.

11          MR. PERRI:  I'm sorry, Your Honor, what was that?

12          THE COURT:  Exhibit 4.

13          MR. PERRI:  Yes.

14          THE COURT:  May I see Exhibit 4, please?

15          MR. PERRI:  Yes, Your Honor.  It's 4-A actually, Your

16  Honor.

17          THE COURT:  Was it used on direct with this witness?

18          MR. PERRI:  No, Your Honor.

19          THE COURT:  What's the question?

20          MR. DOUGHERTY:  For the limited purposes --

21          THE COURT:  No, what's the question you wish to ask?

22  I'm looking at Exhibit 4.  What's the question you wish to ask

23  this witness?

24          MR. DOUGHERTY:  In this particular circumstance was

25  the issue in the bold type where the writ was granted relative

343

1   to the party being pro se.

2          THE COURT:  That's the question?

3          MR. DOUGHERTY:  In other words, is --

4          THE COURT:  That's the question.  I'm going to

5   sustain.  That question is improper.

6   BY MR. DOUGHERTY:

7   Q.  So then the -- there was other reference in your direct

8   relative to the use of the word constitutional treason as

9   something that was being attributed that I created this term or

10  somehow was manufacturing it for my own use and for my own

11  purposes.

12         MR. PERRI:  Objection as to mischaracterization, Your

13  Honor.

14         THE COURT:  Well, I've explained to the jurors many

15  times, and I'll repeat again, and I'll tell you in my final

16  instructions what's evidence and what's not, you recall all

17  that, and what comes out of the words of a witness -- I'm

18  sorry, what comes out of the words of a witness who's

19  testifying under oath is evidence.  What comes out of the words

20  of lawyers or me is not evidence.  And remember, Mr. Dougherty

21  right now is acting as his attorney, and what he says is not

22  evidence.  All right.

23  BY MR. DOUGHERTY:

24  Q.  But to the question about constitutional treason.  Are you

25  familiar with making reference to that term?

344

1  A.   I did make reference to it.  It appears in your

2  communications, threats.

3  Q.   It would be actually the letter U.S. 0000621.  It's in the

4  top paragraph.  It makes reference to constitutional treason.

5  A.   It says, Once the militia orders execution of any judge

6  for constitutional treason, there will be no further appeal

7  possible.

8  Q.   Was it proper -- my hearing of that, that you were

9  attributing this term constitutional treason as being

10  manufactured or created by me?

11  A.   Manufactured in the sense, yes, that it -- I assumed and

12  interpreted, based on the context of your letter, that this is

13  your basis for ordering the militia to make good on your death

14  threats, that you find a judge guilty of constitutional treason

15  because they have not done what you believe they should do; in

16  other words, they've failed your perception of their duties and

17  responsibilities.

18  Q.   So the question is, would it catch you off guard if, in

19  fact, that were to be a term that was used in ex parte Young

20  page 143 by the United States Supreme Court?

21  A.   No.

22  Q.   And that they were using it whenever, when you have

23  difficult political questions and a judge will, in fact, not

24  answer the question, they considered that to be constitutional

25  treason?

345

1  A.   Is that a question?

2  Q.   Yes.  Would it surprise you that it's in the opinion from

3  the Supreme Court --

4  A.   No, the fact that the term has been used previously

5  doesn't surprise me at all.  I interpreted your use of this

6  term in the context of your threat.  And that's how I viewed

7  it.

8  Q.   Which brings up another question.  Once again, I was

9  asking, you received this letter in your executive capacity, do

10  you believe that there are actual protections under the first

11  amendment relative to someone making statements or demanding

12  certain actions as a petition for redress as opposed to simply

13  a threat to a judge who's handling their case?

14  A.   In other words, do I distinguish between the fair exercise

15  of first amendment rights and a direct death threat?

16  Absolutely.

17  Q.   And again, I couldn't agree more with the direct death

18  threat, if that were to be the case.  But once again, the

19  question was, do you see a difference between being in an

20  executive capacity, receiving a letter from a citizen

21  indicating he has experienced those things that are actually

22  criminal under your control as an executive?

23  A.   Well, your premise is incorrect.  As I've said on several

24  occasions, I had no authority to do what you thought I could

25  do.  And I'm not sure how I can answer your question because in

346

1  this case I had no executive authority to issue preliminary

2  injunctions and correct whatever alleged criminal acts you

3  believe were committed against you.

4  Q.   Again, I'm not trying to make this personal, so I just

5  want to clarify where this is all coming from.  If, in fact, a

6  litigant in the court moves for the clerk to enter default

7  under 18 U.S.C. 2076, if the clerk either refuses or neglects,

8  it's a crime punishable by one year in prison.

9       So the question is, and I had asked you repeatedly, do you

10  have any interaction with that or is that --

11           THE COURT:  So I'm going to interrupt you because you

12  gave a statement, which is a legal issue to start, okay.

13           MR. DOUGHERTY:  Okay.

14           THE COURT:  But you're not allowed to testify.  And,

15  you know, I've tried to make that clear for you a number of

16  times.

17           MR. DOUGHERTY:  Again, I just --

18           THE COURT:  If you want to ask a question, you may

19  ask a question to the witness.

20           MR. DOUGHERTY:  Okay.

21  BY MR. DOUGHERTY:

22  Q.   So the question is, if I understood you, you indicated

23  that you have no input relative to the conduct of the clerk

24  entering default or not entering default.  And, in fact, who

25  would be the appropriate person to refer them for criminal

347

1  sanction if, in fact, that were appropriate?

2  A.   Well, again, I'll disagree with your premise because I

3  don't know that to be the case.  But if you wanted to pursue

4  some sort of criminal action against the Clerk of Court, you

5  would go to the U.S. Attorney's office.

6  Q.   Okay.  So that pretty much addresses what my question or

7  concern was.  I was under the impression --

8           THE COURT:  I'm going to stop you.  Again, you know,

9  you're not -- what your impressions are, that's something that

10 nobody should hear.  You are acting as a lawyer right now, and

11 your job as a lawyer is to ask questions to the witness.

12           MR. DOUGHERTY:  Okay.

13 BY MR. DOUGHERTY:

14 Q.   So then in the Government's letter at 616, in fact, there

15 was reference that Keith Dougherty filed paperwork to establish

16 a militia.  And just a couple -- a few quick questions here.

17 It refers to potential outcomes being the three state court

18 judges will be executed.  And in this particular circumstance,

19 when we're talking about the content of this letter, I'm

20 assuming you are not counting yourself among the three state

21 judges?

22 A.   I did not consider myself to be one of the three state

23 court judges, I'm a federal judge.

24 Q.   And again, my intent was to --

25           THE COURT:  You can't talk about your intent.  You're

348

1   asking questions, sir.  You are not allowed to testify.
2   BY MR. DOUGHERTY:
3   Q.   Again, as Chief Judge of the Middle District of
4   Pennsylvania, as you repeatedly stated, you have no authority
5   over these cases that were supposedly improperly handled in my
6   circumstance, then, in fact, you would also not be counted
7   among the three district court judges?
8   A.   I think that was ambiguous.  I don't know if I was one of
9   those three district court level judges or not.  I assumed that
10  I was.
11  Q.   Well, I'm a little bit confused.  If you say that you had
12  no authority in any of these cases because you were a Chief
13  Judge and Chief Judges do not have the authority to do what I
14  apparently was seeking or felt that I was entitled to, how
15  could you then be one of the three circuit -- district court
16  judges who, in fact, would be the victim?
17  A.   Well, I am a district court judge.  You're threatening me.
18  You're saying that there are pending execution orders.  I'm
19  assuming that I'm one of the three district court judges or
20  magistrate judges.  I don't know who the other district court
21  or magistrate judges are because you didn't identify them.
22  Q.   Exactly.  They were not.
23  A.   I assume that, below you state, tell Caldwell, Carlson,
24  and Jones to prepare for the worst.  And in the event, their
25  execution is ordered by militia, there is no appeal.  That's a

1   few paragraphs later.

2        So in this particular instance, I don't know if those are

3   also judges that were the subject, but I assume that one or

4   more of those three judges are among the three that you plan to

5   execute.  The bottom line is, I didn't need to know who you

6   were referring to.  You issued a direct threat.  And that

7   threat was a death threat.  And because of that, I took

8   appropriate action.

9   Q.   And, again, I'm not trying to minimize that --

10             THE COURT:  Again, you can ask your question.  This

11  is not the time, and it's not appropriate for you to offer

12  testimony.

13  BY MR. DOUGHERTY:

14  Q.   Are you familiar with the *United States versus Watts* case

15  as a threat case?

16  A.   I am not.

17  Q.   And insofar as the three circuit court judges, you

18  indicate that you're not a circuit court judge either?

19  A.   I am not.

20  Q.   So that would be fair to say that, that threat wasn't

21  directed at you.  So --

22  A.   Well, the entire correspondence is directed to me.  You're

23  taking -- you're threatening the death of numerous judges if I

24  don't do what you want me to do.  And I told you before, I

25  don't have the authority to do what in this letter you're

1    asking me to do.

2         And I considered it a threat to, frankly, both the state

3    judiciary and the federal judiciary in the manner in which this

4    communication was authored.

5    Q.   And that's where I'm trying to get clarification.  You're

6    indicating you're not in a position of authority to do the

7    things that I supposedly, according to you, want to have you

8    do.  And yet at the same token, you were the target of this

9    letter in terms of the threat portions.

10        So let me ask you this question.  If you could go to page

11   9 in Government Exhibit A, 616.  There it is, yeah.  It's the

12   third paragraph down in brackets.

13   A.   See impeachment of Porteous initiated by Chief of the 5th

14   Circuit, McKee is no longer Chief and Smith is clueless.

15   Q.   So if I was sending this to you in your executive function

16   as Chief Judge, what did this, you know, poorly worded

17   paragraph say to you in terms of the action of the Chief Judge

18   of the 5th Circuit?

19   A.   It didn't have any meaning to me.  I don't know what you

20   intended by that statement.

21             THE COURT:  All right.  Mr. Dougherty, where are you

22   in terms of how much more do you have?

23             MR. DOUGHERTY:  It shouldn't be that -- too much

24   longer, but I did have to take time to go over -- is there a --

25             THE COURT:  Well, we're a little concerned about the

1  jury.  Should we try to wrap this up before we break for lunch?

2  Is that your preference?  So if you can just give me some

3  indication of how much time you think, approximately?

4          MR. DOUGHERTY:  Again, I'm in the process of going

5  over this.  I hadn't really given it a specific time amount.

6          THE COURT:  Do you think it's more like you're about

7  five minutes away?

8          MR. DOUGHERTY:  At least five, maybe, I don't know.

9          THE COURT:  Okay.  Well, if you were thinking at

10  least five, I'd say, finish up and then we'll then break for

11  lunch.  If you think you're going to be longer than five

12  minutes, then maybe we'll take a lunch break now.

13          MR. DOUGHERTY:  Maybe that would be better.

14          THE COURT:  I'm looking at the jurors, they're

15  nodding their heads.  So, yes, all right, let's take a break.

16  And I'd ask if you could aim for 1:30.  You know, it's a little

17  bit less than an hour.  We'll try to start at 1:30.  Remember,

18  you're not to discuss the case, all right.  Thank you.  All

19  right.

20          (Jury left for lunch recess at 12:32 p.m.)

21          THE COURT:  Mr. Dougherty, do you have any sense of

22  how much longer cross examination you have?

23          MR. DOUGHERTY:  Again, I was kind of caught off guard

24  by the --

25          THE COURT:  That question?

1          MR. DOUGHERTY:  As I was looking over where I was and

2  what was permitted and what was rejected, it shouldn't be too

3  much longer.  Ten minutes maybe.

4          THE COURT:  That's all?  I'm just trying to ballpark

5  it maybe.  Then, Mr. Perri, you'll be prepared to do redirect

6  and then we'll go with the next witness?

7          MR. PERRI:  Yes, Your Honor.

8          THE COURT:  Do you think you're resting today?  You

9  don't know?

10         MR. PERRI:  It's possible.  It's possible.  I'm not

11  sure -- and I don't know whether the Defendant would be

12  interested in entering that stipulation.  That would,

13  obviously, shed some time.

14         THE COURT:  Have you determined what you want to do

15  with the stipulation?

16         MR. DOUGHERTY:  I haven't reviewed it yet.

17         THE COURT:  Has it been provided to him?

18         MR. ADKINS:   It has been provided to him, Your Honor.

19         THE COURT:  When we come back from lunch, would you

20  please take a look at the stipulation?  It's regarding 2-A and

21  4-A.

22         MR. DOUGHERTY:  2-A and 4-A.

23         THE COURT:  And you got a copy of that stipulation.

24  It's pretty straight forward.  Anything else I need to attend

25  to?

353

```
 1          MR. PERRI:  Not at this time, Your Honor.

 2          THE COURT:  All right.  Mr. Dougherty, any issue I

 3   need to attend to before this break?

 4          MR. DOUGHERTY:  Pardon me?

 5          THE COURT:  Do I need to attend to any issue?

 6          MR. DOUGHERTY:  No.

 7          THE COURT:  All right.  Then we'll be back, I'm going

 8   to aim to get back right before 1:30.  Thank you, all.

 9          COURTROOM DEPUTY:  All rise.

10          (Lunch recess was taken at 12:35 p.m. and proceedings

11           reconvened at 1:33 p.m.; without the jury.)

12          THE COURT:  All ready?  Mr. Dougherty, did you get a

13   chance to review the stipulation?

14          MR. DOUGHERTY:  No, I did not.

15          THE COURT:  Okay.  Do you want to look at it right

16   now since it's in front of you?

17          MR. DOUGHERTY:  Sure.  Is it over here?

18          MR. YOUNG:  Mr. Dougherty, do you want me to confer

19   with you what it's all about?  If you want?

20          (Mr. Dougherty and Mr. Young confer.)

21          THE COURT:  Count 3 is not mentioned, it's referring

22   to Count 2 and Count 4.

23          MR. DOUGHERTY:  That's my point.  It's actually Count

24   3.

25          THE COURT:  No, Count 3 was dismissed.
```

1          MR. DOUGHERTY:  Okay.

2          THE COURT:  So this is only referring to Count 2 and

3   Count 4.  Count 3 has been dismissed.

4          MR. DOUGHERTY:  I understand that.  I find it

5   confusing as I just looked at it.  If there's only three

6   counts, and one of them is number 4, I'm concerned about that.

7          THE COURT:  I'm going to explain that to the jury.

8          MR. DOUGHERTY:  Okay.

9          MR. ADKINS:  Count 3 was dismissed.

10         MR. DOUGHERTY:  It would look badly on me that there

11  were four counts.

12         THE COURT:  No, I think because the Government raised

13  it, and the Government decided to call it Count 4, I'm willing

14  to tell the jury, if you're going to sign this stipulation,

15  I'll tell the jury that the Government moved to dismiss Count

16  3.

17         MR. DOUGHERTY:  Okay, then I'm agreeable to that.

18         THE COURT:  Okay.  Then I need you to sign it.  And

19  let's make sure it's clear because you're stipulating, which

20  means you're agreeing, you'll be bound by this, that the

21  Government and you are stipulating the following facts are

22  true.

23         First, that United States Exhibit 2-A, which is an

24  electronic e-mail communication dated March 21, 2019, and which

25  is the subject of Count 2, was transmitted in interstate

355

commerce via electronic mail.

Then the second fact is that United States Exhibit
4-A, which is an electronic mail communication dated January
22, 2020, and that's the subject of Count 4, was transmitted in
interstate commerce via electronic mail.

You'll agree to that?

MR. DOUGHERTY:  Yes.

THE COURT:  Because you have a right, you understand,
right, to demand that the Government prove that beyond a
reasonable doubt.  By stipulating to it, the Government will no
longer have to make that proof.  Do you agree to that?

MR. DOUGHERTY:  You convinced me.

THE COURT:  All right, good, go ahead and sign it --
I'm sorry, what?

MR. DOUGHERTY:  Go ahead and make them prove beyond a
reasonable doubt then.  You've convinced me.

THE COURT:  I'm not trying to convince you either
way.  What I'm saying is that I want you to make sure you
understand you have the right, if you want, to insist upon
that.  Sometimes people agree to it so they don't look like
they're objecting to something.  It's your decision, sir,
whatever you wish to do.

MR. YOUNG:  Do you want me to have a chance to talk
to Mr. Dougherty?  Just one second.

THE COURT:  Sure.

356

1          (Mr. Dougherty and Mr. Young confer.)

2          THE COURT:  Okay?

3          MR. DOUGHERTY:  So the answer is, no, I'm not willing

4   to stipulate.

5          THE COURT:  Okay.  All right.  Thank you.  All right,

6   let's bring the jury in.

7          (Jury was brought in at 1:39 p.m.)

8          **CHRISTOPHER CONNER, GOVERNMENT'S WITNESS,**

9          **PREVIOUSLY SWORN, RESUMED THE STAND**

10         THE COURT:  Mr. Dougherty, you can continue your

11  cross examination.

12         **CROSS EXAMINATION (CONTINUED)**

13  BY MR. DOUGHERTY:

14  Q.   Okay.  Not interested in being redundant, I just want to

15  clarify that I understood.  Your position is that the relief

16  that you sought -- thought that I was seeking in this threat

17  letter was something that you did not have the authority to

18  grant?

19  A.   Correct.

20  Q.   And as a result of that, you're indicating that you had no

21  control over these case assignments and, in fact, these things,

22  those issues that I had difficulty with were on autopilot and

23  they actually occurred before you took over as chief?

24  A.   No.  Actually, I think what I said was that the transfer

25  of your cases out of our district started before I became Chief

1  Judge and then continued as you continued to file cases after I
2  became Chief Judge.
3  Q.   Okay.  So that is part and parcel with what I was just
4  saying.  You did have a part to play in the transferring of the
5  cases or you did not?
6  A.   I'll just repeat what I said earlier, and that is, I
7  followed form.  Judge Kane started this process.  I'm assuming
8  she contacted, I don't know because I haven't spoken to her
9  about it, but she would have had to contact the Chief Judge of
10 the Circuit, who at that time was Chief Judge Ted McKee.
11      When I became Chief Judge, Judge Ted McKee was still in
12 his term as Chief Judge, so I would have contacted him
13 initially, and after that, I would have contacted Chief Judge
14 Brooks Smith and requested that your case be transferred to a
15 judge out of district.
16      And at that point, it's the Chief Judge who takes the ball
17 and runs with it, and the Chief Judge is the one who actually
18 affects the transfer.
19 Q.   Okay.
20 A.   And I have no control as Chief Judge over where that case
21 goes once I request an out of district transfer.
22 Q.   That's --
23 A.   I don't ask for a particular judge.  I wouldn't think to
24 ask for a particular judge.  It just is up to the discretion of
25 the Chief Judge in the Circuit.

358

1  Q.   Are you familiar with the standard of, you know, due

2  process articulated in *Marshall versus Jerrico*?

3  A.   I'm familiar with the process of due process.  I'm not

4  sure I remember the particular facts of the case that you just

5  cited.

6  Q.   Would it be out of line for me to say, maybe if I were to

7  tell you that it cites *Carey versus Piphus* being due process is

8  absolute --

9             MR. PERRI:  Objection, Your Honor.

10             THE COURT:  What's the relevance?

11             MR. DOUGHERTY:  Is it -- is it fair to say that

12  you're --

13             THE COURT:  Not a question.  What's the relevance to

14  the question?

15             MR. DOUGHERTY:  Oh, what's the relevance to the

16  question?

17             THE COURT:  Yes.  Why are we asking this witness?

18  We're not here for a legal education of the jury.  What is the

19  purpose of your question, sir?

20             MR. DOUGHERTY:  To attack the unconstitutional

21  process that he was part of regarding the transfer of the case.

22             THE COURT:  That's irrelevant.  That's irrelevant, so

23  the objection is sustained.

24  BY MR. DOUGHERTY:

25  Q.   So then the next issue I was concerned with.  Have you as

359

1  a judge in federal criminal proceedings, had cases where a

2  defendant actually made some sort of self defense claim?

3  A.   It's rare.  I am trying to think.  I don't recall a

4  specific case where self defense was raised.

5  Q.   But is it possible in federal court?

6  A.   Oh, absolutely.

7  Q.   Have you encountered a case where, in fact, someone made a

8  claim of a lesser of evils defense?

9           MR. PERRI:  Objection, Your Honor.

10          THE COURT:  Sustained.  I don't know any relevance to

11  the -- frankly, the last two questions are irrelevant to this

12  case and, in fact, they're the subject of a motion in limine.

13  So move on.

14          MR. DOUGHERTY:  Okay.

15  BY MR. DOUGHERTY:

16  Q.   So do you recall *Rhino versus Berg Manufacturing*?

17          THE COURT:  Sustained, unless you got a reason.  Why

18  are you asking this witness?  I've already explained we are not

19  here to spend hours going over a history of all the United

20  States Supreme Court decisions.  What is the purpose of your

21  question, sir?

22          MR. DOUGHERTY:  That was a decision that Justice --

23  Judge Conner wrote in 2007.

24          THE COURT:  So why do you want to ask him about that

25  case?

360

1          MR. DOUGHERTY:  Because it's similar in the

2    circumstance that I'm facing.

3          THE COURT:  You can ask the question.  Let's see.

4    BY MR. DOUGHERTY:

5    Q.   Do you recall the *Rhino versus Berg* manufacturing opinion?

6    A.   I don't recall it specifically.  I've written thousands of

7    opinions.  I remember the name, but I don't remember the facts

8    of that particular case.  If you want me to review it, I'd

9    appreciate a copy of it.

10   Q.   I don't have the ability to bring a copy to you.

11   A.   Okay.  So the answer to your question is, I don't recall

12   the specifics.

13   Q.   Okay.  In the -- in one of the quotes that, in fact, you

14   were questioned by the prosecution, you made reference to my

15   paragraph on page 10 indicating that the common law is

16   protected, he is not protected by the common law.  And you

17   indicated that that was some sort of concept that I had made

18   up, I believe is what the response was.  Is that true?

19         MR. PERRI:  Objection.  I think that's a

20   mischaracterization.

21         THE COURT:  I'm going to -- I'll overrule the

22   objection.  I mean, again -- so to both sides, in terms of

23   characterization of a question, what the lawyer says is not

24   evidence.  What the lawyer says is just a question.  All right.

25   So go ahead.

1          THE WITNESS:  I don't believe I said that the common
2  law was made up.  I said, your version of what you believed the
3  common law to be and what your rights to be is a mish mash at
4  least in this communication to me; biblical verses, quotes of
5  certain cases, and other material that you've prepared.
6  BY MR. DOUGHERTY:
7  Q.   So is it fair to say that you reject the idea that this
8  communication has any first amendment protections?
9  A.   That's not what I said.
10 Q.   I don't mean to put words in your mouth, I'm trying to get
11 clarification.  If, in fact, I were to say to you that in your
12 executive capacity as a petition for redress, would you say
13 that you disagree with that characterization or there's no
14 possibility of that?
15 A.   Well, I can't separate from your communication that
16 threats of death that are contained in it.  Now if you are
17 asking me, if you didn't have those threats in it, would you
18 have the ability to use profanity or get angry in your words?
19 The answer is, yes.
20      But what you cannot do is, you cannot communicate a direct
21 threat to a federal judicial officer, in this case, multiple
22 federal judicial officers.  That is not protected by the first
23 amendment.
24 Q.   So you indicate that each of these communications are, in
25 fact, a completed, you know, something that is actually being

1  threatened as actionable right now, this is what's going to

2  happen?

3  A.   I don't understand your question.

4  Q.   Again, these statements are made in conjunction with the

5  concept of if, in fact, the crimes continue, even though you

6  disagree with my characterization of crimes, the only option

7  left would be to have -- to take some other action on the

8  conduct of the subject judges to prevent further crimes from

9  being committed.  Is that something that you would reject?

10  A.   I think you're testifying.  That's not my perception of

11  this communication.  I view it as a straight-up threat.

12  Q.   Again, I'm not disputing the fact that you view it as a

13  threat, but once again, where is the immediate action that's

14  dictated in this sentence where, in fact, it gives order of

15  preliminary injunctive relief or must enter default -- as being

16  the action that was suggested for you to take?

17  A.   What the specific threat is on this page is in the

18  preceding paragraph where you say you filed the paperwork to

19  establish a militia and at the appropriate time --

20  Q.   No.

21        THE COURT:  Excuse me, you need to let the witness

22  finish his answer.  You asked a question.  He's answering.

23        THE WITNESS:  And at the appropriate time will order

24  the death of -- and then you list the method by which you are

25  going to execute, or your militia is going to execute, the

363

1   state court judges, which is different from the district court

2   judges, and different, again, from the circuit court judges.

3          And your next paragraph that you're referring to is

4   in the alternative, I can do X, Y, and Z, what you believe

5   you're entitled to receive, which I obviously disagree with.

6   BY MR. DOUGHERTY:

7   Q.   And I think you made that clear.  So are you saying that

8   there is no possibility that 18 U.S.C. 2076 would be applicable

9   in your cases?

10  A.   I don't understand the question.

11  Q.   18 U.S.C. 2076 is when the clerk is required by law to

12  enter something into the docket, whatever that might be.  And

13  if they don't do it, it's a crime.  Are you saying that's not

14  possible in your cases?

15  A.   I'm not saying that.

16  Q.   Pardon me?

17  A.   I am not saying that.

18  Q.   Okay.  And then if, in fact, they were required by law to

19  enter default and then, therefore, you had no tribunal

20  jurisdiction, would that not constitute a further crime or

21  actually a civil conspiracy where you're allowing them to

22  commit a crime because you don't like the litigant?

23  A.   Again, I don't understand your question.  What are you

24  referring to?  In this particular sentence, you state, In the

25  alternative, Satanopher Conner can order a preliminary

364

1   injunctive order related to must enter default and person

2   related to 28 U.S.C. 1654 under WRTL strict -- strick scrutiny.

3   I think you mean strict scrutiny.

4        And what you're referring to there doesn't make a lot of

5   sense to me.  I don't know what my alternative was.  My

6   interpretation of that language is for me to right the wrongs

7   that you believe you suffered in cases other than ones that

8   were before me.

9   Q.   And in the case that was before you, the 18 -- excuse me,

10  13-CV-857, in fact, I did move for default.  And you said that

11  Magistrate Blewitt acted independently.  Then following that,

12  there was a mandamus filed compelling him to enter default.

13  Let me ask you this.

14             THE COURT:  Wait, wait.  That was testimony.  So I

15  thought -- I was giving you leeway because sometimes you might

16  have a question, isn't that true.  But you didn't ask that, you

17  just testified.  So I'm going to strike that from the record.

18  And if you want to ask a question, you can.

19  BY MR. DOUGHERTY:

20  Q.   So the effort on my part to have default entered in the

21  case of *Keith Dougherty versus Carlisle*, which would have paid

22  me a million dollars, and at that point Magistrate Blewitt

23  chose to intervene without tribunal jurisdiction, is there any

24  supervisory responsibility on your part because of him being an

25  inferior constitutional officer?

365

1           THE COURT:  I'm going to strike that question from

2    the -- it's not a question.  I'm going to strike that statement

3    from the record.  You're to ignore it, members of the jury.

4    Mr. Dougherty is not allowed to testify.  He is solely to act

5    as a lawyer, a pro se lawyer.  So I will strike that from the

6    record.  If you want to ask a question, you may.

7    BY MR. DOUGHERTY:

8    Q.   The question that I have is, with the circumstances you

9    had indicated earlier, you had indicated that, once again, I

10   may have misunderstood, that these things were happening

11   without your direct involvement, that it had happened

12   beforehand, and, in fact, they were being assigned

13   automatically without bias towards me or anyone else when, in

14   fact, the first case was first entered -- default was entered,

15   and then it got transferred, you said you have no

16   responsibility or involvement in that particular circumstance.

17   Correct?

18   A.   Are you referring to a case that was before me or some

19   other case?

20   Q.   13-CV-857 was actually under your supervision.

21   A.   Okay.

22   Q.   That Magistrate Blewitt had taken action on without any

23   authority to do so.  And then after that, it was transferred.

24   So you're indicating that you had nothing to do with that or

25   that was something that was happening before you actually

366

1  became Chief, and even though the case was assigned to you, you
2  really had no part in that transfer?
3  A.   Well, I don't agree with your premise, which is that Judge
4  Blewitt acted without authority.  I don't know the details of
5  what he did, and I'd have to study it, but my belief is that
6  our former Magistrate Judge Thomas Blewitt knew his
7  jurisdiction pretty well, and I don't believe he acted without
8  authority.
9      But if he did, your right is to file objections to
10 whatever order he issued and ask for a review.  And that I can
11 do as the Article III judge assigned to a matter that has
12 pretrial management with a magistrate judge.  So there was an
13 opportunity for you to bring it before me, but it never got to
14 me.
15 Q.   And the -- that's what my question is because by the time
16 it got to that process, it was then transferred to the Eastern
17 District of Pennsylvania.  So it would never have been -- it
18 would never have come back --
19 A.   It would have nothing to do with the merits of whatever
20 you're discussing.  That was done, as I said, many times
21 because of the manner and number of lawsuits that you filed
22 within our district and the arising of conflicts by the judges
23 who were presiding over those cases.
24 Q.   The case that you are referring to was, in fact, early on
25 in my history with you.  Now is it true --

1  A.   I'm sorry, what are you referring to?  What page?

2  Q.   13-CV-857.  You're acting like that was late in the

3  process when all these other issues were backing up, so let me

4  --

5         THE COURT:  So I'm going to strike that from the

6  record because that's testimony and it's not permissible.  And

7  we do need to -- we're going over territory again and again.

8  It's repetitive.  So as a matter of case management, I'm going

9  to ask you to, if you have any questions on new topics that you

10 wish to put to this witness, you may.  But we need to be

11 mindful of the time.

12        MR. DOUGHERTY:  Okay.

13 BY MR. DOUGHERTY:

14 Q.   So taking back the good guidance.  Are you familiar with

15 the most recent case out of the Middle District of Pennsylvania

16 with regard to some of the issues *Nick versus Township of*

17 *Scott*?

18 A.   *Nick versus Township of Scott*?  Can you give me a context?

19 You have to understand, I have read tens of thousands of cases.

20 I remember cases by virtue of their facts not their names.

21 Names tend to be very similar.  Do you know the number of U.S.

22 v. Jackson cases or U.S. v. Smith cases there are?  So I

23 remember facts, I don't remember case names unless it's one of

24 mine that I'm very familiar with.

25 Q.   It was a case involving a just compensation claim that, in

368

1  fact, was dismissed relative to state exhaustion that was then

2  reversed by the Supreme Court as of June 21st, 2019?

3  A.   Was this a personal property as opposed to real property

4  just compensation?

5  Q.   No, it was actually a municipal created easement on

6  property.  And it was dismissed on the two-prong dismissal,

7  that you had to --

8            THE COURT:  All right.

9            MR. PERRI:  Your Honor, I ask that the witness be

10  required to proffer the relevance.

11            THE COURT:  I agree.  I was about to ask.  Thank you,

12  Mr. Perri.  Why is this line of, I wouldn't call it

13  questioning, but this line of discussion relevant?

14            MR. DOUGHERTY:  Again, the constitutional question of

15  fifth amendment and the concept that the Middle District of

16  Pennsylvania, in fact, was reversed by the Supreme Court --

17            THE COURT:  Courts get reversed all the time, Mr.

18  Dougherty.  I've been reversed.  It happens.  That's why we

19  have a system of justice that has appellate review.  Why is

20  that relevant to this dispute?

21            MR. DOUGHERTY:  If, in fact, the question is about

22  the same due process clause and its timeliness, I thought it

23  would be relevant to these characterizations of a petition for

24  redress being sent to the chief executive of the Middle

25  District of Pennsylvania whereas they are not --

369

1          THE COURT:  That seems to me not to bear at all on

2   that particular topic, so I'm going to sustain the objection.

3   BY MR. DOUGHERTY:

4   Q.   So wrapping up then, I guess.  The concept of Rule

5   60(b)(4), have you had experience with indicating challenges

6   based on an Order of Court that, in fact, is void on its face?

7   A.   I've had motions under that rule, yes.

8   Q.   And do you think that's a valid and proper procedure in

9   circumstances where, in fact, tribunal jurisdiction is invalid?

10          THE COURT:  I'm going to sustain -- there hasn't been

11   an objection, but this is irrelevant, and I'm not going to

12   permit this line of questioning.

13          MR. DOUGHERTY:  Okay.

14          THE COURT:  You want to make a proffer as to why this

15   is relevant, I'll listen.  Why would it be relevant to this

16   matter?

17          MR. DOUGHERTY:  I'm trying to establish the

18   constitutional protection related to the communication that was

19   sent as a petition for redress as opposed to a direct threat.

20          THE COURT:  Okay.

21          MR. PERRI:  Your Honor, that's a legal matter and

22   it's also the subject of a motion in limine.

23          THE COURT:  Right.  So I'll sustain the objection.

24   BY MR. DOUGHERTY:

25   Q.   So constitution protections are being frame lined --

1            THE COURT:  And I'll strike that, and I'll actually

2    make a comment about it.  I have extended you so much in the

3    way of leeway over the past two days and will continue to do so

4    to ensure that your constitutional rights are protected.  The

5    question you want to ask has no bearing on a legally relevant

6    issue for this jury.  So I will sustain it and I will strike

7    it.

8    BY MR. DOUGHERTY:

9    Q.   So the concept of the notice that's been characterized as

10   some sort of ominous direct threat makes reference to the

11   Supreme Court case *Florida versus Jardines*.  Are you familiar

12   with the concept and character of the case that is referenced

13   in the Government's Exhibit 621, *Entick versus Carrington*?

14   A.   I'm reading that page now.  My recollection is that

15   *Florida v. Jardines* had to do with a dog sniff on a porch and

16   whether or not that was considered a search under the fourth

17   amendment.  I believe that's the *Florida v. Jardines* case.  Am

18   I correct?

19   Q.   Yes.

20   A.   All right.  So I'm not sure if I've answered your

21   question, but I'm familiar with the concept of dog sniffs and

22   the extent to which you need a warrant.

23   Q.   Then I apologize for the confusion of the question.  I was

24   asking whether you are familiar with *Entick versus Carrington*.

25   That was a common law case from 1765.  It's referenced in the

1  opinion.

2  A.   I am not familiar with that case.  That looks to have

3  pre-dated the constitution.  It looks like it was in 1765, if

4  your citation is correct, and I don't know it to be, so the

5  short answer is, no, I'm not familiar with it.

6  Q.   And would it be inappropriate to ask that, are you

7  familiar with the Pennsylvania Constitution adopting that as

8  the basis of what we operate onto this day?

9           MR. PERRI:  Objection as to relevance, and it's the

10  subject of a motion in limine.

11           THE COURT:  Well, I don't have the document in front

12  of me.  Is there a reference in the notice?  I mean, I

13  permitted the question as far as the case because my

14  recollection is it's in the notice.  Is there a reference in

15  the notice?  Does somebody want to put it up on the screen for

16  me?

17           THE WITNESS:  I don't believe there is any reference

18  in the notice to the Pennsylvania adoption of this, but --

19           MR. DOUGHERTY:  Oh, no, it's --

20           THE COURT:  Just hold on.  Give me a second, please.

21  I'm going to sustain the objection.  There's no reference to

22  the Pennsylvania adoption of this, and, therefore, it's

23  irrelevant.

24  BY MR. DOUGHERTY:

25  Q.   The question I had was, were you aware that Pennsylvania

372

1  adopted that case?

2          THE COURT:  And I'm going to sustain that objection.

3  That is subject of a matter that was addressed by me before the

4  Court after extensive argument, so I'm not going to permit the

5  question.  You asked if it is an inappropriate question, the

6  answer is, it is.  So you need to move on.

7  BY MR. DOUGHERTY:

8  Q.   Okay.  Again, back to the topic that I had addressed

9  prior.  On page 1, it specifies a well-regulated militia being

10 necessary.  Do you feel that a militia or even organizing a

11 militia is in some way threatening?

12 A.   Out of context, no.  In context, very much so.

13 Q.   And do you believe in the concept that Heller suggested

14 that a militia is all able-bodied men?

15 A.   I'm sorry, I don't understand your question.  I'm not sure

16 what that has to do with this particular correspondence.

17 Q.   Again, the concept being that the characterization of it

18 as being a threat as opposed to all able-bodied men cannot be a

19 threat.  Are you familiar that that was the characterization of

20 Heller -- *DC versus Heller*?

21 A.   I'm not familiar with the specific facts of that

22 particular case.  If you have it, and you want me to read it,

23 I'll look at it.  But in the context of this communication, it

24 was very clear to me that you were creating the militia, it was

25 your militia, and it was abiding by your orders.  That was my

1  perception.  And I think that was appropriate given the entire

2  reading of your threat.

3  Q.   And if, in fact, the militia has as its corporate charter

4  preserved the common law for all individuals as well as owners,

5  would that change your understanding of the militia that I'm

6  referring to?

7  A.   I have no idea what militia you're referring to, and the

8  militia retaining common law sounds to me like you're acting

9  outside the confines of the rule of law and in a vigilante

10 sense.  So, to me, that probably would not change my view at

11 all.

12 Q.   So do you feel that clerks actually could be cited for a

13 crime as a theoretical?

14 A.   Okay, you're switching gears.  You're talking about Clerks

15 of Court?  Clerks of Court have certain statutory duties and

16 responsibilities.  There are statutes that contain criminal

17 sanctions if Clerks of Court do not do what they're statutorily

18 required to do, that is correct.

19 Q.   Okay.  And would you be able to characterize for the jury

20 what a mandatory claims processing rule is?

21 A.   In what context?  Mandatory claims processing in what

22 manner?

23 Q.   In the manner established by the Supreme Court --

24        THE COURT:  I'm going to interject.  Why is this

25 relevant?

374

1          MR. DOUGHERTY:  Again, relative to the concept of

2   crimes being committed or not.

3          THE COURT:  On the basis of that proffer, I'm going

4   to strike the question and ask you to move on.

5   BY MR. DOUGHERTY:

6   Q.   Are you familiar with the *Horne versus Department of*

7   *Agriculture* case that's mentioned in the communication?

8   A.   I am.

9   Q.   You are.  And that does, in fact, address constitutional

10  protection of personal property.  Are you familiar with that?

11  A.   It had to do with raisin growers, I believe, in

12  California.

13  Q.   Exactly.  That was characterized as personal property and

14  just compensation applies to personal property as well as real

15  property?

16  A.   Subject to a taking, yes.

17  Q.   Yes.  And what amendment would you suggest protects the

18  right of someone to choose their attorney?

19          MR. PERRI:  Objection, relevance, Your Honor.

20          THE COURT:  Yeah, I'm going to sustain that.  It's

21  beyond the scope of the direct examination.  And it also, I

22  would say, under Rule 403 and Rule 402, for that matter, it's

23  inadmissible.

24  BY MR. DOUGHERTY:

25  Q.   Okay.  Could I bring up 611 quickly and highlight the

1  paragraph at Number 4 through 7?

2  A.   Would you like me to read it?

3  Q.   Yes.

4  A.   He is giving -- I am going to tell you right now, he is

5  under investigation for unauthorized practice of law.  Mr. Runk

6  is seriously in jeopardy from this advice.  This motion is, I

7  mean there is spelling errors in it.

8  Q.   Okay.  And the concept being that would you characterize

9  assignment as being engaged in the unauthorized practice of

10  law?

11  A.   Context is everything.  The mere assignment of a contract?

12  I guess under certain circumstances, that would not be the

13  practice of law; in certain circumstances, I think it probably

14  would be.

15  Q.   Could you elaborate on that, please?

16  A.   Well, I can envision a group of contractors getting

17  together organized for purposes of building a hunting cabin,

18  and having one guy say, I just can't complete this job, I'm

19  gonna let my buddy take over.  That technically, I think, would

20  be assignment of a contract.  But that's certainly not the

21  unauthorized practice of law.

22       If you are organizing in a written fashion some sort of

23  clear contract assigning certain rights that you want to be

24  enforceable in court, and you're giving advice about that

25  assignment, then I think, and legal advice about that

376

1  assignment, then I think that would be the unauthorized

2  practice of law or at least potentially would be.  So it has to

3  do with the rendering of both the skill and the advice.

4  Q.   Okay.

5  A.   As opposed to simply taking over somebody else's job or

6  contract.

7  Q.   And, in fact, one of the -- are you familiar that in the

8  Supreme Court case involving Sprint versus the aggregators, one

9  of the defining factors whether something was -- you are hiring

10  an attorney and whether or not it was an actual assignment was

11  based on whether judgment creditors could attach it.  Are you

12  familiar with that concept?

13  A.   No -- well, I am familiar with a lot of the concepts

14  you're mentioning, but in the particular context of the case,

15  no, I'm not intimately familiar with that decision.

16  Q.   Okay.

17           MR. DOUGHERTY:  So in that, I will end my cross

18  examination.

19           THE COURT:  All right.  Thank you very much.  Any

20  redirect?

21           MR. PERRI:  No, thank you.

22           THE COURT:  All right.  Thank you very much.

23           THE WITNESS:  Thank you.

24           THE COURT:  Next witness.

25           MR. ADKINS:  Your Honor, we would call Michael

1    Corricelli.

2         **MICHAEL CORRICELLI, GOVERNMENT'S WITNESS, SWORN**

3         COURTROOM DEPUTY:  Just state your name and spell

4    your last name for the record.

5         THE WITNESS:  Good afternoon.  My name is Postal

6    Inspector Michael Corricelli.  And I spell it

7    C-O-R-R-I-C-E-L-L-I.

8                   **DIRECT EXAMINATION**

9    BY MR. ADKINS:

10   Q.   Mr. Corricelli, where are you currently employed?

11   A.   I'm with the United States Postal Inspection Service

12   stationed here in Harrisburg, Pennsylvania, sir.

13   Q.   How long have you been employed with the Postal Inspection

14   Service?

15   A.   I've been a federal law enforcement officer for just over

16   28 years, and I've been with the Postal Inspection Service for

17   the last almost 21.

18   Q.   I guess describe for the jury your role with the Postal

19   Inspection Service?

20   A.   Yes, sir.  For a lot of people that don't know what the

21   Postal Inspection Service is, if you haven't seen our movies

22   and TV shows, we are the federal law enforcement arm of the

23   Postal Service.

24       Ben Franklin created the Postal Service back

25   pre-Revolutionary War.  A week later, people started stealing

378

1  from it.  So we hired guys to protect the Postal Service, and
2  that's what we've morphed into.  There's about 1250 postal
3  inspectors across the United States.  And we are federal law
4  enforcement officers, federal agents just like FBI or DEA.
5      But our task is to protect the United States Mail, the
6  mail system, the postal employees and its customers from
7  criminal use.  And that's what we do.  We protect the mail as
8  best we can from any type of crime.
9  Q.   And that includes mailing certain types of communications,
10 what is the subject of this case?
11 A.   Yes, sir, that's correct.
12 Q.   And how did -- speaking of this case, how did the
13 information associated with the investigation of Mr. Dougherty
14 come to you?
15 A.   In early May of 2017, I received a telephone call from an
16 FBI agent -- I believe he was a task force officer named Hugh
17 Erhart.  I work with the FBI rather frequently.  We deal with
18 these cases as well as a multitude of other issues involving
19 mail.
20     I got a call saying that one of our judges, Judge Conner,
21 had received a written death threat through the mail.  I asked
22 him if he would be so kind as to send me the envelope, and then
23 I was able to use my tools to dig into it.
24 Q.   Do you remember about when this call from Mr. Erhart came
25 to you?

1  A.   I believe it was May 12th, 2017, sir.

2  Q.   And based on the referral to you, was it your

3  understanding that there was a threat and it was your -- what

4  was your role into investigating it?

5  A.   Yes, sir.  As a postal inspector, we are postal employees,

6  right.  We do not receive tax dollars like most agents.  Our

7  pay and our revenue source operating budget comes from postal

8  revenue.  So as such, I have access to all of the postal

9  services or a great portion of the postal services records

10 regarding the flow of mail, understanding how mail flows from

11 one point to the other, and access to internal records related

12 to that mail flow.

13     So in cases like this, what I do is I use the tools I have

14 access to by virtue of my employment that the average agent or

15 average person doesn't have.  And we dig into things.  For

16 example, to make sure it actually went through the mail.  We

17 occasionally get calls from people saying, hey, you know, this

18 guy got a package mailed to him, and we look and we find out

19 it's FedEx or UPS.  And we do not have jurisdiction over those

20 items, we have jurisdiction over United States Mail.

21 Q.   In connection with the referral or phone call to you about

22 this case, did you receive anything in particular that, I

23 guess, helped you further the investigation?

24 A.   Yes, sir.  The FBI had sent me a digital image of the mail

25 piece.  And with that, I was able to actually start digging

1  into it.

2  Q.   And were you specifically asked whenever you received this

3  to do anything in particular?  Did you act on your prior

4  experience in these types of investigations?

5  A.   Yeah.  The -- basically the FBI just asked me, hey, can

6  you do what you do best and get us information on it.  So based

7  on my experience, I just started working up, just like I would

8  any other suspicious mail item.

9  Q.   If we could, I'd like to bring up what has previously been

10  admitted as Government Exhibit 1-A.

11  A.   Yes, sir.

12  Q.   And first of all, this has previously been admitted, but

13  are you familiar with this exhibit?

14  A.   Yes, sir, I am.

15  Q.   And how are you familiar with it?

16  A.   This is specifically an image I pulled.  So the original

17  image I got from the FBI was a photograph of the actual mail

18  piece that Judge Conner received.  This image that I'm looking

19  at is one I was able to pull up from postal records, which had

20  a little bit more detail than the original.

21      The original piece had been opened by somebody, I don't

22  know if it was Judge Conner or one of his -- I would expect it

23  not to be the judge, it would probably be one of his clerks or

24  assistants.  And it was missing some of the information at the

25  top.

381

1       So just for background, when the Postal Service processes
2   certain kinds of mail, it's all automated.  There's very few
3   employees actually handling piece to piece.  A lot of them go
4   on to different computerized machines and trackable mail, like
5   Priority Mail in particular, goes through one machine, and as
6   it goes through, a computer takes an image of it and it tells
7   it, hey, where it goes, where it goes to the next step, and
8   then it gets sorted and sorted and sorted.
9       This is an image that the computer that postal would have
10  had when it was processed, this is the image they would have
11  had.  Understand that like here in Harrisburg, we have a
12  processing facility.  They get about 25,000 pieces of mail per
13  day.  So these records don't last forever.  We get about a
14  60-day to 90-day retention, and then the server fills, and it
15  purges.  But I was able to pull this image based on the image
16  the FBI gave me.
17  Q.   At that point in time, would it be fair to say, or I'll
18  let you say it, was this image flowing through the mail at this
19  point in time when this picture was taken?
20  A.   Yes, sir.  This would have been processed through one of
21  the machines that specifically does Priority Mail.  And I know
22  based on the tracking number, not to mention the envelope says
23  Priority Mail, that's kind of our fist clue, but the tracking
24  number, which is on the lower left-hand corner that starts 9505
25  and then ends in 105220, that is a Postal Service issued

1    tracking number for priority type mail.

2    Q.   And with respect to other items on this envelope, I guess

3    we'll first start with something that may be unique to what you

4    all do at the Postal Service.  The top right-hand corner where

5    the postage has the dollar amount, if we could highlight that.

6    What is the significance and what does, in your capacity, what

7    do you get from this information?

8    A.   This is actually really important to us.  There's certain

9    ways mail gets into the mail stream, right.  If you go to the

10   post office, and you present the window clerk a letter, a box,

11   an envelope like this, you have to pay for it.  And usually you

12   can pay in cash, debit card, credit card, or if you have an

13   account with one of the services like stamps.com, indicia.com,

14   or there's one more, I can't recall, I'm sorry, but you can

15   create postage on your own if you have already paid for a

16   meter.

17        So what a lot of businesses do is they will have a meter

18   that they rent basically from like stamps.com.  They use a

19   credit card to obtain it.  And then they can print postage at

20   their office or their home.  This shows me that this was

21   someone's meter from stamps.com and that the meter is tracked

22   back to 17112, which is a Harrisburg address, that's the

23   Harrisburg -- one of many Harrisburg zip codes, that it was

24   printed on May the 6th, 2017.  And more importantly, on the far

25   right side, you'll see a series of digits that go vertically

383

1  from top to bottom.

2  Q.   I just highlighted a portion of that.

3  A.   Yes, sir.

4  Q.   Is that what you are referring to?

5  A.   Yes, sir.  I think we just lost it, but -- that series of

6  digits.  We can take that series of digits, and we have

7  something called the national meter tracking system that we

8  have access to, and we can plug that in and see who actually

9  owns or has access to that meter.  And I did that.

10 Q.   Okay.  And when you did that, what kind of information did

11 you get?

12 A.   It came back to Mr. Dougherty.  And I believe he had an

13 insurance company at the time.

14 Q.   And was there an address associated with that?

15 A.   Yes, sir.  I'm not sure if it was a Harrisburg address, I

16 believe it was Manada Hill address, or it might have been South

17 Black Horse Pike, Number 113, I can't recall which one the

18 meter actually came back to.  But it was Mr. Dougherty at that

19 address.

20 Q.   And something I was going to get to in a minute, but I

21 will ask now because I think it might be relevant.  Did you ask

22 anybody within the Postal Service that would be delivering mail

23 to a residence that would be associated with Mr. Dougherty

24 anything about any mailings or the residences that may be

25 associated with him?

384

A.   Yes, sir.  Prior to doing that though, obviously we've got
the return address on this envelope.  I was able to pull up
that return address, the 1134 South Black Horse Pike, Number
113, in Blackwood, New Jersey, and I was able to determine that
that address is actually a UPS store.

There are what we call commercial mail receiving agents
all around the country.  If you don't want to get mail at your
house, and you don't want to have a post office box, you could
pay for a mail location like a UPS store, there's other
companies that do it, UPS is famous for it though, and what you
can do is you just pay a fee and they become your authorized
mail receiving agent.

In order for them to receive your mail though, you have to
complete a postal form, I believe it's a postal form 1583, that
authorizes the Postal Service to deliver your mail to this
location and it authorizes that location to receive mail for
you.

I did obtain a copy of that application, that postal form,
and it did have Mr. Dougherty's name, his driver's license
number, a copy of his driver's license, and a physical address
of Harrisburg, PA, a Manada Hill address.  I don't recall the
actual numbers off the top.

But based on that information, I called the Postal Service
representatives responsible for mail delivery to that Manada
Hill address, and they said that a Keith, and I don't recall a

385

female name, but another Dougherty had been receiving mail
there, but it appeared as if they hadn't received mail in
approximately one month.

       There was mail flowing out of the box, and they stopped
delivering it and were returning the mail because it just
wasn't being picked up.  But previously, Mr. Dougherty had
received mail at that Harrisburg address.

Q.   Just to break that down just a couple of those points just
real quick?

A.   Yes, sir.

Q.   That application for this box number 113, as you
described, is that something where Mr. Dougherty would have to
be in person with his driver's license and other information in
filling out that application before he could get it?

A.   I believe so, yes, sir.

Q.   If we could go to the envelope in its entirety, to part
here?

              THE COURT:  Just give me a second here, I want to
make sure --

              (Pause.)

              A JUROR:  Sorry about that.

              THE COURT:  That's okay.  This is a little bit --
sometimes we have some tedious -- do you want to stand up -- do
you just want to all stand up for five seconds and make sure
everybody can get through the afternoon.

386

1                    (Jurors stood momentarily.)

2                    THE COURT:  All right.  I think we'll all be better

3      for that.  Thank you.  Go ahead.

4      BY MR. ADKINS:

5      Q.   Maybe self-explanatory, but the individual who this --

6      this envelope was addressed to was who?

7      A.   Chief Judge Conner.

8      Q.   And that address as we see there, 228 Walnut Street here

9      in Harrisburg, PA?

10     A.   Yes.

11     Q.   Is that this building?

12     A.   That is this building, yes, sir.

13     Q.   And, in fact, do you know Judge Conner's chambers to be

14     across the hallway?

15     A.   I am very familiar with it, yes, sir.

16     Q.   With respect to, I think you might have mentioned it, the

17     date that it was mail.  I guess can you tell from this envelope

18     the date by which this would have been mailed?

19     A.   So I cannot.  What I can tell you is the date the postage

20     was printed was May the 6th, 2017.  That's not necessarily the

21     same date as it entered the mail stream because a person could

22     be at home working on a weekend, they could print the postage,

23     affix it to the envelope, but not actually drop it off or

24     present it to the Postal Service.  So that would be maybe the

25     right date, but we're not confirmed on that.

387

1        But what I was able to do is by taking that tracking
2   number, that 9505 all the way down to 20 on the bottom right
3   corner, we have a system called product tracking and reporting
4   or PTR.  And PTR is an internal system that postal uses to see
5   where something entered the mail stream all the way up to the
6   point it was delivered.

7        So the way the Postal Service works, we have post offices,
8   we have 64,000 post offices across the United States.  Say you
9   live in Hershey.  You present something to the Hershey post
10  office for delivery to Alaska.  It's not going from Hershey
11  straight to Alaska, it goes to a regional processing center and
12  then it goes to a regional processing center in Alaska and then
13  to a post office in Alaska and then for delivery.

14       This particular piece shows it was accepted at the
15  Blackwood, New Jersey, post office on May 16th, 2017.  I
16  believe it was around 10:12 roughly a.m.  From there, once it
17  was accepted, it went to the next big processing center, which
18  is in Lindberg Av, which is in Philadelphia.

19       From there, it went to the Harrisburg processing center.
20  From Harrisburg, it went to the Harrisburg post office specific
21  that delivers to this building and then delivered here.
22  Q.   I think when you mentioned that it was received in New
23  Jersey, what was the date that it was received?
24  A.   I believe it was May the 6th, 2017.
25  Q.   Okay, I just wanted to clarify that.

388

1  A.   Yes, sir.

2  Q.   That was going to be my next question.  Based off

3  information you can get from this envelope, did you determine

4  which exact post office it was -- it originated from?

5  A.   Yes, sir.

6  Q.   And did you do some investigation at that post office with

7  respect to identifying who may have brought this item in?

8  A.   Yes, sir.  One of the things we do is, once we identify

9  which post office that it was actually mailed from, we want to

10  routinely, as part of our investigation, we want to see did the

11  person mail something else.

12      I spent about 17 years doing bomb and haz mat work where

13  people send anthrax threats and powders and liquids, so we're

14  pretty good at this at this stage.  Not great, but good.

15      One of the things we look at, we use postal records to see

16  what else was mailed at the same time that this particular

17  piece was.  And what we were able to tell was that four other

18  mail pieces were submitted at the same exact time.  And one

19  thing we also found was that the individual that mailed these

20  pieces also purchased, I believe, it was like 95 cents in

21  postage and used a debit card to do that.

22      The other thing we found out was sadly not every post

23  office in America has cameras.  It's just a financial issue

24  based on risk analysis.  This particular post office does have

25  a surveillance camera system, so I reached out to our

389

1  specialist in Philly.  He's a security specialist.  And I was

2  able to obtain surveillance video of May the 6th, 2017, at

3  approximately this time.

4  Q.   And with respect -- before we get there, with respect to

5  the four other mailings, do you know who they were addressed

6  to?

7  A.   I do, sir.  I was able to -- the same system I used to get

8  this first image, I was able to pull up images of those mail

9  pieces as well.

10  Q.   Where were they mailed to?  Can you describe that?

11  A.   Yes.  Two were to, I believe, the prothonotaries; one in

12  Cumberland County, and I can't recall where the other one was.

13  One was to the District of Columbia, I believe a U.S.

14  Attorney's there.  And I believe a fourth one was to the

15  Superior Court of Pennsylvania in Philadelphia.

16  Q.   All to court -- U.S. Attorney's office or court's offices?

17  A.   State or federal courts, yes, sir.

18  Q.   With respect to the return address on them, were you able

19  to get that type of information?

20  A.   Yes, sir.  They all had the same type of postage and the

21  same type of return address label.

22  Q.   And when you say the same type, do you mean the same type

23  of return that we see here in Exhibit 1-A?

24  A.   Yes, sir, that's correct.

25  Q.   And with respect to those mailings, is it your

390

1   understanding those were all placed into the mail at the same
2   exact time and the same location?
3   A.   Yes, sir.  According to postal records, they were all
4   received at the same post office at approximately the same
5   time.
6   Q.   And I think you mentioned the video?
7   A.   Yes, sir.
8   Q.   You go to the post office here in the New Jersey area and
9   pull down that video?
10   A.   I did not, but I had our securities specialist pull it for
11   me, and then he sent the disk to me.
12   Q.   And you were able to review that video?
13   A.   I was, sir.
14   Q.   And what date and time do you remember that you were
15   looking at that video that may have helped you in this
16   investigation?
17   A.   I don't remember exactly what date I was able to pull the
18   images from.  It was within approximately a two-week window.
19   But at the time, I had the postal records and I had a driver's
20   license for Mr. Dougherty, and that's about all I had to work
21   with.
22        The other problem is, as you can imagine by the amount of
23   post offices we have with cameras, the recording device wasn't
24   set exactly at the right time.  So there was an offset, the
25   camera was off by 2 hours and 40 something minutes.  So I had

391

1  to do some math and try to get it to pick the right

2  individuals.

3  Q.   Fair enough.  And after, I think this might be a good

4  point to ask you, during the course of your investigation,

5  including getting this, reviewing the video and taking excerpts

6  from that video and creating still photographs, in totality of

7  your investigation, do you create a report?

8  A.   I did, sir, yes.

9  Q.   And that report summarizes the investigation?

10  A.   Yes, sir, it did.

11  Q.   And with respect to this case, did you -- how many reports

12  did you create with respect to this investigation?

13  A.   I ended up writing a second report because my initial

14  report, I outlined all the work I did with postal records and

15  obtaining the tracking and the images, the PTR, that product

16  tracking, but I took still images of what I thought was the

17  suspect.

18       And then in preparation for this proceeding, I obtained

19  additional images of Mr. Dougherty, and I reviewed the video

20  again and realized I didn't have the right guy at first.

21  Thankfully, you know, my report basically says this appears to

22  be the right guy, and it said, white guy, a little bit older,

23  kind of hard to pick out on sometimes video.  It's never a

24  perfect thing.

25       But I was able to find within seconds -- correction,

1  within approximately minutes of the video, I did find another

2  individual that looked a lot more consistent with Mr. Dougherty

3  based on images.  I had never met him.  I had never seen him

4  before.

5       But I did obtain some additional images in preparation for

6  trial when I reviewed the video.  So I did produce a second

7  report with an individual I believed to be Mr. Dougherty.

8  Q.   So just to be clear from the first report to your second

9  report, what you did was review and updated images within that

10 report?

11 A.   That's correct, sir.

12 Q.   All right.  In front of you, you have what has been

13 marked, but not yet admitted, Government Exhibit 11-A, 11-B,

14 and 11-C.  Do you recognize those?

15 A.   Yes, sir.  These are still images that I took from the

16 video.

17 Q.   And are these the still images that you took that were

18 ultimately uploaded into your second report?

19 A.   Yes, sir, they are.

20 Q.   And you said you took them from the video.  Did they

21 appear to be an accurate representation of what was occurring

22 on the video at the time that the still images were created?

23 A.   It does, sir, yes.

24 Q.   And have they been altered or changed in any way?

25 A.   They do not appear to be.  They appear to be exactly as I

393

1   provided them in my report.

2   Q.   And to be clear, were you the one that created -- were you

3   the person that created these still images?

4   A.   I am, sir.

5            MR. ADKINS:   I would ask that Government Exhibit

6   11-A, 11-B, and 11-C be admitted, Your Honor.

7            MR. DOUGHERTY:   No objection.

8            THE COURT:   All right.   They're admitted.

9   BY MR. ADKINS:

10  Q.   And if we could, please, publish first Government Exhibit

11  11-A.   And you're the one that watched the video.   Tell us what

12  you see here and why you created this still image?

13  A.   Again, this has about a 2 hour 48 minute offset, so the

14  time in the bottom right-hand corner says 12:47 p.m.   It would

15  actually be closer to approximately 9:58'ish.   I believe based

16  on the images, the second set of images I received of Mr.

17  Dougherty, I believe this individual is consistent enough that

18  it is likely him.

19  Q.   And can you circle that individual?   There's three in the

20  photo?

21  A.   (Complied.)

22  Q.   The date down at the bottom 5/6/2017, is that date

23  correct?

24  A.   Yes, sir.

25  Q.   Again, this post office is the post office we've been

394

1  talking about in New Jersey?

2  A.   Yes, sir, Blackwood, New Jersey.

3  Q.   Can we please see Government Exhibit 11-B?  And describe

4  this photograph?

5  A.   This appears to be that same individual, and he is

6  presenting items for mailing to the retail clerk at the far

7  right side of the retail line.

8  Q.   Can you circle that for us, please?

9  A.   Yes, sir.  (Complied.)

10 Q.   And that's the individual we're saying is Mr. Dougherty?

11 A.   I believe it is consistent with Mr. Dougherty, yes, sir.

12 Q.   And can we also now see Government Exhibit 11-C, please?

13 Again, Government Exhibit 11-C, can you describe this and

14 please mark anything that you may want to point out, please?

15 A.   Yes, sir.  This part of the video appears to be an

16 individual that is sealing what appears to be potentially a

17 priority envelope.  I'm not sure it's a priority envelope, but

18 it appears consistent with an individual sealing an envelope.

19 Q.   And based off the timing and your review of other

20 photographs of Mr. Dougherty, do you believe that this is Mr.

21 Dougherty?

22 A.   I do believe so, yes, sir.

23        MR. ADKINS:  May I have one moment, Your Honor?

24        THE COURT:  Yes.

25        (Pause.)

395

1          MR. ADKINS:  No other questions, Your Honor, thank

2    you.

3          THE COURT:  Any cross examination?

4          MR. DOUGHERTY:  None.

5          THE COURT:  Thank you.  You may step down.  Thank

6    you, sir.  Next witness.

7          MR. PERRI:  Your Honor, the United States calls the

8    case agent, Christopher Cruz.

9          **CHRISTOPHER CRUZ, GOVERNMENT'S WITNESS, SWORN**

10         COURTROOM DEPUTY:  State your name and spell your

11   last name for the record.

12         THE WITNESS:  Corporal Christopher Cruz, C-R-U-Z.

13                    **DIRECT EXAMINATION**

14   BY MR. PERRI:

15   Q.   Sir, where do you work?

16   A.   I'm employed with the Pennsylvania Capitol Police.  As

17   part of my employment, I'm also tasked with the FBI's joint

18   terrorism task force where I'm tasked with investigating cases

19   of counter terrorism.

20   Q.   Okay.  How long have you been with Capitol Police?

21   A.   I've been with Capitol Police for 7 years, but I've been a

22   law enforcement officer for a total of 11 years.

23   Q.   All right.  And how long have you been with the task

24   force?

25   A.   I've been with the task force approximately five years

396

1  now.

2  Q.    Do you abbreviate that?  Does the task force have an

3  abbreviation?

4  A.    Yes, the JTTF, Joint Terrorism Task Force.

5  Q.    Okay.  Is that like physically located at the Capitol?

6  A.    No, it's located within this building with the FBI --

7  Q.    Oh, okay.

8  A.    -- space.

9  Q.    Do you work with the FBI a lot?

10 A.    I do.  So I'm a task force officer, so I investigate

11 matters within the scope of my task force being CT matters,

12 domestic terrorism, international terrorism.

13 Q     Is it an FBI task force?

14 A.    Yes, it's an FBI task force.

15 Q.    Okay.  What is the role of the Capitol Police then?

16 A.    The role of the Capitol Police, we patrol the Capitol

17 building.  So we deal with a lot of threats and terrorism

18 related things as well, but generally speaking we're just in

19 charge of maintaining the Capitol, crimes that are committed on

20 Capitol grounds, state or owned or leased buildings or things

21 that have to do with state employees.

22 Q.    Okay.  So do you have to have any special training to be

23 part of that task force?

24 A.    To be part of that task force, yes.  There is actually an

25 on-board training through the FBI that just educates you on how

397

1  to conduct counter terrorism investigations, things of that

2  nature, as well as ongoing training quarterly just for new

3  trends in counter terrorism, things of that nature.

4  Q.   When you say terrorism, are we talking about, you know,

5  people in other countries or is it primarily domestic?

6  A.   It's both, international and domestic terrorism.

7  Q.   So were you so employed back in the early months of 2017?

8  A.   That's correct.

9  Q.   And through your employment, did you have the opportunity

10  to investigate a matter involving a communication that had been

11  sent to a federal judge, specifically, Judge Christopher

12  Conner?

13  A.   I did.

14  Q.   How did this matter come to your attention?

15  A.   This matter came to my attention through another task

16  force officer, Hugh Erhart, who had informed me of the

17  situation.  He took some initial steps, was assisting me

18  throughout the process.  But he had informed me that the letter

19  that was previously mentioned that Judge Conner spoke about had

20  been received.

21  Q.   Okay.  So like was the case assigned to you?

22  A.   The case, yes, was ultimately assigned to me, yes.

23  Q.   Did you actually then obtain a copy of the communication

24  and had a chance to review it?

25  A.   Yes, I obtained a copy of the communication as well as the

1  other communications that were similar that Mr. Corricelli

2  mentioned that went to the prothonotaries' offices and other

3  locations.

4  Q.   And who was it from, the communication?

5  A.   The communication was from Keith Dougherty.

6  Q.   And this is the one that you said was to Judge Conner?

7  A.   That's correct.

8  Q.   How many pages was it?  Do you recall?

9  A.   I don't recall.

10 Q.   How would you characterize the form of the writing?  Was

11 it, you know, an article or, you know, a letter, or what?

12 A.   I would say it was in letter form, perhaps had some

13 documents attached to it, a lot of references to dockets and

14 cases and things of that nature.

15 Q.   Okay.  I want to show you United States Exhibit --

16          MR. PERRI:  May I approach, Your Honor?

17          THE COURT:  Sure.

18 BY MR. PERRI:

19 Q.   United States Exhibit 1-B, which has already been

20 admitted.  Tell me if you recognize that.

21 A.   Yes, this is the letter in which we are speaking.

22 Q.   Okay.  Did you -- when you reviewed that, did you find

23 language in there that in light of your job and your

24 responsibilities as a task force member that was of concern to

25 you?

1  A.   Absolutely.  In reading the -- in reading the document, I

2  mean, there was a number of times that there was concerning and

3  threatening language.

4  Q.   And who was that threatening language directed against?

5  A.   Judge Conner mostly as well as other judges and

6  individuals named.

7  Q.   Did you take this one seriously?

8  A.   Absolutely.

9  Q.   Do you get all kinds of -- do you get a lot of these types

10  of cases?

11  A.   Yes, both through my employment with the Capitol, as you

12  can imagine, being seat of government for state, and here at

13  the FBI with the joint terrorism task force, I get a lot of

14  letters and a lot of different ways, so, yeah.

15  Q.   Are they all the same?

16  A.   No, they're not all the same.  This would -- this would

17  be -- I would characterize this as one of the more strongly

18  worded letters that I've received.

19  Q.   Okay.  Did you get a sense from reading this letter as to

20  what this individual, the Defendant, Mr. Dougherty, wanted from

21  Judge Conner?

22  A.   So in reading the letter, which was hard to follow, it's

23  tough to discern specifically what he wanted, but he definitely

24  wanted him to take action, which seemed to be on prior

25  litigation or civil cases or things like that.  Also threatened

400

1   action if this wasn't rectified.

2   Q.   Okay.  So is that what he was upset -- like what was he

3   upset about?  Could you tell?

4   A.   From what I could make of the letter, he was upset about

5   some prior court cases.  The letter was kind of all over the

6   place.  It was very hard to understand especially without at

7   the time knowing any of his background or knowing much of his

8   background by that point.  But from the letter in and of

9   itself, he wanted him to take some action, like I said, as far

10  as redressing some litigation and some wrongs that he felt he

11  had sustained by other judges in other cases.

12  Q.   Okay.  Were there passages that you found particularly

13  troubling in terms of your decision to investigate this matter?

14  A.   Yeah, absolutely.  If I may have a moment to go over?

15           THE COURT:  Can I have a sidebar?  Just give us a

16  second.

17           (Sidebar discussion held:)

18           MR. PERRI:  I'm not going to go all through the

19  letter, Judge.

20           THE COURT:  Okay.

21           MR. PERRI:  I'm reading your mind.

22           THE COURT:  Thank you.  I just didn't -- I wanted to

23  make sure there was a reason, but that's good.  I think we need

24  to be sensitive of the jurors' time.  Thanks.

25           (Sidebar discussion concluded.)

1  BY MR. PERRI:

2  Q.   Just so we have some reference point for what you're

3  talking about when you say, very troubling language.  Could you

4  point to a couple of the passages?

5  A.   Yes, absolutely.  So in the very beginning, just the full

6  address of Satanopher; the execution order; speaking of

7  well-regulated militia; and then the death of judges; also here

8  the executing of judges.  Those are the ones that really stood

9  out to me just in the initial scanning of the page that really

10 caught my attention and were very strongly worded.

11 Q.   To be clear, there's other language in there?

12 A.   Absolutely.  There's a number of other passages that are

13 concerning.  In full context, the entire letter was very

14 threatening.  He actually -- the way it looks to me and the way

15 I perceived it was, you know, this is an order that's pending.

16 This is what is going to happen unless this action is taken.

17 Q.   Thank you.  Did you involve any other agencies to assist

18 you in your efforts to investigate this matter?

19 A.   Yes.  So I was working with TFO Erhart within the FBI

20 JTTF, who had been in contact with Mr. Corricelli, as he

21 previously testified as to what his involvement was, getting

22 some records for our investigation.

23 Q.   All right.  And did you take any steps yourself to

24 identify the person who sent it?

25 A.   Yes.  So some things that were done, again, is retaining

402

1   those records from the U.S. Postal Inspection Service as well
2   as following up with some open source social media stuff,
3   things like that, trying to determine what was going on,
4   talking to the U.S. Marshal Service, who previously
5   investigated it, as Deputy Hanna had previously testified,
6   getting their take of what their investigation had uncovered as
7   well.
8   Q.   All right.  Did you attempt to find the sender of the
9   communication?
10  A.   I did attempt to locate the sender.  I was aware, as Mr.
11  Corricelli previously testified, that there was not a good
12  address that we had at the time because it was a P.O. Box or
13  some sort of mailing box that he used for return address.  We
14  went to a number of addresses trying to locate him in New
15  Jersey, Pennsylvania, and were unsuccessful.
16  Q.   In this process, did you learn anything about this
17  person's personal circumstances?
18  A.   Yes.  So in speaking with the marshal service and Mr.
19  Corricelli and other agents who were previously involved with
20  him, I learned that he had some business dealings and there was
21  some litigation involving tax issues that didn't go his way.  I
22  know he suffered a divorce, lost his house, things of that
23  nature.
24  Q.   Okay.  Were you ultimately able to locate and make contact
25  with the Defendant?

1  A.   Yes.  So ultimately, yes, I was able to contact him with a

2  few phone numbers, not sure how good they were.  But I just

3  dialed the first one, and were able to locate him, and there

4  was a voicemail message from him.  I left a message.  He

5  contacted me.  And that was our first contact.

6  Q.   And did that result in anything, any meetings or --

7  A.   Yes.  So I asked Mr. Dougherty if he would mind coming

8  into the FBI office to speak about his case and about some of

9  these mailings.

10  Q.   All right.  And did that ever happen?

11  A.   Yes.  I believe about a week later, he had come into the

12  office on his own free will with another individual.  I

13  informed him we wanted to talk about his situation and the

14  mailings.  He was agreeable to that.  We went to the FBI space,

15  myself and SA McNive, and we talked.

16  Q.   Who is the other individual?

17  A.   It was Mr. Brady, I believe, Kenneth Brady.

18  Q.   What was your understanding of the relationship between

19  the two of them?

20  A.   I believe they were -- I believe they were friends, but

21  also there was some sort of business relationship because he

22  had mentioned that he was part of a lawsuit that he was

23  involved with somehow.

24  Q.   A lawsuit?

25  A.   Involving Mr. Dougherty and, I guess, Mr. Brady.

404

1   Q.   Okay.  So that was the connection?

2   A.   Yes.

3   Q.   Were they relatives?  I mean, anything like that?

4   Friends?

5   A.   Yeah, it seemed like they were friends, but, again, they

6   did say in part of the conversation they had mentioned that in

7   one of the suits, well, he's part of it, being some sort of

8   business arrangement or being part of some kind of suit that

9   they filed together was my understanding.

10  Q.   So in the course of that discussion with the Defendant,

11  did it become clear to you that, in addition to you wanting to

12  talk to him about something, that there was actually something

13  he wanted to talk to you about?

14  A.   Yes.  So Mr. Dougherty started talking before he even got

15  in the room.  I kind of had to stop him and introduce myself

16  and kind of slow him down because he was off to the races.  So

17  he definitely was very adamant about talking to me.  After a

18  lengthy conversation, and many side notes, ultimately he was

19  very adamant about me filing charges against a Clerk Peter

20  Welsh.

21  Q.   Okay.  And why did he want you to file charges against

22  Peter Welsh?

23  A.   He believed that Mr. Welsh neglected to do his duty as he

24  was supposed to by statute and, therefore, he had committed a

25  crime, and he wanted me to arrest him for that federal crime of

1  being a clerk and not doing his duty as he was supposed to

2  negligently.

3  Q.   During this conversation, did you manage to ask the

4  Defendant about the letter he sent to Judge Conner?

5  A.   I did ask him about the letter, which he acknowledged that

6  he sent.  I provided him a copy.  He looked through it.  We had

7  a discussion about it.  During that discussion, he had told me

8  that his intention was to inform Judge Conner of all this

9  corruption and things that were going on as well as sending it

10 to a number of other judges, which he pointed out.

11 Q.   Okay.  And did he say during the interview what he wanted

12 from Judge Conner?

13 A.   Again, it was hard to kind of keep it straight.  He would

14 go off on tangents, and I would try to interject to get a

15 little bit more of a feel because I did want to legitimately

16 know about his situation and try to understand and get it

17 straight.  But from what I can gather, again, it was kind of

18 the same as the letter, it was prior litigation or prior cases

19 that were dismissed or filings that were not put in and that he

20 wanted action taken against.

21      He wanted things to be addressed and changed, wanted Judge

22 Conner to make these changes happen and rectify these wrongs

23 that he felt he sustained.

24 Q.   Okay.  And when did this interview take place

25 approximately?

406

1  A.   This interview would have been March 4th, 2019.

2  Q.   All right.  Did he acknowledge any other contact

3  information or personal information?

4  A.   Yeah, we had -- I had gained some contact information from

5  him.  I told him if I had to send him any documents or if he

6  had to send me any documents, so I believe we exchanged

7  e-mails, things like that.

8  Q.   Okay.  Did he tell you what his e-mail address was?

9  A.   Yeah.  I was already familiar with a couple of his from

10  some of the mailings as well, but he had provided me a

11  keithdoughertycfp@gmail.  He has another one also provided of

12  comcast.net, same thing, keithdoughertycfp@comcast.net.

13  Q.   Is that the same e-mail address from which the

14  communications that form the basis of Count 2 and Count 4

15  originated from?

16  A.   Yes, that's correct.  A lot of times they're cc'd.  If he

17  sends it from one, he'll cc the other.

18  Q.   So that brings me then to ask you some questions.  Did you

19  personally receive any communications from the Defendant via

20  e-mail?

21  A.   Yeah, a number of times.  Actually, it wasn't long after

22  the interview that I received an e-mail that had some

23  threatening language in it.

24  Q.   Okay.

25         MR. PERRI:  Your Honor, may I approach?

407

```
 1              THE COURT:  Yes.
 2   BY MR. PERRI:
 3   Q.   I'd like to show you what's been marked for identification
 4   purposes as United States Exhibit 2-A.  Please take a look at
 5   that, review it, and then tell me if you recognize it.
 6   A.   I do.
 7   Q.   How do you recognize that, sir?
 8   A.   This is the e-mail which I was referencing from Keith
 9   Dougherty, keithdoughertycfp@comcast.net, was sent March 21st,
10   2019, 9:17 in the morning to myself, cscruz@fbi.gov, which is
11   my FBI e-mail which I provided to Mr. Dougherty.  Also cc'd was
12   a John Dougherty, Jr., at Best Auto Sales, and a Bob Harvey.
13   The subject is The 20th Highjacker.
14   Q.   That's what it says in the subject line?
15   A.   That's correct.
16   Q.   And does that mean anything to you?  How do you recognize
17   that?
18   A.   The 20th highjacker?  There was -- I'm not sure exactly
19   what he was referencing with the 20th highjacker.  Again, a lot
20   of his correspondence tend to jump all over the place.  It
21   makes it hard to understand kind of where he's drawing that
22   bridge from what he was saying to what he wants me to
23   understand.  So I try the best I can.  But there was definitely
24   some language in here that was very concerning to me.  There's
25   a mention of Ruby Ridge, that just like Ruby Ridge, I'll be
```

408

1  required to order a sniper under the second amendment to shoot
2  Judge Conti in the head to shut her up.
3  Q.   I'm going to ask you some questions about that particular
4  communication.  But first let me ask you if this e-mail, this
5  exhibit that's United States Exhibit 2-A, which purports to be
6  a three-page e-mail, is that a fair, accurate, and correct copy
7  of the e-mail that you personally received from the Defendant?
8  A.   Yes.
9         MR. PERRI:  Your Honor, at this point, we would move
10  for the admission of United States Exhibit 2-A.
11         THE COURT:  Mr. Dougherty?
12         MR. DOUGHERTY:  No objection.
13         THE COURT:  All right.  It's admitted.
14         MR. PERRI:  May we publish that, Your Honor?
15         THE COURT:  Sure.  Anything that's admitted may be
16  published.
17  BY MR. PERRI:
18  Q.   Okay.  Agent Cruz, you've been talking about the header
19  information of the e-mail, so could we expand that, please.
20  Maybe you can just sort of circle your e-mail address there?
21  A.   (Complied.)  Yes.
22  Q.   Then please also circle the e-mail address which you
23  indicated the Defendant admitted to having and using during
24  your interview?
25  A.   (Complied.)

1  Q.   All right.  May we see the full page, please?  All right.

2  Would you please expand the first paragraph?  Would you please

3  read that, Agent?

4  A.   Docson's militia is charged with the duty of preserving

5  the English common law and the PA common law, and it is by its

6  registration well-regulated, a/k/a self defense against crony

7  capitalism, and democrat/socialism.

8  Q.   And the next paragraph, please?  Would you read that?

9  A.   They, the Third Circuit 332 panel, are mocking you FBI

10  Agent Cruz because you are too stupid to realize you must,

11  just, present an information, at a minimum to a Federal Grand

12  Jury, for violations of 18 U.S.C. 2076 and 18 U.S.C. 1951, see

13  the college admission scandal as a mere complaint.

14  Q.   What violations is he talking about?  I'm not asking for

15  your knowledge of those laws, I'm just asking for your sense of

16  what violations that he wants you to pursue?

17  A.   He wants me to pursue, again, going back to Mr. Peter

18  Welsh.  I believe that's what the 2076 charge is about him

19  failing to do his duty as he is supposed to as a Clerk of

20  Court.  So he wants me to file charges against Mr. Welsh.

21  Q.   So he wants you to investigate and insure that charges are

22  brought, criminal charges?

23  A.   Criminal charges.

24  Q.   Against the Clerk of Court here in the Middle District of

25  Pennsylvania?

1  A.   Correct.

2  Q.   Okay.  The next paragraph, please.  I want to ask you,

3  Agent Cruz, does he indicate there what's going to happen if

4  you don't?

5  A.   Yes.  So I mean the opening statement there for that is,

6  Otherwise, and then he goes into speaking about Ruby Ridge and

7  he would have to order a sniper and then using the second

8  amendment as justification to shoot Judge Conti in the head to

9  shut her up.

10  Q.   Okay.  His reference to Ruby Ridge?

11  A.   Um-hum.

12  Q.   What happened -- first of all, what event is he referring

13  to?

14  A.   So I'm not familiar with the full details of Ruby Ridge.

15  I know it was an event, I believe, in a border town on a ranch

16  or something like that the FBI was involved in.  There was an

17  FBI SRT team.  I believe one of the snipers did shoot one of

18  the individuals involved.

19  Q.   So one of the people involved in that incident was shot

20  how?

21  A.   By a sniper.

22  Q.   Where?

23  A.   I'm sorry?  Where?  Yeah, at Ruby Ridge.

24  Q.   No, I mean, where did they get shot?

25  A.   Oh, in the head.  Specifically, yes, sorry, in the head.

411

1  Q.   I should have been more clear.  Okay.  And the next

2  paragraph, please?  Would you read that?

3  A.   You do not have, any, DACA discretion, to not charge Peter

4  Welsh under the negligent standard, as required by law.

5  Q.   How did you take that?

6  A.   So, again, he wants me to charge Peter Welsh as required.

7  Q.   Do you have any choice in the matter?

8  A.   I have no choice.  He is saying that I am required to do

9  so and is, therefore, calling me out.

10 Q.   Not only are you required to do so, but are there

11 consequences if you don't?

12 A.   Yes.

13 Q.   Can we see the full page again, please?  Expand it.  Would

14 you read that one, please?

15 A.   Yes.  A well regulated militia being necessary for a free

16 state, requires the militia to shoot the judges in the head

17 when the FBI refuses to take action, otherwise we will have an

18 extinction event far worse than 9/11.  It will be open season

19 on the judiciary, even though AOC et al want to increase the

20 Supreme Court to 15, the one and only Article III Court is the

21 weakest branch of government because they do not have their own

22 militia.

23 Q.   Now I want to ask you, Agent Cruz, is there anything in

24 this e-mail that indicates the Defendant's personal

25 relationship to that militia or membership in that militia or

412

1  control of the people in that militia?

2      And I want to direct your attention in regard to that

3  question with respect to first the previous paragraph, if we

4  could expand that?  Would you read it, please?

5  A.   If Keith Dougherty's snipers, are members of Docson's

6  militia, and the FBI refuses to enforce the law, under the PA

7  Castle Doctrine, no information nor indictment may, even, be

8  sought, the 2011 expansion is a get out of jail free card.

9  This is not Florida's Stand Your Ground law.

10  Q.   Did that suggest to you anything about whether or not the

11  Defendant had any control over the actions of this militia?

12  A.   Yes.  It directly states that, you know, they are his

13  snipers, members of this Docson's militia, and that because of,

14  from his interpretation, the FBI refuses to enforce the law,

15  again, under justification, his perceived justification under

16  the PA Castle Doctrine, there will be no information nor

17  indictment and this will take place, this action.

18  Q.   The individual that you referred to earlier who was shot

19  at Ruby Ridge, was it a shootout type thing or was it a sniper?

20  A.   I believe it was a sniper.  It was a standoff for a while.

21  It involved a number of federal agents.  If I remember

22  correctly, I think it was a standoff situation.

23  Q.   Okay.  So all right.  With respect to the bottom of that

24  page, did you get any sense there of what that was all about,

25  why he was talking about the 20th highjacker?  What does that

1 mean to you, if anything at all?

2 A.   Yes.  So it's referenced to 9/11 saying about a 20th

3 highjacker and just speaking about 9/11.

4 Q.   Did that have any particular significance to you?

5 A.   He was talking about hitting targets in DC.  The

6 Shanksville, Pennsylvania, is mentioned.  And the idea -- talks

7 about the idea of a 20th highjacker will be widely discussed.

8 Q.   And the last paragraph as well as continuing over to the

9 next page, does he continue that discussion?

10 A.   Yes.  He talks about a novelist.

11 Q.   The top of the next page, please?  Were you able to make

12 any sense of the stuff he was talking about on this page?

13 A.   He talks about 9/11 and kind of a conspiracy theory, I

14 suppose, that they had a laptop that could have stopped it.

15 The FBI looked like fools.  I'm not sure exactly what he was

16 talking about specifically.

17 Q.   Okay.  Anything else stick out to you on that page?  Could

18 we see page 2, please?

19        THE COURT:  Let me just check on the jury.  Do you

20 all need a break?  Are we good to keep going?  Everybody?  Keep

21 going?  All right, let's keep going.

22        THE WITNESS:  Yeah, he talks about the FAA engineers,

23 Boeing, Chinese companies, commercial aircrafts.  He kind of

24 goes all over the place.

25 BY MR. PERRI:

414

1  Q.   Okay.  And then the last page, please, if we could see

2  page 3.  Do you notice that there is some language there that's

3  in a different font?

4  A.   Yes.

5  Q.   Or at least a different size font?

6  A.   Yes.

7  Q.   Could you please read the emphasized language?

8  A.   For clarity if you define 153.1, the third and fourth and

9  DC, judiciary owes Keith Dougherty 3.5 billion dollars

10 declarative relief, and there is no way to refuse to define, a

11 corporation for federal tax purposes, even though that will end

12 their world.

13 Q.   What significance was it there for you that that language

14 there appeared?

15 A.   I'm sorry, could you repeat that question?

16 Q.   What significance was it for you that that language at the

17 end appeared, that will end their world?

18 A.   So, again, for me, the way I interpret it is that, you

19 know, he is going to take some action.  This is a gripe that he

20 has.  He feels he's owed 3.5 billion dollars, that he won't be

21 refused.  He talks about corporation for federal tax purposes.

22 In other words, if this isn't met, action will be taken.

23 Q.   Okay.  Agent, did you have concerns that this was a

24 serious expression?

25 A.   Absolutely.

1  Q.   And did you feel in your capacity that Judge Conti, her

2  safety was implicated?

3  A.   Absolutely.

4  Q.   Did you have any sense of what he was talking about when

5  he references needing to shoot her to, quote, unquote, shut her

6  up?

7  A.   Specifically to shut her up, no, I don't know specifically

8  what she would have said other than, I guess, rulings and

9  things of that nature was what I guess.  What I can gather from

10 his writings that for previous cases, to shut her up, the

11 remedy would be to shoot her in the head.

12 Q.   Okay.  Again, what does it appear that the author, Mr.

13 Dougherty, wants from you and from the FBI based on your

14 reading of this communication?

15 A.   Mr. Dougherty wants me and the FBI to take a criminal --

16 to charge individuals with criminal charges, mainly Peter

17 Welsh, for failing their duties.  He talks about the judges

18 failing to do their duties and actions he's going to take

19 against them.  But he wants action taken.

20 Q.   In the course of your investigation, did you also have the

21 opportunity to become aware of a communication that had been

22 sent via e-mail to Caleb Enerson?

23 A.   Yes.

24 Q.   Were you personally copied on that e-mail?

25 A.   No, I was not copied on the e-mail.  Actually, the way

1  that I became aware of it was through the last U.S. Attorney

2  who was actually assigned to this case prior to your

3  involvement.

4  Q.   And how was it that he was aware of it?

5  A.   It was sent directly to him, I believe, not long after

6  this communication.

7  Q.   So it was an e-mail directed to him?

8  A.   Yes, that's correct, as well as others.  I believe Caleb

9  Enerson was on there.  Jeff Finucane was the last AUSA.  I

10 believe some others.

11             MR. PERRI:  May I approach, Your Honor?

12             THE COURT:  Yes.

13 BY MR. PERRI:

14 Q.   I'd like to show you what's been marked and admitted as

15 United States Exhibit No. 4-A.

16 A.   Yes, that's the -- this is the e-mail you're speaking.

17 Q.   That's the one you're referring to?

18 A.   Yes.

19 Q.   And that was sent to Mr. Finucane.  And can you spell that

20 for the benefit of the reporter?

21 A.   Yes, Finucane, F-I-N-U-C-A-N-E.

22 Q.   Who else was it sent to?

23 A.   Mr. Thomas Young and Mr. Enerson.

24 Q.   Anybody else copied on that?

25 A.   Yes.  So it was sent from keithdoughertycfp@comcast.net,

1   but he also cc'd himself, keithdoughertycfp@gmail.com as well

2   as Best Auto Sales, Michael Ghiglieri, Ken Brady, Alanna

3   Dougherty, Michael Brady.

4   Q.   How do you spell Ghiglieri?

5   A.   G-H-I-G-L-I-E-R-I.

6   Q.   Could we put that on the screen, please?  All right.  So

7   you became aware of this through your investigation.  What was

8   your reaction to this one?

9   A.   So, again, there is a number of things that are kind of

10  hard to discern.  But there's also some threatening language

11  located --

12  Q.   Can we see page 2?

13          THE COURT:  Mr. Perri, there's no objections to you

14  leading, so, you know, I'm a little conscious of time.

15          MR. PERRI:  Understood, Your Honor.

16  BY MR. PERRI:

17  Q.   So would you please -- can I direct your attention to the

18  top of that page?

19  A.   Yes.

20  Q.   And ask you if any of the language that you found

21  troubling in terms of your decision to investigate this matter

22  and take this matter seriously, is there any of that language

23  present there?

24  A.   Yes.  It's the second paragraph starts with, The crux.

25  The crux of the matter is Keith Dougherty avers, he could shoot

418

1  Judge Conti, in the head and claim necessity, under PA's
2  Discretionary Deadly Force, Doctrine.
3  Q.   He mentions Judge Conti again, doesn't he, in the
4  paragraph starting with the word once?
5  A.   Once again even if Judge Connolly is correct in that all
6  that it takes is a rational basis, to ignore all sixth
7  amendment protections, the Supreme Court has said that the
8  moment Keith Dougherty asserted Rule 12.3 and the AUSA from
9  West Virginia defaulted, the indictment must be quashed, even
10  if Keith Dougherty was just like Mullenix, ignoring all other
11  options and just shot Judge Conti, under his Docson's militia
12  authority.
13  Q.   Did you take this language as a serious expression of an
14  intent to do harm?
15  A.   Absolutely.  It's rather spelled out there.  Again, he's
16  got a justification.  He's got, you know, he's fixated on this
17  way of doing it.  And he's also plainly stating that under his
18  militia, he has the authority to do so.
19  Q.   Do you note the similarities in terms of the content and
20  the claims and style that appears in all of the communications
21  that I've asked you about during your testimony today?
22  A.   Yes.  There is a common theme, frustration with past
23  litigations, past filings, judges who preside over them, as
24  well as the same threatening rhetoric of doing harm or ordering
25  others that he can control to do harm if these demands are not

419

1   met; if this is not done, if Judge Conner doesn't do this, if
2   Mr. Welsh is not arrested and charged with a crime, then this
3   is what will happen.
4        It's just a common recurring theme.  It's a common theme
5   throughout all of his writings as well as some of his
6   plastering of legal jargon and court cases, which were obscure
7   in nature to what he's trying to state.
8   Q.   Okay.  So in that regard, you saw the two e-mails as being
9   of the same nature as the letters sent to Judge Conner?
10  A.   Absolutely.  Most of the language is very similar if not
11  the same.
12  Q.   Okay.  And just as serious, would you say?
13  A.   Oh, absolutely.
14  Q.   I want to ask you a question about the timing of the
15  e-mail that forms the basis of Count 4, which is 4-A, Exhibit
16  4.  What date was that e-mail?
17  A.   That date was January 22nd, 2020.
18  Q.   Okay.  Now at the time that this e-mail was sent and
19  received, had legal action already been initiated with respect
20  to the writings contained with respect to the writing that was
21  sent to Judge Conner and the e-mail that was sent directly to
22  you?
23  A.   Yes.
24  Q.   Had legal action already been initiated on that?
25  A.   Yes.  I believe April 2019, there was also a grand jury

420

1  convened and I testified at.

2  Q.   What was the result of that?

3  A.   Mr. Dougherty was indicted.

4  Q.   He was indicted?

5  A.   Yes.

6  Q.   And the two charges had to do with those two

7  communications?

8  A.   Yes.

9  Q.   And so would he then have had an initial appearance and an

10 arraignment?

11 A.   Yes, by that time, yes.

12 Q.   And would he have been informed and advised by a

13 magistrate judge as to the accusations against him of having

14 violated the law as a result of those two communications?

15 A.   Yes, as well as by the U.S. Marshals' office prior

16 involvement.

17 Q.   Yet nevertheless, you later became aware of this

18 additional e-mail that was sent subsequently afterwards on what

19 date?

20 A.   Are you talking of Exhibit 4-A?

21 Q.   Yes.

22 A.   January 22, 2020.

23 Q.   And then there was a superseding indictment, correct?

24 A.   That's correct.

25 Q.   And that means it takes the place of the original?

421

1  A.   Yep.

2  Q.   And it included all three of those?

3  A.   Agreed.  That was on February 2020.

4           MR. PERRI:  All right.  May I have a moment, Your

5  Honor?

6           THE COURT:  Yes.

7           MR. PERRI:  Thank you, Your Honor.  I have no

8  questions.

9           THE COURT:  Okay.  Now do you want to take a quick

10 break or -- we do, that's what I thought.  Then we'll start

11 with the cross examination.  Thank you very much.  Thank you

12 for being patient.  And we'll give you about 10 minutes.

13          COURTROOM DEPUTY:  All rise.

14          (Jury left for a recess at 3:23 p.m.)

15          THE COURT:  Do you need to use the restroom, Mr.

16 Dougherty?

17          MR. DOUGHERTY:  Yes.

18          THE COURT:  Come back a little bit early so we can

19 discuss some brief issues, okay.  Is that what you need, 10

20 minutes?

21          DEPUTY MARSHAL:  Just up and down.

22          THE COURT:  That's what I would do.  Let's just go.

23 Same with the Government.  So in about five minutes or so,

24 we'll come back.

25          (Recess was taken at 3:25 p.m. and proceeding

422

1              reconvened at 3:30 p.m.; without the jury.)

2              THE COURT:  So I'm a little -- I'm not putting a time

3    on, we time our trials in Delaware, but I just don't want to --

4    we got to watch the jury.  And there's, you know, I just want

5    to be careful about repeating things that are in the record.

6    And I just want to be cognizant of their time.

7              These people give inordinate sacrifice to come in and

8    give up their time.  So if both sides could just be conscious

9    of that, I'd appreciate it.  So anything else before we get

10   started?

11             MR. PERRI:  No, Your Honor.

12             THE COURT:  Okay.  Thank you.  Let's bring the jury

13   in.

14             (Jury was brought in at 3:35 p.m.)

15             THE COURT:  Cross examination.

16                        **CROSS EXAMINATION**

17   BY MR. DOUGHERTY:

18   Q.   So Mr. Cruz, I'm going to try and save some time here and

19   basically indicate that Judge Conner and I pretty much covered

20   the letter, okay, and jump right to the e-mail?

21   A.   Okay.

22   Q.   And if you could, are you able to express to the jury the

23   impression that I was under when I came to see you on March

24   4th?

25   A.   Yes.  As I previously stated, the impression that you were

1  given was that I was looking into your situation, and that's

2  when you provided me that you wanted Mr. Welsh to be charged

3  with the criminal act based on him failing to do his duty under

4  the statute and that you believe he should be charged.

5  Q.   And the -- you had properly identified Kenneth Brady came

6  along with me?

7  A.   Yes.

8  Q.   And he actually is the daughter of my partner -- son of my

9  partner in a case and also, therefore, involved with it.  That

10 was all made clear.  There was also another FBI agent in the

11 room.  What was his name?

12 A.   Yes, that was Agent McNiven.  I believe you spoke to him

13 previously prior to my involvement as well.

14 Q.   He was the one that actually was present at the April

15 13th, 2015, interview?

16 A.   I believe that's the correct one, yes.

17 Q.   Okay.  So this being for context, I'm confused here.  With

18 the Government's exhibit, with the Government's exhibits, which

19 I had no objection to, you've omitted the attachment

20 doc_militia_pdf?

21 A.   Which exhibit are we speaking of?

22 Q.   It's an attachment to 2-A.  It's there on the Government's

23 exhibit?

24 A.   I have 4-A in front of me.

25 Q.   So do you understand?  2-A?

424

1  A.   2-A, yes.

2  Q.   The attachment doc_militia?

3  A.   Okay.

4  Q.   Why is that not attached to this e-mail?

5  A.   That's the printout of the e-mail as I saw it.  The

6  Government does not put on the attachment.

7  Q.   Pardon me?

8  A.   The Government did not put on the attachment.

9  Q.   Okay.  Again, without that, this document loses context,

10 okay, as to what that actually was, especially considering the

11 opening paragraph.  And you have to read it in context.  Would

12 that be fair?

13 A.   I won't concede to that because I'm not sure that that's

14 true and accurate.

15 Q.   Okay.  So in the opening paragraph, it says, Docson is

16 charged with the duty of preserving the English common law and

17 the PA common law.  Is that a correct reading of that?

18 A.   Could I see it up on the screen just so we're referencing

19 the same thing?

20 Q.   That would be 2-A.  (Complied.)  The first paragraph,

21 Docson's militia is charged with the duty of preserving the

22 English common law and the PA common law?

23 A.   Okay.

24 Q.   If that were to be, you were to find out it's part of the

25 attachment, and that happens to be the corporate charter of the

425

1  nonprofit corporation titled Docson's Militia, would that

2  surprise you?

3  A.   It wouldn't surprise me, but I don't know the context of

4  what the attachment would have to do with what's actually seen

5  here in the e-mail.

6  Q.   Again, I think it's fairly well stated in the paragraph

7  what I am charged with the duty of, and, therefore, attaching

8  the document to it to give context, then you understand what

9  I'm trying to say.

10           MR. PERRI:  Your Honor, the Defendant is testifying.

11           THE COURT:  Yeah, all right.

12  BY MR. DOUGHERTY:

13  Q.   So how about paragraph --

14           THE COURT:  Hold up.

15           MR. DOUGHERTY:  Okay.

16           THE COURT:  When you ask a question, whether you like

17  the answer or not, that is the witness's right.

18           MR. DOUGHERTY:  Good enough.

19           THE COURT:  This is not testimony.  I'm going to

20  strike that statement.  It was not a question.  All right.

21  BY MR. DOUGHERTY:

22  Q.   In paragraph 2, are you familiar with the reference to the

23  Third Circuit 332 panel actually meets?

24  A.   I'm not.

25  Q.   But were you able to take a look at the federal statute 18

1  U.S.C. 2076?

2  A.   I was.

3        MR. DOUGHERTY:  And could I have a copy of that so I

4  could present it for --

5        THE COURT:  Actually, hold up.  I think I might have

6  a copy for you.  Yes.

7        (Complied.)

8  BY MR. DOUGHERTY:

9  Q.   In the lower right-hand side, 2076, could you read that

10 for the jury?

11 A.   Yes.  Clerk of the United States District Court.  Whoever

12 being a Clerk of a District Court of the United States

13 willfully refuses or neglects to make or forward any reports,

14 certificates, statement, or document as required by law shall

15 be fined under this title or imprisoned not more than one year

16 or both.

17 Q.   And could you just read the bottom citations there as far

18 as the statute and the date and that kind of thing?

19 A.   June 25th, 1948.

20 Q.   And the question I have is, if, in fact, you are aware of,

21 I think you were present in the courtroom with your witness,

22 Caleb Enerson, and there was a reading of Rule 55 requiring the

23 clerk to enter default, would you characterize that as being

24 covered by this statute?

25 A.   I don't recall specifically Rule 55.  I am familiar with

427

1  this statute somewhat, but I can't really speak on something

2  I'm not educated on to say this is definitely related to this.

3  I think it would be a mischaracterization of my knowledge

4  because I just don't know that.

5  Q.   Okay.  So you understand my difficulty.  I thought you

6  were an FBI agent and --

7         THE COURT:  Again, that's not appropriate.  That's

8  your testimony.

9         MR. DOUGHERTY:  Good enough.

10 BY MR. DOUGHERTY:

11 Q.   So you said that I was there under the impression that you

12 were investigating my reference to crimes?

13 A.   You were there under the impression that I was looking

14 into your situation, which I was.  I was legitimately trying to

15 get a feel for what you were speaking about and what the

16 situation entailed specifically to the best I could.

17 Q.   But is it fair to say though it truly was a criminal

18 investigation of me and not any kind of you looking into my

19 complaint that I had actually filed in 2016?

20 A.   Oh, there was, yes, there was an open criminal

21 investigation on you as part of it, absolutely, as well as my

22 understanding the background situation and what you were

23 specifically speaking of because it gives me context into what

24 we're talking about.

25 Q.   So the one paragraph, if we could, on 2-A, and that would

428

1  be the fifth paragraph starting with Lon, the paragraph

2  beginning with Lon?  Could you read that for the jury?

3  A.   Yes.

4       Lon Tomohisa Horiuchi, born June 9th, 1954, is the

5  American FBI agent who shot and killed Vicki Weaver at Ruby

6  Ridge in 1992.  An FBI HRT sniper and former United States Army

7  officer, he was involved in controversial deployments during

8  the 1992 Ruby Ridge standoff and the 1993 Waco siege.  In 1997,

9  Horiuchi was charged with manslaughter for the death of Vicki

10 Weaver at Ruby Ridge, but the charges were later dropped.

11      And then there's a link to a Wikipedia page.

12 Q.   So you can clear that.  Now you then indicate that the

13 circumstance that I was trying to convey, I'm under the

14 impression I'm speaking to an FBI agent who would be familiar

15 with this incident.  Had you any prior training or explanation

16 related to this particular incident?

17 A.   I do not have any specifics on this incident.  My being a

18 task force officer versus an FBI agent has nothing to do with

19 that.  So I don't understand what you're --

20 Q.   Well, my point is, you present yourself to me as an FBI

21 agent, so I think I'm talking to FBI?

22 A.   I am a task force officer for the FBI, and, therefore, I

23 represent the Government and the FBI in my capacity in the

24 scope of what I'm investigating.

25 Q.   So, therefore, if we could move then to the top of the

429

1  second page.  Just highlight the Wikipedia attachment.  So what
2  you see on the previous page is actually a copy and paste from
3  this location.  Were you aware of that or did you not notice
4  that?
5  A.   I noticed it, but I don't know what that has to do with
6  anything.
7  Q.   Okay.  So going back to the previous page.  This -- were
8  you aware that this 20th highjacker incident was extremely
9  embarrassing to the FBI?
10 A.   Okay.
11 Q.   Again, were you aware?
12 A.   Not a hundred percent aware of the details, but I'll
13 concede if that's what you're saying.
14 Q.   And were you aware that they indicated that it was the
15 problem of communication between the FBI and the CIA that led
16 to the successful murder of thousands of American citizens?
17 A.   Again, I don't have personal knowledge, but I'll concede
18 if that's what you say.
19 Q.   Well, again, from the point that I thought I was dealing
20 with an FBI agent who would be aware of this embarrassing
21 moment.  Can we go to the next page?
22         MR. PERRI:  Your Honor, we move to strike as to that
23 last comment?
24         THE COURT:  Okay.  I mean, the agent conceded that
25 the language -- he was asked if he was aware, and he said,

430

1    again, I don't have personal knowledge, but I'll concede if

2    that's what you say.  I guess, so, yeah, let's try to stick to

3    just answer the question and then you just ask questions.

4    BY MR. DOUGHERTY:

5    Q.   Could we highlight beginning with By the Washington Times

6    down to the hyper link?  Could you read that for the jury,

7    please?

8    A.   By the Washington Times, Thursday, April 15, 2004.  The

9    disclosure that Jamie Gorlick, a member of the September 11

10   commission, was personally responsible for instituting a key

11   obstacle to cooperation between law enforcement and

12   intelligence operations before the terrorist attacks raises

13   disturbing questions about the integrity of the commission

14   itself.

15        And then there's a link to the Washington Times.

16   Q.   So that brings me to the last paragraph.  If you could

17   clear that off.  And -- I'm sorry, I didn't mean to have that

18   brought up.  Let's go to the last page.  And if you could just

19   highlight the confidentiality notice.  Could you read that to

20   the jury?

21   A.   Confidentiality notice.  The information in this message,

22   and any files transmitted with it, is confidential, may be

23   legally privileged, and intended only for the use of the

24   individuals named above.  Be aware that the use of any

25   confidential or personal information may be restricted by state

431

1  and federal privacy laws.  If you are not the intended

2  recipient, do not further disseminate this message.  If this

3  message was received in error, please notify the sender and

4  delete it.

5  Q.   Now how did that, you know, banner at the bottom impact

6  you?  How did you feel about that?

7  A.   I didn't have any feelings towards it.

8  Q.   Would it not give you some pause if, in fact, you were

9  going to forward it on or post it to some public display or

10  website or whatever like that?

11  A.   It's part of a criminal investigation, so I wouldn't

12  forward it to anybody.

13  Q.   I'm not suggesting you would.  I'm talking about from my

14  mindset.  I'm under the impression I'm talk to an FBI agent

15  investigating crimes that have been made against me,

16  significant crimes.  I think you're looking into it.

17          THE COURT:  Okay.  You can ask a question, but you

18  can't testify.

19          MR. DOUGHERTY:  Okay.

20  BY MR. DOUGHERTY:

21  Q.   So if I was under that false impression, would that change

22  my mindset as to who I'm communicating and whether this is

23  confidential or not?

24          MR. PERRI:  Objection, Your Honor.  He's asking the

25  witness to speculate on his mindset.

432

1          THE COURT:  I know.  It's a very dangerous thing to

2   do.  So -- but I'll sustain the objection.

3          MR. DOUGHERTY:  Good enough.

4   BY MR. DOUGHERTY:

5   Q.   So now for the large font up above, it says, For clarity

6   if you define.  Okay.  Could you read that for the jury again?

7   A.   For clarity if you define 153.1, the third and fourth DC,

8   judiciary owes Keith Dougherty 3.5 billion dollars, declarative

9   relief, and there is no way to refuse to define, a corporation

10  for federal tax purposes, even though that will end their

11  world.

12  Q.   So are you aware of who that will end their world is

13  referring to?

14  A.   In the context of what you're speaking of, I would say the

15  individuals in which you mentioned that you were having gripes

16  with in these litigations and that they owe you some sort of

17  monies.

18  Q.   Well, again, if I were to suggest to you --

19          THE COURT:  You can't do this.  You asked a question,

20  what he's aware of, and that ends it.  I mean, you asked him

21  what he thought this meant.  He answered it.  You don't get to

22  testify to what you really meant by it.  That's testimony.

23  BY MR. DOUGHERTY:

24  Q.   Can you read the top line again?

25  A.   For clarity if you define 153.1, the third and fourth DC.

433

1  Q.   Judiciary?

2  A.   Do you want me to keep going?

3  Q.   Yes.

4  A.   Judiciary owes Keith Dougherty 3.5 billion dollars,

5  declarative relief.

6  Q.   Now at that point, one of the Government's exhibits at No.

7  5 makes reference to a case, which is, this is Government 5-A.

8  Are you familiar with the content of this case?

9  A.   No, I'm not familiar with the content, no.

10  Q.   Could you highlight the top left-hand corner and bring it

11  up, the Dougherty et al paragraph?

12          (Complied.)

13          THE COURT:  I do want to thank the Government for

14  being so cooperative about this.

15  BY MR. DOUGHERTY:

16  Q.   Could you read that for the jury?

17  A.   *Dougherty et al versus Dupes et al;* assigned to Honorable

18  Joy Flowers Conti; case in other court, Third Circuit 19-01026;

19  cause, 42:1983 Civil Rights Act.

20  Q.   So the victim in count -- or the fourth e-mail is, as far

21  as I understand, Judge Conti.

22          THE COURT:  I'm going to strike that.  It is

23  testimony.  You cannot testify.  You can only ask questions.

24  And ladies and gentlemen of the jury, I told you this at the

25  beginning.  We have rules.

434

1            We have rules that guide procedure and guide the
2    introduction of evidence.  And I, as a judge, am required to
3    enforce those rules equally, fairly, and impartially against
4    both sides of this case.
5            I am attempting to do that.  When you have a
6    non-lawyer act as a lawyer, that -- it can be very difficult
7    because you can see the size of those books.  There's a lot of
8    rules.  All right.  So Mr. Dougherty, I'm going to remind you.
9    You can only ask questions.  You cannot testify.
10           MR. DOUGHERTY:  Okay.
11   BY MR. DOUGHERTY:
12   Q.   So again, in the Government's Count 4, 4-A, who is the
13   purported victim in that case of that count?
14   A.   I'm sorry, for 4-A?
15   Q.   For 4-A, yes.
16   A.   The one in which you threatened Judge Conti, is that what
17   you're speaking of?
18   Q.   You answered the question.  So now does that put in
19   context for you who that is on the Government's Exhibit 5 as to
20   who Joy Conti is?
21   A.   As to whom she is and how she's involved with you, yes.
22   As to the specifics of any of your cases that I cite, I have no
23   personal knowledge of the in-depth details.  Questions for that
24   is not something I'm going to have personal knowledge of.
25   Q.   So to clarify once again.  The initial contact from March

435

1  4th, it was voluntary between you and I?

2  A.   Yes.

3  Q.   And as far as these e-mails, you derived from that that I

4  was trying to get you to do an investigation of a crime for me?

5  A.   Yes, you were very adamant with that, that Mr. Welsh

6  committed the crime and that you wanted me to investigate and

7  you wanted charges to be brought against him.

8  Q.   And is it fair to say that when I just asked you about the

9  confidentiality notice, and you indicated that you, because of

10 it being an ongoing investigation, you would never pass that

11 information along?

12 A.   I'm not really sure what your question is.

13 Q.   I'm saying, you acknowledged that when I said to you,

14 there is confidentiality, and how would that impact you, and

15 you said it was an ongoing investigation, you would not pass it

16 along.

17 A.   Not to the public.

18          MR. PERRI:  The witness did not say that.

19          THE COURT:  Right.  And the witness's testimony,

20 which the only evidence is what witnesses said.  The witness

21 just testified to that effect.

22 BY MR. DOUGHERTY:

23 Q.   So my question is, my mind, you know, if we're talking

24 about what I'm thinking, I was unaware as to you being engaged

25 in a criminal investigation.

436

1          MR. PERRI:  Objection, Your Honor, as to what he's

2     aware of.

3          THE COURT:  Right.  You cannot testify.

4     BY MR. DOUGHERTY:

5     Q.   So again, back to the page 3 of e-mail 2 and the amount of

6     money referred to.  Just a quick reference.  In the matter that

7     was listed as Government's number 5, are you aware that Caleb

8     Enerson is actually representing the State of Pennsylvania in

9     that case?

10    A.   You said in number 5?  Can you provide that for me?

11    Q.   Yes, Exhibit 5-A, the case was brought up 17-CV 1541.

12    Were you aware that Caleb Enerson is actually representing the

13    Pennsylvania Corporate Net Income and Franchise Tax Department?

14    A.   Is that what you're showing to me?

15    Q.   Yes.

16    A.   As I said previously, I don't have in-depth knowledge of

17    the ins and outs of your civil cases, so you can show me

18    something, and I can't confirm it on the screen.

19    Q.   So now back to number 2, page 3 of the --

20         MS. LESKO:  Are you referring to the March 29 e-mail,

21    3-A?

22         MR. DOUGHERTY:  Yes, 3-A, page 3, the large font.

23         COURTROOM DEPUTY:  It's 2-A.

24         MR. DOUGHERTY:  2-A, pardon me.

25    BY MR. DOUGHERTY:

437

1  Q.   And it's page 3.  Thank you.  So are you aware that the
2  referenced amount in this case is relating to a case that had
3  involved the California Corporate Net Income and Franchise Tax
4  Department?
5  A.   No, I didn't.
6  Q.   So the other communications to that subject, you had not
7  had a chance to read or view or it was something you hadn't
8  considered?
9          MR. PERRI:  Objection, Your Honor.  The Defendant has
10 got to lay some foundation for knowledge.  The witness just
11 said he's not aware.
12         THE COURT:  Right, I agree.  And he said he's not
13 aware.
14         MR. DOUGHERTY:  Okay.
15 BY MR. DOUGHERTY:
16 Q.   Now let's go to Government Exhibit 4-A.  And if you could,
17 go to the page 2.  And if you could highlight the entire
18 portion all the way down to under Docson's militia authority.
19 Now again, could you read the first paragraph?
20 A.   Starting with, be skyped?
21 Q.   No, just the first paragraph.
22 A.   The crux of the matter is Keith Dougherty avers, he could
23 shoot Judge Conti, in the head and claim necessity, under PA's
24 Discretionary Deadly Force, Doctrine.
25 Q.   And that was something that you indicated is the basis

438

1  upon which Count 4 is based?

2  A.   Yes, that's part of it, you know, threatening to shoot

3  someone in the head and then claiming you have some sort of

4  justification for it under law, I think it's a fair assumption.

5  Q.   And the last paragraph, could you read the entirety of it?

6  A.   Once again even if Judge Connolly is correct in that all

7  that it takes is a rational basis, to ignore all sixth

8  amendment protections, the Supreme Court has said the moment

9  Keith Dougherty asserted Rule 12.3 and the AUSA from West

10 Virginia defaulted, the indictment must be quashed, even if

11 Keith Dougherty was just like Mullenix, ignoring all other

12 options and just shot Judge Conti, under his Docson's militia

13 authority.

14 Q.   Are you familiar with that Mullenix is referring to?

15 A.   No.  But I was concerned, again, that he was mentioning

16 shooting Judge Conti in the head under some sort of authority.

17         THE COURT:  He answered it.  He does not know what

18 Mullenix referred to.

19         MR. DOUGHERTY:  Again, that being said, I am done

20 with my questions.

21         THE COURT:  All right.  Thank you.  All right.  Any

22 redirect?

23         MR. PERRI:  Just one question.

24         THE COURT:  All right.

25                    **REDIRECT EXAMINATION**

439

1  BY MR. PERRI:

2  Q.   Agent Cruz, you indicated this e-mail came to your work

3  account.  Where were you when you received it?

4  A.   In this building here in Harrisburg, Pennsylvania.

5  Q.   And this is in the Middle District of Pennsylvania?

6  A.   That's correct.

7           MR. PERRI:  Thank you, Your Honor.

8           THE COURT:  Thank you.  You may step down.  All

9  right.  Next witness.

10          MR. ADKINS:  Next witness, Your Honor?

11          THE COURT:  Yes.

12          MR. ADKINS:  I would call Special Agent Pat Armor.

13          THE COURT:  Okay, thank you.

14          **PAT ARMOR, GOVERNMENT'S WITNESS, SWORN**

15          COURTROOM DEPUTY:  State your name and spell your

16 last name for the record.

17          THE WITNESS:  My name is Patrick Armor.

18 P-A-T-R-I-C-K.  Last name Armor, A-R-M-O-R.

19                    **DIRECT EXAMINATION**

20                    **ON QUALIFICATIONS**

21 BY MR. ADKINS:

22 Q.   Special Agent Armor, where are you currently employed?

23 A.   With the Federal Bureau of Investigation.

24 Q.   Okay.  And how long have you been with the FBI?

25 A.   Approximately six and a half years.

1  Q.   Within the FBI, are you assigned to any specific division
2  at this point in time?
3  A.   Yes.  I am assigned to work cyber matters, so in the cyber
4  division of the FBI.
5  Q.   How long have you been assigned to that division?
6  A.   The entire time, six and a half years.
7  Q.   And other law enforcement work history prior to the FBI,
8  do you have any?
9  A.   No.
10  Q.   And your education?  Where did you receive any degrees you
11  may have?
12  A.   So I have a bachelor of science degree from Millersville
13  University in Pennsylvania, and my degree is in meteorology.
14  Q.   And with respect to your work history prior to joining the
15  FBI, can you, I guess, briefly describe each of those jobs that
16  you may have prior to joining the FBI?
17  A.   Sure.  After college, I was employed in the private
18  industry doing mainly information technology work, so usually
19  referred to IT.  So I did various -- I had various jobs for
20  about eight years, and it mainly involved information
21  technology.
22  Q.   And I know you're being a little modest about your
23  background.  Where did you work specifically in private -- your
24  private industry for -- did you work for the National Weather
25  Service?

1  A.   Yes, yes.

2  Q.   Can you describe your role with the National Weather

3  Service?

4  A.   So, yeah, I was contracted through a government contractor

5  that we did systems design and architecture for the National

6  Weather Service.  So my meteorology background, they were

7  looking for folks with aptitude in information technology, so I

8  was designing their networks and systems architecture that was

9  behind their watch and warning system.  So a lot of computer,

10  server, and networking work.

11  Q.   And with respect to the National Weather Service, how long

12  were you there?

13  A.   I was there approximately five years.

14  Q.   And through your other work in the private practice or

15  private industry, was that about eight years in total you were

16  in the private industry before joining the FBI?

17  A.   Yes.

18  Q.   And not to get into all the other jobs, but through your

19  work in the private industry before joining the FBI, can you

20  just describe the types of things you did, as you just did with

21  the National Weather Service?

22  A.   Yes.  So basically designed, implemented, administered for

23  each of those jobs computer servers and networking equipment.

24  Q.   And it was pretty much the same role for each of those

25  positions?

442

1  A.   Yeah, it was all around information technology, whether it
2  was from -- like I said, networking equipment or processing
3  servers that handled e-mail, data processing, database, or
4  anything in that regard.
5  Q.   Now let's talk about some of the training experience that
6  you've had with the FBI since joining them in 2015 -- is that
7  right?
8  A.   Yes.
9  Q.   Specifically, have you been assigned to investigate high
10 tech computer intrusion crimes?
11 A.   Yes.
12 Q.   Online fraud?
13 A.   Yes.
14 Q.   Theft of intellectual and personal information?
15 A.   Yes.
16 Q.   Did you also have to attend specialized computer training
17 at the FBI academy?
18 A.   Yes.
19 Q.   And which would include incident handling and computer
20 network forensics?
21 A.   Correct.
22 Q.   In that capacity, do you regularly collect -- I guess
23 interface with informational technology professionals to
24 collect evidence and share relevant and necessary intelligence
25 with respect to that evidence?

443

1  A.   Yes.

2  Q.   And one of the other items through your work with the FBI,

3  are you certified in digital extraction for gathering and

4  handling digital evidence?

5  A.   Yes.

6  Q.   Can you kind of describe what that means briefly as far as

7  extraction?  What does that mean?

8  A.   Yeah, sure.  So if there is some sort of computer

9  intrusion event or any sort of activity that would be worth

10  analyzing for folks like myself as an agent or other analysts

11  within the FBI, we extract data by getting a forensic image of

12  the data typically.  And so it's a clean copy of the evidence

13  that we can then go make a copy of, however many times we need,

14  and then analyze it.

15  Q.   And with respect to your role with the FBI here in

16  Harrisburg, how many individuals have the knowledge, training,

17  and experience within the FBI here that you have with respect

18  to the computer forensics?

19  A.   Just myself.

20  Q.   And I think you had mentioned before about in the network

21  architecture and that being one of your specialties as far as

22  your education and experience.  Would it be fair to say

23  computer forensics is also one of the areas of your expertise?

24  A.   Yes.

25            MR. ADKINS:  Your Honor, at this point in time, I

444

1   would move under Rule 702 of the Federal Rules of Evidence to

2   tender Special Agent Armor as an expert in the field of network

3   architecture and computer forensics.

4           THE COURT:  All right.  Mr. Dougherty?

5           MR. DOUGHERTY:  No objection.

6           THE COURT:  Okay.  Thank you.

7           MR. ADKINS:  Thank you, Your Honor.

8                      **DIRECT EXAMINATION**

9   BY MR. ADKINS:

10  Q.   Now let's talk about this case.

11  A.   Okay.

12  Q.   How did you get involved in the case concerning Mr.

13  Dougherty?

14  A.   I can't recall the year, but I was informed by my -- when

15  I arrived in Harrisburg from my former office in Philadelphia,

16  I was asked by my former supervisor here in Harrisburg to ask

17  if I had the knowledge and experience and training to speak to

18  the elements of this case, this situation.  And as I reviewed

19  it, you know, I said, yes, I do.

20  Q.   So you were asked to take a look at e-mails specifically?

21  A.   Yes.

22  Q.   And I have in front of you, prior to you sitting down,

23  what has been previously admitted as Government Exhibit 2-A and

24  Government Exhibit 4-A.  Do you see those there in front of

25  you?

1  A.   Yes.

2  Q.   Okay.  And if we could, please, show Government Exhibit

3  2-A.  Are you familiar with this document?

4  A.   Yes.

5  Q.   And you've seen it before in your work in this case

6  involving Mr. Dougherty?

7  A.   Yes.

8  Q.   And is this one of the e-mails that you're asked to

9  analyze for certain information?

10  A.   Yes.

11  Q.   Okay.  And what specifically were you asked to do as it

12  related to this e-mail?

13  A.   Regarding this e-mail, I was asked to look at the e-mail

14  header information, which is technical information regarding

15  the flow of the receipt of the information to the FBI account.

16  Q.   As we see Exhibit No. 2-A here, do we see e-mail header

17  information?

18  A.   No.

19  Q.   And can you explain to the jury what e-mail header

20  information specifically is?

21  A.   Sure.  E-mail header information is typically -- well,

22  it's very rarely shown in an e-mail.  It's the raw information

23  that shows the flow in from the sending e-mail.  So basically

24  when the e-mail hits your account, the server that runs your

25  e-mail account, it will show from the onset on that system, and

446

1  it will show the flow to your certain e-mail client, so to your

2  inbox.

3       And it's data that's not easily decipherable for the

4  average user, so that's why it's not displayed.  But it's

5  available for every e-mail.

6            MR. ADKINS:  Okay.  And may I approach, Your Honor?

7            THE COURT:  Yes, please.

8  BY MR. ADKINS:

9  Q.   I'm going to hand you what's been marked not yet admitted

10 as Government Exhibit 2-B.  Do you recognize that?

11 A.   Yes.

12 Q.   How do you recognize it?

13 A.   The e-mail header for Exhibit 2-A e-mail.

14 Q.   Okay.  And did you through your work in this case obtain

15 that e-mail header?

16 A.   Yes.

17 Q.   And how did you obtain it?

18 A.   Actually, this was already obtained and presented to me.

19 Q.   Provided to you in your capacity to look at this as an

20 expert?

21 A.   Right, yes.

22 Q.   And if we could, for the jury's purposes -- I'm sorry,

23 before that, the information that you received in Government

24 Exhibit 2-B, is that, what I've shown you, the way that you

25 received it?  Is the document correct?

447

1   A.   Yes.

2   Q.   Nothing has been added, deleted, or changed that you're

3   aware of with respect to Exhibit 2-B?

4   A.   Correct.

5   Q.   I know there's a lot of information on that exhibit.  But

6   through your review and understanding of seeing that, it's a

7   true and accurate copy of the e-mail header information that

8   you've received with respect to Government Exhibit 2-A?

9   A.   Yes.

10        MR. ADKINS:  I'd ask that it be admitted into

11  evidence, Your Honor.

12        MR. DOUGHERTY:  No objection.

13        THE COURT:  All right.  It's admitted.

14  BY MR. ADKINS:

15  Q.   Can we pull up 2-B?  This is what you were just talking

16  about, right?

17  A.   Yes.

18  Q.   As far as information, that may be kind of hard to

19  understand for the average person?

20  A.   Yes.

21  Q.   For the not-so-average person, you, can you explain to us

22  kind of just what generally you're looking at when you look at

23  header information like this?  And what are you looking for?

24  A.   So when you first look at it, this is what I battle with

25  every day, explaining things like this.  You look at the first

448

1   step of how the e-mail was received.  So you can see the

2   initial servers, computer servers that process it and send it

3   along down the line all the way until you get to the second

4   page to where it processes to the e-mail clients such as

5   Microsoft Outlook or even just a web browser if you were on

6   Google's G-Mail.

7   Q.   And I want to hand you what's marked, not yet admitted,

8   Government Exhibit 12, 13, and 14.  I'll give you a moment to

9   review those.

10  A.   (Pause.)  Okay.

11  Q.   Recognize all three of those exhibits?

12  A.   Yes.

13  Q.   And specifically with respect to Exhibit No. 12, is that a

14  subpoena and subpoena return for information associated with

15  Microsoft?

16  A.   Yes.

17  Q.   And in it, does it have e-mail header information

18  associated with it?

19  A.   Yes.

20  Q.   And in addition to that, does it also have a declaration

21  of authenticity of business records pursuant to Federal Rules

22  803(6) and 902(11)?

23  A.   Yes.

24  Q.   And this is received from Microsoft in response to a

25  subpoena by the United States Attorney's Office?

449

1   A.   Yes.

2        MR. ADKINS:  Your Honor, pursuant to those rules I

3   just cited, I'd move for the admission of Government's Exhibit

4   No. 12.

5        MR. DOUGHERTY:  No objection.

6        THE COURT:  They are admitted.

7   BY MR. ADKINS:

8   Q.   We'll get back to number 12 in just one moment.  But with

9   respect to Government's Exhibit No. 13, is this a subpoena and

10  related attachments to Century Link?

11  A.   Yes.

12  Q.   And a response from Century Link in addition to a

13  declaration from a law enforcement support team from Century

14  Link certifying that the attached is an original record in the

15  company's custody, and that making a declaration that these

16  were made at or near the time of the occurrence of the matters

17  or for information transmitted from persons with knowledge of

18  those matters kept in the course regularly conducted activity

19  and made by the business's regularly conducted activity as a

20  regular practice?

21  A.   Yes.

22  Q.   Have you seen this document before and used it in your

23  review of this case?

24  A.   Yes.

25        MR. ADKINS:  Your Honor, pursuant to those same rules

450

1  cited for Government's Exhibit No. 12, I move for the admission
2  of Government's Exhibit No. 13, please.
3          MR. DOUGHERTY:  No objection.
4          THE COURT:  All right.  It's admitted.
5  BY MR. ADKINS:
6  Q.   Finally, Government's Exhibit No. 14.  Are you familiar
7  with this document as well?
8  A.   Yes.
9  Q.   And this is information related to a subpoena to Comcast.
10 And with it has a certificate of authenticity of Federal Rules
11 of Evidence 902(11) and 902(13) on one of the pages that this
12 record was -- that it's certified and it's intended to satisfy
13 those rules of evidence.  And you're familiar with this?
14 A.   Yes.
15 Q.   And did you use this in your analysis in this case?
16 A.   Yes.
17         MR. ADKINS:  Your Honor, again, pursuant to those
18 same rules I just cited, I would move for the admission of
19 Government's Exhibit No. 14.
20         THE COURT:  All right.  Any objection?
21         MR. DOUGHERTY:  No objection.
22         THE COURT:  It's admitted.
23         MR. ADKINS:  Thank you, Your Honor.
24 BY MR. ADKINS:
25 Q.   And when you look at that e-mail header information that

451

1  we had, Government's Exhibit No. 2-B relating to Government's

2  Exhibit No. 2-A, that e-mail, on page 2, it lists a lot of

3  information from -- if we could put up Government's Exhibit No.

4  2-B, page 2.

5       Some things that may make some sense, at least for me, is

6  on this page we see the to and from.  Some of the things that

7  we saw on Government's Exhibit No. 2-A in the top of that

8  e-mail about who the sender was and who the recipient was.

9  Right?

10 A.   Yes.

11 Q.   And I guess maybe kind of to jump to what's contained in

12 those Government's Exhibits 12, 13, and 14.  With respect to

13 the information from this header information, does Government's

14 Exhibit No. 12 show that -- what does Government's Exhibit No.

15 12, I should say, what does it show on the last page?

16 Reference to the header information that we have here?

17 A.   So if you look at the last page of Exhibit 12 and the

18 physical locations of the servers that are described in Exhibit

19 2-B, they're at the very beginning of 2-B, basically in the

20 first half of the page.  This -- the business records show that

21 the physical locations of these servers that are hosted by

22 Microsoft Corporation are in Cheyenne, Wyoming, and West Des

23 Moines, Iowa.

24 Q.   And is it your understanding that the recipient of this

25 e-mail in Exhibit 2-A, one of the recipients, was Christopher

1  Cruz?

2  A.   Yes.

3  Q.   And are you familiar with Mr. Cruz?

4  A.   Yes.

5  Q.   Are you familiar with where his office is located?

6  A.   Yes.

7  Q.   Where is that?

8  A.   Harrisburg, PA.

9  Q.   Here in the Middle District of Pennsylvania?

10 A.   Yes.

11 Q.   With respect to the information that we recovered from

12 Exhibit 14, if we could put that on the screen, please?  This

13 is a subpoena -- this is in relation to information we

14 requested from Comcast.  This request for information is for

15 what e-mail address?

16 A.   For the e-mail address, and I'll just --

17 Q.   You can look at the screen, too?

18 A.   Okay.

19 Q.   You can use your finger if you want?

20 A.   Oh, okay.  Keithdoughertycfp@comcast.net.

21 Q.   Are you talking about this area here?

22 A.   Yes.

23 Q.   And so the return and the information that follows this

24 below is in relation to Mr. Dougherty -- I'm sorry, in relation

25 to that e-mail address?

453

1   A.   Yes.

2   Q.   Okay.  Below that, we have -- and we can highlight this

3   area, please?  And can you describe the information here that

4   we see in relationship to that e-mail address?

5   A.   Yes.  So the information, this subscriber to that e-mail

6   address at Comcast was in the name of Keith Dougherty, and

7   service address 8075 Manada View Drive, Harrisburg, PA.

8   Q.   And it goes on to describe some information, including his

9   telephone number and other e-mail user ID's, which I think I

10  want to take note of.  If we could go out of it for one moment.

11  Okay.  I think that's what we need to discuss -- all we need to

12  discuss with respect to Exhibit No. 14.

13       Let me ask you a general question based on your knowledge

14  and understanding, not being an expert.  Can you explain how an

15  e-mail communication travels in the internet from a sender to a

16  recipient?  What's the -- what's the initial step as far as

17  that goes?

18  A.   Sure.  So when a person sends an e-mail from their e-mail

19  client, what it does is, it connects to some sort of exchange

20  server.  So there's some sort of -- it's like a post office, I

21  liken it to a post office to where you take your letter that

22  you draft, and you take it to the post office.  It's got a

23  recipient's name on it, in this case, it would have an e-mail

24  address.

25       And your exchange server that's connected to the internet

454

1  will know how to route that information and will look to other

2  devices on the internet, which exists all across the world.

3  And they'll know how to route that.  So they'll know what other

4  post office to route it to.  And if there's any along the way,

5  it will hit those.

6      Then when it comes into the recipient, it comes in through

7  their exchange server, which is like their post office.  And

8  then they know which user ID's box to put it in.

9      That's what you see in the e-mail header information is

10 the route that it takes when it gets to the user's post office

11 and the steps that it takes to get to their client, to their

12 inbox, mailbox.

13 Q.   Is it safe to say once the sender hits send on the e-mail,

14 that it's then transmitted into this world of the internet?

15 A.   Yes.

16 Q.   And from there, bounces around in the internet until it

17 reaches its destination?

18 A.   Yes.

19 Q.   Is that a, I guess, a watered down version --

20 A.   Yeah.

21 Q.   -- of the way you described it?

22 A.   Yeah.  And I can explain if you'd like?

23 Q.   Go ahead, please.

24 A.   So when it looks to route this, it looks to multiple

25 servers in every case of an e-mail send.  It looks to servers

1    that are authorities within the internet to say, okay, where is

2    the mail exchange server located for me to get this to its

3    destination.

4         And so it looks to servers throughout the world.  It

5    touches them.  It gets that information.  And then it routes it

6    however it needs to route it and typically multiple steps in

7    between.

8    Q.   And just wrapping up our discussion of 2-A, and then we'll

9    jump to 4-A to conclude, in 2-A, if you could pull that up one

10   more time, please.  At the top, this e-mail address at

11   keithdoughertycfp@comcast.net, that's the same e-mail address

12   that we received information from Comcast, as we just discussed

13   in Government's Exhibit No. 14.  Right?

14   A.   Yes.

15   Q.   And moving onto Government Exhibit 4-A that has previously

16   been admitted.  I believe that's in front of you, too, Special

17   Agent?

18   A.   Yes.

19   Q.   Now when you received this -- when you received this

20   e-mail, you didn't also receive header information for this

21   e-mail, did you?

22   A.   No.

23   Q.   And in determining kind of the flow of things with respect

24   to this e-mail, again, the from is the same e-mail address as

25   Exhibit 2-A.  Is that right?

456

1  A.   Correct, yes.

2  Q.   And with respect to the recipient here, as alleged in the

3  indictment specifically, one of those would be -- if you could

4  highlight that, please?  Are you aware of

5  cenerson@attorneygeneral.gov?

6  A.   Yes.

7  Q.   And do you know who that is?

8  A.   I know who it is personally.

9  Q.   And you know that it's Caleb Enerson that works at the

10 Pennsylvania Attorney General's office?

11 A.   Yes.

12 Q.   And do you know where that office is located?

13 A.   Yes.

14 Q.   And where is it located?

15 A.   Harrisburg, Pennsylvania.

16 Q.   And that's just right across the street here in Strawberry

17 Square?

18 A.   Yes.

19 Q.   With respect to your role in this case in identifying

20 where e-mails flow at the PA Attorney General's office, did you

21 do some steps to understand that flow prior to coming to court

22 today?

23 A.   Yes.

24 Q.   And can you describe for the jury kind of what you're able

25 to, information you're able to get and what that meant to you?

1  A.   Yes.  The way that, in my research, the way that the

2  attorneygeneral.gov e-mail exchange works, so basically they

3  are a post office for e-mail, is set up in a similar fashion to

4  the FBI, but there's different routes that it takes when the

5  message first is received by their system.  And from what I was

6  able to determine, it starts in San Jose, California.

7  Q.   So you're saying, again, using the word I used before,

8  when the sender here, this sender,

9  keithdoughertycfp@comcast.net, sends this e-mail, it's then

10  transmitted into the internet.  And from your understanding of

11  the PA Attorney General's e-mail, it goes out to California

12  before it comes back here?

13  A.   Correct.

14  Q.   So theoretically, the sender here where it states Keith

15  Dougherty could be sitting across from Mr. Enerson here at Mr.

16  Enerson's office, but that e-mail isn't just going between

17  those two computers, for lack of better words?

18  A.   Correct.

19  Q.   It takes a long trip out west before it comes back?

20  A.   Yes.

21          MR. ADKINS:  May I have one moment, Your Honor?

22          THE COURT:  Sure.

23          (Pause.)

24  BY MR. ADKINS:

25  Q.   And then just in conclusion here, Special Agent.  In your

458

1  work, in your understanding of how the internet flows, is the

2  internet a facility of interstate commerce?

3  A.   Yes.

4  Q.   And to a reasonable degree of certainty, are you saying

5  that these e-mails traveled in interstate commerce across state

6  lines where they were sent to ultimately where they were

7  received?

8  A.   Yes.

9         MR. ADKINS:  No other questions, Your Honor.

10        THE COURT:  Thank you.  Any cross?

11        MR. DOUGHERTY:  Just briefly.

12                       **CROSS EXAMINATION**

13  BY MR. DOUGHERTY:

14  Q.   With regard to these e-mails in question, there were no

15  financial transactions, nothing else attached to them, just

16  simply the information?

17  A.   From what I can tell, there were attachments to these

18  e-mails.  I did not review the attachments, only just the basic

19  information regarding the flow of the e-mail.

20  Q.   So the answer is, no, there was no financial transactions

21  or --

22  A.   Transactions as in financial information that was --

23  Q.   Financial transactions.  Any kind of money changing hands,

24  anything like that?

25  A.   Not that I recall.

459

1           MR. DOUGHERTY:  Okay.  Thank you.  No more questions.

2           THE COURT:  Any redirect?

3           MR. ADKINS:  No, Your Honor, thank you.

4           THE COURT:  Okay.  Next witness.

5           MR. ADKINS:  We rest, Your Honor.

6           THE COURT:  All right.  Thank you.  All right.  Now I

7    need to excuse you for -- I'm wondering -- I have to attend to

8    something that's typical.  And it may -- I'm going to guess

9    it's going to take at least 10 minutes.

10          I could bring you back for the 15 or do you want to

11   call it a day and start fresh tomorrow morning?  What's your

12   preference?  I think -- is that for tomorrow?  Start fresh?

13   Okay.  I like that.  Thank you.  All right.

14          So it's very important, again, you don't discuss the

15   case, you don't do any research on the case.  If anybody talks

16   to you, please alert me to that in the morning.  And we do

17   appreciate your service.  And we'll see you in the morning.

18   All right.

19          COURTROOM DEPUTY:  Judge, 9:00?  Or do you want to do

20   it earlier?

21          THE COURT:  Well, do you like to start at 8:30 or 9?

22          THE JURY:  Nine.

23          THE COURT:  Nine, okay.  Don't hesitate.  Okay.

24   Well, then we'll see you tomorrow and we'll start at 9.  Thank

25   you very much.

460

1            COURTROOM DEPUTY:  All rise.

2            (Jury excused for the day at 4:35 p.m.)

3            THE COURT:  All right.  Let's all have a seat.

4  Anything I need to consider from the Government's vantage at

5  this moment?

6            MR. ADKINS:  Other than jury instructions, Your

7  Honor, no.

8            THE COURT:  No, okay.  Anything I need to consider

9  from the defense other than jury instructions?

10           MR. DOUGHERTY:  No, that's what I thought we were --

11           THE COURT:  Right, but I just wondered if there were

12  any other issues.

13           MR. YOUNG:  May I just inform him about one of the

14  things he could argue if he wants to?

15           THE COURT:  Sure.

16           MR. YOUNG:  I mean --

17           THE COURT:  Yeah, let's do that.

18           (Mr. Dougherty and Mr. Young confer.)

19           MR. YOUNG:  Judge, I think I can, without breaching

20  any privilege, I just went over Rule 29 briefly and some of the

21  time he can do it and, you know -- I just wanted to inform him

22  of that.

23           THE COURT:  All right, thank you.

24           MR. YOUNG:  I didn't inform him whether he should.

25           THE COURT:  Okay.

461

1          MR. DOUGHERTY:  So my question was, the time limit.
2    When would be --
3          THE COURT:  I'll hear you right now.
4          MR. DOUGHERTY:  Okay.  My position is they have
5    failed to establish the essential element that the threats
6    were, in fact, transmitted with the intent to threaten any of
7    them in Counts 1, 2, and 4.
8          THE COURT:  Okay.  And I'm going to deny -- you're
9    asking for a motion basically for a directed verdict?
10         MR. DOUGHERTY:  Yes.
11         THE COURT:  Right.  And I'm going to deny the motion.
12   I think ample evidence has been submitted from which a rational
13   jury could conclude that all of the elements of the offenses
14   have been established.  We're going to get into more detail in
15   jury instructions, so I'm going to -- I think I'll reserve kind
16   of my discussion of the law then.
17         I think Mr. Perri actually summarized the law on a
18   number of occasions, but I'm going to -- I'd be willing to hear
19   more argument when we get into jury instructions on that.  I
20   want to add, Mr. Perri, my comment when we came back out and I
21   said I just wanted to make sure we move, it was not meant to be
22   critical.
23         In fact, I commend the Government on its presentation
24   just -- I don't mean in terms of getting into the merits, I
25   have no opinion on the merits, that's not my job.  But it's

1 difficult to try a pro se case.

2        MR. PERRI:  Understood, Your Honor.  I appreciate

3 that.  I appreciate you saying that.

4        THE COURT:  So speaking for the Court, I am

5 appreciative of that.  Really, I was trying to preempt though,

6 there was some -- there was some repetitiveness, but I

7 understand why with respect to the last witness.  We had the

8 sidebar conference, Mr. Dougherty participated in that.

9        I didn't know if you were going to call another

10 witness to do similar, and I was trying to say I do want to be

11 cognizant of the jury's time.  It was not meant as a criticism

12 in any way.  It was more preemptive to see if something else

13 was coming down the pike.

14        Let's talk about jury instructions.  So I reviewed

15 what was submitted.  I don't know if it was docketed.

16        MR. ADKINS:  Your Honor, if I may?

17        THE COURT:  Yes.

18        MR. ADKINS:  I have proposed -- I just have simply

19 titled a one-page for this purpose, a proposed jury instruction

20 number 16 related to interstate commerce.  I think it maybe

21 should be discussed.  I have copies for you and your clerk and

22 the Defendant as well, if you would like those right now.

23        THE COURT:  Sure.  Well, did you -- first of all, did

24 the Government bring with it -- I had ordered to produce 20

25 copies.  Do you have those with you?

1          MR. PERRI:  We did, Your Honor, and we have them with

2    us.  We did -- the short answer is, yes.  There's a couple of

3    things we have to discuss.  And one of them is the way, first

4    of all, it did not specify an instruction for interstate

5    commerce.

6          And secondly, the other thing is for jury instruction

7    number 5, which relates to the charge of interstate

8    communication of a threat.  We realize that it has a fourth

9    element stated there, the communication was addressed to a

10   United States federal judge.  That's not in the statute.  It's

11   wrong, apparently it's block and copy --

12         THE COURT:  That's okay.  Did you already make those

13   changes?

14         MR. PERRI:  So I was hoping -- so I've got 20 copies

15   of the version that you told me to make 20 copies of, and then

16   I have 20 copies of the one without that element.

17         THE COURT:  So here's what I'd like to do.  Let's

18   start with then -- well, first of all, let's start with the

19   most recent version that you have, which, in other words, you

20   have made some changes to what I said.  All right?

21         But I'd like you to provide a copy of both documents

22   to Mr. Dougherty and both documents to me.

23         MR. PERRI:  Yes, Your Honor.

24         THE COURT:  Then we'll kind of walk through.

25         MR. PERRI:  Then Mr. Adkins has prepared a proposed

464

1  instruction.

2           THE COURT:  To add to that?

3           MR. PERRI:  Yes.

4           THE COURT:  That's fine.  Let's get the two copies.

5  The one is the copies of what I had ordered basically adopting

6  your instructions, the original.  And then let's get -- and

7  let's mark it 1 so everybody is on the same page.  Just

8  handwrite 1 on the upper right-hand copy.  Give Mr. Dougherty a

9  copy.  Give me a couple copies.

10          (Complied.)

11          Now actually while you're preparing that, Mr.

12  Dougherty, I think I should engage in what we call a colloquy

13  with you because -- and it's a little unusual because I think

14  you -- because you're proceeding pro se, and you appear to have

15  some knowledge, I'm not going to say it's always correct, about

16  your constitutional rights.

17          So you obviously know, and I'm going to repeat, you

18  have a right under the fifth amendment.  You cannot be

19  compelled to testify.  And the Government, under our

20  Constitution, has the burden of proving each and every element

21  of a crime that's been charged against a Defendant beyond a

22  reasonable doubt.

23          The burden always rests with the Government.  And so

24  you can sit silent, and the Government still has to prove your

25  guilt beyond a reasonable doubt.  And, in fact, I would

465

1  instruct the jury were you not to present a defense, that they

2  could not hold that fact against you.  And if you decided not

3  to testify, they cannot hold that fact against you.

4           So do you understand those rights?

5           MR. DOUGHERTY:  Yes, I do.

6           THE COURT:  All right.  Now is it your desire to

7  testify or not testify?

8           MR. DOUGHERTY:  To testify.

9           THE COURT:  All right.  And do you put -- do you --

10  is the -- so you intend to put on a defense?

11          MR. DOUGHERTY:  (Nodded head affirmatively.)

12          THE COURT:  Now once you put on a defense, the

13  Government can fault you for things that are lacking in your

14  defense, according to the Government's view, in argument.  Do

15  you understand that?

16          MR. DOUGHERTY:  Yes.

17          THE COURT:  Okay.  So you kind of -- I just want to

18  be really clear.  You open yourself up, once you testify, once

19  you start to put on a defense, the Government is allowed to

20  say, that's not much of a defense, and poke holes in it.

21  Whereas if you didn't put on a defense and you didn't testify,

22  the Government could not say anything about that.  They

23  couldn't ask the jury to draw a negative inference from that.

24  Do you understand all that?

25          MR. DOUGHERTY:  Yes.

466

1          THE COURT:  Okay.  You wish to testify.  Is there
2    anything else you plan on putting forward as a defense tomorrow
3    other than your testimony?

4          MR. DOUGHERTY:  No.  I was under the impression I
5    missed my opportunity for that.

6          THE COURT:  Well, again, you know, you proceeded as a
7    lawyer.  I mean, that's the risk you take, and I can't tell you
8    how to put on a defense.  That's not my job.  And Mr. Young has
9    been very, I think, generous and gracious in terms of offering
10   you legal advice, to the extent you have sought it.

11         So I guess that's right, if you're not putting
12   anything else on, you're not, that's a decision you made.  So
13   you are testifying.  Do you have any sense approximately of how
14   long you think you would testify initially before -- let me
15   just step back.

16         If you are going to testify, then you are subject to
17   cross examination from the Government.  Do you understand that?

18         MR. DOUGHERTY:  Yes.

19         THE COURT:  Okay.  Now just, and I'm not going to
20   require a precise estimate, but I am just trying to get a sense
21   of the day tomorrow.  How long do you expect that you might
22   testify in your direct testimony?

23         MR. DOUGHERTY:  At this point, I hadn't really done
24   the proper analysis, so I was hoping I would get that done by
25   tonight.  But I don't expect it to be, you know, all day.

467

1          THE COURT:  Well, that's what I'm getting at.  Do you
2  think, for instance, you would finish with your testimony
3  before lunch?
4          MR. DOUGHERTY:  Probably, yeah.  Again, it might run
5  a little bit longer depending on what happens with the process,
6  but I think that would be appropriate.
7          THE COURT:  Okay.  And then one thing you might want
8  to do when you prepare for your testimony is to go back and
9  think about and maybe even restudy the rulings I've made, okay.
10  I'm not going to let you put in front of the jury the statute,
11  the Pennsylvania statutes and constitutional provisions that
12  you believe justify based on a self defense theory.
13          I've already ruled that's not permissible because as
14  a matter of law, that is not, in fact, a justification, it's
15  not an appropriate defense.  Okay.  So now with all that
16  then -- and, Mr. Young, I don't know if you think I should
17  engage in any further colloquy?
18          MR. YOUNG:  I mean, I don't really know it's my place
19  to say anything about that one way or the other.
20          THE COURT:  Well, and that's appropriate, too.  You
21  are standby counsel.
22          MR. YOUNG:  Yeah, no, I think Mr. Dougherty is aware
23  of his right.  I have spoken to him about it as well.  So I
24  think he's made his decision.
25          THE COURT:  All right.  So then let's talk about jury

468

1  instructions.  So you've got these sets, if you could hand them

2  up and provide them to Mr. Dougherty, please.

3          (Complied.)

4          THE COURT:  In the first instance, either -- hold on

5  a second.

6          (Pause.)

7          THE COURT:  Okay.  So in the first instance -- and

8  Mr. Adkins or Mr. Perri, I don't care, but could you walk me

9  through what's changed, what Mr. Perri sort of was summarizing

10 between the version between essentially I had adopted and then

11 the proposed amendments.  Okay?

12         MR. PERRI:  Yes, Your Honor.

13         THE COURT:  That would be great, thank you.

14         MR. PERRI:  So if we could look at jury instruction

15 number 4, that is the jury instruction that sets forth the

16 elements for mailing threatening communications.

17         THE COURT:  Right.

18         MR. PERRI:  And that's correct.  But if we then look

19 at jury instruction number 5, it appears that I inadvertently

20 copied over the fourth element.  And there is no fourth element

21 for that charge, interstate communication of a threat.  There's

22 no mention of judges or anything like that.  And I think you

23 kind of have to look at the statute to know what I'm talking

24 about.

25         THE COURT:  Right.  Okay.  Just give me one second.

469

1              (Pause.)

2              THE COURT:  Okay.  So I think that -- and do you have

3    any objection to this amendment?

4              MR. DOUGHERTY:  No.

5              THE COURT:  So then we'll make that change.  Okay.

6    What's the next change?

7              MR. PERRI:  Your Honor, in the paragraph, again,

8    speaking of jury instruction number 5, it says, The Defendant

9    is charged in Counts 2, 3, and 4.  As the Court is aware, we

10   have dismissed Count 3.

11             THE COURT:  Right.

12             MR. PERRI:  So that needs to come out.

13             THE COURT:  Any objection to that change, Mr.

14   Dougherty?

15             MR. DOUGHERTY:  No.

16             THE COURT:  Okay, that's fine.

17             MR. PERRI:  And then we noticed that this set of jury

18   instructions does not have any mention of the interstate

19   commerce.

20             THE COURT:  Right, so we need to add that.

21             MR. PERRI:  So that needs to be added.

22             THE COURT:  Yes.

23             MR. PERRI:  While we were talking, going over last

24   night all the case law for *Elonis* and etc., we happened to

25   notice that the initial *Elonis* case specifically addresses the

470

1    interstate nexus element in some pretty clear language as it

2    pertains to e-mails and the internet.

3          And so Mr. Adkins has prepared a proposed instruction

4    for the convenience of the Court, which, of course, the Court

5    is welcome to, you know, corroborate with looking at the

6    language itself in the case.  As you know, *Elonis* was reversed,

7    but on other grounds.  It was reversed as it pertained to the

8    mens rea element not anything with respect to interstate nexus.

9          THE COURT:  Right, okay.  So you want to then -- you

10   can hand up and provide to Mr. Dougherty a copy of the proposed

11   interstate commerce element.

12         (Complied.)

13         THE COURT:  When do you propose to insert this in the

14   number?

15         MR. ADKINS:  I had it as number 16 just because we

16   had 15 other ones, Your Honor.  I don't know if it might be

17   better to move it back in the jury instructions closer to, you

18   know -- it might make some sense to put it somewhere after

19   instruction number 5.

20         THE COURT:  Just hold on.

21         (Pause.)

22         MR. ADKINS:  Maybe any time after instructions 4 and

23   5, which talk about interstate commerce, specifically, 5 about

24   the e-mail communication.  So any time after and close to

25   instruction number 5, I think it would make more sense.

471

1          THE COURT:  All right.  Well, let's table where we're

2   going to put it because I kind of have a bigger problem.  And

3   this is what happens when you're, you know, I guess, reviewing

4   these last week, it's Thanksgiving, maybe not paying sufficient

5   attention to this.

6          So one thing I just realized, for instance, is I

7   don't even understand why we're having the willful instruction.

8   I mean, we don't define the essential elements of either

9   charges as involving willfulness.

10          MR. PERRI:  I think I know where it came from, Your

11   Honor.  I don't disagree with you that -- with your point.  I

12   think where it came from, to the extent that it may have some

13   value for the analysis, is the language of the indictment uses

14   that word.

15          THE COURT:  Right.

16          MR. PERRI:  And I didn't draft it.  That was Mr.

17   Finucane.  I think that's why his initial set of jury

18   instructions included an instruction for willingly and --

19   willfully, sorry.  And it just stayed in there.  So I agree

20   about your reading of the statute.  But if you're wondering how

21   we got an instruction for willfully, I think that's the

22   explanation.

23          MR. YOUNG:  Judge --

24          THE COURT:  Just give me a second.

25          MR. PERRI:  If you look --

472

1           THE COURT:  If you could give me a second, please?

2           MR. PERRI:  Sure.

3           (Pause.)

4           THE COURT:  Okay, I will hear you.

5           MR. PERRI:  Thank you, Judge.  I have one more.

6           THE COURT:  I'm on the willfulness right now.

7           MR. PERRI:  I have one more thought for you that may

8    be helpful.  I noticed in some instructions, Judge, the word

9    willfully is kind of inserted as surplusage.  If you look here,

10   the definition between knowingly and willfully, it's almost

11   exactly the same.

12          So they say knowingly and willfully, but they're not

13   intending to suggest that willfully is a higher and extra

14   burden that has to be met in some sort of different, more

15   exigent mens rea.  And I noticed this before, and I thought

16   that was my impression of what was going on, but I drafted

17   these very early in the case before I had a chance to really

18   formulate all my thoughts.  So I apologize for --

19          THE COURT:  You don't need to apologize, that's all

20   right.  Mr. Young?

21          MR. YOUNG:  Judge --

22          THE COURT:  I noticed that in the proposed jury

23   instructions submitted this afternoon by Mr. Dougherty, there

24   was a willfulness instruction taken from the New Jersey case.

25          MR. YOUNG:  Yeah.  I just wanted to, if I may sit

 1  next to him for a second, because I haven't had a chance to

 2  discuss this with him?

 3          (Complied.)

 4          THE COURT:  Yes.  Let me tell you what I'm thinking.

 5  So I think there's an awful lot of case law on willfulness.

 6  And, in fact -- and I can't remember which, but there's a

 7  decision that rings in my brain.  I mean, it's interesting when

 8  the Supreme Court discusses willfulness, it often says it's a

 9  difficult to define concept.

10          That's the precisely the problem.  And whereas I

11  think knowledge, as generally accepted, is a higher mens rea.

12  And it's undisputed, that's what the Court says in *Elonis*, this

13  is the Supreme Court decision, quote, there is no dispute that

14  the mental state requirement in Section 875(c) is satisfied if

15  the Defendant transmits a communication for the purpose of

16  issuing a threat or with knowledge that the communication will

17  be viewed as a threat; in other words, knowledge and intent.

18          But the Government is actually -- you're not arguing,

19  you're not asking for a jury instruction on recklessness.  You

20  have actually limited yourself to knowledge and intent of the

21  Defendant.

22          MR. PERRI:  That's correct, Your Honor.

23          THE COURT:  So I don't think we need a willfulness

24  because I think that we've got a knowledge and intent

25  instruction.  Now we can -- I will hear the Defendant on the

474

 1   other proposed jury instruction on true threat, but let's just

 2   deal with willfulness for right now.  Do we need willfulness?

 3   My take right now is we do not.

 4          MR. YOUNG:  I won't belabor the point.  I'm not going

 5   to argue for the Defendant, but I want to say one thing.  In

 6   the New Jersey case, *New Jersey v. Brody*, the Government itself

 7   submitted proposed jury instruction that included knowingly and

 8   willful.  Maybe belts and suspender approach, maybe

 9   unnecessary, but well within the Court's discretion.

10          THE COURT:  Well, it strikes me that -- in my mind,

11   willfulness is a lower mens rea.  I think the burden is higher

12   to show knowledge.  So -- I mean, I'm almost tempted, if the

13   Defendant wants to, maybe we can add willfulness, but I think

14   it makes it easier for the Government, you know --

15          MR. YOUNG:  I'll step back unless he wants to confer

16   with me.  It's his case obviously.

17          THE COURT:  All right.  Mr. Dougherty, do you have

18   any -- do you -- what's your opinion about whether we should

19   have a willfulness instruction or not?

20          MR. DOUGHERTY:  I would find that the minimum that we

21   would need.

22          THE COURT:  I agree with you.  And the Government is

23   contents to go with knowledge, which is higher, so do you want

24   a willfulness instruction?

25          MR. DOUGHERTY:  I would say willfully would attract

475

 1    some of the things that I'm talking about in addition to the

 2    knowledge, right.

 3            THE COURT:  The problem is the statute doesn't use

 4    the word -- can you show me anywhere in the statute that uses

 5    the word willful?

 6            MR. DOUGHERTY:  I'm just talking about the Supreme

 7    Court's case talking about each of the statutory elements have

 8    to be proven beyond a reasonable doubt.

 9            THE COURT:  Right.

10            MR. DOUGHERTY:  That was the concept that the

11    subjective intent of communication had to be to threaten not

12    simply, I'm sending someone --

13            THE COURT:  That's a different -- I think that's a

14    different issue.  We're going to talk about that issue.

15            MR. DOUGHERTY:  Okay.

16            THE COURT:  And that is, you want an instruction that

17    says you had to intend to threaten the person?

18            MR. DOUGHERTY:  Yes.

19            THE COURT:  Right, I got that.  We're going to deal

20    with that.  The question here is just, do we need to have an

21    instruction for willfulness?

22            MR. DOUGHERTY:  I think that goes part and parcel

23    with the subjective intent.  In other words, you're indicating

24    --

25            THE COURT:  Okay.  So let's assume just for argument

476

1  -- then we'll do that, let's table the willfulness, and let's
2  talk about the subjective intent.  All right.  So now you have
3  proposed an instruction -- so let's step back now.  Let's look
4  at what we've got, which is the corrected version.  And let's
5  start with 876(c), mailing threatening communications.

6        And the elements the Government has in these proposed
7  instructions are, number one, the Defendant knowingly used the
8  United States Mail to send a communication; two, the
9  communication contained a statement that a reasonable recipient
10 would view as a true threat to injure a person, that's the
11 objective component; three, the Defendant either intended the
12 communication to be a threat or had knowledge that it would be
13 viewed as a threat, that's the subjective intent requirement as
14 far as I'm concerned.

15        Now I'll hear you, but I think that's what it is.

16        MR. DOUGHERTY:  Okay.

17        THE COURT:  And then fourth, the communication was
18 addressed to a United States federal judge.  Now the Third
19 Circuit in its *Elonis* decision was explicit that there was both
20 an objective and a subjective intent requirement.  Do you agree
21 with that?

22        MR. DOUGHERTY:  Yes.

23        THE COURT:  And that's what I think.  I think that
24 those two requirements are set forth here.  So, you know,
25 that's why I actually think it is.  Now because it says you had

477

1  to either intend the communication was a threat or you had to

2  have knowledge that it would be viewed as a threat.  And it's

3  had knowledge.  It's not that a reasonable person would have

4  knowledge, it's that you had knowledge.

5          And that was the issue that the Supreme Court

6  addressed in the *Elonis* decision at 575 U.S. 723.  Now there,

7  the Court was dealing with 875(c), not 876(c), but I don't

8  think it makes a material difference.

9          And what the question before the Court was in *Elonis*

10  was whether 875(c) required that the Defendant be aware of the

11  threatening nature of the communication and, if not, whether

12  the first amendment required such a showing.  And the Court

13  never got to the first amendment issue because the Court

14  concluded, the majority did, that the statute requires that the

15  Defendant be aware of the threatening nature of the

16  communication.

17          So, in other words, it was rejecting the Third

18  Circuit's earlier holding that the intent requirement under

19  875(c) could be met by an understanding of the Defendant that a

20  reasonable person would view the communication as a threat.

21  And that was effectively a negligence standard.  And the

22  Supreme Court said, not good enough.  Right?

23          MR. DOUGHERTY:  Yes.

24          THE COURT:  All right.  Now it's true that Justice

25  Alito wanted a recklessness standard, and the majority really

478

1  didn't address that expressly.  But I think it didn't address
2  it because I go back to that key phrase that I said, which is,
3  that the majority said there's no dispute that the mental state
4  requirement is satisfied if the Defendant transmitted
5  communication for the purpose of issuing a threat.  That would
6  be intent, right?

7         MR. DOUGHERTY:  Yes.

8         THE COURT:  Or with knowledge that the communication
9  would be viewed as a threat.  That's the knowledge requirement.
10 And that's what the Government's instructions, which I said I
11 would adopt, requires.  There's got to be, the third element
12 says that the Defendant either intended the communication to be
13 a threat or had knowledge that it would be viewed as a threat.

14        And I think that satisfies the Supreme Court's *Elonis*
15 decision as well as the Third Circuit's decision on remand in
16 *Elonis*.  All right?  So that's why I'm willing to accept jury
17 instruction number 4 and number 5, okay.

18        Now do you -- it sounds like -- I don't know, do you
19 object to jury instructions 4 or 5?

20        MR. DOUGHERTY:  The jury instruction number 5 that
21 says in the third that, you know, all the way to the right
22 sentence, threat -- it says, threat or.  And I would prefer
23 threat and had knowledge that it would be viewed as threat.

24        THE COURT:  Yeah, I'm not willing to do that because
25 I think the Supreme Court made clear that it is an or.  It's

479

1  disjunctive, it's an or.  So I'm going to go with jury

2  instruction number 4 and number 5.

3        Then we get to what has now been renumbered as jury

4  instruction number 6, which was what I ruled upon, which was

5  that -- I actually went back -- I rejected -- the Government's

6  had proposed an instruction for determination of true threat,

7  which I rejected.

8        And the reason was, I went back to *Elonis.*  And the

9  Third Circuit there made explicitly clear, I think in the text

10 of the opinion and in a footnote, I think it was footnote 5,

11 but I honestly can't recall the footnote, what the number was,

12 but they expressly said that the District Court had properly

13 given an instruction on the objective prong.

14       And that instruction is what I put forth in what is

15 now jury instruction number 6, which is, A statement is

16 objectively a true threat when a Defendant makes a statement in

17 a context or under such circumstances wherein a reasonable

18 person would foresee that the statement would be interpreted by

19 those to whom the maker communicates the statement as a serious

20 expression of an intention to inflict bodily injury on an

21 individual.

22       MR. DOUGHERTY:  So I --

23       THE COURT:  I just want to be clear, that's what I

24 put in my order.

25       MR. DOUGHERTY:  I'm objecting then to that refusal to

480

1  change the word to and.

2          THE COURT:  Okay.

3          MR. DOUGHERTY:  And, again, I had proffered the

4  concept of constructive transmittal just to address the

5  recklessness standard; in other words, that's a synonym for it.

6  If, in fact, I took care to, in fact, make sure it wasn't

7  recklessly broadcast, but rather in a closed environment under

8  a specific set of circumstances, it never could be reckless,

9  therefore, it could not meet the requirement.

10         THE COURT:  And I get that, but they're not asking

11 for recklessness.  And I wouldn't permit them now, they

12 wouldn't be able to argue now that recklessness --

13         MR. DOUGHERTY:  I'm saying, that is what protects me

14 relative to this issue, you know, because there is no

15 recklessness if, in fact, it had the privacy banner across the

16 bottom, therefore, those two would be precluded by that

17 recklessness.

18         And that is -- that was where even -- in other words,

19 the Supreme Court refused to rule on recklessness.  I said,

20 well, clearly it has to be a reasonable person cannot be used

21 anywhere.  So we keep referring to a reasonable person would

22 view, a reasonable person, and then they turn around and say,

23 negligence is never sufficient.

24         So I said, well, then under Justice Alito's argument,

25 recklessness would be at least qualified.  But *Elonis*'s counsel

481

1  indicated it would not, it would take more than that.

2          So that's when I came up with the concept, if you

3  demonstrated it was constructively transmitted recklessly,

4  then, in fact, you would meet that element.  That's what I was

5  suggesting.  But apparently it never -- I don't know if it

6  never got to you or --

7          THE COURT:  But it doesn't matter because, as I say,

8  I do believe that the current iteration of the instructions

9  satisfies *Elonis*.  And by *Elonis*, I mean both the Supreme

10  Court's decision in *Elonis* at 575 U.S. 723 and on remand.  And

11  -- just give me a second.

12          (Pause.)

13          THE COURT:  And it was footnote 5 of the remand

14  decision, which is 841 F.3d 589, footnote 5, in which the Third

15  Circuit said, quote, the District Court's instruction in this

16  case properly states the objective component.

17          MR. DOUGHERTY:  That's what I was talking in

18  reference of the recklessness being to the subjective standard.

19          THE COURT:  Okay, hold on.

20          MR. DOUGHERTY:  Because they had to be the same.

21  They said it had to be true of all the elements of the crime.

22          THE COURT:  The only thing -- does somebody have my

23  order?

24          MR. PERRI:  Yes, I can find that for you, Judge.

25          THE COURT:  I've actually got it.  Okay.  Actually

482

1    I'm going to correct my own work just to be really really
2    clear.  What I had done in my order -- so the Third Circuit in
3    the *Elonis* decision, 841 F.3d 589, footnote 5, it explicitly
4    said that the District Court's jury instruction on the
5    objective component was correct.
6            And that was what motivated me to write my order and
7    to recast, rewrite the determination of true threat
8    instruction.  What I wrote was what the Government has put in
9    its papers, which is that a statement is objectively a true
10   threat when a Defendant makes a statement in a context or under
11   such circumstances wherein a reasonable person would foresee
12   that the statement would be interpreted by those to whom the
13   maker communicates the statement as a serious expression of an
14   intention to inflict bodily injury on an individual.
15           Now I actually had deleted a couple words.  The Third
16   Circuit, the instruction that they had expressly approved, at
17   the end said, an intention to inflict bodily injury or take the
18   life of an individual.  And I had taken the, or take the life
19   of an individual, out because I thought in a way, I mean, it's
20   superfluous if you're going to inflict bodily injury.
21           But I think, because I want to do exactly what the
22   Third Circuit has already approved, I think we should insert
23   that language back.  And I also think it fits the facts, the
24   allegations, at least the theory of the Government.
25           So the jury instruction number 6 needs to be amended

483

1  to at the end, it should say -- and I'm going to require the

2  Government to ultimately submit copies of this, so let's make

3  sure we're all on the same page.  Are you ready?

4          MR. ADKINS:  Yeah.

5          THE COURT:  So it should be amended at the end to

6  inflict bodily injury, delete on, and then you'd say, or take

7  the life of, because that is explicitly what's in the opinion.

8  All right.

9          Now then we turn to the issue of recklessness.  Okay.

10  And the Government's theory is not based on recklessness, and

11  the Government is not asking for a recklessness instruction.

12  And I'm not going to give it.  And I'm going to go with the

13  instruction that requires that there had to either be an intent

14  to communicate the threat or knowledge, actual knowledge that

15  the Defendant would view it as a threat.  So it's above

16  recklessness.  And it's above willfulness.

17          MR. PERRI:  I was just going to say, Your Honor, it's

18  possible, and I don't want to speak for Mr. Dougherty, it's

19  possible that he is not clear on the fact that recklessness is

20  a lower standard.

21          THE COURT:  Well, I think I made it clear, but it's

22  true, he might not be.

23          MR. PERRI:  And the case law, that's still up in the

24  air.  So we tried to stay away from that.

25          THE COURT:  That's the point.  I think you have to

484

1   stay away, and that's why it has to be knowledge.  Now let's
2   get to whether you want an instruction on willfulness.  And
3   normally -- so does the Government want an instruction on
4   willfulness?  Think about this, right?
5            Normally where does willfulness come up in the
6   context?  It usually comes up in the context of willful
7   blindness being a substitute for actual knowledge.  That's
8   normally where it comes up.  It's a lower -- in other words,
9   it's a lower standard even.
10           And the Government, you do have in there an actual --
11  you've got a willfulness instruction, but you've got no
12  explanation as to why it ties into the elements for the reasons
13  you've explained, Mr. Perri.  So what is the Government's
14  position?  Do you want a willfulness instruction or not?
15           MR. PERRI:  Actually, I think the willfulness is
16  typically a higher standard.  I don't mean to --
17           THE COURT:  No, that's fine.
18           MR. PERRI:  And I think it usually comes into play in
19  situations where a person is not only breaking law, but knows
20  they're breaking the law, and is intentionally breaking the
21  law.
22           THE COURT:  Yeah, I don't believe that.  In fact, in
23  Elonis, in the Supreme Court case, Justice Roberts made the
24  point that we don't require defendants to have knowledge that
25  they are actually breaking the law, except in incredibly

1  limited circumstances.

2          MR. PERRI:  I think it's --

3          THE COURT:  But, I mean -- well, let's -- we don't

4  have to resolve that.

5          MR. PERRI:  Mr. Dougherty's position is that he would

6  like to have it in there, is that correct?

7          MR. DOUGHERTY:  Yes.  In other words, I read it more

8  like you do.  But it's not willfully knowing that you are

9  breaking the law, but willfully doing the element that is, in

10 fact, the crime.

11         THE COURT:  Okay.  Then you need to put it -- it's

12 got to be in the elements of the crime then.

13         MR. DOUGHERTY:  The --

14         THE COURT:  My point is, you can't have an

15 instruction for willfulness when you don't have willfulness

16 being an element of the crime.  So if you want to put it as an

17 element of the crime, then I'll entertain that.

18         MR. PERRI:  If you put it that way, Judge, then I

19 don't want it in because it's not in the language of *Elonis*.

20         THE COURT:  I agree, it's not in the language in

21 *Elonis*.

22         MR. PERRI:  Or the statute.

23         MR. DOUGHERTY:  Your Honor, there in a copy of the

24 document that we gave you, it actually has Third Circuit model

25 jury instruction willfully defined.  In fact, that would be --

486

1          THE COURT:  Hold on.

2          (Pause.)

3          THE COURT:  Right.  And so I'm looking at this --

4    this is a willfulness instruction from the *Brody* case.  It was

5    document number 83 in the *Brody* case that was filed back in

6    September of 2018, specifically on September 25th.  And there's

7    no question, it has a willfulness instruction.

8          But look at the first sentence of it.  It says, the

9    offense of threatening a federal official also requires the

10   Government to prove that Mr. Brody acted willfully with respect

11   to the element of making a threat.  That is the position, I

12   guess, the Government took in that case.  Right?

13         MR. PERRI:  Judge, I just pulled up the statutes in

14   question, 875(c) and 876(c).  And Mr. Adkins pointed out, he's

15   correct, there is no mention of willful.

16         THE COURT:  Oh, I'm well aware of that.  And I'm well

17   aware that the Supreme Court said it referred to the knowing

18   and intentional language of the statute.  It doesn't refer to

19   willfulness.  In fact, Justice Thomas's dissent and Justice

20   Alito's, their opinions talk about willfulness.  I think if you

21   -- I think you'll find, and I'll just confirm, there's no

22   mention of the word willful in the majority opinion in *Elonis*.

23         (Pause.)

24         THE COURT:  So a couple points.  I can't find the

25   word willful in Justice Roberts' majority opinion, it's not

1  there.  It's in the dissents.

2           Secondly, as I thought Justice Roberts said, quote,

3  This is not to the say that a Defendant must know that his

4  conduct is illegal before he may be found guilty.  The familiar

5  maxim, ignorance of the law is no excuse, typically holds true.

6  Instead, our cases have explained that a defendant must

7  generally know the facts that make his conduct fit the

8  definition of the offense, even if he does not know those facts

9  give rise to a crime, unquote.

10          That's what I think we're dealing with.  I'm going to

11 go with knowledge and intent.  That's what is in the

12 instructions of the Government.  Now -- all right.  So that's

13 what I'm going to do.

14          Now, Mr. Dougherty, though you want to add a -- you

15 want to still amend the jury instructions in what ways?

16          MR. DOUGHERTY:  The circumstances you just ruled on,

17 I guess, was already taken care of.  But the concept was when I

18 suggested constructively transmitted was to, in fact, address

19 this willfully knowingly at least to the recklessness standard

20 but certainly above negligence.

21          THE COURT:  So -- as I understand your theory, you're

22 saying that because you have a disclaimer at the end of the

23 e-mail that says this is not to be forwarded, that you did not

24 think the threat was being communicated to the recipient, to

25 the intended recipient?  What is your theory?

1          MR. DOUGHERTY:  The intended recipient in Count 2, I

2     thought, was a police officer investigating my crime against,

3     claimed against the District Court.  It actually falls into an

4     entrapment defense.  You lure me in under false pretenses, get

5     me to say something incriminating, no different than an

6     excessive *Terry* stop, just hang around until he says something

7     that puts him in jail, you know.  So it's kind of in the

8     neighborhood of an entrapment.

9          Again, I would agree that some of the language and

10    coarseness and vulgarity might be something that I would have,

11    you know, in a hypothetical rhetorical circumstance where I am

12    talking to somebody, do you realize how bad the consequences

13    are if we don't fix what is going on.

14          THE COURT:  But let me -- let me stop you there.  The

15    one thing is though, the statute expressly makes clear that you

16    can communicate a threat to person A that is actually

17    threatening person B.

18          MR. DOUGHERTY:  Yes, but --

19          THE COURT:  So because it expressly does it, it

20    doesn't matter that you have a disclaimer that says, by the

21    way, keep this e-mail to yourself.  If you send the e-mail,

22    right, I mean -- and the Government needs to stand up and

23    correct me if I'm wrong on this -- but 876(c) provides whoever

24    knowingly so deposits or causes to be delivered as aforesaid

25    any communication with or without a name or designating a

489

1  marked subscribed thereto addressed to any other person and

2  containing any threat to kidnap any person or any threat to

3  injure the person of the addressee or of another.

4          MR. DOUGHERTY:  Okay, that's 876.  That's not the

5  circumstance.

6          THE COURT:  You want to talk about 875?

7          MR. DOUGHERTY:  875.

8          THE COURT:  Let me pull up 875.  Hold on.

9          (Pause.)

10         THE COURT:  Okay.  But then 875 reads, whoever

11  transmits in interstate commerce any communication containing

12  any threat to kidnap any person or any threat to injure the

13  person of another.  It's not limited to the addressee.

14         MR. DOUGHERTY:  But again, I'm talking about the

15  Supreme Court affirmatively saying the subjective intent

16  element must be attached to all of the elements of the crime.

17  I'm saying, if I'm thinking, they said, they specifically say,

18  the *Elonis* conviction cannot stand and what he thinks does

19  matter.

20          So you're simply saying generally, if you were

21  communicating to someone or whatever, I'm thinking I'm

22  communicating in a closed environment with someone who's

23  investigating, so I'm saying, if you don't do something about

24  this person, you know, the consequences of it will be dire.

25  This thing is going to get worse and worse and worse until it

490

1  gets out of control.

2           I'm not suggesting I'm going to do that, but I can

3  see where somebody reading that on a public airway could easily

4  jump to the conclusion, not in the argument I was having.  So I

5  will -- I would like to point out as far as my reading of

6  *(inaudible)*, a case that was in the Sixth Circuit, he tried to

7  plead guilty to a situation where he talked to someone that he

8  thought was, in fact, a co-conspirator or whatever, and it was

9  a confidential informant, went to the Circuit, and got denied.

10          They wouldn't accept the plea deal because they

11 didn't have the elements.  They bring it back.  They drop the

12 threat by that single communication with the confidential

13 informant.  And they did convict him successfully for attempted

14 arson.

15          One of those counts had to be dismissed because the

16 mass wasn't in interstate commerce.  I didn't read it all the

17 way to the end.  I'm simply saying, if the Supreme Court has

18 said the subjective intent element attaches to each of the

19 elements of the crime, not just the fact that a communication

20 was sent, you know, then, in fact, you have to address the

21 environment.

22          I think I'm talking to an FBI agent in a confidential

23 circumstance.  And like I'll say once again, it's more

24 analogous to being entrapped in speaking to him.

25          THE COURT:  Okay.  I'm going to let you --

491

1          MR. PERRI:  Your Honor, may I speak to that, please?

2          THE COURT:  Yes.

3          MR. PERRI:  The Defendant keeps saying that the

4  Supreme Court said that the subjective intent applies to every

5  element of the crime.  That's wrong.  That's simply not right.

6  It doesn't apply to the true threat definition.  It doesn't

7  apply to interstate nexus.  That's an incorrect statement.  So

8  the premise from which he's reasoning is incorrect.

9          MR. DOUGHERTY:  It actually says --

10         MR. PERRI:  It does not say that --

11         THE COURT:  Hold on.  Actually --

12         MR. PERRI:  If I may finish?  I let you talk for a

13 long time, Mr. Dougherty.

14         MR. DOUGHERTY:  Okay.

15         MR. PERRI:  Your Honor, on September 22nd, 2021, I

16 filed a pleading called United States Response to Defendant's

17 Proposed Supplemental Jury Instructions.  And if you have a

18 chance, please check that out.

19         Paragraph number 4, and I'll just read this for

20 convenience sake, In his proposed instruction on constructive

21 transmittal, the Defendant appears to seek an instruction

22 addressing the fact that some of his communications were not

23 sent to the threatened individual but to third parties.

24 Unfortunately, the purported concept of constructive

25 transmittal does not exist in federal jurisprudence.

492

1  Accordingly, the United States would object to the use of this
2  term in the instructions.
3          It may be important at this juncture to clarify that
4  a threatening statement need not be addressed to or received by
5  the threatened individual in order for there to be a violation
6  of either 18 U.S.C. 875(c) or 876(c).  There is much case law
7  in support of this proposition.
8          Nor is it necessary to prove that the victim even
9  knew about the threat against him or her.  Rather, whether the
10  statement at issue is made directly to the intended victim is
11  only one factor to consider.
12          THE COURT:  Okay, all right.  Now I've heard enough.
13  I'm going to rule.  If you're convicted, you can take an appeal
14  to the Third Circuit and you can explore this question.  I
15  actually feel confident that this is the correct reading, and
16  I'll tell you why.
17          A, because I think it is explicitly stated by the
18  Court in *Elonis*.  But there's B, the statute is apt to address
19  a harm that's not limited to people who have a, quote,
20  subjective intent to go threaten somebody.
21          It's a greater harm.  And it includes the harm that
22  is caused when people send a communication that they know the
23  recipient or others will view as threatening.  And that's a
24  different harm.  And it's a very very serious harm.
25          So for that reason, as a policy matter, and

493

especially when you look at the express language in the
statute, and you look at the express holding in the language in
the *Elonis* decision, I'm going to go with the instructions that
I have already said I will with respect to knowledge and
intent.

Now there is still the question of the Government has
in there a willfulness instruction.  What's the Government's
position?

MR. ADKINS:  Your Honor, while, I think, some other
discussion was going on, I talked to Mr. Perri.  And I haven't
looked back to see if in the case where it discusses or not
needing the willfulness instruction.

THE COURT:  I didn't say there's a case that
expressly says you don't need a willfulness instruction.

MR. ADKINS:  Not that you need it, but just
addressing the knowing element of it.  If in the indictment it
uses the words that our indictment uses -- I guess that's my
only hang up -- that would be our only hang up because our
indictment uses both words.

THE COURT:  That's fine, but here's what you got to
do.  You can't have it both ways.

MR. ADKINS:  Okay.

THE COURT:  If you want a willfulness instruction,
and if you think you need one, then you better say you got to
refer to it as an element of the crime.  I mean, you can't tell

494

1  the jury, because the jury is going to be confused, they're

2  going to say, wait, knowledge and intent are the elements, and

3  then all of a sudden, I got a willfulness instruction.  They're

4  going to say, where did willfulness come in?  You can't do

5  that.

6           MR. PERRI:  I agree.

7           THE COURT:  You need to sort that out.  Mr.

8  Dougherty, you can think about it overnight, but we got to

9  resolve this in the morning.  So the jury is not coming in

10  until 9, so I need you here at 8:30, and we're going to resolve

11  this issue.  Are there any other jury instructions that are out

12  there?

13           MR. PERRI:  The interstate commerce.

14           THE COURT:  I think Mr. Dougherty already agreed

15  there should be an interstate commerce instruction.

16           MR. DOUGHERTY:  Um-hum.

17           THE COURT:  Frankly, I think it would be an error as

18  a matter of law not to give it.  We're going to include that as

19  an element of the crime.

20           MR. PERRI:  I wanted to ask if the Court intended to

21  put a 404(b) instruction in the final instruction.  I know you

22  already --

23           THE COURT:  I think that would be a good idea.  We

24  could remind them.  What do you think, Mr. Dougherty?

25           MR. DOUGHERTY:  Yep.

495

1          THE COURT:  Yep.  And I think it should be phrased to

2  deal with the April 7th letter and the April 30th clerk

3  incident.

4          MR. PERRI:  Correct, Your Honor.  And that brings me

5  to my second point.  I know we talked a lot about true threat

6  and the relevance of both those things to a determination of

7  true threat that the jury has to make.  They have to make that

8  determination.  And what you said was correct.

9          However, I realized that in your decision on the

10  404(b) evidence, you also indicate, The Government argues, and

11  I agree, that the April 7th, 2015, letter, talking only about

12  the letter now --

13          THE COURT:  Right.

14          MR. PERRI:  -- especially when considered in light of

15  the discussion the Defendant had with law enforcement about the

16  letter is probative of the Defendant's knowledge, intent, modus

17  operandi, identity, and planning.

18          So our suggestion would be if you were going to give

19  a 404(b) instruction, that it include that as well because it

20  was relevant for those other purposes.  It just so happened

21  that we were so focused on the true threat stuff that we didn't

22  talk about it earlier.

23          THE COURT:  Okay.  All right.  I do agree with what I

24  said in the opinion.  I do think the letter -- so the reason

25  why the letter is probative of modus operandi, especially when

496

1  coupled with the discussion on -- with the subsequent

2  discussion with the deputy marshal, is in part because of the

3  similarities between them; the style, the language.

4          So it shows an intent then to continue to use that.

5  So it is probative.  And I will then expand a limiting

6  instruction to be consistent with my order.  That goes with

7  regard to the April 7th letter, all right.  That doesn't go to

8  the April 30th clerk's interaction.

9          MR. PERRI:  Correct, Your Honor.

10         THE COURT:  And that, as far as I can tell, I mean,

11  I'll listen to you, but it should be solely limited to Judge

12  Conner's perception of the letter that followed in years later.

13         MR. PERRI:  We don't dispute that.

14         THE COURT:  All right.  So you can draft up an

15  instruction that is consistent with that, and we can review it

16  tomorrow morning.  But I do think we should have a limited

17  instruction added to the jury instructions.

18         MR. PERRI:  One last thing, Judge.  Do you want to

19  have an instruction indicating to them that they're not to

20  consider the fact that there was maybe at one time a Count 3,

21  because we've heard about Count 1 and Count 2?

22         THE COURT:  So where we are on that is, I just think

23  they're so far, as far as I can tell, the jury has heard

24  there's a Count 1, Count 2, and Count 4.  They don't know

25  anything about a Count 3.

497

1           MR. PERRI:  That's correct.

2           THE COURT:  I think I'll just leave it that way.

3   What do you think, Mr. Dougherty?

4           MR. DOUGHERTY:  If you think that's appropriate, you

5   know.  I was kind of put off by it because someone's got to be

6   looking at physically -- so, you know, my position would be, I

7   would probably do something to explain it.  But if you're

8   saying --

9           THE COURT:  Well, I think normally what you do is,

10  you say you're to disregard whether there's a Count 3 or

11  anything about it.  That's what you would normally do in a

12  case.

13          MR. YOUNG:  My two cents is, I agree, because, first

14  of all, not knowing how it's going to impact the jury, but it

15  could leave the impression that maybe Count 3 is lacking, but

16  maybe Count 1, 2, and 4 are pretty strong.

17          THE COURT:  Right.  And that's why it always cuts

18  both ways, right.  I just had this come up in a civil case

19  where I dismissed, you know, something and it backfired.

20          MR. YOUNG:  As I've heard the testimony so far, I

21  don't think it's a big issue.

22          THE COURT:  Okay.

23          MR. YOUNG:  I think less said about it, probably the

24  better.

25          THE COURT:  All right.  All right.  I feel bad, I

498

1  apologize, I'm going to get you out of here.

2           MR. YOUNG:  I got to get him a shirt.

3           THE COURT:  Anything else we need to address then?

4           MR. ADKINS:  One thing, Your Honor.  Do you have a

5  preference of where this interstate commerce jury instruction

6  falls within the order of the jury instructions final version?

7           THE COURT:  Well, it should come when we start

8  talking about the elements, right?

9           MR. ADKINS:  Somewhere close.

10          THE COURT:  It's actually the first element for at

11 least one of the charges, so you might put it first.  But, you

12 know, the way it should be, it should be, here's the charge,

13 here's the -- here are the elements of one charge, here are the

14 elements of other charges.  And then you go through the

15 elements is the way it should go, so it makes sense to the

16 jury.

17          You haven't figured out the willfulness thing yet,

18 but you're going to do that tonight.  You're going to have to

19 scramble to get a final copy printed probably during lunch

20 time.  All right?

21          I want to thank the Marshals for their patience.

22 Anything else?  All right, we're good.  We can go.  Thank you.

23          COURTROOM DEPUTY:  All rise.

24          (Proceeding adjourned for the day at 5:38 p.m.)

25

0

CERTIFICATION


        I, Wendy C. Yinger, Federal Official Realtime Court
Reporter, in and for the United States District Court for the
Middle District of Pennsylvania, do hereby certify that
pursuant to Section 753, Title 28, United States Code, that the
foregoing is a true and correct transcript of the
stenographically reported proceedings held in the
above-entitled matter and that the transcript page format is in
conformance with the regulations of the Judicial Conference of
the United States.



                        /s/ Wendy C. Yinger
                        Wendy C. Yinger, RMR, CRR
                        U.S. Official Court Reporter
                        (717)440-1535




        (The foregoing of this transcript does not apply to any
reproduction of the same by any means unless under the direct
control and/or supervision of the certifying reporter.)

'

**'19** [1] - 246:18

# 0

**0000621** [1] - 344:3
**004-A** [1] - 341:21
**08012** [1] - 270:4

# 1

**1** [17] - 250:10, 250:12, 255:10, 258:13, 261:15, 270:14, 285:17, 287:20, 298:24, 335:5, 372:9, 461:7, 464:7, 464:8, 496:21, 496:24, 497:16
**1-A** [6] - 269:13, 269:25, 270:12, 270:18, 380:10, 389:23
**1-B** [8] - 269:14, 270:13, 273:13, 274:5, 312:7, 312:8, 314:11, 398:19
**10** [9] - 283:22, 303:19, 313:13, 313:19, 360:15, 421:12, 421:19, 459:9
**10-CV-1071** [1] - 328:22
**105220** [1] - 381:25
**10:12** [1] - 387:16
**10:16** [1] - 283:25
**10:18** [1] - 284:16
**10:32** [1] - 284:17
**10:35** [1] - 285:13
**10th** [3] - 263:12, 277:20, 293:10
**11** [2] - 395:22, 430:9
**11-A** [3] - 392:13, 393:6, 393:11
**11-B** [2] - 392:13, 393:6, 394:3
**11-C** [4] - 392:14, 393:6, 394:12, 394:13
**11-CV-1295** [1] - 328:25
**113** [4] - 270:4, 383:17, 384:4, 385:11
**1134** [2] - 270:3, 384:3
**11th** [1] - 287:15

**12** [13] - 292:15, 292:16, 304:18, 328:18, 448:8, 448:13, 449:4, 449:8, 450:1, 451:12, 451:14, 451:15, 451:17
**12(b)(6)** [1] - 317:25
**12.3** [2] - 418:8, 438:9
**1250** [1] - 378:2
**12:32** [1] - 351:20
**12:35** [1] - 353:10
**12:47** [1] - 393:14
**12th** [1] - 379:1
**13** [8] - 254:18, 254:23, 254:25, 328:18, 448:8, 449:9, 450:2, 451:12
**13-CV-857** [7] - 255:8, 327:19, 332:16, 332:20, 364:10, 365:20, 367:2
**13th** [5] - 255:15, 257:13, 257:20, 257:21, 423:15
**14** [8] - 307:1, 448:8, 450:6, 450:19, 451:12, 452:12, 453:12, 455:13
**14-CV** [1] - 332:11
**14-CV-447** [1] - 329:25
**14-CV-480** [1] - 337:2
**14-CV-922** [2] - 332:15, 337:18
**143** [1] - 344:20
**144** [1] - 306:21
**14th** [1] - 300:24
**15** [5] - 273:14, 411:20, 430:8, 459:10, 470:16
**15-CV-582** [1] - 252:16
**153.1** [3] - 414:8, 432:7, 432:25
**1541** [1] - 436:11
**1583** [1] - 384:14
**15th** [1] - 254:18
**16** [2] - 462:20, 470:15
**1652** [4] - 320:25, 321:23, 321:24, 322:3
**1654** [4] - 324:18, 325:18, 326:16, 364:2
**16th** [1] - 387:15
**17** [1] - 388:12
**17-CV** [1] - 436:11
**17112** [1] - 382:22
**1765** [2] - 370:25, 371:3
**18** [9] - 251:17, 346:7,

363:8, 363:11, 364:9, 409:12, 425:25, 492:6
**1800's** [1] - 288:21
**19** [1] - 268:10
**19-01026** [1] - 433:18
**1948** [1] - 426:19
**1951** [1] - 409:12
**1954** [1] - 428:4
**1984** [1] - 313:5
**1988** [1] - 313:8
**1992** [2] - 428:6, 428:8
**1993** [1] - 428:8
**1997** [1] - 428:8
**1:30** [3] - 351:16, 351:17, 353:9
**1:33** [1] - 353:11
**1:39** [1] - 356:7
**1A** [1] - 306:21

# 2

**2** [30] - 250:18, 250:25, 254:13, 264:14, 264:16, 287:20, 299:4, 314:10, 314:14, 315:5, 353:22, 354:2, 354:25, 390:25, 393:13, 406:14, 413:18, 417:12, 425:22, 436:5, 436:19, 437:17, 451:2, 451:4, 461:7, 469:9, 488:1, 496:21, 496:24, 497:16
**2-A** [24] - 352:20, 352:22, 354:23, 407:4, 408:5, 408:10, 423:22, 423:25, 424:1, 424:20, 427:25, 436:23, 436:24, 444:23, 445:3, 445:16, 446:13, 447:8, 451:2, 451:7, 451:25, 455:8, 455:9, 455:25
**2-B** [4] - 446:10, 446:24, 447:3, 447:15, 451:1, 451:4, 451:19
**20** [6] - 267:14, 387:2, 462:24, 463:14, 463:15, 463:16
**2002** [1] - 267:11
**2003)** [1] - 316:24
**2004** [1] - 430:8

**2007** [1] - 359:23
**2011** [1] - 412:8
**2013** [3] - 328:15, 334:16, 335:5
**2014** [3] - 254:18, 254:20, 299:25
**2015** [12] - 245:4, 245:10, 246:12, 246:22, 250:15, 253:5, 257:13, 258:3, 328:12, 423:15, 442:6, 495:11
**2016** [4] - 254:7, 309:16, 310:2, 427:19
**2017** [12] - 246:17, 268:3, 269:20, 311:14, 378:15, 379:1, 382:24, 386:20, 387:15, 387:24, 389:2, 397:7
**2018** [1] - 486:6
**2019** [5] - 354:24, 368:2, 406:1, 407:10, 419:25
**2020** [5] - 280:4, 355:4, 419:17, 420:22, 421:3
**2021** [1] - 491:15
**2076** [7] - 346:7, 363:8, 363:11, 409:12, 409:18, 426:1, 426:9
**20th** [8] - 267:12, 407:13, 407:18, 407:19, 412:25, 413:2, 413:7, 429:8
**21** [2] - 354:24, 377:17
**219** [1] - 313:8
**21st** [2] - 368:2, 407:9
**22** [2] - 355:4, 420:22
**228** [1] - 386:8
**228-29** [1] - 313:7
**22nd** [2] - 419:17, 491:15
**25,000** [1] - 381:12
**25th** [2] - 426:19, 486:6
**2706** [1] - 251:17
**275** [1] - 316:23
**28** [5] - 320:24, 321:21, 321:22, 364:2, 377:16
**280** [2] - 267:24, 268:25
**29** [2] - 436:20, 460:20
**29th** [1] - 309:16
**2nd** [2] - 267:11, 300:24

# 3

**3** [23] - 250:18, 256:21, 264:16, 289:10, 316:4, 317:14, 353:21, 353:24, 353:25, 354:3, 354:9, 354:16, 414:2, 436:5, 436:19, 436:22, 437:1, 469:9, 469:10, 496:20, 496:25, 497:10, 497:15
**3-A** [2] - 436:21, 436:22
**3.5** [4] - 414:9, 414:20, 432:8, 433:4
**30** [2] - 245:10, 246:22
**30th** [7] - 241:16, 247:15, 253:5, 253:8, 254:19, 495:2, 496:8
**332** [2] - 409:9, 425:23
**3:23** [1] - 421:14
**3:25** [1] - 421:25
**3:30** [1] - 422:1
**3:35** [2] - 422:14

# 4

**4** [27] - 290:18, 294:12, 312:12, 342:12, 342:14, 342:22, 353:22, 354:3, 354:6, 354:13, 355:4, 375:1, 406:14, 419:15, 419:16, 434:12, 438:1, 461:7, 468:15, 469:9, 470:22, 478:17, 478:19, 479:2, 491:19, 496:24, 497:16
**4-A** [15] - 342:15, 352:21, 352:22, 355:3, 416:15, 419:15, 420:20, 423:24, 434:12, 434:14, 434:15, 437:16, 444:24, 455:9, 455:15
**40** [1] - 390:25
**402** [1] - 374:22
**403** [2] - 327:1, 374:22
**404(b** [3] - 494:21, 495:10, 495:19
**42:1983** [1] - 433:19

**446** [1] - 313:4
**466** [1] - 313:4
**48** [1] - 393:13
**480** [1] - 332:11
**484** [1] - 313:8
**4:35** [1] - 460:2
**4th** [3] - 406:1, 422:24,
435:1

## 5

**5** [24] - 255:18, 291:1,
295:15, 319:18,
322:25, 433:7,
434:19, 436:7,
436:10, 463:7,
468:19, 469:8,
470:19, 470:23,
470:25, 478:17,
478:19, 478:20,
479:2, 479:10,
481:13, 481:14,
482:3
**5-A** [1] - 433:7, 436:11
**5/18/2015** [2] - 250:19,
264:17
**5/6/2017** [1] - 393:22
**5/8** [1] - 251:12
**500** [1] - 267:23
**522** [1] - 313:4
**55** [2] - 426:22, 426:25
**575** [2] - 477:6, 481:10
**578** [1] - 316:24
**589** [2] - 481:14, 482:3
**595** [1] - 316:21
**5:38** [1] - 498:24
**5th** [2] - 350:13,
350:18

## 6

**6** [4] - 297:3, 479:4,
479:15, 482:25
**60(b)(4** [1] - 369:5
**60-day** [1] - 381:14
**600** [1] - 267:23
**611** [1] - 374:25
**616** [2] - 347:14,
350:11
**621** [1] - 370:13
**64,000** [1] - 387:8
**6th** [4] - 382:24,
386:20, 387:24,
389:2

## 7

**7** [9] - 243:1, 245:3,

254:15, 299:12,
299:22, 375:1,
395:21
**702** [1] - 444:1
**723** [2] - 477:6, 481:10
**734-737** [1] - 313:4
**7th** [5] - 246:11,
257:22, 495:2,
495:11, 496:7

## 8

**8** [3] - 300:5, 309:6,
310:16
**803(6** [1] - 448:22
**8075** [1] - 453:7
**83** [1] - 486:5
**841** [2] - 481:14, 483:3
**875** [4] - 489:6, 489:7,
489:8, 489:10
**875(c** [6] - 473:14,
477:7, 477:10,
477:19, 486:14,
492:6
**876** [1] - 489:4
**876(c** [3] - 476:5,
477:7, 488:23
**876(c)** [2] - 486:14,
492:6
**8:30** [2] - 459:21,
494:10
**8:55** [1] - 241:1
**8th** [5] - 258:1, 258:2,
258:4, 259:4, 259:8

## 9

**9** [8] - 300:16, 300:17,
313:13, 313:18,
350:11, 459:21,
459:24, 494:10
**9/11** [4] - 411:18,
413:2, 413:3, 413:13
**9/29** [1] - 310:2
**90-day** [1] - 381:14
**902(11** [2] - 448:22,
450:11
**902(13** [1] - 450:11
**95** [1] - 388:20
**9505** [2] - 381:24,
387:2
**9:00** [1] - 459:19
**9:04** [1] - 245:24
**9:17** [1] - 407:10
**9:58'ish** [1] - 393:15
**9th** [1] - 428:4

## A

**A-R-M-O-R** [1] -
439:18
**a.m** [7] - 241:1,
245:24, 283:25,
284:16, 284:17,
285:13, 387:16
**a/k/a** [1] - 409:6
**abbreviate** [1] - 396:2
**abbreviation** [1] -
396:3
**abide** [1] - 292:11
**abiding** [1] - 372:25
**ability** [2] - 360:10,
361:18
**able** [35] - 253:24,
266:1, 282:18,
316:2, 321:4, 322:3,
337:13, 372:14,
372:18, 373:19,
378:23, 379:25,
380:19, 381:15,
384:2, 384:4, 387:1,
388:17, 389:2,
389:7, 389:8,
389:18, 390:12,
390:17, 391:25,
402:24, 403:1,
403:3, 413:11,
422:22, 425:25,
456:24, 456:25,
457:6, 480:12
**able-bodied** [2] -
372:14, 372:18
**absent** [1] - 316:10
**absolute** [1] - 358:8
**absolutely** [17] -
249:25, 275:19,
280:11, 332:10,
345:16, 359:6,
399:1, 399:8,
400:14, 401:5,
401:12, 414:25,
415:3, 418:15,
419:10, 419:13,
427:21
**academy** [1] - 442:17
**accept** [4] - 256:15,
264:19, 478:16,
490:10
**acceptable** [1] -
317:24
**accepted** [3] - 387:14,
387:17, 473:11
**access** [5] - 379:8,
379:11, 379:14,
383:8, 383:9
**accommodating** [1] -

248:12
**according** [10] -
253:10, 259:12,
261:3, 261:6,
261:19, 262:9,
296:10, 350:7,
390:3, 465:14
**accordingly** [1] -
492:1
**account** [5] - 382:13,
439:3, 445:15,
445:24, 445:25
**accountable** [1] -
314:1
**accounting** [1] - 338:9
**accounts** [1] - 263:7
**accuracy** [1] - 283:1
**accurate** [11] - 243:6,
244:2, 269:21,
290:24, 292:7,
314:9, 314:22,
392:21, 408:6,
424:14, 447:7
**accurately** [1] - 316:5
**accusations** [1] -
420:13
**acknowledge** [1] -
406:2
**acknowledged** [2] -
405:5, 435:13
**acquiescence** [1] -
315:13
**Act** [1] - 433:19
**act** [8] - 287:24,
305:16, 338:22,
338:24, 365:4,
380:3, 423:3, 434:6
**acted** [4] - 364:11,
366:4, 366:7, 486:10
**acting** [8] - 297:18,
305:9, 313:1,
314:25, 343:21,
347:10, 367:2, 373:8
**action** [31] - 281:25,
300:3, 302:9, 319:2,
319:6, 319:9, 322:9,
322:10, 323:4,
339:8, 339:10,
340:24, 347:4,
349:8, 350:17,
362:7, 362:13,
362:16, 365:22,
399:24, 400:1,
400:9, 401:16,
405:20, 411:17,
412:17, 414:19,
414:22, 415:19,
419:19, 419:24
**actionable** [1] - 362:1
**actions** [9] - 295:19,

301:19, 307:19,
319:12, 322:7,
323:3, 345:12,
412:11, 415:18
**active** [7] - 252:15,
274:17, 299:18,
328:13, 331:17,
338:19, 341:8
**activities** [1] - 338:1
**activity** [3] - 443:9,
449:18, 449:19
**actor** [1] - 313:6
**acts** [4] - 288:15,
292:16, 306:12,
346:2
**Acts** [1] - 322:5
**actual** [13] - 282:11,
292:5, 313:25,
327:16, 341:7,
345:10, 376:10,
380:17, 384:22,
483:14, 484:7,
484:10
**adamant** [3] - 404:17,
404:19, 435:5
**add** [5] - 461:20,
464:2, 469:20,
474:13, 487:14
**added** [3] - 447:2,
469:21, 496:17
**addition** [5] - 276:3,
404:11, 448:20,
449:12, 475:1
**additional** [8] -
281:19, 334:18,
335:12, 339:17,
339:23, 391:19,
392:5, 420:18
**address** [50] - 268:20,
268:23, 270:24,
271:5, 271:9,
271:11, 292:24,
319:15, 322:24,
333:6, 374:9,
382:22, 383:14,
383:15, 383:16,
383:19, 384:2,
384:3, 384:5,
384:20, 384:21,
384:25, 385:7,
386:8, 389:18,
389:21, 401:6,
402:12, 402:13,
406:8, 406:13,
408:20, 408:22,
452:15, 452:16,
452:25, 453:4,
453:6, 453:7,
453:24, 455:10,
455:11, 455:24,

478:1, 480:4, 487:18, 490:20, 492:18, 498:3
**addressed** [17] - 254:8, 285:24, 308:20, 308:21, 309:17, 323:3, 335:16, 372:3, 372:8, 386:6, 389:5, 405:21, 463:9, 476:18, 477:6, 489:1, 492:4
**addressee** [2] - 489:3, 489:13
**addresses** [3] - 347:6, 402:14, 469:25
**addressing** [2] - 491:22, 493:16
**adjourned** [1] - 498:24
**ADKINS** [45] - 245:20, 321:20, 321:22, 352:18, 354:9, 376:25, 377:9, 386:4, 393:5, 393:9, 394:23, 395:1, 439:10, 439:12, 439:21, 443:25, 444:7, 444:9, 446:6, 446:8, 447:10, 447:14, 449:2, 449:7, 449:25, 450:5, 450:17, 450:23, 450:24, 457:21, 457:24, 458:9, 459:3, 459:5, 460:6, 462:16, 462:18, 470:15, 470:22, 483:4, 493:9, 493:15, 493:22, 498:4, 498:9
**Adkins** [4] - 463:25, 468:8, 470:3, 486:14
**administered** [1] - 441:22
**Administrative** [1] - 282:1
**administrative** [6] - 280:15, 290:2, 290:4, 290:5, 307:22, 334:21
**administrator** [1] - 252:15
**admissible** [3] - 241:18, 249:10, 249:14
**admission** [7] - 270:12, 310:15, 408:10, 409:13, 449:3, 450:1, 450:18
**admitted** [33] - 241:22,

241:23, 243:8, 245:4, 245:11, 249:15, 250:16, 250:21, 250:25, 251:3, 258:12, 264:13, 270:16, 310:18, 380:10, 380:12, 392:13, 393:6, 393:8, 398:20, 408:13, 408:15, 408:23, 416:14, 444:23, 446:9, 447:10, 447:13, 448:7, 449:6, 450:4, 450:22, 455:16
**adopt** [1] - 478:11
**adopted** [2] - 372:1, 468:10
**adopting** [2] - 371:7, 464:5
**adoption** [2] - 371:18, 371:22
**advice** [5] - 375:6, 375:24, 375:25, 376:3, 466:10
**advise** [1] - 311:3
**advised** [3] - 252:15, 252:17, 420:12
**AEDPA's** [1] - 307:20
**affects** [1] - 357:18
**affirmatively** [2] - 465:11, 489:15
**affix** [1] - 386:23
**aforesaid** [1] - 488:24
**afoul** [1] - 296:21
**afraid** [1] - 324:8
**afternoon** [4] - 241:8, 377:5, 385:25, 472:23
**afterwards** [1] - 420:18
**agencies** [1] - 401:17
**agency** [2] - 318:24, 319:1
**Agent** [12] - 408:18, 409:3, 409:10, 410:3, 411:23, 423:12, 439:2, 439:12, 439:22, 444:2, 455:17, 457:25
**agent** [6] - 378:16, 379:14, 384:12, 395:8, 414:23, 423:10, 427:6, 428:5, 428:14, 428:18, 428:21, 429:20, 429:24, 431:14, 443:10,

490:22
**agents** [5] - 378:4, 379:6, 384:6, 402:19, 412:21
**aggregators** [1] - 376:8
**aggression** [1] - 242:2
**aggressive** [1] - 279:7
**agitated** [3] - 252:1, 261:10, 297:17
**ago** [1] - 298:16
**agree** [21] - 242:23, 326:8, 326:15, 333:4, 333:7, 345:17, 355:6, 355:11, 355:20, 366:3, 368:11, 437:12, 471:19, 474:22, 476:20, 485:20, 488:9, 494:6, 495:11, 495:23, 497:13
**agreeable** [2] - 354:17, 403:14
**agreed** [4] - 252:20, 337:20, 421:3, 494:14
**agreeing** [2] - 335:1, 354:20
**Agriculture** [1] - 374:7
**ahead** [7] - 318:19, 333:17, 355:13, 355:15, 360:25, 386:3, 454:23
**aim** [2] - 351:16, 353:8
**air** [1] - 483:24
**aircrafts** [1] - 413:23
**airway** [1] - 490:3
**al** [5] - 304:21, 411:19, 433:11, 433:17
**Alanna** [1] - 417:2
**Alaska** [4] - 387:10, 387:11, 387:12, 387:13
**alert** [1] - 459:16
**alerted** [1] - 277:21
**Alito** [1] - 477:25
**Alito's** [2] - 480:24, 486:20
**allegation** [1] - 318:21
**allegations** [2] - 262:11, 482:24
**alleged** [6] - 241:22, 241:24, 261:9, 262:20, 346:2, 456:2
**allegedly** [2] - 253:2, 261:17
**alleges** [1] - 260:8
**Allen** [1] - 313:4
**allowed** [6] - 288:14,

337:20, 346:14, 348:1, 365:4, 465:19
**allowing** [5] - 246:14, 246:25, 326:18, 333:13, 363:21
**allows** [1] - 327:25
**almost** [4] - 294:25, 377:17, 472:10, 474:12
**alter** [1] - 316:18
**altercation** [5] - 241:17, 241:22, 243:7, 277:19, 277:20
**altered** [1] - 392:24
**alternative** [4] - 301:23, 363:4, 363:25, 364:5
**alternatively** [1] - 341:7
**ambiguous** [1] - 348:8
**amenable** [1] - 313:3
**amend** [1] - 487:15
**amended** [2] - 482:25, 483:5
**amendment** [23] - 289:14, 290:20, 290:25, 306:5, 306:8, 307:13, 345:11, 345:15, 361:8, 361:23, 368:15, 370:17, 374:17, 408:1, 410:8, 418:7, 438:8, 464:18, 469:3, 477:12, 477:13
**amendments** [3] - 282:15, 300:24, 468:11
**America** [1] - 388:23
**American** [2] - 428:5, 429:16
**amount** [5] - 351:5, 382:5, 390:22, 436:5, 437:2
**ample** [1] - 461:12
**analogous** [1] - 490:24
**analysis** [7] - 313:7, 313:10, 388:24, 450:15, 466:24, 471:13
**analysts** [1] - 443:10
**analyze** [2] - 443:14, 445:9
**analyzing** [1] - 443:10
**AND** [1] - 286:3
**angry** [1] - 361:18
**answer** [18] - 267:17, 280:20, 315:14,

318:5, 333:23, 340:12, 344:24, 345:25, 356:3, 360:11, 361:19, 362:22, 371:5, 372:6, 425:17, 430:3, 458:20, 463:2
**answered** [5] - 340:10, 370:20, 432:21, 434:18, 438:17
**answering** [1] - 362:22
**anthrax** [2] - 271:15, 388:13
**AOC** [1] - 411:19
**apologize** [5] - 258:15, 370:23, 472:18, 472:19, 498:1
**apparent** [1] - 279:19
**appeal** [5] - 280:13, 299:10, 302:23, 303:3, 303:4, 307:9, 341:4, 341:6, 344:6, 348:25, 492:13
**appealable** [1] - 341:17
**appealed** [1] - 341:14
**appeals** [1] - 305:7
**Appeals** [13] - 261:22, 261:23, 262:6, 274:18, 274:20, 275:10, 282:2, 293:11, 299:9, 305:9, 335:2, 339:16, 341:19
**appear** [13] - 262:4, 269:21, 293:6, 294:14, 295:3, 300:6, 309:10, 309:12, 392:21, 392:25, 415:12, 464:14
**appearance** [1] - 420:9
**appeared** [5] - 277:3, 295:13, 385:2, 414:14, 414:17
**appearing** [1] - 340:4
**appellate** [2] - 280:12, 368:19
**applicable** [2] - 241:11, 363:8
**application** [3] - 384:18, 385:11, 385:14
**applies** [4] - 290:1, 312:21, 374:14, 491:4

**apply** [4] - 318:25, 322:8, 491:6, 491:7
**appoint** [1] - 306:4
**appreciate** [6] - 314:19, 360:9, 422:9, 459:17, 462:2, 462:3
**appreciative** [2] - 247:12, 462:5
**approach** [12] - 256:18, 258:7, 258:9, 269:9, 293:16, 294:25, 309:2, 398:16, 406:25, 416:11, 446:6, 474:8
**approached** [1] - 295:19
**appropriate** [22] - 288:1, 289:20, 292:12, 300:19, 301:11, 305:6, 308:17, 317:19, 330:10, 346:25, 347:1, 349:8, 349:11, 362:19, 362:23, 373:1, 427:7, 467:6, 467:15, 467:20, 497:4
**appropriately** [1] - 305:3
**approved** [2] - 482:16, 482:22
**April** [20] - 241:16, 245:3, 245:10, 246:11, 246:22, 247:15, 253:5, 253:8, 257:19, 257:20, 257:21, 257:22, 419:25, 423:14, 430:8, 495:2, 495:11, 496:7, 496:8
**apt** [1] - 492:18
**aptitude** [1] - 441:7
**AR-15s** [1] - 300:22
**architecture** [4] - 441:5, 441:8, 443:21, 444:3
**area** [4] - 331:11, 390:8, 452:21, 453:3
**areas** [1] - 443:23
**arguably** [1] - 244:13
**argue** [3] - 460:14, 474:5, 480:12
**argues** [1] - 495:10
**arguing** [1] - 473:18
**argument** [7] - 323:10, 372:4, 461:19,

465:14, 475:25, 480:24, 490:4
**arises** [1] - 332:19
**arising** [2] - 329:20, 366:22
**arm** [1] - 377:22
**Armor** [5] - 439:12, 439:17, 439:18, 439:22, 444:2
**ARMOR** [1] - 439:14
**arms** [1] - 290:23
**Army** [1] - 428:6
**arraignment** [1] - 420:10
**arrangement** [1] - 404:8
**arrest** [1] - 404:25
**arrested** [1] - 419:2
**arrived** [1] - 444:15
**arson** [1] - 490:14
**Article** [6] - 313:13, 313:18, 313:19, 366:11, 411:20
**article** [1] - 398:11
**articulated** [1] - 358:2
**ascertain** [1] - 282:18
**aside** [2] - 272:15, 330:7
**aspect** [3] - 331:2, 332:8, 341:20
**aspects** [1] - 332:3
**assault** [1] - 300:25
**Assembly** [1] - 320:7
**asserted** [2] - 418:8, 438:9
**assessment** [1] - 246:16
**assign** [1] - 281:20
**assignability** [2] - 316:9, 317:15, 317:22
**assigned** [45] - 255:9, 274:22, 277:11, 280:14, 298:16, 298:20, 316:17, 317:18, 327:21, 328:22, 329:1, 329:9, 329:17, 329:21, 329:25, 330:2, 330:4, 330:13, 331:4, 331:6, 331:16, 331:23, 332:12, 332:14, 332:16, 333:20, 333:21, 334:18, 334:22, 336:12, 336:17, 337:5, 339:17, 365:12, 366:1, 366:11, 397:21,

397:22, 416:2, 433:17, 440:1, 440:3, 440:5, 442:9
**assigning** [1] - 375:23
**assignment** [19] - 281:15, 316:11, 317:23, 318:2, 327:22, 327:25, 328:10, 328:11, 329:6, 331:3, 331:21, 332:4, 334:25, 375:9, 375:11, 375:20, 375:25, 376:1, 376:10
**assignments** [6] - 282:1, 328:8, 331:22, 333:6, 339:23, 356:21
**assist** [2] - 315:19, 401:17
**assistants** [1] - 380:24
**assisting** [2] - 265:5, 397:17
**associated** [9] - 278:11, 301:5, 309:14, 378:13, 383:14, 383:23, 383:25, 448:14, 448:18
**assume** [6] - 305:16, 308:5, 336:12, 348:23, 349:3, 475:25
**assumed** [5] - 244:2, 274:4, 286:4, 344:11, 348:9
**assumes** [1] - 340:8
**assuming** [11] - 273:20, 291:12, 298:12, 299:8, 299:9, 299:19, 319:3, 330:15, 347:20, 348:19, 357:7
**assumption** [2] - 336:9, 438:4
**assurance** [1] - 341:1
**attach** [1] - 376:11
**attached** [5] - 398:13, 424:4, 449:14, 458:15, 489:16
**attaches** [1] - 490:18
**attaching** [1] - 425:7
**attachment** [8] - 423:19, 423:22, 424:2, 424:6, 424:8, 424:25, 425:4, 429:1
**attachments** [3] - 449:10, 458:17,

458:18
**attack** [1] - 358:20
**attacks** [1] - 430:12
**attempt** [3] - 307:5, 402:8, 402:10
**attempted** [1] - 490:13
**attempting** [4] - 304:21, 325:23, 326:23, 434:5
**attend** [6] - 246:3, 352:24, 353:3, 353:5, 442:16, 459:7
**attended** [1] - 272:15
**attention** [14] - 268:11, 271:22, 272:17, 282:8, 282:9, 295:16, 301:22, 304:19, 397:14, 397:15, 401:10, 412:2, 417:17, 471:5
**attorney** [3] - 343:21, 374:18, 376:10
**Attorney** [4] - 416:1, 456:10, 456:20, 457:11
**Attorney's** [5] - 284:2, 347:5, 389:14, 389:16, 448:25
**attorneygeneral.gov** [1] - 457:2
**attorneys** [3] - 305:24, 332:5, 337:21
**attract** [1] - 474:25
**attributed** [1] - 343:9
**attributing** [1] - 344:9
**August** [1] - 267:11
**AUSA** [3] - 416:9, 418:8, 438:9
**authenticity** [2] - 448:21, 450:10
**author** [2] - 291:22, 415:12
**authored** [2] - 317:11, 350:4
**authorities** [1] - 455:1
**authority** [24] - 280:3, 280:4, 280:5, 280:7, 288:8, 302:17, 304:5, 322:9, 345:24, 346:1, 348:4, 348:12, 348:13, 349:25, 350:6, 356:17, 365:23, 366:4, 366:8, 418:12, 418:18, 437:18, 438:13, 438:16
**authorization** [1] - 289:14

**authorized** [2] - 324:23, 384:11
**authorizes** [2] - 384:15, 384:16
**Auto** [2] - 407:12, 417:2
**automated** [1] - 381:2
**automatically** [1] - 365:13
**autopilot** [1] - 356:22
**Av** [1] - 387:18
**available** [5] - 254:23, 256:16, 305:11, 305:12, 446:5
**average** [5] - 379:14, 379:15, 446:4, 447:19, 447:21
**avers** [2] - 417:25, 437:22
**avoid** [2] - 302:8, 332:4
**aware** [44] - 253:7, 253:8, 254:10, 255:7, 255:14, 265:19, 277:22, 278:24, 279:12, 308:16, 319:20, 337:9, 371:25, 402:10, 415:21, 416:1, 416:4, 417:7, 420:17, 426:20, 429:3, 429:8, 429:11, 429:12, 429:14, 429:20, 429:25, 430:24, 432:12, 432:20, 436:2, 436:7, 436:12, 437:1, 437:11, 437:13, 447:3, 456:4, 467:22, 469:9, 477:10, 477:15, 486:16, 486:17
**awful** [1] - 473:5

# B

**bachelor** [1] - 440:12
**backfired** [1] - 497:19
**background** [9] - 255:1, 255:4, 256:3, 381:1, 400:7, 400:8, 427:22, 440:23, 441:6
**backing** [1] - 367:3
**bad** [3] - 256:19, 488:12, 497:25
**badly** [1] - 354:10
**balance** [2] - 298:4,

298:5
**ball** [1] - 357:16
**ballpark** [1] - 352:4
**Baltimore** [1] - 255:13
**bankruptcy** [5] -
254:8, 254:18,
254:19, 254:22,
255:19
**Bankruptcy** [1] -
254:17
**banner** [2] - 431:5,
480:15
**bar** [1] - 313:2
**Bar** [1] - 304:22
**Barre** [1] - 310:5
**based** [30] - 244:6,
249:24, 256:9,
268:18, 268:24,
270:14, 271:25,
309:10, 312:16,
321:15, 333:25,
344:12, 369:6,
376:11, 379:2,
380:6, 381:15,
381:22, 384:23,
388:2, 388:24,
392:3, 393:15,
394:19, 415:13,
423:3, 438:1,
453:13, 467:12,
483:10
**bashing** [1] - 300:20
**basic** [2] - 289:25,
458:18
**basis** [15] - 245:13,
246:17, 247:2,
277:16, 288:25,
289:5, 320:2,
344:13, 371:8,
374:3, 406:14,
418:6, 419:15,
437:25, 438:7
**battle** [2] - 306:23,
447:24
**bear** [4] - 288:3,
290:23, 315:19,
369:1
**bearing** [2] - 324:14,
370:5
**bears** [2] - 325:2,
325:12
**became** [15] - 252:1,
261:10, 278:12,
278:13, 279:19,
334:15, 335:5,
335:25, 356:25,
357:2, 357:11,
366:1, 416:1, 417:7,
420:17
**become** [4] - 304:24,

384:11, 404:11,
415:21
**becomes** [1] - 331:5
**becoming** [1] - 279:7
**beforehand** [1] -
365:12
**beginning** [8] -
264:24, 303:14,
315:10, 401:5,
428:2, 430:5,
433:25, 451:19
**begins** [1] - 284:8
**behalf** [1] - 295:9
**behavior** [1] - 280:23
**beheading** [1] -
300:22
**behind** [3] - 284:23,
327:16, 441:9
**belabor** [1] - 474:4
**belief** [1] - 366:5
**believes** [5] - 288:9,
292:2, 292:3,
292:11, 294:21,
296:16, 298:1,
304:5, 306:11
**bell** [1] - 288:11
**below** [3] - 348:23,
452:24, 453:2
**belts** [1] - 474:8
**Ben** [1] - 377:24
**bench** [2] - 268:10,
308:18
**beneath** [2] - 254:15,
312:23
**benefit** [1] - 416:20
**Berg** [2] - 359:16,
360:5
**best** [6] - 283:11,
294:15, 378:8,
380:6, 407:23,
427:16
**Best** [2] - 407:12,
417:2
**better** [10] - 272:18,
272:19, 311:5,
329:22, 351:13,
386:2, 457:17,
470:17, 493:24,
497:24
**between** [16] - 247:14,
259:3, 263:22,
267:23, 345:14,
345:19, 403:18,
429:15, 430:11,
435:1, 455:7,
457:16, 468:10,
472:10, 496:3
**beyond** [9] - 282:11,
341:24, 342:1,
355:9, 355:15,

374:21, 464:21,
464:25, 475:8
**bias** [2] - 340:14,
365:13
**Bible** [2] - 291:21,
306:20
**biblical** [8] - 282:14,
291:10, 291:13,
291:18, 292:8,
292:25, 293:1, 361:4
**big** [2] - 387:17,
497:21
**bigger** [1] - 471:2
**bilateral** [1] - 316:12
**Bill** [3] - 259:15, 261:3
**bill** [1] - 288:11
**billion** [4] - 414:9,
414:20, 432:8, 433:4
**bit** [14] - 246:4,
249:16, 265:8,
290:9, 312:2,
318:19, 348:11,
351:17, 380:20,
385:22, 391:22,
405:15, 421:18,
467:5
**Black** [3] - 270:3,
383:17, 384:3
**black** [1] - 303:3
**Blackwood** [4] -
270:4, 384:4,
387:15, 394:2
**blah** [6] - 264:6
**Blessed** [1] - 306:21
**blessed** [1] - 306:22
**Blewitt** [9] - 291:21,
298:22, 336:4,
336:18, 364:11,
364:22, 365:22,
366:4, 366:6
**Blewitt's** [1] - 336:21
**blindness** [1] - 484:7
**block** [1] - 463:11
**blush** [1] - 303:14
**board** [2] - 338:18,
396:25
**Bob** [1] - 407:12
**bodied** [2] - 372:14,
372:18
**bodily** [5] - 479:20,
482:14, 482:17,
482:20, 483:6
**Boeing** [1] - 413:23
**bold** [1] - 342:25
**bomb** [1] - 388:12
**book** [4] - 291:13,
321:6, 321:7, 321:16
**books** [1] - 434:7
**border** [1] - 410:15
**born** [2] - 315:20,

428:4
**bottom** [16] - 273:14,
294:10, 296:5,
299:22, 308:2,
316:7, 340:12,
349:5, 383:1, 387:2,
393:14, 393:22,
412:23, 426:17,
431:5, 480:16
**bounces** [1] - 454:16
**bound** [2] - 297:17,
354:20
**Box** [1] - 402:12
**box** [7] - 298:15,
382:10, 384:8,
385:4, 385:11,
402:13, 454:8
**bracketed** [1] - 294:9
**brackets** [3] - 275:10,
294:5, 350:12
**Brady** [10] - 293:12,
305:22, 315:14,
316:1, 403:17,
403:25, 417:2,
417:3, 423:5
**brain** [1] - 473:7
**branch** [1] - 411:21
**breaching** [1] - 460:19
**break** [14] - 241:12,
283:22, 284:1,
284:4, 284:15,
285:19, 351:1,
351:10, 351:12,
351:15, 353:3,
385:8, 413:20,
421:10
**breaking** [5] - 484:19,
484:20, 484:25,
485:9
**breaks** [1] - 283:19
**bribe** [1] - 341:9
**bridge** [1] - 407:22
**brief** [4] - 253:25,
281:9, 299:1, 421:19
**briefly** [7] - 253:4,
284:7, 284:13,
440:15, 443:6,
458:11, 460:20
**bring** [17] - 245:19,
247:18, 251:20,
319:6, 324:8, 325:7,
341:21, 356:6,
360:10, 366:13,
374:25, 380:9,
422:12, 433:10,
459:10, 462:24,
490:11
**brings** [7] - 243:24,
314:11, 319:19,
345:8, 406:18,

430:16, 495:4
**broad** [1] - 301:17
**broadcast** [1] - 480:7
**Brody** [4] - 474:6,
486:4, 486:5, 486:10
**Brooks** [6] - 275:9,
275:12, 308:11,
335:3, 335:4, 357:14
**brought** [12] - 243:25,
245:24, 268:13,
285:13, 333:5,
356:7, 388:7,
409:22, 422:14,
430:18, 435:7,
436:11
**browser** [1] - 448:5
**buddy** [1] - 375:19
**budget** [1] - 457:8
**building** [16] - 246:23,
253:7, 253:15,
253:19, 253:21,
263:21, 273:21,
279:13, 375:17,
386:11, 386:12,
387:21, 396:6,
396:17, 439:4
**Building** [2] - 263:12,
271:9
**buildings** [1] - 396:20
**burden** [4] - 464:20,
464:23, 472:14,
474:11
**Bureau** [2] - 290:5,
439:23
**business** [7] - 254:9,
295:12, 402:20,
403:21, 404:8,
448:21, 451:20
**business's** [1] -
449:19
**businesses** [1] -
382:17
**BY** [84] - 247:9, 251:5,
255:6, 256:7,
257:10, 258:11,
258:20, 265:25,
267:3, 269:11,
270:17, 285:16,
309:4, 310:19,
311:24, 314:21,
315:4, 317:6,
317:13, 318:18,
319:17, 322:2,
327:12, 331:13,
333:18, 340:16,
340:22, 343:6,
343:23, 346:21,
347:13, 348:2,
349:13, 356:13,
358:24, 359:15,

360:4, 361:6, 363:6,
364:19, 365:7,
367:13, 369:3,
369:24, 370:8,
371:24, 372:7,
374:5, 374:24,
377:9, 386:4, 393:9,
395:14, 398:18,
401:1, 407:2,
408:17, 413:25,
416:13, 417:16,
422:17, 425:12,
425:21, 426:8,
427:10, 430:4,
431:20, 432:4,
432:23, 433:15,
434:11, 435:22,
436:4, 436:25,
437:15, 439:1,
439:21, 444:9,
446:8, 447:14,
449:7, 450:24,
457:24, 458:13
**bytes** [2] - 282:15,
295:2

# C

**C-O-R-R-I-C-E-L-L-I**
[1] - 377:7
**C-R-U-Z** [1] - 395:12
**CA123037517** [2] -
251:8, 253:1
**cabin** [1] - 375:17
**Caldwell** [16] - 255:9,
273:22, 273:23,
298:14, 298:19,
302:21, 303:22,
304:21, 305:4,
308:9, 327:21,
328:9, 328:23,
335:16, 348:23
**Caleb** [6] - 415:22,
416:8, 426:22,
436:7, 436:12, 456:9
**California** [5] -
337:21, 374:12,
437:3, 457:6, 457:11
**calm** [2] - 251:24,
263:16
**camera** [2] - 388:25,
390:25
**cameras** [2] - 388:23,
390:23
**campaign** [1] - 254:7
**cannot** [12] - 303:4,
361:20, 372:18,
386:19, 433:23,
434:9, 436:3,
464:18, 465:3,

480:20, 489:18
**capable** [3] - 281:19,
282:25, 304:7
**capacity** [8] - 345:9,
345:20, 361:12,
382:6, 415:1,
428:23, 442:22,
446:19
**capitalism** [1] - 409:7
**Capitol** [10] - 395:16,
395:20, 395:21,
396:5, 396:15,
396:16, 396:19,
396:20, 399:11
**caption** [3] - 283:17,
285:24, 298:23
**capture** [1] - 276:4
**card** [7] - 328:6,
328:7, 382:12,
382:19, 388:21,
412:8
**cardboard** [1] - 270:6
**cards** [2] - 328:3,
328:5
**care** [5] - 242:5, 338:9,
468:8, 480:6, 487:17
**career** [3] - 254:9,
268:13, 272:10
**careful** [1] - 422:5
**carefully** [1] - 241:5
**Carey** [1] - 358:7
**Carlisle** [3] - 294:3,
327:18, 364:21
**Carlson** [11] - 273:22,
273:25, 302:21,
308:9, 329:1, 330:1,
330:14, 332:12,
337:6, 348:23
**Carrington** [2] -
370:13, 370:24
**carry** [1] - 303:8
**carrying** [1] - 306:9
**cars** [1] - 276:22
**case** [198] - 241:4,
246:2, 252:14,
252:16, 252:25,
253:6, 254:19,
255:10, 264:3,
264:20, 264:25,
265:2, 265:10,
277:15, 278:4,
278:15, 280:19,
281:7, 281:16,
281:21, 281:23,
282:4, 290:8,
294:17, 294:20,
298:3, 312:13,
312:18, 312:24,
313:1, 315:24,
316:20, 316:22,

316:25, 317:7,
317:16, 317:17,
317:18, 317:23,
318:7, 318:9,
318:12, 318:20,
319:5, 319:9,
319:22, 320:2,
320:3, 320:14,
323:9, 323:12,
323:16, 323:19,
324:5, 324:9,
324:11, 325:15,
326:3, 326:7,
327:15, 327:16,
327:17, 327:20,
328:6, 328:8, 328:9,
328:25, 329:5,
329:6, 329:11,
329:12, 329:15,
329:17, 329:24,
330:3, 330:4,
330:12, 330:19,
330:22, 331:20,
331:21, 332:2,
332:3, 332:11,
332:12, 332:15,
332:16, 333:15,
333:20, 335:2,
335:12, 335:19,
336:3, 336:10,
336:22, 336:24,
337:1, 337:7,
337:18, 337:19,
338:14, 340:21,
345:13, 345:18,
346:1, 347:3,
349:14, 349:15,
351:18, 356:21,
357:14, 357:20,
358:4, 358:21,
359:4, 359:7,
359:12, 359:25,
360:8, 361:21,
364:9, 364:21,
365:14, 365:18,
365:19, 366:1,
366:24, 367:8,
367:15, 367:23,
367:25, 370:11,
370:12, 370:17,
370:25, 371:2,
371:13, 372:1,
372:22, 374:7,
376:8, 376:14,
378:10, 378:12,
379:22, 391:11,
395:8, 397:21,
397:22, 403:8,
416:2, 423:9, 433:7,
433:8, 433:18,
434:4, 434:13,

436:9, 436:11,
437:2, 444:10,
444:12, 444:18,
445:5, 446:14,
449:23, 450:15,
453:23, 454:25,
456:19, 459:15,
462:1, 469:24,
469:25, 470:6,
472:17, 472:24,
473:5, 474:6,
474:16, 475:7,
481:16, 483:23,
484:23, 486:4,
486:5, 486:12,
490:6, 492:6,
493:11, 493:13,
497:12, 497:18
**cases** [83] - 263:23,
265:9, 267:21,
267:23, 267:24,
269:5, 277:10,
277:11, 278:10,
278:14, 279:21,
280:5, 280:9,
280:13, 281:1,
282:15, 293:24,
293:25, 295:12,
299:17, 299:20,
299:21, 302:7,
317:1, 322:8, 324:6,
325:25, 327:22,
328:2, 328:22,
329:6, 329:17,
329:21, 330:9,
331:15, 331:23,
331:25, 332:1,
332:7, 333:1,
333:10, 333:25,
334:18, 334:20,
335:1, 335:13,
335:14, 337:10,
339:7, 339:14,
339:17, 339:19,
340:6, 348:5,
348:12, 356:25,
357:1, 357:5, 359:1,
361:5, 363:9,
363:14, 364:7,
366:23, 367:19,
367:20, 367:22,
378:18, 379:13,
395:18, 398:14,
399:10, 399:25,
400:5, 400:11,
405:18, 415:10,
419:6, 434:22,
436:17, 487:6
**cash** [2] - 254:22,
382:12
**Castle** [2] - 412:7,

412:16
**catch** [1] - 344:18
**caught** [4] - 282:8,
282:9, 351:23,
401:10
**caused** [4] - 279:17,
292:23, 314:12,
492:22
**causes** [1] - 488:24
**cc** [4] - 273:17,
273:21, 308:3,
406:17
**cc'd** [3] - 406:16,
407:11, 417:1
**cenerson@**
**attorneygeneral.**
**gov** [1] - 456:5
**center** [4] - 387:11,
387:12, 387:17,
387:19
**Central** [1] - 331:8
**cents** [2] - 388:20,
497:13
**Century** [3] - 449:10,
449:12, 449:13
**ceremonial** [1] -
280:17
**cert** [1] - 289:12
**certain** [25] - 275:16,
275:17, 280:17,
280:18, 290:2,
308:6, 308:9, 310:3,
318:20, 318:21,
328:5, 334:16,
340:24, 341:14,
345:12, 361:5,
373:15, 375:12,
375:13, 375:23,
378:9, 381:2, 382:8,
445:9, 446:1
**certainly** [7] - 282:10,
297:20, 305:12,
305:15, 326:21,
375:20, 487:20
**certainty** [1] - 458:4
**certificate** [1] - 450:10
**certificates** [1] -
426:14
**certified** [2] - 443:3,
450:12
**certifying** [1] - 449:14
**Cf** [1] - 313:4
**challenge** [2] -
320:10, 322:9
**challenges** [1] - 369:5
**chambers** [4] -
269:22, 271:12,
271:13, 386:13
**chance** [15] - 244:3,
261:24, 271:17,

284:9, 284:20,
297:11, 305:5,
324:12, 353:13,
355:23, 397:24,
437:7, 472:17,
473:1, 491:18
**change** [14] - 256:12,
256:18, 256:24,
280:11, 284:6,
309:1, 311:3, 373:5,
373:10, 431:21,
469:5, 469:6,
469:13, 480:1
**changed** [4] - 392:24,
405:21, 447:2, 468:9
**changes** [3] - 405:22,
463:13, 463:20
**changing** [2] - 284:12,
458:23
**chapter** [2] - 254:10,
254:23
**Chapter** [3] - 254:18,
254:23, 254:25
**character** [1] - 370:12
**characterization** [5] -
360:23, 361:13,
362:6, 372:17,
372:19
**characterizations** [1] -
368:23
**characterize** [7] -
297:21, 300:12,
373:19, 375:8,
398:10, 399:17,
426:23
**characterized** [3] -
244:13, 370:9,
374:13
**characterizing** [1] -
244:20
**charge** [10] - 276:5,
396:19, 409:18,
411:3, 411:6,
415:16, 463:7,
468:21, 498:12,
498:13
**charged** [11] - 320:5,
409:4, 419:2, 423:2,
423:4, 424:16,
424:21, 425:7,
428:9, 464:21, 469:9
**charges** [18] - 242:23,
245:14, 246:17,
247:3, 325:2,
404:19, 404:21,
409:20, 409:21,
409:22, 409:23,
415:16, 420:6,
428:10, 435:7,
471:9, 498:11,

498:14
**charging** [1] - 319:2
**CHARLES** [1] - 266:23
**Charles** [2] - 267:1,
267:7
**charter** [2] - 373:3,
424:25
**Chasanow** [1] -
274:20
**chase** [1] - 324:14
**chastise** [1] - 280:22
**check** [8] - 274:2,
274:7, 286:1,
286:21, 308:4,
312:5, 413:19,
491:18
**checked** [2] - 267:24,
271:16
**cheek** [1] - 305:23
**Cheyenne** [1] - 451:22
**chief** [4] - 281:17,
338:7, 356:23,
368:24
**Chief** [80] - 242:5,
274:8, 275:6, 275:8,
275:9, 275:11,
277:18, 277:20,
278:6, 278:12,
278:13, 279:5,
280:2, 280:3, 280:7,
280:8, 280:11,
280:15, 281:13,
281:14, 281:15,
281:20, 285:25,
286:20, 288:4,
296:19, 299:3,
304:5, 305:25,
308:10, 309:24,
311:2, 312:5, 312:9,
317:2, 319:25,
328:17, 329:1,
329:25, 330:13,
332:12, 334:15,
334:16, 335:1,
335:2, 335:5,
335:11, 335:25,
337:6, 337:25,
338:1, 338:4,
338:12, 338:24,
339:15, 339:18,
339:22, 348:3,
348:12, 348:13,
350:13, 350:14,
350:16, 350:17,
356:25, 357:2,
357:9, 357:10,
357:11, 357:12,
357:13, 357:16,
357:17, 357:20,
357:25, 366:1, 386:7

**Chinese** [1] - 413:23
**choice** [2] - 411:7,
411:8
**choices** [1] - 296:24
**choose** [1] - 374:18
**chose** [1] - 364:23
**CHRIST** [1] - 286:5
**Christ** [1] - 286:6
**Christopher** [9] -
266:21, 267:1,
267:7, 286:6, 311:2,
395:8, 395:12,
397:11, 451:25
**CHRISTOPHER** [3] -
266:23, 356:8, 395:9
**chronology** [1] -
257:14
**CIA** [1] - 429:15
**circle** [9] - 270:20,
270:21, 271:2,
271:3, 271:6,
393:19, 394:8,
408:20, 408:22
**circuit** [6] - 300:22,
301:14, 348:15,
349:17, 349:18,
363:2
**Circuit** [36] - 242:21,
261:21, 261:22,
262:6, 274:15,
274:17, 274:19,
275:10, 281:14,
281:23, 282:1,
293:10, 305:13,
308:10, 326:18,
334:19, 335:11,
339:16, 339:18,
350:14, 350:18,
357:10, 357:25,
409:9, 425:23,
433:18, 476:19,
479:9, 481:15,
482:2, 482:16,
482:22, 485:24,
490:6, 490:9, 492:14
**Circuit's** [2] - 477:18,
478:15
**circulated** [1] - 308:14
**circumstance** [12] -
244:1, 323:18,
328:20, 342:24,
347:18, 348:6,
360:2, 365:16,
428:13, 488:11,
489:5, 490:23
**circumstances** [18] -
243:13, 265:14,
273:1, 279:15,
312:21, 312:22,
323:6, 339:6, 365:8,

369:9, 375:12,
375:13, 402:17,
479:17, 480:8,
482:11, 485:1,
487:16
**citation** [2] - 312:13,
371:4
**citations** [4] - 282:14,
294:25, 316:20,
426:17
**cite** [1] - 434:22
**cited** [5] - 358:5,
373:12, 449:3,
450:1, 450:18
**cites** [1] - 358:7
**citing** [2] - 325:25
**citizen** [1] - 345:20
**citizens** [2] - 314:1,
429:16
**City** [3] - 276:7, 276:8,
276:11
**civil** [19] - 252:16,
255:15, 263:23,
267:21, 267:23,
267:24, 290:7,
306:13, 319:3,
322:7, 322:10,
323:4, 326:19,
329:11, 363:21,
399:25, 436:17,
497:18
**Civil** [1] - 433:19
**claim** [7] - 290:7,
305:5, 359:2, 359:8,
367:25, 418:1,
437:23
**claimed** [1] - 488:3
**claiming** [1] - 438:3
**claims** [9] - 277:25,
278:5, 279:21,
334:4, 334:10,
334:11, 373:20,
373:21, 418:20
**clarification** [2] -
350:5, 361:11
**clarify** [11] - 245:1,
245:2, 246:8,
247:11, 247:13,
312:1, 346:5,
356:15, 387:25,
434:25, 492:3
**clarity** [5] - 247:18,
414:8, 432:5, 432:7,
432:25
**clause** [4] - 289:15,
289:20, 289:21,
368:22
**clean** [1] - 443:12
**clear** [32] - 262:23,
287:7, 291:19,

292:13, 297:19,
301:16, 303:7,
303:16, 311:13,
318:6, 346:15,
354:19, 363:7,
372:24, 375:23,
392:8, 393:2,
401:11, 404:11,
411:1, 423:10,
428:12, 430:17,
465:18, 470:1,
478:25, 479:9,
479:23, 482:2,
483:19, 483:21,
488:15
**clearly** [3] - 293:3,
294:6, 480:20
**clerk** [17] - 241:16,
268:13, 272:10,
336:19, 337:24,
338:23, 339:1,
346:6, 346:7,
346:23, 363:11,
382:10, 394:6,
405:1, 426:23,
462:21, 495:2
**Clerk** [8] - 338:4,
338:11, 347:4,
404:19, 409:19,
409:24, 426:11,
426:12
**clerk's** [17] - 243:7,
245:11, 246:23,
251:15, 252:7,
252:13, 263:6,
263:12, 263:13,
278:25, 279:14,
310:9, 330:17,
337:9, 337:16, 496:8
**Clerk's** [1] - 338:1
**clerks** [3] - 373:12,
373:15, 380:23
**Clerks** [2] - 373:14,
373:17
**client** [3] - 446:1,
453:19, 454:11
**clients** [1] - 448:4
**close** [3] - 287:13,
470:24, 498:9
**closed** [3] - 241:7,
480:7, 489:22
**closer** [2] - 393:15,
470:17
**clue** [1] - 381:23
**clueless** [1] - 350:14
**co** [3] - 262:13,
262:14, 490:8
**co-conspirator** [3] -
262:13, 262:14,
490:8

coarseness [1] - 488:10
code [1] - 313:2
codes [1] - 382:23
cogent [1] - 282:18
cognizant [2] - 422:6, 462:11
colleague [1] - 259:19
colleagues [10] - 263:8, 273:5, 273:6, 277:14, 277:22, 279:4, 280:8, 280:22, 303:6, 308:15
collect [2] - 442:22, 442:24
collection [1] - 255:19
college [2] - 409:13, 440:17
colloquy [2] - 464:12, 467:17
Columbia [5] - 252:8, 252:14, 253:3, 262:18, 389:13
combination [3] - 279:16, 292:25, 329:1
combined [1] - 266:8
Comcast [4] - 450:9, 452:14, 453:6, 455:12
comcast.net [1] - 406:12
comforted [1] - 341:1
coming [9] - 246:4, 303:2, 318:14, 334:25, 346:5, 403:7, 456:21, 462:13, 494:9
commend [1] - 461:23
comment [4] - 314:9, 370:2, 429:23, 461:20
comments [3] - 314:11, 325:4, 333:12
commerce [14] - 355:1, 355:5, 458:2, 458:5, 462:20, 463:5, 469:19, 470:11, 470:23, 489:11, 490:16, 494:13, 494:15, 498:5
commercial [2] - 384:6, 413:23
commission [3] - 267:11, 430:10, 430:13
commit [2] - 306:11,

363:22
committed [7] - 262:5, 346:3, 362:9, 374:2, 396:19, 404:24, 435:6
committees [1] - 280:18
committing [2] - 261:17, 315:19
Common [6] - 275:1, 275:4, 286:22, 294:2, 294:18, 299:24
common [20] - 297:24, 303:24, 303:25, 304:6, 360:15, 360:16, 361:1, 361:3, 370:25, 373:4, 373:8, 409:5, 418:22, 419:4, 424:16, 424:17, 424:22
communicate [5] - 279:20, 337:16, 361:20, 483:14, 488:16
communicated [4] - 273:1, 273:5, 338:24, 487:24
communicates [2] - 479:19, 482:13
communicating [6] - 289:5, 293:15, 301:9, 431:22, 489:21, 489:22
communication [64] - 251:11, 272:6, 273:3, 273:8, 273:9, 273:11, 273:20, 274:5, 274:6, 283:2, 283:10, 300:15, 308:15, 308:17, 308:25, 314:2, 323:14, 337:8, 339:15, 350:4, 354:24, 355:3, 361:4, 361:8, 361:15, 362:11, 369:18, 372:23, 374:7, 397:10, 397:23, 397:25, 398:4, 398:5, 402:9, 408:4, 415:14, 415:21, 416:6, 429:15, 453:15, 463:8, 463:9, 468:21, 470:24, 473:15, 473:16, 475:11, 476:8, 476:9, 476:12,

476:17, 477:1, 477:11, 477:16, 477:20, 478:5, 478:8, 478:12, 488:25, 489:11, 490:12, 490:19, 492:22
communications [23] - 241:25, 243:9, 245:13, 246:16, 247:2, 268:9, 277:17, 283:1, 325:13, 337:15, 344:2, 361:24, 378:9, 398:1, 406:14, 406:19, 418:20, 420:7, 420:14, 437:6, 468:16, 476:5, 491:22
Community [1] - 316:23
companies [2] - 384:10, 413:23
company [2] - 309:25, 383:13
company's [2] - 332:7, 449:15
comparative [1] - 324:22
compelled [1] - 464:19
compelling [1] - 364:12
compensation [3] - 367:25, 368:4, 374:14
complaint [6] - 251:13, 298:18, 305:11, 341:10, 409:13, 427:19
complaints [4] - 290:6, 299:17, 305:13, 334:13
complete [3] - 307:23, 375:18, 384:14
completed [1] - 361:25
completely [2] - 244:1, 256:10
compliance [1] - 288:16
complicity [1] - 315:12
complied [8] - 248:17, 271:3, 307:20, 393:21, 394:9, 408:25, 424:20, 468:3
Complied [13] -

245:23, 250:9, 251:4, 314:20, 321:18, 322:1, 327:11, 408:21, 426:7, 433:12, 464:10, 470:12, 473:3
component [3] - 476:11, 481:16, 482:5
components [1] - 242:23
computer [13] - 328:10, 381:6, 381:9, 441:9, 441:23, 442:10, 442:16, 442:19, 443:8, 443:18, 443:23, 444:3, 448:2
computerized [1] - 381:4
computers [1] - 457:17
concede [4] - 424:13, 429:13, 429:17, 430:1
conceded [1] - 429:24
concept [25] - 254:11, 254:21, 312:20, 313:9, 313:23, 341:13, 341:17, 360:17, 362:5, 368:15, 369:4, 370:9, 370:12, 370:21, 372:13, 372:17, 374:1, 375:8, 376:12, 473:9, 475:10, 480:4, 481:2, 487:17, 491:24
concepts [1] - 376:13
concern [13] - 253:25, 268:7, 276:10, 279:17, 282:21, 285:2, 287:11, 287:12, 292:23, 297:15, 340:2, 347:7, 398:24
concerned [7] - 254:2, 341:16, 350:25, 354:6, 358:25, 438:15, 476:14
concerning [4] - 399:2, 401:13, 407:24, 444:12
concerns [3] - 295:12, 341:2, 414:23
conclude [2] - 455:9, 461:13
concluded [3] - 327:5,

400:25, 477:14
conclusion [2] - 457:25, 490:4
concoct [1] - 298:22
condition [1] - 290:16
conduct [9] - 244:14, 256:20, 315:18, 315:19, 346:23, 362:8, 397:1, 487:4, 487:7
conducted [2] - 449:18, 449:19
confer [8] - 248:18, 249:6, 249:18, 353:18, 353:20, 356:1, 460:18, 474:15
conference [1] - 462:8
conferences [1] - 280:18
confidence [1] - 316:16
confident [1] - 492:15
confidential [6] - 430:22, 430:25, 431:23, 490:9, 490:12, 490:22
confidentiality [4] - 430:19, 430:21, 435:9, 435:14
confines [1] - 373:9
confirm [2] - 436:18, 486:21
confirmed [2] - 308:12, 386:25
conflict [3] - 334:2, 334:3, 334:7
conflicts [4] - 277:13, 277:23, 324:17, 366:22
conform [1] - 288:9
confrontational [1] - 266:9
confuse [1] - 326:22
confused [4] - 298:23, 348:11, 423:17, 494:1
confusing [1] - 354:5
confusion [3] - 314:12, 326:25, 370:23
Congress [2] - 288:15, 322:6
congressional [1] - 288:17
conjunction [1] - 362:4
connected [2] - 330:9, 453:25
connection [7] -

257:12, 257:13,
257:22, 259:3,
288:3, 379:21, 404:1
**connections** [1] -
291:18
**connects** [1] - 453:19
**CONNER** [2] - 266:23,
356:8
**Conner** [33] - 242:5,
243:10, 243:16,
245:12, 255:10,
266:21, 267:1,
267:7, 285:18,
285:25, 308:21,
309:24, 311:2,
311:25, 359:23,
363:25, 378:20,
380:18, 380:22,
386:7, 397:12,
397:19, 398:6,
399:5, 399:21,
405:4, 405:8,
405:12, 405:22,
419:1, 419:9,
419:21, 422:19
**Conner's** [4] - 241:24,
243:19, 386:13,
496:12
**Connolly** [2] - 418:5,
438:6
**conscious** [2] -
417:14, 422:8
**consciousness** [2] -
283:10, 293:16
**consent** [1] - 316:17
**consequence** [1] -
305:3
**consequences** [5] -
306:17, 307:25,
411:11, 488:12,
489:24
**consequently** [1] -
253:14
**consider** [6] - 268:9,
347:22, 460:4,
460:8, 492:11,
496:20
**consideration** [1] -
285:2
**considered** [8] -
276:17, 292:24,
297:19, 344:24,
350:2, 370:16,
437:8, 495:14
**considering** [1] -
424:10
**consistency** [1] -
329:22
**consistent** [8] -
300:15, 304:16,

392:2, 393:17,
394:11, 394:18,
496:6, 496:15
**conspiracy** [4] -
260:11, 262:12,
363:21, 413:13
**conspirator** [3] -
262:13, 262:14,
490:8
**conspirators** [1] -
260:9
**constant** [1] - 326:17
**constantly** [1] -
329:15
**constitute** [1] - 363:20
**constitutes** [1] -
315:18
**Constitution** [6] -
305:1, 313:14,
313:18, 322:5,
371:7, 464:20
**constitution** [7] -
291:5, 291:17,
298:6, 306:1,
307:19, 369:25,
371:3
**constitutional** [26] -
282:15, 285:1,
288:16, 288:18,
292:12, 296:9,
296:15, 296:17,
298:2, 307:7, 307:8,
332:8, 343:8,
343:24, 344:4,
344:6, 344:9,
344:14, 344:24,
364:25, 368:14,
369:18, 370:4,
374:9, 464:16,
467:11
**constructive** [3] -
480:4, 491:20,
491:24
**constructively** [2] -
481:3, 487:18
**construed** [1] - 244:13
**Consulting** [2] -
315:22, 327:18
**contact** [17] - 247:11,
252:17, 252:20,
253:4, 264:22,
266:8, 272:11,
276:7, 339:22,
357:9, 401:20,
402:24, 403:1,
403:5, 406:2, 406:4,
434:25
**contacted** [10] - 246:2,
252:7, 252:13,
252:24, 273:8,

273:21, 357:8,
357:12, 357:13,
403:5
**contacts** [1] - 264:22
**contain** [3] - 247:4,
272:5, 373:16
**contained** [9] - 245:6,
245:14, 246:18,
246:20, 247:3,
361:16, 419:20,
451:11, 476:9
**containing** [2] - 489:2,
489:11
**content** [7] - 250:22,
250:23, 252:3,
347:19, 418:19,
433:8, 433:9
**contents** [2] - 271:16,
474:23
**context** [31] - 243:8,
243:12, 256:11,
287:9, 288:4, 292:6,
302:24, 304:14,
306:8, 344:12,
345:6, 367:18,
372:12, 372:23,
373:21, 375:11,
376:14, 401:13,
423:17, 424:9,
424:11, 425:3,
425:8, 427:23,
432:14, 434:19,
479:17, 482:10,
484:6
**Conti** [17] - 280:25,
281:9, 282:4,
296:20, 408:2,
410:8, 415:1, 418:1,
418:3, 418:11,
433:18, 433:21,
434:16, 434:20,
437:23, 438:12,
438:16
**continually** [1] - 312:4
**continuation** [3] -
300:6, 303:1, 303:5
**continue** [7] - 316:14,
335:13, 356:10,
362:5, 370:3, 413:9,
496:4
**continued** [2] - 357:1
**CONTINUED** [3] -
247:8, 285:15,
356:12
**continues** [2] - 291:2,
316:12
**continuing** [4] - 285:7,
297:24, 298:2, 413:8
**contract** [7] - 316:12,
318:3, 318:4,

375:11, 375:20,
375:23, 376:6
**contracted** [1] - 441:4
**contractor** [1] - 441:4
**contractors** [1] -
375:16
**contracts** [2] - 255:19,
256:22
**contractual** [2] -
316:9, 317:15
**contrary** [1] - 256:12
**control** [9] - 265:11,
338:12, 345:22,
356:21, 357:20,
412:1, 412:11,
418:25, 490:1
**controversial** [1] -
428:7
**convened** [2] - 241:1,
420:1
**convenience** [2] -
470:4, 491:20
**conversation** [8] -
251:24, 251:25,
252:1, 259:17,
261:11, 404:6,
404:18, 405:3
**convey** [1] - 428:13
**convict** [1] - 490:13
**convicted** [2] - 285:2,
492:13
**conviction** [1] -
489:18
**convince** [1] - 355:17
**convinced** [2] -
355:12, 355:16
**cooperation** [1] -
430:11
**cooperative** [1] -
433:14
**copied** [4] - 415:24,
415:25, 416:24,
468:20
**copies** [11] - 269:21,
308:12, 462:21,
462:25, 463:14,
463:15, 463:16,
464:4, 464:5, 464:9,
483:2
**copy** [26] - 274:4,
308:5, 321:4,
321:15, 352:23,
360:9, 360:10,
384:18, 384:20,
397:23, 397:25,
405:6, 408:6, 426:3,
426:6, 429:2,
443:12, 443:13,
447:7, 463:11,
463:21, 464:8,

464:9, 470:10,
485:23, 498:19
**corner** [5] - 381:24,
382:4, 387:3,
393:14, 433:10
**Corporal** [1] - 395:12
**corporate** [2] - 373:3,
424:25
**Corporate** [1] -
436:13, 437:3
**corporation** [4] -
414:11, 414:21,
425:1, 432:9
**Corporation** [1] -
451:22
**corpus** [1] - 300:24
**correct** [81] - 243:3,
253:13, 253:24,
257:16, 259:9,
265:4, 268:25,
269:21, 270:7,
270:9, 277:4, 277:5,
281:6, 282:6,
286:18, 289:9,
290:14, 290:19,
291:7, 295:14,
302:13, 302:15,
306:16, 306:18,
306:19, 306:21,
311:9, 311:15,
312:6, 312:9,
313:15, 319:4,
320:11, 320:23,
328:16, 332:10,
336:9, 336:14,
346:2, 356:19,
365:17, 370:18,
371:4, 373:18,
378:11, 389:24,
392:11, 393:23,
397:8, 398:7,
406:16, 407:15,
408:6, 410:1, 416:8,
418:5, 420:23,
420:24, 423:16,
424:17, 438:6,
439:6, 442:21,
446:25, 447:4,
456:1, 457:13,
457:18, 464:15,
468:18, 473:22,
482:1, 482:5, 485:6,
486:15, 488:23,
492:15, 495:4,
495:8, 496:9, 497:1
**corrected** [1] - 476:4
**correction** [1] - 391:25
**correctly** [4] - 243:21,
260:11, 318:24,
412:22

**correspondence** [20] - 269:19, 273:7, 275:22, 279:18, 283:7, 283:8, 289:1, 291:25, 292:9, 292:20, 296:24, 303:15, 308:5, 308:7, 308:13, 308:14, 320:4, 349:22, 372:16, 407:20

**CORRICELLI** [1] - 377:2

**Corricelli** [8] - 252:25, 377:1, 377:6, 377:10, 398:1, 401:20, 402:11, 402:19

**corroborate** [1] - 470:5

**corrupt** [3] - 298:12, 298:16, 319:1

**corruption** [2] - 299:23, 405:9

**counsel** [4] - 284:10, 284:11, 467:21, 480:25

**count** [2] - 433:20, 434:13

**Count** [31] - 270:14, 353:21, 353:22, 353:23, 353:25, 354:2, 354:3, 354:9, 354:13, 354:15, 354:25, 355:4, 406:14, 419:15, 434:12, 438:1, 469:10, 488:1, 496:20, 496:21, 496:24, 496:25, 497:10, 497:15, 497:16

**counted** [1] - 348:6

**counter** [4] - 263:10, 395:19, 397:1, 397:3

**counterpart** [1] - 263:11

**counties** [2] - 331:8, 331:9

**counting** [1] - 347:20

**countries** [1] - 397:5

**country** [2] - 314:1, 384:7

**Counts** [2] - 461:7, 469:9

**counts** [3] - 354:6, 354:11, 490:15

**County** [10] - 274:25, 275:3, 275:5, 286:23, 286:25,

294:2, 294:18, 295:9, 337:4, 389:12

**couple** [8] - 347:16, 385:8, 401:4, 406:9, 463:2, 464:9, 482:15, 486:24

**coupled** [1] - 496:1

**course** [11] - 251:25, 261:5, 261:10, 278:16, 305:7, 308:14, 391:4, 404:10, 415:20, 449:18, 470:4

**court** [48] - 243:7, 246:23, 249:9, 249:13, 251:16, 252:8, 252:13, 253:3, 263:16, 277:24, 278:3, 279:22, 280:17, 290:7, 298:13, 299:18, 300:20, 300:21, 300:22, 301:13, 301:14, 320:11, 328:21, 331:24, 338:7, 340:24, 346:6, 347:17, 347:23, 348:7, 348:9, 348:15, 348:17, 348:19, 348:20, 349:17, 349:18, 359:5, 363:1, 363:2, 375:24, 389:16, 400:5, 419:6, 433:18, 456:21

**COURT** [363] - 241:3, 241:13, 241:21, 242:4, 242:12, 242:18, 242:25, 243:5, 243:14, 243:18, 243:22, 244:3, 244:8, 244:11, 244:16, 244:22, 245:9, 245:16, 245:18, 245:22, 245:25, 247:23, 248:2, 248:4, 248:7, 248:13, 248:19, 248:24, 249:3, 249:7, 250:3, 250:6, 250:12, 250:16, 250:20, 250:24, 255:3, 255:23, 257:3, 257:6, 258:8, 258:10, 258:17, 265:23, 266:14, 266:17, 266:22, 269:10, 270:16,

283:18, 283:21, 284:1, 284:10, 284:14, 284:18, 285:10, 285:14, 309:3, 310:18, 311:18, 311:22, 314:16, 314:18, 314:24, 317:4, 317:8, 318:13, 319:13, 321:6, 321:14, 321:19, 321:21, 321:23, 321:25, 322:12, 322:18, 322:20, 322:23, 323:1, 323:7, 323:11, 323:21, 323:25, 324:7, 324:24, 325:6, 325:11, 325:17, 325:21, 326:6, 326:12, 326:15, 326:20, 327:4, 327:6, 327:9, 333:4, 333:13, 333:17, 340:10, 340:18, 341:22, 341:25, 342:4, 342:7, 342:12, 342:14, 342:17, 342:19, 342:21, 343:2, 343:4, 343:14, 346:11, 346:14, 346:18, 347:8, 347:25, 349:10, 350:21, 350:25, 351:6, 351:9, 351:14, 351:21, 351:25, 352:4, 352:8, 352:14, 352:17, 352:19, 352:23, 353:2, 353:5, 353:7, 353:12, 353:15, 353:21, 353:25, 354:2, 354:7, 354:12, 354:18, 355:8, 355:13, 355:17, 355:25, 356:2, 356:5, 356:10, 358:10, 358:13, 358:17, 358:22, 359:10, 359:17, 359:24, 360:3, 360:21, 362:21, 364:14, 365:1, 367:5, 368:8, 368:11, 368:17, 369:1, 369:10, 369:14, 369:20, 369:23, 370:1, 371:11, 371:20,

372:2, 373:24, 374:3, 374:20, 376:19, 376:22, 376:24, 385:18, 385:22, 386:2, 393:8, 394:24, 395:3, 395:5, 398:17, 400:15, 400:20, 400:22, 407:1, 408:11, 408:13, 408:15, 413:19, 416:12, 417:13, 421:6, 421:9, 421:15, 421:18, 421:22, 422:2, 422:12, 422:15, 425:11, 425:14, 425:16, 425:19, 426:5, 427:7, 429:24, 431:17, 432:1, 432:19, 433:13, 433:22, 435:19, 436:3, 437:12, 438:17, 438:21, 438:24, 439:8, 439:11, 439:13, 444:4, 444:6, 446:7, 447:13, 449:6, 450:4, 450:20, 450:22, 457:22, 458:10, 459:2, 459:4, 459:6, 459:21, 459:23, 460:3, 460:8, 460:11, 460:15, 460:17, 460:23, 460:25, 461:3, 461:8, 461:11, 462:4, 462:17, 462:23, 463:12, 463:17, 463:24, 464:2, 464:4, 465:6, 465:9, 465:12, 465:17, 466:1, 466:6, 466:19, 467:1, 467:7, 467:20, 467:25, 468:4, 468:7, 468:13, 468:17, 468:25, 469:2, 469:5, 469:11, 469:13, 469:16, 469:20, 469:22, 470:9, 470:13, 470:20, 471:1, 471:15, 471:24, 472:1, 472:4, 472:6, 472:19, 472:22, 473:4, 473:23, 474:10, 474:17,

474:22, 475:3, 475:9, 475:13, 475:16, 475:19, 475:25, 476:17, 476:23, 477:24, 478:8, 478:24, 479:23, 480:2, 480:10, 481:7, 481:13, 481:19, 481:22, 481:25, 483:5, 483:21, 483:25, 484:17, 484:22, 485:3, 485:11, 485:14, 485:20, 486:1, 486:3, 486:16, 486:24, 487:21, 488:14, 488:19, 489:6, 489:8, 489:10, 490:25, 491:2, 491:11, 492:12, 493:13, 493:20, 493:23, 494:7, 494:14, 494:17, 494:23, 495:1, 495:13, 495:23, 496:10, 496:14, 496:22, 497:2, 497:9, 497:17, 497:22, 497:25, 498:3, 498:7, 498:10

**Court** [80] - 241:5, 254:17, 256:15, 261:22, 261:23, 262:6, 274:17, 274:20, 274:25, 275:10, 281:14, 281:25, 282:2, 282:3, 285:4, 286:22, 288:12, 293:10, 294:2, 294:18, 299:9, 299:24, 305:9, 312:13, 312:15, 319:23, 320:10, 322:10, 335:2, 338:5, 338:11, 339:16, 341:19, 344:20, 345:3, 347:4, 359:20, 368:2, 368:16, 369:6, 370:11, 372:4, 373:15, 373:17, 373:23, 376:8, 389:15, 409:20, 409:24, 411:20, 418:7, 426:11, 426:12, 438:8, 462:4, 469:9, 470:4, 473:8,

473:12, 473:13,
477:5, 477:7, 477:9,
477:12, 477:13,
477:22, 478:25,
479:12, 480:19,
484:23, 486:17,
488:3, 489:15,
490:17, 491:4,
492:18, 494:20
**Court's** [6] - 474:9,
475:7, 478:14,
481:10, 481:15,
482:4
**court's** [1] - 389:16
**courthouse** [2] -
273:10, 277:21
**courthouses** [1] -
310:5
**courtroom** [3] - 257:7,
267:19, 426:21
**COURTROOM** [12] -
266:24, 283:24,
321:9, 353:9, 377:3,
395:10, 421:13,
436:23, 439:15,
459:19, 460:1,
498:23
**Courts** [1] - 282:2
**courts** [9] - 241:17,
279:22, 280:12,
281:18, 299:19,
305:7, 322:7,
368:17, 389:17
**cover** [5] - 309:11,
309:21, 310:20,
312:3, 329:11
**covered** [2] - 422:19,
426:24
**create** [4] - 301:10,
382:15, 391:7,
391:12
**created** [12] - 277:13,
277:23, 334:3,
334:7, 343:9,
344:10, 368:5,
377:24, 392:22,
393:2, 393:3, 393:12
**creating** [2] - 372:24,
391:6
**creation** [1] - 301:6
**credibility** [1] - 323:15
**credit** [2] - 382:12,
382:19
**creditors** [1] - 376:11
**Creek** [2] - 316:23,
318:7
**crime** [27] - 251:17,
260:21, 260:22,
346:8, 363:13,
363:20, 363:22,

373:13, 378:8,
404:25, 419:2,
435:4, 435:6,
464:21, 481:21,
485:10, 485:12,
485:16, 485:17,
487:9, 488:2,
489:16, 490:19,
491:5, 493:25,
494:19
**crimes** [15] - 260:16,
260:18, 260:20,
261:9, 261:18,
262:5, 362:5, 362:6,
362:8, 374:2,
396:19, 427:12,
431:15, 431:16,
435:25
**criminal** [27] - 267:21,
267:24, 267:25,
298:18, 298:24,
299:4, 299:7, 299:8,
306:13, 319:3,
325:2, 345:22,
346:2, 346:25,
347:4, 359:1,
373:16, 378:7,
409:22, 409:23,
415:15, 415:16,
423:3, 427:17,
427:20, 431:11,
435:25
**criminality** [1] - 325:5
**criminals** [2] - 300:14,
305:21
**critical** [1] - 461:22
**criticism** [1] - 462:11
**crony** [1] - 409:6
**cross** [13] - 244:4,
246:8, 266:17,
284:8, 311:22,
351:22, 356:11,
376:17, 395:3,
421:11, 422:15,
458:10, 466:17
**CROSS** [5] - 247:8,
311:23, 356:12,
422:16, 458:12
**cross-examine** [1] -
244:4
**cross-examining** [1] -
246:8
**crux** [4] - 323:9,
417:24, 417:25,
437:22
**Cruz** [10] - 395:8,
395:12, 408:18,
409:10, 410:3,
411:23, 422:18,
439:2, 452:1, 452:3

**CRUZ** [1] - 395:9
**cscruz@fbi.gov** [1] -
407:10
**CT** [1] - 396:11
**culpability** [1] -
315:20
**Cumberland** [7] -
274:25, 286:23,
294:2, 294:18,
295:9, 337:4, 389:12
**curiosity** [1] - 333:1
**curious** [1] - 327:15
**current** [1] - 481:8
**custody** [1] - 449:15
**customers** [1] - 378:6
**cut** [2] - 293:20,
293:23
**cuts** [1] - 497:17
**cyber** [2] - 440:3

# D

**DACA** [1] - 411:3
**danger** [1] - 242:1
**dangerous** [1] - 432:1
**Darby** [6] - 252:14,
252:15, 252:17,
252:20, 262:17,
262:21
**dark** [1] - 303:3
**data** [4] - 442:3,
443:11, 443:12,
446:3
**database** [1] - 442:3
**date** [21] - 251:2,
264:17, 287:13,
287:18, 288:20,
309:14, 310:3,
386:17, 386:18,
386:19, 386:21,
386:25, 387:23,
390:14, 390:17,
393:22, 419:16,
419:17, 420:19,
426:18
**dated** [3] - 354:24,
355:3, 371:3
**dates** [1] - 311:13
**daughter** [1] - 423:8
**David** [1] - 306:22
**days** [2] - 294:6, 370:3
**DC** [6] - 262:24,
372:20, 413:5,
414:9, 432:7, 432:25
**DEA** [1] - 378:4
**dead** [1] - 303:4
**Deadly** [2] - 418:2,
437:24
**deal** [7] - 265:2,

378:17, 396:17,
474:2, 475:19,
490:10, 495:2
**dealing** [3] - 429:19,
477:7, 487:10
**dealings** [3] - 278:21,
295:12, 402:20
**dealt** [1] - 317:20
**dear** [1] - 280:8
**death** [23] - 272:5,
274:6, 282:12,
287:12, 289:6,
291:4, 291:17,
293:1, 296:18,
300:20, 302:8,
305:22, 306:12,
344:13, 345:15,
345:17, 349:7,
349:23, 361:16,
362:24, 378:21,
401:7, 428:9
**debit** [2] - 382:12,
388:21
**debtors** [1] - 295:7
**deceased** [1] - 273:23
**December** [1] - 254:19
**decide** [5] - 242:9,
243:15, 247:1,
281:16, 338:19
**decided** [5] - 265:9,
323:16, 323:20,
354:13, 465:2
**deciding** [2] - 245:4,
245:11
**decipherable** [1] -
446:3
**decision** [33] - 264:2,
284:12, 288:12,
288:20, 296:20,
299:10, 317:16,
320:2, 322:7,
334:12, 335:20,
335:21, 335:22,
336:4, 341:4,
355:21, 359:22,
376:15, 400:13,
417:21, 466:12,
467:24, 473:7,
473:13, 476:19,
477:6, 478:15,
481:10, 481:14,
482:3, 493:3, 495:9
**decisions** [6] -
280:21, 280:23,
283:9, 286:12,
299:11, 359:20
**deck** [2] - 328:4, 328:7
**declaration** [3] -
448:20, 449:13,
449:15

**declarative** [3] -
414:10, 432:8, 433:5
**declaratory** [6] -
295:24, 299:24,
300:3, 313:3,
322:25, 323:3
**default** [25] - 302:3,
302:7, 336:5,
336:19, 337:19,
337:24, 338:1,
338:22, 339:1,
339:2, 339:3, 339:4,
339:5, 346:6,
346:24, 362:15,
363:19, 364:1,
364:10, 364:12,
364:20, 365:14,
426:23
**defaulted** [4] - 337:7,
339:7, 418:9, 438:10
**defaulting** [1] - 337:23
**defend** [2] - 304:25,
306:14
**Defendant** [52] -
241:6, 245:5,
246:19, 247:4,
247:19, 257:16,
260:6, 261:6, 261:7,
262:3, 264:5,
278:15, 282:5,
291:6, 303:25,
304:10, 325:23,
332:25, 336:5,
352:11, 399:20,
402:25, 404:10,
405:4, 406:19,
408:7, 408:23,
412:11, 425:10,
437:9, 462:22,
464:21, 469:8,
473:15, 473:21,
473:25, 474:5,
474:13, 476:7,
476:11, 477:10,
477:15, 477:19,
478:4, 478:12,
479:16, 482:10,
483:15, 487:3,
491:3, 491:21,
495:15
**defendant** [3] - 334:6,
359:2, 487:6
**Defendant's** [7] -
250:24, 258:12,
264:14, 265:13,
411:24, 491:16,
495:16
**defendants** [5] -
268:1, 337:7,
337:10, 337:19,

484:24
**defense** [18] - 298:23, 359:2, 359:4, 359:8, 409:6, 460:9, 465:1, 465:10, 465:12, 465:14, 465:19, 465:20, 465:21, 466:2, 466:8, 467:12, 467:15, 488:4
**Defense** [1] - 261:15
**definable** [1] - 313:11
**define** [8] - 414:8, 414:10, 432:6, 432:7, 432:9, 432:25, 471:8, 473:9
**defined** [1] - 485:25
**defining** [1] - 376:9
**definitely** [4] - 399:23, 404:17, 407:23, 427:2
**definition** [3] - 472:10, 487:8, 491:6
**degree** [5] - 315:15, 315:18, 440:12, 440:13, 458:4
**degrees** [1] - 440:10
**Delaware** [1] - 422:3
**delay** [1] - 334:18
**delete** [2] - 431:4, 483:6
**deleted** [2] - 447:2, 482:15
**delicate** [1] - 298:5
**deliver** [1] - 384:15
**delivered** [5] - 260:10, 260:11, 387:6, 387:21, 488:24
**deliverer** [1] - 306:24
**delivering** [2] - 383:22, 385:5
**delivers** [1] - 387:21
**delivery** [3] - 384:24, 387:10, 387:13
**demand** [2] - 261:4, 355:9
**demanding** [1] - 345:11
**demands** [1] - 418:25
**demeanor** [2] - 252:21, 266:9
**democrat/socialism** [1] - 409:7
**demonstrate** [1] - 289:12
**demonstrated** [2] - 301:16, 481:3
**denied** [2] - 266:4, 490:9
**deny** [3] - 283:6,

461:8, 461:11
**Department** [4] - 276:8, 374:6, 436:13, 437:4
**department** [1] - 276:11
**deployments** [1] - 428:7
**deposits** [1] - 488:24
**depth** [2] - 434:23, 436:16
**deputy** [9] - 245:3, 245:10, 246:10, 251:11, 259:13, 263:25, 265:5, 496:2
**DEPUTY** [13] - 266:24, 283:24, 321:9, 353:9, 377:3, 395:10, 421:13, 421:21, 436:23, 439:15, 459:19, 460:1, 498:23
**Deputy** [9] - 245:20, 257:11, 259:19, 260:7, 261:8, 262:4, 262:10, 264:16, 402:5
**derived** [1] - 435:3
**Des** [1] - 451:22
**descending** [1] - 254:2
**describe** [13] - 276:16, 283:11, 377:18, 389:10, 394:3, 394:13, 440:15, 441:2, 441:20, 443:6, 453:3, 453:8, 456:24
**described** [9] - 280:8, 283:9, 295:19, 301:1, 307:17, 316:5, 385:12, 451:18, 454:21
**description** [1] - 298:14
**design** [1] - 441:5
**designated** [3] - 330:3, 332:20, 333:21
**designating** [1] - 488:25
**designation** [5] - 282:3, 309:24, 330:18, 330:20, 331:2
**designations** [1] - 330:24
**designed** [1] - 441:22
**designing** [1] - 441:8
**desire** [1] - 465:6

**destination** [2] - 454:17, 455:3
**detail** [5] - 279:18, 293:5, 297:2, 380:20, 461:14
**details** [5] - 318:4, 366:4, 410:14, 429:12, 434:23
**deterioration** [1] - 265:13
**determination** [8] - 300:23, 307:10, 329:12, 330:17, 479:6, 482:7, 495:6, 495:8
**determine** [6] - 288:17, 339:19, 384:4, 388:3, 402:3, 457:6
**determined** [3] - 254:17, 320:20, 352:14
**determining** [2] - 320:14, 455:23
**Deuteronomy** [3] - 291:11, 291:12, 291:13
**develop** [1] - 338:20
**developed** [1] - 282:19
**device** [4] - 255:18, 256:14, 256:21, 390:23
**devices** [1] - 454:2
**devil** [1] - 318:4
**dialed** [1] - 403:3
**dictated** [1] - 362:14
**die** [6] - 292:18, 304:22, 304:23, 311:5, 315:14, 316:1
**difference** [2] - 345:19, 477:8
**different** [20] - 244:1, 284:9, 287:9, 301:2, 313:11, 333:1, 338:25, 363:1, 363:2, 381:4, 399:14, 414:3, 414:5, 457:4, 472:14, 475:13, 475:14, 488:5, 492:24
**difficult** [8] - 282:16, 314:5, 314:7, 323:24, 344:23, 434:6, 462:1, 473:9
**difficulties** [1] - 266:9
**difficulty** [3] - 254:1, 356:22, 427:5
**dig** [2] - 378:23,

379:15
**digging** [1] - 379:25
**digital** [3] - 379:24, 443:3, 443:4
**digits** [3] - 382:25, 383:6
**dire** [1] - 489:24
**direct** [26] - 266:17, 271:22, 276:16, 279:20, 292:10, 295:16, 301:4, 301:12, 304:18, 333:5, 338:5, 341:22, 342:1, 342:17, 343:7, 345:15, 345:17, 349:6, 361:20, 365:11, 369:19, 370:10, 374:21, 412:2, 417:17, 466:22
**DIRECT** [6] - 267:2, 285:15, 377:8, 395:13, 439:19, 444:8
**directed** [7] - 242:14, 298:11, 349:21, 349:22, 399:4, 416:7, 461:9
**directing** [1] - 303:8
**direction** [1] - 284:9
**directly** [8] - 255:7, 272:11, 293:15, 337:1, 412:12, 416:5, 419:21, 492:10
**disagree** [8] - 243:23, 314:8, 340:13, 347:2, 361:13, 362:6, 363:5, 471:11
**disagreed** [1] - 295:19
**discern** [2] - 399:23, 417:10
**disclaimer** [2] - 487:22, 488:20
**disclosure** [1] - 430:9
**discretion** [3] - 357:24, 411:3, 474:9
**Discretionary** [2] - 418:2, 437:24
**discuss** [10] - 272:13, 285:6, 285:19, 351:18, 421:19, 453:11, 453:12, 459:14, 463:3, 473:2
**discussed** [3] - 413:7, 455:12, 462:21
**discusses** [2] - 473:8, 493:11
**discussing** [3] -

**discussion** [19] - 262:15, 322:17, 325:14, 327:5, 333:5, 341:23, 368:13, 400:17, 400:25, 404:10, 405:7, 413:9, 455:8, 461:16, 493:10, 495:15, 496:1, 496:2
**discussions** [1] - 313:10
**disfavors** [1] - 340:5
**disgruntled** [1] - 279:20
**dishonored** [1] - 311:4
**disjunctive** [1] - 479:1
**disk** [1] - 390:11
**dismiss** [3] - 317:20, 317:25, 354:15
**dismissal** [1] - 368:6
**dismissed** [13] - 254:19, 294:4, 323:9, 340:6, 353:25, 354:3, 354:9, 368:1, 368:6, 405:19, 469:10, 490:15, 497:19
**dismissing** [2] - 323:20, 326:18
**display** [1] - 431:9
**displayed** [1] - 446:4
**disposed** [1] - 305:14
**dispute** [5] - 340:7, 368:20, 473:13, 478:3, 496:13
**disputing** [1] - 362:12
**disregard** [1] - 497:10
**disrespectful** [1] - 286:16
**disseminate** [1] - 431:2
**dissent** [1] - 486:19
**dissents** [1] - 487:1
**distinguish** [1] - 345:14
**distract** [1] - 324:10
**distribution** [1] - 328:2
**district** [46] - 252:7, 252:13, 253:2, 267:18, 267:19, 273:24, 273:25, 274:1, 274:13, 277:12, 277:16, 277:25, 278:6, 278:10, 278:12, 279:9, 279:11,

281:13, 281:18, 298:13, 300:21, 301:13, 331:11, 332:1, 333:25, 334:13, 334:14, 334:23, 334:24, 335:10, 335:13, 335:14, 336:2, 337:11, 339:17, 348:7, 348:9, 348:15, 348:17, 348:19, 348:20, 356:25, 357:15, 357:21, 363:1, 366:22

**District** [51] - 252:8, 252:13, 253:3, 255:8, 255:12, 255:20, 262:18, 262:23, 274:8, 278:17, 280:25, 281:4, 281:11, 281:13, 281:15, 285:25, 286:20, 298:24, 299:1, 305:21, 310:1, 310:9, 311:2, 312:5, 312:9, 317:3, 329:2, 330:1, 330:14, 332:12, 332:21, 333:22, 337:6, 338:5, 339:10, 348:3, 366:17, 367:15, 368:15, 368:25, 389:13, 409:24, 426:11, 426:12, 439:5, 452:9, 479:12, 481:15, 482:4, 488:3

**district-wide** [1] - 334:13

**districts** [1] - 319:21

**disturbed** [1] - 289:18

**disturbing** [4] - 271:21, 282:11, 291:14, 430:13

**division** [4] - 331:24, 440:1, 440:4, 440:5

**divorce** [1] - 402:22

**doc_militia** [1] - 424:2

**doc_militia_pdf** [1] - 423:20

**docket** [6] - 251:16, 298:17, 330:18, 330:21, 338:10, 363:12

**docketed** [1] - 462:15

**dockets** [2] - 278:9, 398:13

**Docsan** [1] - 301:7

**Docson** [3] - 307:16, 315:21, 424:15

**Docson's** [8] - 409:4, 412:5, 412:13, 418:11, 424:21, 425:1, 437:18, 438:12

**Doctrine** [5] - 307:20, 412:7, 412:16, 418:2, 437:24

**document** [18] - 248:21, 248:22, 250:21, 298:6, 308:23, 309:7, 314:11, 371:11, 399:1, 424:9, 425:8, 426:14, 445:3, 446:25, 449:22, 450:7, 485:24, 486:5

**documents** [5] - 398:13, 406:5, 406:6, 463:21, 463:22

**dog** [2] - 370:15, 370:21

**dollar** [1] - 382:5

**dollars** [8] - 255:18, 256:21, 364:22, 379:6, 414:9, 414:20, 432:8, 433:4

**domestic** [3] - 396:12, 397:5, 397:6

**Donald** [1] - 254:7

**done** [14] - 265:2, 301:9, 313:25, 323:11, 335:4, 344:15, 366:20, 401:25, 419:1, 438:19, 466:23, 466:24, 482:2

**Donio** [2] - 274:10, 274:14

**Doscon** [3] - 301:7, 301:8

**dot** [3] - 312:24

**doubt** [6] - 299:16, 355:10, 355:16, 464:22, 464:25, 475:8

**Dougherty** [150] - 241:10, 245:18, 246:7, 247:5, 248:16, 248:18, 248:19, 249:6, 250:3, 251:23, 252:2, 252:6, 252:12, 252:15, 252:16, 252:18, 252:19, 252:21, 253:1, 254:17,

259:6, 259:12, 259:16, 259:21, 260:6, 260:8, 261:19, 262:11, 262:16, 262:21, 263:11, 263:14, 264:18, 264:22, 266:4, 268:20, 270:3, 274:23, 276:22, 277:4, 277:9, 277:16, 278:10, 279:19, 280:20, 284:7, 284:18, 286:5, 291:25, 292:3, 298:1, 298:18, 299:10, 300:18, 303:23, 304:12, 304:22, 309:13, 314:17, 314:24, 315:21, 319:14, 322:16, 322:23, 324:19, 326:13, 327:9, 327:17, 337:4, 341:25, 343:20, 347:15, 350:21, 351:21, 353:2, 353:12, 353:18, 353:20, 355:24, 356:1, 356:10, 364:21, 365:4, 368:18, 378:13, 383:12, 383:18, 383:23, 385:1, 385:6, 385:12, 390:20, 391:19, 392:2, 392:7, 393:17, 394:10, 394:11, 394:20, 394:21, 398:5, 399:20, 403:7, 403:25, 404:14, 407:9, 407:11, 407:12, 408:11, 414:9, 415:13, 415:15, 417:3, 417:25, 418:8, 418:10, 420:3, 421:16, 432:8, 433:4, 433:11, 433:17, 434:8, 437:22, 438:9, 438:11, 444:4, 444:13, 445:6, 452:24, 453:6, 457:15, 460:18, 462:8, 463:22, 464:8, 464:12, 467:22, 468:2, 469:14, 470:10, 472:23,

474:17, 483:18, 487:14, 491:13, 494:8, 494:14, 494:24, 497:3

**DOUGHERTY** [213] - 243:24, 244:7, 244:10, 244:15, 244:19, 247:9, 247:25, 248:3, 248:23, 249:1, 250:5, 250:8, 250:10, 250:14, 250:18, 251:5, 255:5, 255:6, 255:22, 256:6, 256:7, 257:2, 266:16, 270:15, 285:9, 310:17, 311:24, 314:21, 315:4, 317:6, 317:13, 318:18, 319:15, 319:17, 321:8, 321:12, 321:24, 322:2, 322:19, 322:24, 323:2, 323:8, 323:17, 323:23, 324:2, 324:16, 325:3, 325:10, 325:16, 325:19, 326:17, 327:3, 327:8, 327:12, 331:13, 333:11, 333:16, 333:18, 340:16, 340:22, 342:2, 342:6, 342:10, 342:20, 342:24, 343:3, 343:6, 343:23, 346:13, 346:17, 346:20, 346:21, 347:12, 347:13, 348:2, 349:13, 350:23, 351:4, 351:8, 351:13, 351:23, 352:1, 352:16, 352:22, 353:4, 353:6, 353:14, 353:17, 353:23, 354:1, 354:4, 354:8, 354:10, 354:17, 355:7, 355:12, 355:15, 356:3, 356:13, 358:11, 358:15, 358:20, 358:24, 359:14, 359:15, 359:22, 360:1, 360:4, 361:6, 363:6, 364:19, 365:7, 367:12,

367:13, 368:14, 368:21, 369:3, 369:13, 369:17, 369:24, 370:8, 371:19, 371:24, 372:7, 374:1, 374:5, 374:24, 376:17, 393:7, 395:4, 408:12, 421:17, 422:17, 425:12, 425:15, 425:18, 425:21, 426:3, 426:8, 427:9, 427:10, 430:4, 431:19, 431:20, 432:3, 432:4, 432:23, 433:15, 434:10, 434:11, 435:22, 436:4, 436:22, 436:24, 436:25, 437:14, 437:15, 438:19, 444:5, 447:12, 449:5, 450:3, 450:21, 458:11, 458:13, 459:1, 460:10, 461:1, 461:4, 461:10, 465:5, 465:8, 465:11, 465:16, 465:25, 466:4, 466:18, 466:23, 467:4, 469:4, 469:15, 474:20, 474:25, 475:6, 475:10, 475:15, 475:18, 475:22, 476:16, 476:22, 477:23, 478:7, 478:20, 479:22, 479:25, 480:3, 480:13, 481:17, 481:20, 485:7, 485:13, 485:23, 487:16, 488:1, 488:18, 489:4, 489:7, 489:14, 491:9, 491:14, 494:16, 494:25, 497:4

**Dougherty's** [12] - 251:25, 254:19, 266:8, 281:1, 282:16, 294:8, 299:2, 299:24, 337:12, 384:19, 412:5, 485:5

**down** [21] - 252:4, 266:14, 284:22, 296:5, 312:14, 312:24, 350:12,

385:8, 387:2, 390:9, 393:22, 395:5, 404:16, 421:21, 430:6, 437:18, 439:8, 444:22, 448:3, 454:19, 462:13
**downward** [1] - 256:20
**dozen** [1] - 268:10
**draft** [3] - 453:22, 471:16, 496:14
**drafted** [1] - 472:16
**draw** [2] - 301:22, 465:23
**drawing** [1] - 407:21
**Drive** [1] - 453:7
**driver's** [4] - 384:19, 384:20, 385:13, 390:19
**driving** [1] - 276:23
**drop** [2] - 386:23, 490:11
**dropped** [1] - 428:10
**due** [4] - 358:1, 358:3, 358:7, 368:22
**Dupes** [1] - 433:17
**during** [16] - 251:23, 251:25, 254:6, 254:8, 259:13, 261:10, 262:3, 264:19, 391:4, 405:3, 405:7, 405:11, 408:23, 418:21, 428:7, 498:19
**duties** [10] - 288:2, 316:10, 316:11, 316:18, 317:15, 321:2, 344:16, 373:15, 415:17, 415:18
**duty** [9] - 331:6, 404:23, 405:1, 409:4, 409:19, 423:3, 424:16, 424:21, 425:7
**dying** [1] - 295:23

### E

**e-mail** [88] - 252:18, 342:4, 342:9, 354:24, 406:8, 406:13, 406:20, 406:22, 407:8, 407:11, 408:4, 408:6, 408:7, 408:19, 408:20,

408:22, 411:24, 415:22, 415:24, 415:25, 416:7, 416:16, 419:15, 419:16, 419:18, 419:21, 420:18, 422:20, 424:4, 424:5, 425:5, 433:20, 436:5, 436:20, 439:2, 442:3, 445:12, 445:13, 445:16, 445:19, 445:21, 445:22, 445:23, 445:24, 445:25, 446:1, 446:5, 446:13, 446:15, 447:7, 448:1, 448:4, 448:17, 450:25, 451:2, 451:8, 451:25, 452:15, 452:16, 452:25, 453:4, 453:5, 453:9, 453:15, 453:18, 453:23, 454:9, 454:13, 454:25, 455:10, 455:11, 455:20, 455:21, 455:24, 457:2, 457:3, 457:9, 457:11, 457:16, 458:19, 470:24, 487:23, 488:21
**e-mails** [10] - 406:7, 419:8, 435:3, 444:20, 445:8, 456:20, 458:5, 458:14, 458:18, 470:2
**ear** [2] - 322:16, 327:9
**early** [7] - 286:13, 288:21, 366:24, 378:15, 397:7, 421:18, 472:17
**easement** [1] - 368:5
**easier** [1] - 474:14
**easily** [2] - 446:3, 490:3
**Eastern** [8] - 255:11, 281:10, 298:23, 299:1, 332:21, 333:22, 339:10, 366:16
**easy** [1] - 306:6
**Ebert** [7] - 274:23, 274:24, 286:21, 286:22, 293:22, 295:22
**Eby** [4] - 275:2, 286:23, 286:24

**educate** [1] - 324:25
**educated** [1] - 427:2
**educates** [1] - 396:25
**education** [3] - 358:18, 440:10, 443:22
**effect** [2] - 294:3, 435:21
**effectively** [1] - 477:21
**effort** [2] - 336:19, 364:20
**efforts** [7] - 289:20, 295:6, 304:22, 304:23, 319:20, 336:21, 401:18
**EG** [2] - 297:22, 298:8
**eight** [2] - 440:20, 441:15
**eighth** [1] - 254:14
**either** [18] - 260:10, 268:18, 283:6, 301:25, 319:2, 324:19, 334:10, 335:3, 346:7, 349:18, 355:17, 468:4, 471:8, 476:11, 477:1, 478:12, 483:13, 492:6
**elaborate** [2] - 328:3, 375:15
**electronic** [4] - 354:24, 355:1, 355:3, 355:5
**element** [22] - 461:5, 463:9, 463:16, 464:20, 468:20, 470:1, 470:8, 470:11, 478:11, 481:4, 485:9, 485:16, 485:17, 486:11, 489:16, 490:18, 491:5, 493:16, 493:25, 494:19, 498:10
**elements** [18] - 242:23, 444:18, 461:13, 468:16, 471:8, 475:7, 476:6, 481:21, 484:12, 485:12, 489:16, 490:11, 490:19, 494:2, 498:8, 498:13, 498:14, 498:15
**Elkin's** [1] - 338:14
**ellipsis** [1] - 282:14
**elmo** [1] - 258:17
**Elonis** [22] - 241:5, 469:24, 469:25,

470:6, 473:12, 476:19, 477:6, 477:9, 478:14, 478:16, 479:8, 481:9, 481:10, 482:3, 484:23, 485:19, 485:21, 486:22, 489:18, 492:18, 493:3
**Elonis's** [1] - 480:25
**embarrassed** [1] - 288:19
**embarrassing** [2] - 429:9, 429:20
**emphasize** [1] - 302:16
**emphasized** [1] - 414:7
**employed** [7] - 289:19, 377:10, 377:13, 395:16, 397:7, 439:22, 440:17
**employee** [3] - 338:5, 338:17
**employees** [5] - 253:7, 378:6, 379:5, 381:3, 396:21
**employment** [4] - 379:14, 395:17, 397:9, 399:11
**enclave** [2] - 298:12, 298:16
**encompasses** [1] - 265:19
**encountered** [1] - 359:7
**end** [16] - 246:9, 264:24, 275:9, 293:21, 306:1, 376:17, 414:11, 414:17, 432:10, 432:12, 482:17, 483:1, 483:5, 487:22, 490:17
**endeavor** [1] - 269:6
**ended** [5] - 252:12, 280:4, 282:4, 335:20, 391:13
**ends** [2] - 381:25, 432:20
**Enerson** [8] - 415:22, 416:9, 416:23, 426:22, 436:8, 436:12, 456:9, 457:15
**Enerson's** [1] - 457:16
**enforce** [5] - 289:20, 313:1, 412:6, 412:14, 434:3

**enforceable** [1] - 375:24
**enforcement** [9] - 249:4, 377:15, 377:22, 378:4, 395:22, 430:11, 440:7, 449:13, 495:15
**engage** [2] - 464:12, 467:17
**engaged** [2] - 375:9, 435:24
**engineers** [1] - 413:22
**English** [3] - 409:5, 424:16, 424:22
**enlarge** [1] - 287:20
**enlarged** [1] - 289:10
**ensure** [2] - 300:23, 370:4
**entailed** [1] - 427:16
**enter** [10] - 302:9, 338:1, 339:1, 346:6, 362:15, 363:12, 363:19, 364:1, 364:12, 426:23
**entered** [6] - 336:19, 364:20, 365:14, 386:21, 387:5
**entering** [5] - 302:3, 339:1, 346:24, 352:12
**entertain** [1] - 485:17
**Entick** [2] - 370:13, 370:24
**entire** [12] - 248:22, 250:21, 289:1, 291:24, 293:4, 296:12, 302:25, 349:22, 373:1, 401:13, 437:17, 440:6
**entirety** [2] - 385:16, 438:5
**entitled** [3] - 249:25, 348:14, 363:5
**entomology** [2] - 311:5, 311:8
**entrapment** [2] - 488:4, 488:8
**entrapped** [1] - 490:24
**entry** [1] - 251:7
**envelope** [19] - 268:18, 268:24, 269:25, 270:5, 270:12, 287:14, 378:22, 381:22, 382:2, 382:11, 384:2, 385:16, 386:6, 386:17, 386:23, 388:3,

394:17, 394:18
**environment** [3] -
480:7, 489:22,
490:21
**envision** [1] - 375:16
**equal** [1] - 328:1
**equally** [2] - 313:24,
434:3
**equals** [1] - 280:9
**equipment** [3] - 284:3,
441:23, 442:2
**Erhart** [4] - 378:17,
378:24, 397:16,
401:19
**ERIC** [1] - 247:6
**Erie** [1] - 337:4
**erroneous** [1] - 296:20
**error** [2] - 431:3,
494:17
**errors** [1] - 375:7
**escorted** [2] - 253:14,
263:20
**ESP** [1] - 289:16
**especially** [6] -
289:16, 400:6,
424:10, 493:1,
495:14, 495:25
**essential** [3] - 315:17,
461:5, 471:8
**essentially** [6] -
290:16, 290:20,
296:23, 329:7,
338:7, 468:10
**establish** [6] - 300:18,
323:17, 347:15,
362:19, 369:17,
461:5
**established** [2] -
373:23, 461:14
**establishing** [1] -
313:25
**establishment** [1] -
313:20
**Estates** [1] - 316:23
**estimate** [1] - 466:20
**et** [5] - 304:21, 411:19,
433:11, 433:17
**etc** [1] - 469:24
**etymology** [1] -
311:10
**ETYMOLOGY** [1] -
311:10
**evening** [2] - 246:1,
246:9
**event** [7] - 263:9,
302:22, 348:24,
410:12, 410:15,
411:18, 443:9
**eventually** [1] - 271:13
**everywhere** [1] -

282:13
**Evidence** [2] - 444:1,
450:11
**evidence** [24] - 244:5,
244:22, 247:21,
247:24, 248:21,
249:5, 249:20,
249:23, 340:9,
343:16, 343:19,
343:20, 343:22,
360:24, 434:2,
435:20, 442:24,
442:25, 443:4,
443:12, 447:11,
450:13, 461:12,
495:10
**evils** [1] - 359:8
**ex** [3] - 296:10,
337:15, 344:19
**exact** [3] - 388:4,
388:18, 390:2
**exactly** [13] - 243:21,
271:11, 320:19,
326:16, 348:22,
374:13, 390:17,
390:24, 392:25,
407:18, 413:15,
472:11, 482:21
**examination** [11] -
284:8, 311:22,
342:1, 351:22,
356:11, 374:21,
376:18, 395:3,
421:11, 422:15,
466:17
**EXAMINATION** [13] -
247:8, 257:9, 267:2,
285:15, 311:23,
356:12, 377:8,
395:13, 422:16,
438:25, 439:19,
444:8, 458:12
**examine** [1] - 244:4
**examining** [1] - 246:8
**example** [8] - 296:2,
296:11, 296:19,
297:12, 307:3,
329:19, 331:23,
379:16
**except** [3] - 322:4,
335:20, 484:25
**exception** [2] -
335:15, 335:24
**exceptions** [5] -
249:11, 249:14,
329:5, 331:19, 332:3
**excerpts** [1] - 391:5
**excessive** [1] - 488:6
**exchange** [5] -
453:19, 453:25,

454:7, 455:2, 457:2
**exchanged** [1] - 406:6
**excuse** [6] - 262:12,
338:4, 362:21,
364:9, 459:7, 487:5
**excused** [1] - 460:2
**execute** [9] - 288:1,
289:14, 292:11,
301:12, 301:13,
302:1, 349:5, 362:25
**executed** [4] - 296:9,
296:23, 307:11,
347:18
**executing** [2] -
289:18, 401:8
**execution** [18] - 287:3,
287:8, 287:10,
287:11, 287:12,
289:2, 297:1,
302:22, 303:13,
303:16, 305:2,
305:17, 307:7,
344:5, 348:18,
348:25, 401:6
**executive** [9] - 288:15,
338:7, 345:9,
345:20, 345:22,
346:1, 350:15,
361:12, 368:24
**executory** [1] - 316:11
**exercise** [1] - 345:14
**exhaust** [1] - 290:4
**exhausted** [1] -
289:13
**Exhaustion** [1] -
307:20
**exhaustion** [5] -
289:22, 290:1,
290:8, 290:11, 368:1
**exhibit** [12] - 250:7,
250:17, 261:15,
312:7, 312:12,
319:18, 380:13,
408:5, 423:18,
423:21, 423:23,
447:5
**Exhibit** [78] - 250:10,
250:12, 250:25,
254:13, 258:12,
261:15, 264:14,
269:13, 269:14,
269:25, 270:12,
270:13, 285:17,
294:19, 309:6,
310:16, 312:7,
312:8, 312:23,
314:11, 341:21,
342:12, 342:14,
342:22, 350:11,
354:23, 355:2,

370:13, 380:10,
389:23, 392:13,
393:5, 393:10,
394:3, 394:12,
394:13, 398:15,
398:19, 407:4,
408:5, 408:10,
416:15, 419:15,
420:20, 434:19,
436:11, 437:16,
444:23, 444:24,
445:2, 445:16,
446:10, 446:13,
446:24, 447:3,
447:8, 448:8,
448:13, 449:3,
449:9, 450:1, 450:2,
450:6, 450:19,
451:1, 451:2, 451:3,
451:7, 451:14,
451:17, 451:18,
451:25, 452:12,
453:12, 455:13,
455:15, 455:25
**exhibited** [2] - 252:21,
340:14
**Exhibits** [1] - 451:12
**exhibits** [3] - 423:18,
433:6, 448:11
**exigent** [1] - 472:15
**exist** [1] - 491:25
**exists** [1] - 454:2
**expand** [14] - 271:4,
294:9, 297:3,
300:12, 302:20,
303:19, 307:1,
310:21, 310:23,
408:19, 409:2,
411:13, 412:4, 496:5
**expands** [1] - 300:17
**expansion** [1] - 412:8
**expect** [3] - 380:22,
466:21, 466:25
**expeditious** [1] -
329:23
**experience** [9] -
267:13, 321:15,
369:5, 380:4, 380:7,
442:5, 443:17,
443:22, 444:17
**experienced** [2] -
265:10, 345:21
**expert** [4] - 311:11,
444:2, 446:20,
453:14
**expertise** [1] - 443:23
**explain** [7] - 259:11,
354:7, 445:19,
447:21, 453:14,
454:22, 497:7

**explained** [4] -
343:14, 359:18,
484:13, 487:6
**explaining** [1] -
447:25
**explains** [1] - 336:3
**explanation** [4] -
331:14, 428:15,
471:22, 484:12
**explanatory** [1] -
386:5
**explicit** [1] - 476:19
**explicitly** [4] - 479:9,
482:3, 483:7, 492:17
**explore** [1] - 492:14
**express** [4] - 316:10,
422:22, 493:1, 493:2
**Express** [1] - 270:6
**expression** [5] -
242:3, 414:24,
418:13, 479:20,
482:13
**expressly** [6] - 478:1,
479:12, 482:16,
488:15, 488:19,
493:14
**extended** [1] - 370:2
**extensive** [1] - 372:4
**extent** [5] - 291:21,
338:13, 370:22,
466:10, 471:12
**extinction** [1] - 411:18
**extortion** [1] - 319:9
**extra** [1] - 472:13
**extract** [1] - 443:11
**extraction** [2] - 443:3,
443:7
**extremely** [1] - 429:8
**eye** [1] - 276:12
**eyebrows** [1] - 292:22

**F**

**F-I-N-U-C-A-N-E** [1] -
416:21
**F.3d** [2] - 481:14,
482:3
**F.Supp.2d** [1] - 316:24
**FAA** [1] - 413:22
**face** [7] - 275:15,
296:15, 306:10,
315:11, 315:12,
369:6
**face-to-face** [1] -
275:15
**facility** [2] - 381:12,
458:2
**facing** [1] - 360:2
**fact** [97] - 244:21,

253:18, 253:23,
254:7, 254:9,
256:11, 256:14,
264:6, 264:7, 264:8,
279:12, 288:18,
292:10, 313:13,
313:24, 314:8,
314:9, 314:12,
316:6, 317:16,
317:18, 317:23,
319:23, 319:24,
323:4, 323:18,
323:19, 324:4,
336:18, 337:5,
337:10, 337:21,
340:4, 340:17,
340:23, 341:15,
341:17, 341:18,
344:19, 344:23,
345:4, 346:5,
346:24, 347:1,
347:14, 348:6,
348:16, 355:2,
356:21, 359:7,
359:12, 360:13,
361:11, 361:25,
362:5, 362:12,
362:14, 363:18,
364:10, 365:12,
365:14, 366:24,
368:1, 368:16,
368:21, 369:6,
369:9, 373:3, 374:9,
376:7, 386:13,
426:20, 431:8,
461:6, 461:23,
464:25, 465:2,
465:3, 467:14,
473:6, 480:6,
480:15, 481:4,
483:19, 484:22,
485:10, 485:25,
486:19, 487:18,
490:8, 490:19,
490:20, 491:22,
496:20
**factor** [2] - 279:14,
492:11
**factors** [2] - 279:16,
376:9
**facts** [17] - 243:25,
256:3, 256:11,
264:19, 264:25,
312:19, 324:15,
340:8, 354:21,
358:4, 360:7,
367:20, 367:23,
372:21, 482:23,
487:7, 487:8
**factual** [1] - 253:24

**failed** [2] - 344:16,
461:5
**failing** [5] - 305:3,
409:19, 415:17,
415:18, 423:3
**fair** [18] - 245:16,
265:6, 269:21,
290:11, 318:13,
340:25, 345:14,
349:20, 358:11,
361:7, 381:17,
391:3, 408:6,
424:12, 427:17,
435:8, 438:4, 443:22
**fairly** [3] - 328:2,
425:6, 434:3
**faith** [1] - 315:23
**falls** [2] - 488:3, 498:6
**false** [2] - 431:21,
488:4
**familiar** [56] - 254:6,
254:23, 265:18,
274:9, 274:20,
289:22, 312:17,
312:19, 312:20,
313:21, 313:22,
316:25, 317:17,
318:9, 318:22,
320:24, 321:2,
336:20, 339:21,
343:25, 349:14,
358:1, 358:3,
367:14, 367:24,
370:11, 370:21,
370:24, 371:2,
371:5, 371:7,
372:19, 372:21,
374:6, 374:10,
376:7, 376:12,
376:13, 376:15,
380:13, 380:15,
386:15, 406:9,
410:14, 425:22,
426:25, 428:14,
433:8, 433:9,
438:14, 445:3,
450:6, 450:13,
452:3, 452:5, 487:4
**familiarity** [1] - 337:22
**family** [4] - 276:13,
276:14, 295:7,
315:21
**famous** [1] - 384:10
**far** [22] - 264:25,
277:17, 295:10,
341:15, 371:13,
382:24, 394:6,
400:9, 411:18,
426:17, 433:20,
435:3, 443:6,

443:21, 447:18,
453:16, 476:14,
490:5, 496:10,
496:23, 497:20
**fashion** [3] - 319:16,
375:22, 457:3
**faster** [1] - 249:17
**fate** [1] - 296:22
**fault** [1] - 465:13
**favor** [4] - 249:22,
299:11, 315:5
**fax** [6] - 309:7, 309:18,
310:4, 310:7, 310:10
**faxes** [1] - 309:12
**FBI** [57] - 378:4,
378:16, 378:17,
379:24, 380:5,
380:17, 381:16,
396:6, 396:9,
396:13, 396:14,
396:25, 399:13,
401:19, 403:8,
403:14, 407:11,
409:9, 410:16,
410:17, 411:17,
412:6, 412:14,
413:15, 415:13,
415:15, 423:10,
427:6, 428:5, 428:6,
428:14, 428:18,
428:20, 428:21,
428:22, 428:23,
429:9, 429:15,
429:20, 431:14,
439:24, 440:1,
440:4, 440:7,
440:15, 440:16,
441:16, 441:19,
442:6, 442:17,
443:2, 443:11,
443:15, 443:17,
445:15, 457:4,
490:22
**FBI's** [1] - 395:17
**February** [1] - 421:3
**federal** [38] - 267:9,
273:19, 276:5,
286:11, 288:14,
290:7, 292:11,
296:17, 304:24,
316:22, 319:7,
319:21, 320:12,
324:22, 340:14,
347:23, 350:3,
359:1, 359:5,
361:21, 361:22,
377:15, 377:22,
378:3, 378:4,
389:17, 397:11,
404:25, 412:21,

414:11, 414:21,
425:25, 431:1,
432:10, 463:10,
476:18, 486:9,
491:25
**Federal** [9] - 263:12,
271:9, 317:25,
320:24, 409:11,
439:23, 444:1,
448:21, 450:10
**FedEx** [1] - 379:19
**fee** [1] - 384:11
**feelings** [1] - 431:7
**felt** [6] - 243:20, 278:5,
304:17, 348:14,
400:10, 405:23
**female** [1] - 385:1
**few** [9] - 247:13,
270:20, 297:1,
299:17, 312:2,
347:16, 349:1,
381:2, 403:2
**field** [3] - 260:1, 260:2,
444:2
**fifth** [3] - 368:15,
428:1, 464:18
**figure** [1] - 323:13
**figured** [1] - 498:17
**file** [8] - 263:13, 341:4,
341:6, 341:10,
357:1, 366:9,
404:21, 409:20
**filed** [27] - 250:14,
251:13, 254:8,
254:17, 264:16,
269:5, 277:13,
277:16, 278:10,
299:18, 299:24,
300:18, 301:4,
329:24, 331:15,
331:20, 332:11,
335:12, 336:1,
347:15, 362:18,
364:12, 366:21,
404:9, 427:19,
486:5, 491:16
**files** [1] - 430:22
**filing** [7] - 257:23,
259:6, 290:7, 331:7,
331:9, 331:10,
404:19
**filings** [3] - 255:24,
405:19, 418:23
**filling** [1] - 385:14
**fills** [1] - 381:14
**final** [6] - 252:22,
336:15, 343:15,
494:21, 498:6,
498:19
**finally** [2] - 311:25,

450:6
**financial** [9] - 254:1,
254:2, 254:21,
266:9, 388:23,
458:15, 458:20,
458:22, 458:23
**fine** [8] - 244:19,
256:6, 267:17,
321:12, 464:4,
469:16, 484:17,
493:20
**fined** [1] - 426:15
**finger** [2] - 270:21,
452:19
**fingers** [1] - 306:23
**finish** [4] - 351:10,
362:22, 467:2,
491:12
**Finucane** [4] - 416:9,
416:19, 416:21,
471:17
**firm** [1] - 267:15
**first** [72] - 257:18,
269:24, 271:14,
272:4, 272:7, 273:1,
280:9, 285:17,
286:7, 286:16,
287:6, 288:6,
290:12, 294:16,
295:11, 297:23,
298:7, 301:18,
301:22, 303:10,
303:11, 303:14,
303:20, 304:11,
304:19, 305:20,
307:2, 308:21,
309:10, 309:21,
310:20, 333:25,
334:7, 339:5, 339:9,
345:10, 345:15,
354:23, 361:8,
361:22, 365:14,
380:12, 382:3,
389:8, 391:20,
392:8, 393:10,
403:3, 403:5, 408:4,
409:2, 410:12,
412:3, 424:20,
437:19, 437:21,
447:24, 447:25,
451:20, 457:5,
462:23, 463:3,
463:18, 468:4,
468:7, 477:12,
477:13, 486:8,
497:13, 498:10,
498:11
**fist** [1] - 381:23
**fit** [1] - 487:7
**fits** [1] - 482:23

**five** [9] - 331:18, 351:7, 351:8, 351:10, 351:11, 385:24, 395:25, 421:23, 441:13
**fix** [1] - 488:13
**fixated** [1] - 418:16
**flag** [1] - 329:10
**flip** [1] - 269:17
**floor** [2] - 263:12, 277:21
**Florida** [3] - 370:11, 370:15, 370:17
**Florida's** [1] - 412:9
**flow** [10] - 254:22, 379:10, 379:12, 445:15, 445:23, 446:1, 455:23, 456:20, 456:21, 458:19
**Flowers** [2] - 280:25, 433:18
**flowing** [2] - 381:18, 385:4
**flows** [2] - 379:10, 458:1
**flunky** [1] - 298:21
**focused** [1] - 495:21
**folks** [2] - 441:7, 443:10
**follow** [6] - 252:6, 293:7, 293:13, 294:19, 316:2, 399:22
**follow-up** [1] - 252:6
**followed** [3] - 294:23, 357:7, 496:12
**following** [4] - 335:8, 354:21, 364:11, 402:2
**follows** [2] - 288:25, 452:23
**font** [4] - 414:3, 414:5, 432:5, 436:22
**fools** [1] - 413:15
**footnote** [6] - 479:10, 479:11, 481:13, 481:14, 482:3
**force** [17] - 256:15, 378:16, 395:18, 395:24, 395:25, 396:2, 396:10, 396:11, 396:13, 396:14, 396:23, 396:24, 397:16, 398:24, 399:13, 428:18, 428:22
**Force** [3] - 396:4, 418:2, 437:24
**foreclosure** [1] - 254:1

**forensic** [1] - 443:11
**forensics** [4] - 442:20, 443:18, 443:23, 444:3
**foresee** [3] - 332:24, 479:18, 482:11
**forever** [1] - 381:13
**form** [12] - 246:17, 247:2, 313:14, 319:4, 335:8, 357:7, 384:14, 384:18, 398:10, 398:12, 406:14
**formal** [3] - 301:6, 307:5, 307:6
**formed** [1] - 245:13
**former** [7] - 274:24, 298:14, 319:25, 366:6, 428:6, 444:15, 444:16
**formerly** [1] - 274:12
**forms** [1] - 419:15
**formulate** [1] - 472:18
**Forrester** [3] - 312:14, 312:19, 313:8
**forth** [3] - 468:15, 476:24, 479:14
**fortress** [1] - 306:24
**forum** [1] - 332:5
**forward** [6] - 285:7, 352:24, 426:13, 431:9, 431:12, 466:2
**forwarded** [3] - 253:14, 310:11, 487:23
**foundation** [1] - 437:10
**four** [5] - 254:8, 278:10, 354:11, 388:17, 389:5
**fourth** [15] - 251:7, 251:19, 278:15, 312:13, 370:16, 389:14, 414:8, 432:7, 432:25, 433:20, 463:8, 468:20, 476:17
**frame** [1] - 369:25
**Franchise** [2] - 436:13, 437:3
**Franklin** [1] - 377:24
**frankly** [5] - 293:13, 326:25, 350:2, 359:11, 494:17
**fraud** [7] - 260:9, 260:14, 260:15, 261:18, 262:10, 262:11, 442:12
**Frederick** [4] - 255:13, 274:21, 299:5,

339:12
**free** [7] - 256:21, 290:22, 291:4, 291:16, 403:12, 411:15, 412:8
**frequently** [1] - 378:17
**fresh** [3] - 258:23, 459:11, 459:12
**friend** [1] - 295:9
**friends** [4] - 295:6, 403:20, 404:4, 404:5
**frivolous** [1] - 294:4
**front** [9] - 325:2, 353:16, 371:11, 392:12, 423:24, 444:22, 444:24, 455:16, 467:10
**frustration** [1] - 418:22
**fucking** [2] - 295:22, 297:14
**fugitives** [1] - 276:4
**full** [11] - 266:24, 272:17, 284:24, 285:5, 288:23, 290:15, 401:5, 401:13, 409:1, 410:14, 411:13
**function** [2] - 313:5, 350:15

# G

**G-H-I-G-L-I-E-R-I** [1] - 417:5
**G-Mail** [1] - 448:6
**gained** [1] - 406:4
**gather** [2] - 405:17, 415:9
**gathering** [1] - 443:3
**gears** [1] - 373:14
**General** [1] - 320:7
**general** [9] - 249:4, 249:10, 252:3, 279:25, 280:2, 299:13, 301:17, 335:8, 453:13
**General's** [3] - 456:10, 456:20, 457:11
**generally** [16] - 249:13, 293:19, 294:13, 294:15, 313:22, 325:23, 333:4, 333:7, 333:24, 335:25, 337:15, 396:18, 447:22, 473:11, 487:7, 489:20
**generated** [2] -

257:12, 274:23
**generation** [1] - 259:25
**generous** [1] - 466:9
**gentlemen** [1] - 433:24
**Ghiglieri** [2] - 417:2, 417:4
**ghost** [1] - 295:8
**gist** [3] - 283:8, 295:7
**given** [9] - 244:16, 249:2, 256:11, 267:22, 340:19, 351:5, 373:1, 423:1, 479:13
**God** [1] - 292:17
**gonna** [2] - 286:11, 375:19
**Google's** [1] - 448:6
**Gorlick** [1] - 430:9
**Gorsuch** [3] - 293:9, 315:6, 315:7
**governing** [1] - 298:6
**Government** [65] - 241:15, 246:14, 246:24, 248:1, 248:4, 250:21, 250:25, 284:23, 285:3, 341:21, 350:11, 354:12, 354:13, 354:15, 354:21, 355:9, 355:10, 380:10, 392:13, 393:5, 393:10, 394:3, 394:12, 394:13, 421:23, 424:6, 424:8, 428:23, 433:7, 433:13, 437:16, 444:23, 444:24, 445:2, 446:10, 446:23, 447:8, 448:8, 455:15, 461:23, 462:24, 464:19, 464:23, 464:24, 465:13, 465:19, 465:22, 466:17, 473:18, 474:6, 474:14, 474:22, 476:6, 482:8, 482:24, 483:2, 483:11, 484:3, 484:10, 486:10, 486:12, 487:12, 488:22, 493:6, 495:10
**government** [5] - 287:25, 319:7, 399:12, 411:21,

441:4
**GOVERNMENT'S** [6] - 247:6, 266:23, 356:8, 377:2, 395:9, 439:14
**Government's** [31] - 312:8, 347:14, 370:13, 423:18, 423:22, 433:6, 434:12, 434:19, 436:7, 449:3, 449:9, 450:1, 450:2, 450:6, 450:19, 451:1, 451:3, 451:7, 451:12, 451:13, 451:14, 455:13, 460:4, 465:14, 469:24, 479:5, 483:10, 484:13, 493:7
**governmental** [4] - 313:20, 318:20, 318:24, 318:25
**gracious** [1] - 466:9
**Grand** [1] - 409:11
**grand** [1] - 419:25
**grant** [2] - 283:6, 356:18
**granted** [1] - 342:25
**great** [6] - 241:13, 245:19, 297:15, 379:9, 388:14, 468:13
**greater** [1] - 492:21
**Green** [1] - 315:21
**gripe** [1] - 414:19
**gripes** [1] - 432:15
**ground** [1] - 289:16
**Ground** [1] - 412:9
**grounds** [3] - 244:6, 396:20, 470:7
**group** [2] - 331:4, 375:16
**growers** [1] - 374:11
**guard** [2] - 344:18, 351:23
**guess** [29] - 242:7, 242:18, 247:16, 282:11, 298:9, 301:3, 302:7, 306:10, 314:12, 369:4, 375:12, 377:18, 379:23, 382:2, 386:17, 403:25, 415:8, 415:9, 430:2, 440:15, 442:22, 451:11, 454:19, 459:8, 466:11, 471:3, 486:12,

487:17, 493:17
**guidance** [3] - 315:17, 315:22, 367:14
**guide** [2] - 434:1
**guidelines** [1] - 320:12
**guilt** [1] - 464:25
**guilty** [3] - 344:14, 487:4, 490:7
**gun** [1] - 300:25
**guy** [5] - 375:18, 379:18, 391:20, 391:22
**guys** [1] - 378:1

## H

**habeas** [1] - 300:24
**hac** [1] - 337:20
**half** [6] - 267:23, 268:10, 439:25, 440:6, 451:20
**hall** [1] - 267:20
**hallway** [1] - 386:14
**hand** [10] - 381:24, 382:4, 393:14, 426:9, 433:10, 446:9, 448:7, 464:8, 468:1, 470:10
**handed** [1] - 268:14
**handle** [8] - 278:3, 279:6, 280:16, 281:13, 331:20, 336:6, 339:23
**handled** [14] - 279:8, 279:21, 280:9, 281:11, 299:2, 299:16, 319:22, 335:9, 335:13, 336:11, 336:18, 341:18, 348:5, 442:3
**handling** [12] - 277:14, 280:6, 281:1, 281:7, 281:8, 281:19, 329:13, 336:23, 345:13, 381:3, 442:19, 443:4
**hands** [2] - 306:22, 458:23
**handwrite** [1] - 464:8
**hang** [3] - 488:6, 493:18
**hanging** [1] - 298:15
**Hanna** [3] - 245:20, 257:11, 402:5
**HANNA** [1] - 247:6
**happy** [2] - 286:12, 318:5
**hard** [8] - 268:15,

391:23, 399:22, 400:6, 405:13, 407:21, 417:10, 447:18
**harm** [9] - 266:5, 418:14, 418:24, 418:25, 492:19, 492:21, 492:24
**harmful** [1] - 271:16
**Harrisburg** [27] - 262:23, 267:15, 276:7, 276:9, 310:6, 331:8, 331:20, 377:12, 381:11, 382:22, 382:23, 383:15, 384:21, 385:7, 386:9, 387:19, 387:20, 439:4, 443:16, 444:15, 444:16, 452:8, 453:7, 456:15
**Hartman** [3] - 250:19, 264:17, 264:21
**Hartman's** [1] - 264:19
**Harvey** [1] - 407:12
**hate** [5] - 292:21, 293:2, 297:10, 297:19, 299:6
**hatred** [1] - 297:18
**haz** [1] - 388:12
**head** [11] - 408:2, 410:8, 410:25, 411:16, 415:11, 418:1, 437:23, 438:3, 438:16, 465:11
**headed** [1] - 284:12
**header** [15] - 408:18, 445:14, 445:16, 445:19, 445:21, 446:13, 446:15, 447:7, 447:23, 448:17, 450:25, 451:13, 451:16, 454:9, 455:20
**heading** [3] - 287:2, 307:2, 310:21
**headquarters** [1] - 310:8
**heads** [1] - 351:15
**hear** [10] - 322:18, 322:19, 322:21, 323:25, 347:10, 461:3, 461:18, 472:4, 473:25, 476:15
**heard** [11] - 244:20, 244:24, 245:3, 246:10, 246:22, 249:8, 252:18,

492:12, 496:21, 496:23, 497:20
**hearing** [2] - 316:5, 344:8
**hearings** [1] - 284:20
**hearsay** [4] - 244:6, 249:8, 249:24
**heated** [1] - 263:14
**heed** [1] - 292:16
**held** [3] - 313:1, 322:17, 400:17
**Heller** [3] - 372:13, 372:20
**help** [4] - 246:15, 247:18, 332:1, 333:24
**helped** [2] - 379:23, 390:15
**helpful** [1] - 472:8
**Hershey** [3] - 387:9, 387:10
**hesitate** [1] - 459:23
**Hess** [3] - 294:1, 294:4, 294:5
**high** [1] - 442:9
**higher** [5] - 472:13, 473:11, 474:11, 474:23, 484:16
**Highjacker** [1] - 407:13
**highjacker** [6] - 407:18, 407:19, 412:25, 413:3, 413:7, 429:8
**highlight** [13] - 273:14, 283:17, 285:22, 305:18, 374:25, 382:5, 429:1, 430:5, 430:19, 433:10, 437:17, 453:2, 456:4
**highlighted** [2] - 296:1, 383:2
**Hill** [3] - 383:16, 384:21, 384:25
**himself** [4] - 304:11, 304:12, 306:14, 417:1
**hire** [1] - 338:17
**hired** [1] - 378:1
**hiring** [1] - 376:9
**history** [6] - 299:7, 299:14, 359:19, 366:25, 440:7, 440:14
**hit** [1] - 454:5
**hits** [2] - 445:24, 454:13
**hitting** [1] - 413:5
**Hobby** [1] - 293:8

**hold** [17] - 248:2, 249:21, 250:1, 256:4, 321:14, 323:21, 371:20, 425:14, 426:5, 465:2, 465:3, 468:4, 470:20, 481:19, 486:1, 489:8, 491:11
**holding** [2] - 477:18, 493:2
**holds** [1] - 487:5
**holes** [1] - 465:20
**home** [2] - 382:20, 386:22
**honestly** [8] - 282:20, 290:8, 293:7, 294:22, 306:10, 320:16, 332:14, 479:11
**honor** [2] - 291:5, 291:17
**Honor** [91] - 241:19, 242:13, 243:4, 243:13, 245:8, 245:15, 248:11, 250:2, 255:21, 257:4, 258:7, 265:22, 266:12, 269:9, 270:11, 309:2, 310:15, 311:17, 318:11, 319:11, 321:20, 322:22, 325:9, 325:22, 332:23, 340:8, 341:23, 342:11, 342:15, 342:16, 342:18, 343:13, 352:7, 352:18, 353:1, 358:9, 359:9, 368:9, 369:21, 374:19, 376:25, 393:6, 394:23, 395:1, 395:7, 398:16, 406:25, 408:9, 408:14, 416:11, 417:15, 421:5, 421:7, 422:11, 425:10, 429:22, 431:24, 436:1, 437:9, 439:7, 439:10, 443:25, 444:7, 446:6, 447:11, 449:2, 449:25, 450:17, 450:23, 457:21, 458:9, 459:3, 459:5, 460:7, 462:2, 462:16, 463:1, 463:23, 468:12,

469:7, 470:16, 471:11, 473:22, 483:17, 485:23, 491:1, 491:15, 493:9, 495:4, 496:9, 498:4
**Honorable** [2] - 266:21, 433:17
**hope** [2] - 245:25, 283:22
**hoped** [1] - 272:23
**hoping** [2] - 463:14, 466:24
**Horiuchi** [2] - 428:4, 428:9
**Horne** [1] - 374:6
**Horse** [3] - 270:4, 383:17, 384:3
**hosted** [1] - 451:21
**hour** [2] - 351:17, 393:13
**hours** [2] - 359:19, 390:25
**house** [2] - 384:8, 402:22
**HRT** [1] - 428:6
**Hugh** [2] - 378:16, 397:16
**hum** [6] - 244:10, 252:11, 255:17, 309:3, 410:11, 494:16
**humor** [2] - 303:3
**hundred** [1] - 429:12
**hunting** [1] - 375:17
**hyper** [1] - 430:6
**hyperbole** [1] - 242:16
**hypothetical** [2] - 318:5, 488:11

## I

**IC** [2] - 266:6, 266:7
**Id** [2] - 313:3, 313:7
**ID's** [2] - 453:9, 454:8
**idea** [10] - 257:14, 284:14, 316:3, 317:22, 337:14, 361:7, 373:7, 413:6, 413:7, 494:23
**identification** [5] - 269:13, 276:21, 309:6, 316:22, 407:3
**identified** [5] - 250:11, 273:9, 298:17, 327:18, 423:5
**identify** [5] - 250:4, 250:5, 250:12, 348:21, 388:8,

401:24
**identifying** [2] - 388:7, 456:19
**identity** [3] - 313:6, 329:7, 495:17
**idiot** [3] - 295:22, 298:21
**idiots** [2] - 300:14, 303:22
**ignorance** [1] - 487:5
**ignore** [3] - 365:3, 418:6, 438:7
**ignoring** [2] - 418:10, 438:11
**II** [4] - 293:13, 305:22, 315:14, 316:1
**III** [3] - 273:24, 366:11, 411:20
**illegal** [1] - 487:4
**illegitimate** [1] - 306:2
**Illinois** [1] - 337:21
**illogical** [1] - 290:10
**illustration** [1] - 324:16
**image** [13] - 379:24, 380:16, 380:17, 380:18, 381:6, 381:9, 381:10, 381:15, 381:18, 389:8, 393:12, 443:11
**images** [14] - 389:8, 390:18, 391:15, 391:16, 391:19, 392:3, 392:5, 392:9, 392:15, 392:17, 392:22, 393:3, 393:16
**imagine** [2] - 390:22, 399:12
**immediate** [2] - 271:22, 362:13
**immediately** [3] - 272:17, 273:8, 273:20
**immune** [1] - 312:22
**immunity** [14] - 300:25, 306:3, 306:12, 306:15, 307:21, 307:23, 308:1, 312:16, 312:20, 313:7, 313:10, 313:14, 313:20, 313:25
**impact** [2] - 431:5, 435:14, 497:14
**impartial** [1] - 332:9
**impartially** [1] - 434:3
**impeachment** [1] - 350:13

**implemented** [1] - 441:22
**implicated** [1] - 415:2
**implications** [1] - 285:6
**implied** [1] - 324:3
**important** [3] - 382:8, 459:14, 492:3
**importantly** [1] - 382:24
**impression** [16] - 271:25, 279:5, 296:22, 305:15, 334:1, 347:7, 422:23, 422:25, 427:11, 427:13, 428:14, 431:14, 431:21, 466:4, 472:16, 497:15
**impressions** [1] - 347:9
**imprisoned** [1] - 426:15
**improper** [2] - 341:5, 343:5
**improperly** [2] - 253:17, 348:5
**in-depth** [2] - 434:23, 436:16
**in-person** [1] - 252:18
**inaccurate** [2] - 256:10, 341:5
**inadmissible** [1] - 374:23
**inadvertently** [1] - 468:19
**inappropriate** [2] - 371:6, 372:5
**inappropriately** [1] - 305:10
**inaudible** [1] - 490:6
**inbox** [2] - 446:2, 454:12
**incident** [15] - 245:10, 246:23, 247:14, 253:4, 253:8, 263:5, 278:24, 279:14, 410:19, 428:15, 428:16, 428:17, 429:8, 442:19, 495:3
**include** [3] - 442:19, 494:18, 495:19
**included** [4] - 273:3, 421:2, 471:18, 474:7
**includes** [3] - 292:1, 378:9, 492:21
**including** [2] - 391:5, 453:8
**Income** [2] - 436:13, 437:3

**incorrect** [4] - 341:6, 345:23, 491:7, 491:8
**increase** [1] - 411:19
**increased** [2] - 252:1, 334:9
**incredibly** [2] - 271:21, 484:25
**incriminating** [1] - 488:5
**indent** [1] - 312:24
**indented** [1] - 305:19
**independently** [3] - 336:7, 338:6, 364:11
**indicate** [12] - 251:19, 270:2, 270:24, 283:19, 309:17, 329:14, 349:18, 361:24, 410:3, 422:19, 428:12, 495:10
**indicated** [20] - 251:13, 254:9, 265:1, 277:3, 286:1, 301:4, 319:9, 334:8, 337:6, 339:11, 346:22, 360:17, 365:9, 408:23, 429:14, 435:9, 437:25, 439:2, 481:1
**indicates** [2] - 314:23, 411:24
**indicating** [12] - 297:10, 308:4, 324:22, 330:9, 345:21, 350:6, 356:20, 360:15, 365:24, 369:5, 475:23, 496:19
**indication** [3] - 297:19, 334:5, 351:3
**indicative** [1] - 242:9
**indicia.com** [1] - 382:13
**indicted** [2] - 420:3, 420:4
**indictment** [10] - 412:7, 412:17, 418:9, 420:23, 438:10, 456:3, 471:13, 493:16, 493:17, 493:19
**individual** [29] - 242:2, 277:25, 278:18, 280:10, 283:14, 298:5, 308:24, 334:10, 334:11, 386:5, 388:19, 392:2, 392:7, 393:17, 393:19, 394:5, 394:10,

394:16, 394:18, 399:20, 403:12, 403:16, 412:18, 479:21, 482:14, 482:18, 482:19, 491:23, 492:5
**individually** [2] - 280:9, 280:13
**individuals** [8] - 373:4, 391:2, 399:6, 410:18, 415:16, 430:24, 432:15, 443:16
**industry** [5] - 440:18, 440:24, 441:15, 441:16, 441:19
**inexpensive** [1] - 300:23
**inexplicably** [1] - 255:11
**inference** [1] - 465:23
**inferior** [4] - 289:13, 296:8, 306:3, 364:25
**inflict** [5] - 479:20, 482:14, 482:17, 482:20, 483:6
**inform** [4] - 405:8, 460:13, 460:21, 460:24
**informant** [2] - 490:9, 490:13
**information** [70] - 252:20, 252:25, 253:11, 256:9, 263:19, 265:13, 265:19, 276:21, 378:13, 380:6, 380:24, 382:7, 383:10, 384:23, 385:13, 388:3, 389:19, 406:3, 406:4, 408:19, 409:11, 412:7, 412:16, 430:21, 430:25, 435:11, 440:18, 440:20, 441:7, 442:1, 442:14, 445:9, 445:14, 445:15, 445:17, 445:20, 445:21, 445:22, 446:23, 447:5, 447:7, 447:18, 447:23, 448:14, 448:17, 449:17, 450:9, 450:25, 451:3, 451:13, 451:16, 452:11, 452:13, 452:14, 452:23, 453:3,

453:5, 453:8, 454:1, 454:9, 455:5, 455:12, 455:20, 456:25, 458:16, 458:19, 458:22
**informational** [1] - 442:23
**informed** [7] - 253:20, 313:7, 397:16, 397:18, 403:13, 420:12, 444:14
**infringed** [1] - 290:23
**initial** [13] - 264:21, 266:8, 298:13, 327:16, 391:13, 397:17, 401:9, 420:9, 434:25, 448:2, 453:16, 469:25, 471:17
**initiated** [3] - 350:13, 419:19, 419:24
**injunction** [2] - 295:24, 302:6
**injunctions** [1] - 346:2
**injunctive** [3] - 313:3, 362:15, 364:1
**injure** [3] - 476:10, 489:3, 489:12
**injury** [5] - 479:20, 482:14, 482:17, 482:20, 483:6
**inordinate** [1] - 422:7
**input** [1] - 346:23
**insects** [1] - 311:9
**insert** [2] - 470:13, 482:22
**inserted** [1] - 472:9
**insertion** [2] - 294:7, 294:8
**inserts** [2] - 291:6, 293:25
**insist** [1] - 355:19
**insists** [1] - 340:4
**insofar** [1] - 349:17
**Inspection** [6] - 377:11, 377:13, 377:16, 377:19, 377:21, 402:1
**Inspector** [2] - 252:24, 377:6
**inspector** [1] - 379:5
**inspectors** [1] - 378:3
**instance** [13] - 286:16, 288:6, 312:11, 312:12, 318:16, 320:9, 334:7, 340:3, 349:2, 467:2, 468:4, 468:7, 471:6
**instead** [2] - 286:6, 487:6

**instituting** [1] - 430:10
**instruct** [1] - 465:1
**instruction** [72] -
241:15, 242:6,
242:19, 242:20,
242:25, 243:1,
243:2, 243:12,
244:17, 462:19,
463:4, 463:6, 464:1,
468:14, 468:15,
468:19, 469:8,
470:3, 470:19,
470:25, 471:7,
471:18, 471:21,
472:24, 473:19,
473:25, 474:1,
474:7, 474:19,
474:24, 475:16,
475:21, 476:3,
478:17, 478:20,
479:2, 479:4, 479:6,
479:13, 479:14,
479:15, 481:15,
482:4, 482:8,
482:16, 482:25,
483:11, 483:13,
484:2, 484:3,
484:11, 484:14,
485:15, 485:25,
486:4, 486:7,
491:20, 491:21,
493:7, 493:12,
493:14, 493:23,
494:3, 494:15,
494:21, 495:19,
496:6, 496:15,
496:17, 496:19,
498:5
**Instructions** [1] -
491:17
**instructions** [27] -
241:3, 241:9,
343:16, 460:6,
460:9, 461:15,
461:19, 462:14,
464:6, 468:1,
469:18, 470:17,
470:22, 471:18,
472:8, 472:23,
476:7, 478:10,
478:19, 481:8,
487:12, 487:15,
492:2, 493:3,
494:11, 496:17,
498:6
**instrument** [1] -
294:24
**insult** [1] - 295:22
**Insurance** [1] - 337:5
**insurance** [1] - 383:13

**insure** [1] - 409:21
**integrity** [1] - 430:13
**intellectual** [1] -
442:14
**intelligence** [2] -
430:12, 442:24
**intend** [4] - 324:17,
465:10, 475:17,
477:1
**intended** [14] - 246:19,
247:4, 279:19,
293:3, 350:20,
430:23, 431:1,
450:12, 476:11,
478:12, 487:25,
488:1, 492:10,
494:20
**intending** [1] - 472:13
**intent** [29] - 242:10,
242:11, 266:4,
301:16, 303:7,
347:24, 347:25,
418:14, 461:6,
473:17, 473:20,
473:24, 475:11,
475:23, 476:2,
476:13, 476:20,
477:18, 478:6,
483:13, 487:11,
489:15, 490:18,
491:4, 492:20,
493:5, 494:2,
495:16, 496:4
**intention** [4] - 405:8,
479:20, 482:14,
482:17
**intentional** [1] -
486:18
**intentionally** [1] -
484:20
**interaction** [4] -
337:25, 339:13,
346:10, 496:8
**interest** [1] - 327:13
**interested** [2] -
352:12, 356:14
**interesting** [1] - 473:7
**interestingly** [1] -
277:9
**interface** [1] - 442:23
**interfered** [2] - 299:23,
300:2
**interference** [2] -
251:14, 299:23
**interject** [2] - 373:24,
405:14
**internal** [2] - 379:11,
387:4
**internally** [1] - 264:20
**international** [2] -

396:12, 397:6
**internet** [11] - 246:1,
453:15, 453:25,
454:2, 454:14,
454:16, 455:1,
457:10, 458:1,
458:2, 470:2
**interpret** [2] - 302:11,
414:18
**interpretation** [3] -
287:7, 364:6, 412:14
**interpreted** [5] -
289:7, 344:12,
345:5, 479:18,
482:12
**interrupt** [1] - 346:11
**interstate** [19] -
354:25, 355:5,
458:2, 458:5,
462:20, 463:4,
463:7, 468:21,
469:18, 470:1,
470:8, 470:11,
470:23, 489:11,
490:16, 491:7,
494:13, 494:15,
498:5
**intervene** [1] - 364:23
**interview** [7] - 251:12,
405:11, 405:24,
406:1, 406:22,
408:24, 423:15
**intimately** [1] - 376:15
**introduce** [6] - 247:24,
248:2, 248:6, 251:1,
326:23, 404:15
**introduced** [6] -
246:13, 246:24,
247:25, 248:5,
248:9, 248:10
**introduction** [1] -
434:2
**intrusion** [2] - 442:10,
443:9
**invalid** [1] - 369:9
**investigate** [14] -
260:8, 260:24,
261:8, 262:5,
262:10, 396:10,
397:10, 400:13,
401:18, 409:21,
417:21, 435:6, 442:9
**investigated** [2] -
305:14, 402:5
**investigating** [8] -
262:20, 379:4,
395:18, 427:12,
428:24, 431:15,
488:2, 489:23
**Investigation** [1] -

439:23
**investigation** [25] -
264:23, 264:24,
265:6, 324:19,
375:5, 378:13,
379:23, 388:6,
388:10, 390:16,
391:4, 391:7, 391:9,
391:12, 401:22,
402:6, 415:20,
417:7, 427:18,
427:21, 431:11,
435:4, 435:10,
435:15, 435:25
**investigations** [3] -
266:11, 380:4, 397:1
**investigator** [1] -
265:10
**investigators** [1] -
266:10
**Investment** [1] -
327:17
**involve** [2] - 316:16,
401:17
**involved** [23] - 253:6,
293:9, 293:25,
295:4, 295:11,
315:16, 330:8,
333:12, 336:6,
336:8, 337:3,
402:19, 403:23,
410:16, 410:18,
410:19, 412:21,
423:9, 428:7,
434:21, 437:3,
440:20, 444:12
**involvement** [6] -
365:11, 365:16,
401:21, 416:3,
420:16, 423:13
**involves** [1] - 254:24
**involving** [16] -
262:21, 282:5,
293:24, 318:20,
324:18, 326:12,
327:16, 329:7,
367:25, 376:8,
378:18, 397:10,
402:21, 403:25,
445:6, 471:9
**Iowa** [1] - 451:23
**ironically** [1] - 280:19
**irony** [1] - 302:16
**irrelevant** [5] - 358:22,
359:11, 369:11,
371:23
**ISIS** [1] - 300:21
**issue** [28] - 242:19,
305:4, 323:9, 324:4,
324:15, 324:18,

327:13, 333:3,
336:18, 340:2,
341:17, 342:25,
346:1, 346:12,
353:2, 353:5,
358:25, 370:6,
388:23, 475:14,
477:5, 477:13,
480:14, 483:9,
492:10, 494:11,
497:21
**issued** [6] - 252:17,
277:15, 278:14,
349:6, 366:10,
381:25
**issues** [23] - 271:15,
271:16, 280:10,
283:20, 295:4,
300:25, 320:17,
325:24, 326:3,
333:7, 335:21,
335:22, 338:9,
338:10, 339:21,
341:16, 356:22,
367:3, 367:16,
378:18, 402:21,
421:19, 460:12
**issuing** [2] - 473:16,
478:5
**IT** [1] - 440:19
**item** [2] - 380:8, 388:7
**items** [4] - 379:20,
382:2, 394:6, 443:2
**iteration** [1] - 481:8
**itself** [10] - 268:19,
282:21, 285:19,
285:21, 317:23,
323:6, 400:9,
430:14, 470:6, 474:6

# J

**Jackson** [1] - 367:22
**jail** [2] - 412:8, 488:7
**James** [1] - 291:14
**Jamie** [1] - 430:9
**January** [4] - 299:25,
355:3, 419:17,
420:22
**Jardines** [3] - 370:11,
370:15, 370:17
**jargon** [1] - 419:6
**Jean** [1] - 305:22
**Jeff** [1] - 416:9
**jeopardy** [1] - 375:6
**Jerrico** [1] - 358:2
**Jerry** [1] - 274:12
**Jersey** [14] - 241:4,
268:21, 270:4,

274:13, 384:4,
387:15, 387:23,
390:8, 394:1, 394:2,
402:15, 472:24,
474:6
**Jew** [1] - 297:14
**jive** [1] - 321:1
**job** [10] - 252:2,
286:10, 305:3,
318:24, 347:11,
375:18, 376:5,
398:23, 461:25,
466:8
**jobs** [4] - 440:15,
440:19, 441:18,
441:23
**Joel** [4] - 255:11,
281:10, 298:25,
339:9
**John** [2] - 273:24,
407:12
**join** [1] - 306:2
**joined** [2] - 315:6,
315:7
**joining** [5] - 440:14,
440:16, 441:16,
441:19, 442:6
**joint** [2] - 395:17,
399:13
**Joint** [1] - 396:4
**joke** [1] - 242:15
**Jones** [11] - 273:22,
273:24, 302:21,
308:9, 329:2, 330:1,
330:14, 332:13,
337:7, 348:24
**JORDAN** [1] - 274:16
**Jordan** [6] - 274:17,
299:7, 299:8, 299:9,
319:25, 320:4
**Jordon** [1] - 274:15
**Jose** [1] - 457:6
**Joy** [3] - 280:25,
433:18, 434:20
**Jr** [1] - 407:12
**JSI** [4] - 259:5, 259:6,
259:15
**JTTF** [2] - 396:4,
401:20
**judge** [134] - 241:7,
245:20, 247:19,
255:13, 264:3,
266:20, 267:9,
267:10, 267:16,
267:18, 267:21,
268:5, 269:1,
269:12, 270:19,
273:16, 273:23,
273:25, 274:1,
274:13, 274:15,

274:17, 274:22,
274:25, 275:3,
275:4, 276:13,
276:25, 277:3,
278:9, 279:8,
280:24, 281:4,
281:10, 281:12,
282:7, 283:12,
284:6, 285:11,
285:18, 286:25,
287:21, 289:11,
289:15, 289:17,
289:22, 291:5,
291:17, 292:18,
293:5, 295:15,
296:11, 296:17,
297:10, 298:25,
299:12, 300:5,
301:1, 301:21,
303:12, 303:25,
304:9, 304:18,
305:9, 305:19,
306:7, 307:2, 307:7,
307:10, 308:20,
309:5, 310:23,
311:20, 312:11,
312:16, 319:22,
320:5, 320:21,
322:11, 323:16,
325:20, 325:22,
329:8, 329:13,
329:16, 329:18,
329:21, 331:9,
331:10, 331:12,
331:19, 331:22,
331:23, 332:6,
332:21, 334:1,
334:5, 334:22,
335:9, 335:21,
335:22, 336:17,
339:14, 340:3,
340:5, 340:9, 341:5,
344:5, 344:14,
344:23, 345:13,
347:23, 348:17,
349:18, 357:15,
357:23, 357:24,
359:1, 366:11,
366:12, 380:23,
397:11, 420:13,
434:2, 459:19,
460:19, 463:10,
471:23, 472:21,
476:18, 486:19
**Judge** [173] - 241:23,
242:5, 243:10,
243:15, 243:19,
245:12, 255:10,
267:16, 268:2,
271:7, 271:17,
274:8, 274:24,

275:6, 275:8, 275:9,
275:12, 275:23,
277:18, 277:20,
278:7, 278:12,
278:13, 279:5,
280:3, 280:7, 280:8,
280:11, 281:8,
281:9, 281:13,
281:14, 281:15,
281:20, 281:24,
282:4, 285:18,
285:24, 285:25,
286:20, 286:22,
288:4, 288:11,
290:19, 291:2,
293:22, 294:1,
294:2, 294:4,
294:13, 295:22,
296:7, 296:19,
296:20, 297:13,
298:7, 298:14,
298:22, 299:4,
299:9, 300:16,
302:24, 303:21,
304:5, 305:4, 308:2,
308:10, 311:7,
311:25, 312:5,
312:9, 314:15,
317:2, 319:25,
320:4, 321:9, 326:4,
328:9, 328:23,
329:2, 330:1,
330:14, 332:13,
333:14, 333:21,
334:15, 334:16,
335:1, 335:2, 335:3,
335:4, 335:5, 335:7,
335:11, 335:16,
335:25, 337:6,
337:25, 338:4,
338:12, 338:24,
339:16, 339:18,
339:20, 339:22,
348:3, 348:13,
350:16, 350:17,
357:1, 357:2, 357:7,
357:9, 357:10,
357:11, 357:12,
357:13, 357:16,
357:17, 357:20,
357:25, 359:23,
366:3, 366:6,
378:20, 380:18,
380:22, 386:7,
386:13, 397:11,
397:19, 398:6,
399:5, 399:21,
400:19, 405:4,
405:8, 405:12,
405:21, 408:2,
410:8, 415:1, 418:1,

418:3, 418:5,
418:11, 419:1,
419:9, 419:21,
422:19, 433:21,
434:16, 437:23,
438:6, 438:12,
438:16, 472:5,
472:8, 481:24,
485:18, 496:11,
496:18
**judge's** [3] - 278:8,
280:10, 305:8
**Judge's** [1] - 280:15
**judges** [76] - 263:22,
273:17, 273:19,
279:11, 280:5,
280:22, 281:17,
286:11, 289:15,
289:19, 292:11,
293:11, 296:25,
297:21, 298:4,
298:13, 300:9,
300:13, 300:20,
300:21, 300:22,
301:2, 301:13,
301:14, 301:15,
301:18, 302:15,
304:25, 305:15,
308:6, 312:22,
313:1, 327:22,
328:11, 328:13,
331:5, 331:16,
331:17, 331:18,
331:25, 334:11,
334:25, 338:18,
338:19, 347:18,
347:21, 347:23,
348:7, 348:9,
348:16, 348:19,
348:20, 348:21,
349:3, 349:4,
349:17, 349:23,
362:8, 363:1, 363:2,
366:22, 378:20,
399:5, 400:11,
401:7, 401:8,
405:10, 411:16,
415:17, 418:23,
468:22
**Judges** [2] - 308:9,
348:13
**judgment** [12] -
295:24, 299:24,
300:3, 302:8, 323:3,
335:17, 335:20,
338:22, 339:1,
339:3, 339:5, 376:11
**judicial** [18] - 272:5,
272:13, 273:9,
277:25, 278:2,

284:19, 288:1,
288:8, 288:13,
295:19, 298:1,
312:20, 320:25,
340:14, 341:8,
341:11, 361:21,
361:22
**judicially** [1] - 327:15
**judiciary** [10] - 276:5,
288:14, 305:12,
350:3, 411:19,
414:9, 432:8, 433:1,
433:4
**jump** [6] - 318:19,
407:20, 422:20,
451:11, 455:9, 490:4
**juncture** [2] - 308:8,
492:3
**June** [3] - 368:2,
426:19, 428:4
**jurisdiction** [9] -
302:19, 334:23,
336:16, 363:20,
364:23, 366:7,
369:9, 379:19,
379:20
**jurisprudence** [1] -
491:25
**JUROR** [1] - 385:21
**jurors** [2] - 343:14,
351:14
**Jurors** [1] - 386:1
**jurors'** [1] - 400:24
**JURY** [1] - 459:22
**Jury** [5] - 283:25,
285:13, 409:12,
422:14, 491:17
**jury** [101] - 241:2,
241:3, 242:9,
243:15, 244:23,
245:19, 245:21,
245:24, 247:21,
251:21, 254:16,
256:2, 285:1,
298:15, 306:5,
306:8, 306:13,
312:25, 316:8,
319:19, 324:13,
325:1, 326:22,
351:1, 351:20,
353:11, 354:7,
354:14, 354:15,
356:6, 356:7,
358:18, 365:3,
370:6, 373:19,
377:18, 413:19,
419:25, 421:14,
422:1, 422:4,
422:12, 422:22,
426:10, 428:2,

430:6, 430:20,
432:6, 433:16,
433:24, 445:19,
456:24, 460:2,
460:6, 460:9,
461:13, 461:15,
461:19, 462:14,
462:19, 463:6,
465:1, 465:23,
467:10, 467:25,
468:14, 468:15,
468:19, 469:8,
469:17, 470:17,
471:17, 472:22,
473:19, 474:1,
474:7, 478:16,
478:19, 478:20,
479:1, 479:3,
479:15, 482:4,
482:25, 485:25,
487:15, 494:1,
494:9, 494:11,
495:7, 496:17,
496:23, 497:14,
498:5, 498:6, 498:16

**jury's** [2] - 446:22,
462:11

**Justice** [8] - 359:12,
477:24, 480:24,
484:23, 486:19,
486:25, 487:2

**justice** [1] - 368:19

**justification** [12] -
289:3, 289:18,
291:16, 291:25,
292:10, 296:13,
410:8, 412:15,
418:16, 438:4,
467:14

**justifications** [1] -
289:8

**justified** [3] - 291:23,
296:25, 303:8

**justify** [1] - 467:12

## K

**Kalian** [1] - 316:23
**Kane** [5] - 278:9,
334:16, 335:4,
335:7, 357:7

**keep** [9] - 276:12,
290:22, 405:13,
413:20, 413:21,
433:2, 480:21,
488:21

**keeps** [1] - 491:3

**Keith** [34] - 264:18,
264:22, 268:20,
270:3, 277:4, 294:8,

299:24, 300:18,
303:23, 304:12,
304:22, 309:13,
315:21, 324:18,
327:17, 337:3,
337:12, 347:15,
364:21, 384:25,
398:5, 407:8, 412:5,
414:9, 417:25,
418:8, 418:10,
432:8, 433:4,
437:22, 438:9,
438:11, 453:6,
457:14

**keithdoughertycfp@
comcast.net** [6] -
406:12, 407:9,
416:25, 452:20,
455:11, 457:9

**keithdoughertycfp@
gmail** [1] - 406:11

**keithdoughertycfp@
gmail.com** [1] -
417:1

**Kelly** [3] - 293:9,
315:6, 315:7

**Ken** [1] - 417:2

**Kenneth** [2] - 403:17,
423:5

**Kent** [2] - 274:17,
299:9

**kept** [1] - 449:18

**key** [5] - 315:23,
430:10, 478:2

**kidnap** [2] - 489:2,
489:12

**kids** [1] - 276:19

**kill** [2] - 301:18, 306:2

**killed** [1] - 428:5

**killing** [1] - 301:2

**kind** [47] - 246:6,
246:9, 260:11,
260:16, 262:20,
270:5, 272:22,
281:3, 283:13,
284:5, 287:1, 291:1,
291:6, 318:19,
330:24, 351:23,
378:22, 381:23,
383:10, 391:23,
400:5, 404:8,
404:15, 404:16,
405:13, 405:17,
407:21, 413:13,
413:23, 417:9,
426:18, 427:18,
443:6, 447:18,
447:22, 451:11,
455:23, 456:24,
458:23, 461:15,

463:24, 465:17,
468:23, 471:2,
472:9, 488:7, 497:5

**kindness** [1] - 306:23

**kinds** [3] - 313:9,
381:2, 399:9

**King** [1] - 291:14

**kiss** [1] - 305:23

**knowing** [6] - 400:7,
485:8, 486:17,
493:16, 497:14

**knowingly** [6] -
472:10, 472:12,
474:7, 476:7,
487:19, 488:24

**knowledge** [44] -
255:15, 278:20,
315:13, 326:11,
332:18, 409:15,
427:3, 429:17,
430:1, 434:23,
434:24, 436:16,
437:10, 443:16,
444:17, 449:17,
453:13, 464:15,
473:11, 473:16,
473:17, 473:20,
473:24, 474:12,
474:23, 475:2,
476:12, 477:2,
477:3, 477:4, 478:8,
478:9, 478:13,
478:23, 483:14,
484:1, 484:7,
484:24, 487:11,
493:4, 494:2, 495:16

**known** [3] - 277:9,
277:10, 277:19

**knows** [3] - 301:19,
333:15, 484:19

## L

**label** [1] - 389:21
**lack** [3] - 326:10,
337:22, 457:17

**lacked** [1] - 320:21

**lacking** [3] - 288:19,
465:13, 497:15

**ladies** [1] - 433:24

**language** [35] - 266:5,
268:6, 285:21,
291:20, 295:21,
324:22, 364:6,
398:23, 399:3,
399:4, 401:3,
401:11, 406:23,
407:24, 414:2,
414:7, 414:13,
414:16, 417:10,

417:20, 417:22,
418:13, 419:10,
429:25, 470:1,
470:6, 471:13,
482:23, 485:19,
485:20, 486:18,
488:9, 493:1, 493:2,
496:3

**laptop** [1] - 413:14

**large** [6] - 297:4,
297:12, 300:9,
305:18, 432:5,
436:22

**larger** [2] - 252:9,
288:3

**Larry** [5] - 293:13,
305:22, 315:14,
316:1, 337:4

**last** [30] - 246:9,
246:15, 251:7,
251:21, 266:1,
268:16, 273:13,
307:12, 316:7,
359:11, 377:4,
377:17, 381:13,
395:11, 413:8,
414:1, 416:1, 416:9,
429:23, 430:16,
430:18, 438:5,
439:16, 439:18,
451:15, 451:17,
462:7, 469:23,
471:4, 496:18

**late** [3] - 246:4, 280:7,
367:2

**law** [67] - 249:4,
267:14, 268:13,
288:9, 289:16,
294:20, 297:24,
303:24, 303:25,
304:6, 304:17,
314:1, 323:19,
324:17, 324:20,
325:5, 325:6,
360:15, 360:16,
361:2, 361:3,
363:11, 363:18,
370:25, 373:4,
373:8, 373:9, 375:5,
375:10, 375:13,
375:21, 376:2,
377:15, 377:22,
378:3, 395:22,
409:5, 411:4, 412:6,
412:9, 412:14,
420:14, 424:16,
424:17, 424:22,
426:14, 430:11,
438:4, 440:7,
449:13, 461:16,

461:17, 467:14,
469:24, 473:5,
483:23, 484:19,
484:20, 484:21,
484:25, 485:9,
487:5, 492:6,
494:18, 495:15

**laws** [1] - 254:10,
254:22, 318:9,
322:4, 409:15, 431:1

**lawsuit** [2] - 403:22,
403:24

**lawsuits** [2] - 329:19,
366:21

**lawyer** [12] - 256:1,
314:25, 315:3,
347:10, 347:11,
360:23, 360:24,
365:5, 434:6, 466:7

**lawyers** [1] - 343:20

**lay** [1] - 437:10

**laying** [2] - 289:7,
296:12

**lays** [1] - 312:15

**lead** [6] - 251:11,
254:1, 259:13,
265:7, 266:10, 340:5

**leading** [1] - 417:14

**learn** [1] - 402:16

**learned** [3] - 286:12,
288:25, 402:20

**leased** [1] - 396:20

**least** [18] - 283:6,
285:24, 286:15,
304:14, 305:24,
307:6, 328:13,
351:8, 351:10,
361:4, 376:2, 414:5,
451:5, 459:9,
480:25, 482:24,
487:19, 498:11

**leave** [4] - 263:17,
263:19, 497:2,
497:15

**Lebanon** [2] - 275:3,
286:25

**led** [5] - 253:17,
280:23, 293:2,
299:10, 429:15

**leeway** [3] - 364:15,
370:3

**left** [8] - 283:25,
330:21, 351:20,
362:7, 381:24,
403:4, 421:14,
433:10

**left-hand** [2] - 381:24,
433:10

**legal** [11] - 256:15,
313:12, 324:15,

346:12, 358:18, 369:21, 375:25, 419:6, 419:19, 419:24, 466:10
**legally** [4] - 309:1, 311:4, 370:5, 430:23
**legitimacy** [1] - 305:5
**legitimate** [1] - 256:9
**legitimately** [2] - 405:15, 427:14
**lengthy** [2] - 318:17, 404:18
**LESKO** [1] - 436:20
**less** [5] - 328:7, 334:12, 337:3, 351:17, 497:23
**lesser** [1] - 359:8
**lesson** [1] - 305:24
**letter** [77] - 242:14, 245:4, 246:11, 246:12, 257:22, 268:3, 268:18, 268:19, 270:13, 271:18, 272:1, 273:6, 273:13, 273:14, 276:2, 277:3, 279:2, 280:1, 282:8, 283:12, 285:18, 285:19, 285:21, 285:24, 287:7, 287:14, 288:4, 296:12, 302:25, 303:11, 304:1, 304:15, 308:20, 311:13, 312:4, 314:23, 323:2, 323:6, 323:13, 324:25, 337:2, 341:15, 342:6, 344:3, 344:12, 345:9, 345:20, 347:14, 347:19, 349:25, 350:9, 356:17, 382:10, 397:18, 398:11, 398:12, 398:21, 399:19, 399:22, 400:4, 400:5, 400:8, 400:19, 401:13, 405:4, 405:5, 405:18, 422:20, 453:21, 495:2, 495:11, 495:12, 495:16, 495:24, 495:25, 496:7, 496:12
**letters** [6] - 245:6, 268:5, 283:2, 399:14, 399:18,

419:9
**level** [5] - 300:21, 300:22, 301:13, 301:14, 348:9
**levels** [1] - 312:16
**liberties** [1] - 298:5
**liberty** [1] - 340:19
**license** [5] - 276:22, 384:19, 384:20, 385:13, 390:20
**life** [5] - 276:1, 302:12, 482:18, 483:7
**light** [3] - 288:3, 398:23, 495:14
**likely** [1] - 393:18
**liken** [1] - 453:21
**limine** [3] - 359:12, 369:22, 371:10
**limit** [1] - 461:1
**limited** [24] - 241:21, 241:22, 243:7, 244:6, 244:16, 244:24, 245:4, 245:11, 246:14, 246:20, 246:25, 326:24, 331:5, 331:16, 336:16, 338:13, 342:20, 473:20, 485:1, 489:13, 492:19, 496:11, 496:16
**limiting** [2] - 241:14, 496:5
**Lindberg** [1] - 387:18
**line** [12] - 322:10, 332:24, 340:13, 349:5, 358:6, 368:12, 368:13, 369:12, 394:7, 407:14, 432:24, 448:3
**Linebaugh** [1] - 275:4
**lined** [2] - 334:20, 369:25
**lines** [3] - 319:24, 338:21, 458:6
**link** [5] - 247:14, 330:10, 428:11, 430:6, 430:15
**Link** [3] - 449:10, 449:12, 449:14
**liquids** [1] - 388:13
**list** [1] - 362:24
**listed** [3] - 262:13, 262:14, 436:7
**listen** [2] - 369:15, 496:11
**lists** [1] - 451:2
**litany** [1] - 333:10
**litigant** [7] - 277:23,

299:18, 330:8, 335:12, 340:4, 346:6, 363:22
**litigants** [3] - 283:3, 332:5, 334:5
**litigation** [27] - 274:22, 277:13, 279:6, 281:11, 281:19, 290:3, 290:17, 295:4, 295:7, 299:2, 299:15, 299:16, 300:7, 320:11, 326:9, 326:12, 334:4, 335:9, 336:1, 339:20, 340:5, 340:15, 399:25, 400:10, 402:21, 405:18
**litigations** [2] - 418:23, 432:16
**live** [1] - 387:9
**living** [1] - 276:8
**LLC** [1] - 315:22
**Lobby** [1] - 293:8
**locate** [4] - 402:10, 402:14, 402:24, 403:3
**located** [8] - 276:10, 396:5, 396:6, 417:11, 452:5, 455:2, 456:12, 456:14
**location** [5] - 384:9, 384:16, 390:2, 429:3
**locations** [4] - 295:25, 398:3, 451:18, 451:21
**logical** [1] - 339:22
**logically** [1] - 294:23
**Lon** [3] - 428:1, 428:2, 428:4
**look** [37] - 241:6, 241:11, 254:13, 258:5, 259:7, 268:15, 269:14, 298:9, 309:8, 352:20, 353:15, 354:10, 355:20, 372:23, 379:18, 388:15, 407:4, 425:25, 444:20, 445:13, 446:19, 447:22, 447:24, 447:25, 450:25, 451:17, 452:17, 454:1, 468:14, 468:18, 468:23, 471:25, 472:9, 476:3, 486:8, 493:1,

493:2
**looked** [6] - 278:9, 354:5, 392:2, 405:6, 413:15, 493:11
**looking** [18] - 309:10, 309:21, 311:10, 342:22, 351:14, 352:1, 380:18, 390:15, 423:1, 427:13, 427:18, 431:16, 441:7, 447:22, 447:23, 470:5, 486:3, 497:6
**looks** [7] - 371:2, 371:3, 401:14, 454:24, 454:25, 455:4
**Lord** [3] - 292:17, 306:21, 306:22
**lose** [1] - 311:6
**loses** [1] - 424:9
**loss** [1] - 333:9
**lost** [2] - 383:5, 402:22
**loving** [1] - 306:23
**lower** [6] - 381:24, 426:9, 474:11, 483:20, 484:8, 484:9
**lunch** [10] - 241:13, 284:4, 294:6, 351:1, 351:11, 351:12, 351:20, 352:19, 467:3, 498:19
**Lunch** [1] - 353:10
**lunchtime** [1] - 284:2
**lure** [1] - 488:4
**lush** [1] - 294:5

# M

**M-E-K-I-L-O** [1] - 268:17
**machine** [4] - 247:22, 259:1, 284:3, 381:5
**machines** [2] - 381:4, 381:21
**Madison** [2] - 288:10, 342:3
**Magistrate** [12] - 298:22, 329:1, 330:1, 330:14, 332:12, 336:4, 336:21, 337:6, 364:11, 364:22, 365:22, 366:6
**magistrate** [10] - 274:1, 301:14, 336:11, 336:13, 336:16, 336:17, 348:20, 348:21,

366:12, 420:13
**magistrates** [1] - 300:21
**mail** [145] - 251:14, 252:18, 259:6, 260:8, 260:10, 260:11, 260:15, 261:17, 262:10, 262:11, 268:3, 269:2, 271:11, 271:15, 342:4, 342:9, 354:24, 355:1, 355:3, 355:5, 378:6, 378:7, 378:19, 378:21, 379:10, 379:12, 379:16, 379:24, 380:8, 380:17, 381:2, 381:4, 381:12, 381:18, 382:1, 382:9, 383:22, 384:6, 384:7, 384:9, 384:12, 384:13, 384:15, 384:16, 384:24, 385:1, 385:2, 385:4, 385:5, 385:7, 386:17, 386:21, 387:5, 388:11, 388:18, 389:8, 390:1, 406:8, 406:13, 406:20, 406:22, 407:8, 407:11, 408:4, 408:6, 408:7, 408:19, 408:20, 408:22, 411:24, 415:22, 415:24, 415:25, 416:7, 416:16, 419:15, 419:16, 419:18, 419:21, 420:18, 422:20, 424:4, 424:5, 425:5, 433:20, 436:5, 436:20, 439:2, 442:3, 445:12, 445:13, 445:16, 445:19, 445:21, 445:22, 445:23, 445:24, 445:25, 446:1, 446:5, 446:13, 446:15, 447:7, 448:1, 448:4, 448:17, 450:25, 451:2, 451:8, 451:25, 452:15, 452:16, 452:25, 453:4, 453:5, 453:9, 453:15, 453:18, 453:23, 454:9,

454:13, 454:25,
455:2, 455:10,
455:11, 455:20,
455:21, 455:24,
457:2, 457:3, 457:9,
457:11, 457:16,
458:19, 470:24,
487:23, 488:21
**Mail** [9] - 270:6, 270:8,
378:5, 379:20,
381:5, 381:21,
381:23, 448:6, 476:8
**mailbox** [1] - 454:12
**mailed** [7] - 251:15,
379:18, 386:18,
388:9, 388:16,
388:19, 389:10
**mailing** [8] - 253:2,
263:3, 297:20,
378:9, 394:6,
402:13, 468:16,
476:5
**mailings** [6] - 383:24,
389:5, 389:25,
403:9, 403:14,
406:10
**mails** [10] - 406:7,
419:8, 435:3,
444:20, 445:8,
456:20, 458:5,
458:14, 458:18,
470:2
**main** [1] - 310:9
**maintaining** [1] -
396:19
**majority** [5] - 477:14,
477:25, 478:3,
486:22, 486:25
**maker** [2] - 479:19,
482:13
**male** [1] - 263:11
**man** [3] - 292:16,
292:18, 295:23
**Manada** [4] - 383:16,
384:21, 384:24,
453:7
**manage** [1] - 405:3
**management** [5] -
336:23, 336:25,
338:10, 366:12,
367:8
**mandamus** [9] -
287:21, 287:23,
287:24, 341:16,
341:19, 342:3,
342:8, 342:10,
364:12
**mandatory** [2] -
373:20, 373:21
**manner** [8] - 244:12,

279:21, 282:12,
295:18, 350:3,
366:21, 373:22,
373:23
**manslaughter** [1] -
428:9
**manufactured** [2] -
344:10, 344:11
**Manufacturing** [1] -
359:16
**manufacturing** [2] -
343:10, 360:5
**Marbury** [2] - 288:10,
342:3
**March** [6] - 354:24,
406:1, 407:9,
422:23, 434:25,
436:20
**Maria** [1] - 338:14
**Marjorie** [1] - 274:14
**mark** [12] - 250:6,
250:24, 274:2,
274:7, 286:1,
286:21, 305:25,
308:4, 312:5,
394:14, 464:7
**marked** [10] - 258:12,
264:13, 269:12,
309:5, 392:13,
407:3, 416:14,
446:9, 448:7, 489:1
**marks** [4] - 282:13,
287:3, 292:4, 295:25
**MARSHAL** [1] -
421:21
**marshal** [18] - 245:3,
245:10, 246:10,
257:12, 263:25,
265:5, 272:8,
272:11, 272:12,
273:2, 276:3, 276:6,
276:7, 276:24,
277:21, 287:16,
402:18, 496:2
**Marshal** [7] - 257:11,
259:19, 260:7,
261:8, 262:4,
264:17, 402:4
**Marshal's** [1] - 250:18
**Marshall** [1] - 358:2
**Marshals** [6] - 250:14,
263:19, 272:22,
275:14, 275:15,
498:21
**Marshals'** [1] - 420:15
**Martin** [1] - 273:25
**Maryland** [1] - 274:22
**mash** [1] - 361:3
**mass** [1] - 490:16
**mat** [1] - 388:12

**materia** [1] - 300:25
**material** [3] - 333:3,
361:5, 477:8
**materially** [1] - 316:18
**math** [1] - 391:1
**matter** [36] - 278:3,
281:13, 281:21,
289:2, 329:7, 329:9,
329:13, 329:19,
331:6, 332:14,
334:2, 336:21,
338:18, 366:11,
367:8, 369:16,
369:21, 372:3,
374:22, 397:10,
397:14, 397:15,
400:13, 401:18,
411:7, 417:21,
417:22, 417:25,
436:6, 437:22,
467:14, 481:7,
488:20, 489:19,
492:25, 494:18
**matters** [19] - 246:3,
277:24, 280:16,
290:6, 326:2, 326:5,
326:19, 328:21,
331:4, 334:16,
335:16, 336:13,
341:11, 396:11,
440:3, 449:16,
449:18
**Matthew** [4] - 250:19,
264:17, 264:19,
264:21
**maxim** [1] - 487:5
**McKee** [11] - 252:16,
275:11, 299:3,
299:4, 305:25,
335:3, 350:14,
357:10, 357:11
**McNive** [1] - 403:15
**McNiven** [1] - 423:12
**MD** [1] - 316:24
**MDPA** [1] - 310:1
**mean** [47] - 244:8,
247:23, 256:6,
273:18, 284:6,
284:10, 284:11,
287:8, 289:17,
290:10, 296:14,
301:1, 305:7,
324:25, 326:12,
331:2, 341:25,
360:22, 361:10,
364:3, 371:12,
375:7, 389:22,
399:2, 404:3,
407:16, 410:5,
410:24, 413:1,

429:24, 430:17,
432:20, 443:7,
460:16, 461:24,
466:7, 467:18,
471:8, 473:7,
474:12, 481:9,
482:19, 484:16,
485:3, 488:22,
493:25, 496:10
**meaning** [4] - 256:20,
298:21, 303:4,
350:19
**means** [8] - 241:21,
290:4, 290:11,
306:15, 328:6,
354:20, 420:25,
443:6
**meant** [8] - 287:7,
303:15, 303:16,
432:21, 432:22,
456:25, 461:21,
462:11
**measure** [1] - 290:13
**media** [1] - 402:2
**mediation** [1] - 338:20
**meet** [3] - 311:25,
480:9, 481:4
**meeting** [3] - 259:8,
275:15, 276:6
**meetings** [1] - 403:6
**meets** [1] - 425:23
**Mekilo** [1] - 268:14
**member** [3] - 315:21,
398:24, 430:9
**members** [8] - 295:7,
307:16, 308:6,
308:18, 315:22,
365:3, 412:5, 412:13
**membership** [1] -
411:25
**memorialize** [1] -
259:23
**memory** [2] - 288:19,
321:2
**men** [2] - 372:14,
372:18
**mens** [4] - 470:8,
472:15, 473:11,
474:11
**mental** [2] - 473:14,
478:3
**mention** [6] - 381:22,
407:25, 468:22,
469:18, 486:15,
486:22
**mentioned** [15] -
286:23, 330:13,
341:3, 353:21,
374:7, 386:16,
387:22, 390:6,

397:19, 398:2,
403:22, 404:6,
413:6, 432:15,
443:20
**mentioning** [2] -
376:14, 438:15
**mentions** [1] - 418:3
**mere** [2] - 375:11,
409:13
**merits** [4] - 324:9,
366:19, 461:24,
461:25
**message** [6] - 403:4,
430:21, 431:2,
431:3, 457:5
**met** [8] - 272:12,
278:21, 287:16,
392:3, 414:22,
419:1, 472:14,
477:19
**meteorology** [2] -
440:13, 441:6
**meter** [7] - 382:16,
382:17, 382:21,
383:7, 383:9, 383:18
**method** [2] - 328:9,
329:10, 362:24
**Michael** [4] - 376:25,
377:6, 417:2, 417:3
**MICHAEL** [1] - 377:2
**microphone** [1] -
324:1
**Microsoft** [4] - 448:5,
448:15, 448:24,
451:22
**mid** [2] - 283:22, 284:1
**mid-morning** [2] -
283:22, 284:1
**Middle** [22] - 255:8,
255:20, 262:23,
274:8, 278:16,
285:25, 286:20,
305:21, 310:1,
310:8, 311:2, 312:5,
312:9, 317:3,
332:20, 348:3,
367:15, 368:15,
368:24, 409:24,
439:5, 452:9
**middle** [2] - 246:8,
297:4
**might** [22] - 242:15,
248:9, 249:16,
291:7, 321:21,
328:18, 363:12,
364:15, 383:16,
383:21, 386:16,
391:3, 426:5,
466:21, 467:4,
467:7, 470:16,

470:18, 483:22,
488:10, 498:11
**Mike** [2] - 252:14,
252:24
**Militia** [1] - 425:1
**militia** [52] - 290:19,
290:21, 291:15,
292:1, 292:2,
292:10, 300:19,
301:6, 301:8,
301:10, 301:12,
302:2, 302:9,
302:22, 303:8,
307:6, 307:9,
307:17, 344:5,
344:13, 347:16,
348:25, 362:19,
362:25, 372:9,
372:10, 372:11,
372:14, 372:24,
372:25, 373:3,
373:5, 373:7, 373:8,
401:7, 409:4,
411:15, 411:16,
411:22, 411:25,
412:1, 412:6,
412:11, 412:13,
418:11, 418:18,
424:21, 437:18,
438:12
**militias** [1] - 307:14
**Millersville** [1] -
440:12
**million** [3] - 255:18,
256:21, 364:22
**mind** [9] - 247:19,
258:5, 258:23,
279:3, 291:19,
400:21, 403:7,
435:23, 474:10
**mindful** [1] - 367:11
**minds** [1] - 289:19
**mindset** [3] - 431:14,
431:22, 431:25
**mine** [3] - 265:8,
327:15, 367:24
**minimize** [1] - 349:9
**minimum** [2] - 409:11,
474:20
**minister** [1] - 292:17
**ministerial** [1] -
338:22
**minute** [2] - 383:20,
393:13
**minutes** [10] - 283:23,
351:7, 351:12,
352:3, 390:25,
392:1, 421:12,
421:20, 421:23,
459:9

**mischaracterization**
[3] - 343:12, 360:20,
427:3
**misconception** [1] -
280:2
**misconduct** [4] -
305:10, 305:11,
341:8, 341:10
**mish** [1] - 361:3
**mislead** [1] - 324:13
**missed** [1] - 466:5
**missing** [3] - 253:2,
263:3, 380:24
**misspelled** [1] -
274:15
**misspelling** [1] -
311:12
**misstated** [2] - 324:4,
324:5
**misunderstood** [1] -
365:10
**mocking** [1] - 409:9
**model** [1] - 485:24
**modest** [1] - 440:22
**modified** [1] - 243:2
**modus** [2] - 495:16,
495:25
**Moines** [1] - 451:23
**moment** [14] - 265:22,
269:14, 311:17,
394:23, 400:14,
418:8, 421:4,
429:21, 438:8,
448:8, 449:8,
453:10, 457:21,
460:5
**momentarily** [1] -
386:1
**money** [2] - 436:6,
458:23
**monies** [2] - 256:15,
432:17
**month** [1] - 385:3
**months** [1] - 397:7
**moral** [1] - 315:20
**morning** [11] - 245:25,
267:4, 267:5,
283:22, 284:1,
407:10, 459:11,
459:16, 459:17,
494:9, 496:16
**morphed** [1] - 378:2
**most** [10] - 294:6,
300:23, 312:21,
321:2, 335:10,
340:2, 367:15,
379:6, 419:10,
463:19
**mostly** [2] - 251:24,
399:5

**Mother** [3] - 293:12,
315:13, 316:1
**motion** [11] - 294:4,
317:20, 317:25,
335:18, 335:23,
359:12, 369:22,
371:10, 375:6,
461:9, 461:11
**motions** [2] - 335:20,
369:7
**motivated** [1] - 482:6
**Motz** [13] - 255:13,
274:20, 274:21,
281:8, 281:9,
281:24, 297:13,
297:15, 299:4,
299:5, 339:12,
339:20, 339:22
**mouth** [1] - 361:10
**move** [22] - 249:16,
270:11, 294:12,
300:16, 310:15,
316:4, 319:15,
340:20, 340:24,
359:13, 364:10,
372:6, 374:4, 408:9,
428:25, 429:22,
444:1, 449:3, 450:1,
450:18, 461:21,
470:17
**moved** [2] - 337:23,
354:15
**moves** [1] - 346:6
**movies** [1] - 377:21
**moving** [3] - 323:4,
327:13, 455:15
**MR** [425] - 241:7,
241:19, 242:1,
242:11, 242:13,
242:24, 243:4,
243:12, 243:17,
243:21, 243:24,
244:7, 244:10,
244:15, 244:19,
245:8, 245:15,
245:17, 245:20,
247:9, 247:19,
247:25, 248:3,
248:6, 248:11,
248:15, 248:23,
249:1, 250:2, 250:5,
250:8, 250:10,
250:14, 250:18,
250:23, 251:5,
255:5, 255:6,
255:21, 255:22,
256:6, 256:7, 257:2,
257:4, 257:10,
258:7, 258:9,
258:11, 258:18,

258:20, 265:22,
265:25, 266:12,
266:16, 266:20,
267:3, 269:9,
269:11, 270:11,
270:15, 270:17,
284:6, 284:11,
285:9, 285:16,
309:2, 309:4,
310:15, 310:17,
310:19, 311:17,
311:20, 311:24,
314:14, 314:17,
314:21, 315:4,
317:6, 317:13,
318:11, 318:18,
319:11, 319:15,
319:17, 321:8,
321:12, 321:20,
321:22, 321:24,
322:2, 322:11,
322:19, 322:22,
322:24, 323:2,
323:8, 323:17,
323:23, 324:2,
324:16, 325:3,
325:9, 325:10,
325:16, 325:19,
325:20, 325:22,
326:9, 326:14,
326:17, 327:3,
327:8, 327:12,
330:25, 331:13,
332:23, 333:11,
333:16, 333:18,
340:8, 340:16,
340:22, 341:23,
342:2, 342:6,
342:10, 342:11,
342:13, 342:15,
342:18, 342:20,
342:24, 343:3,
343:6, 343:12,
343:23, 346:13,
346:17, 346:20,
346:21, 347:12,
347:13, 348:2,
349:13, 350:23,
351:4, 351:8,
351:13, 351:23,
352:1, 352:7,
352:10, 352:16,
352:18, 352:22,
353:1, 353:4, 353:6,
353:14, 353:17,
353:18, 353:23,
354:1, 354:4, 354:8,
354:9, 354:10,
354:17, 355:7,
355:12, 355:15,
355:23, 356:3,

356:13, 358:9,
358:11, 358:15,
358:20, 358:24,
359:9, 359:14,
359:15, 359:22,
360:1, 360:4,
360:19, 361:6,
363:6, 364:19,
365:7, 367:12,
367:13, 368:9,
368:14, 368:21,
369:3, 369:13,
369:17, 369:21,
369:24, 370:8,
371:9, 371:19,
371:24, 372:7,
374:1, 374:5,
374:19, 374:24,
376:17, 376:21,
376:25, 377:9,
386:4, 393:5, 393:7,
393:9, 394:23,
395:1, 395:4, 395:7,
395:14, 398:16,
398:18, 400:18,
400:21, 401:1,
406:25, 407:2,
408:9, 408:12,
408:14, 408:17,
413:25, 416:11,
416:13, 417:15,
417:16, 421:4,
421:7, 421:17,
422:11, 422:17,
425:10, 425:12,
425:15, 425:18,
425:21, 426:3,
426:8, 427:9,
427:10, 429:22,
430:4, 431:19,
431:20, 431:24,
432:3, 432:4,
432:23, 433:15,
434:10, 434:11,
435:18, 435:22,
436:1, 436:4,
436:22, 436:24,
436:25, 437:9,
437:14, 437:15,
438:19, 438:23,
439:1, 439:7,
439:10, 439:12,
439:21, 443:25,
444:5, 444:7, 444:9,
446:6, 446:8,
447:10, 447:12,
447:14, 449:2,
449:5, 449:7,
449:25, 450:3,
450:5, 450:17,
450:21, 450:23,

450:24, 457:21,
457:24, 458:9,
458:11, 458:13,
459:1, 459:3, 459:5,
460:6, 460:10,
460:13, 460:16,
460:19, 460:24,
461:1, 461:4,
461:10, 462:2,
462:16, 462:18,
463:1, 463:14,
463:23, 463:25,
464:3, 465:5, 465:8,
465:11, 465:16,
465:25, 466:4,
466:18, 466:23,
467:4, 467:18,
467:22, 468:12,
468:14, 468:18,
469:4, 469:7,
469:12, 469:15,
469:17, 469:21,
469:23, 470:15,
470:22, 471:10,
471:16, 471:23,
471:25, 472:2,
472:5, 472:7,
472:21, 472:25,
473:22, 474:4,
474:15, 474:20,
474:25, 475:6,
475:10, 475:15,
475:18, 475:22,
476:16, 476:22,
477:23, 478:7,
478:20, 479:22,
479:25, 480:3,
480:13, 481:17,
481:20, 481:24,
483:4, 483:17,
483:23, 484:15,
484:18, 485:2,
485:5, 485:7,
485:13, 485:18,
485:22, 485:23,
486:13, 487:16,
488:1, 488:18,
489:4, 489:7,
489:14, 491:1,
491:3, 491:9,
491:10, 491:12,
491:14, 491:15,
493:9, 493:15,
493:22, 494:6,
494:13, 494:16,
494:20, 494:25,
495:4, 495:14,
496:9, 496:13,
496:18, 497:1,
497:4, 497:13,
497:20, 497:23,

498:2, 498:4, 498:9
**MS** [1] - 436:20
**mullahs** [1] - 306:1
**Mullenix** [4] - 418:10,
438:11, 438:14,
438:18
**multiple** [3] - 361:21,
454:24, 455:6
**multitude** [1] - 378:18
**municipal** [1] - 368:5
**murder** [1] - 429:16
**musical** [1] - 294:24
**must** [11] - 296:9,
312:4, 315:14,
362:15, 364:1,
409:10, 418:9,
438:10, 487:3,
487:6, 489:16

# N

**name** [34] - 266:24,
267:1, 267:6,
268:16, 270:24,
274:3, 275:7, 277:6,
278:8, 278:11,
286:3, 294:6,
308:23, 309:1,
311:3, 328:7,
332:15, 334:5,
360:7, 377:3, 377:4,
377:5, 384:19,
385:1, 395:10,
395:11, 423:11,
439:15, 439:16,
439:17, 439:18,
453:6, 453:23,
488:25
**name's** [1] - 311:5
**named** [7] - 255:13,
273:6, 278:15,
280:25, 378:16,
399:6, 430:24
**names** [4] - 274:9,
367:20, 367:21,
367:23
**national** [1] - 383:7
**National** [5] - 440:24,
441:2, 441:5,
441:11, 441:21
**nature** [14] - 279:17,
286:10, 308:16,
313:5, 334:3, 397:2,
397:3, 398:14,
402:23, 415:9,
419:7, 419:9,
477:11, 477:15
**near** [1] - 449:16
**necessarily** [4] -

286:7, 286:9,
286:14, 386:20
**necessary** [6] -
290:21, 307:22,
372:10, 411:15,
442:24, 492:8
**necessity** [2] - 418:1,
437:23
**need** [49] - 247:12,
256:4, 268:15,
272:7, 282:25,
283:1, 283:18,
284:5, 298:4,
322:20, 323:21,
329:14, 333:9,
335:14, 340:19,
349:5, 352:24,
353:3, 353:5,
354:18, 362:21,
367:7, 367:10,
370:22, 372:6,
400:23, 413:20,
421:15, 421:19,
443:13, 453:11,
459:7, 460:4, 460:8,
469:20, 472:19,
473:23, 474:2,
474:21, 475:20,
485:11, 492:4,
493:14, 493:15,
493:24, 494:7,
494:10, 498:3
**needed** [5] - 266:11,
271:22, 273:2,
335:9, 339:17
**needing** [2] - 415:5,
493:12
**needs** [7] - 301:9,
305:24, 455:6,
469:12, 469:21,
482:25, 488:22
**negative** [1] - 465:23
**neglected** [1] - 404:23
**neglects** [2] - 346:7,
426:13
**negligence** [3] -
477:21, 480:23,
487:20
**negligent** [2] - 305:16,
411:4
**negligently** [1] - 405:2
**neighborhood** [3] -
276:9, 276:11, 488:8
**Net** [2] - 436:13, 437:3
**network** [3] - 442:20,
443:20, 442:2
**networking** [3] -
441:10, 441:23,
442:2
**networks** [1] - 441:8

**neutral** [1] - 332:9
**never** [22] - 251:16,
272:6, 277:2,
277:15, 278:13,
278:18, 278:21,
299:16, 327:14,
366:13, 366:17,
366:18, 391:23,
392:3, 435:10,
477:13, 480:8,
480:23, 481:5, 481:6
**nevertheless** [1] -
420:17
**new** [6] - 257:8, 284:3,
306:4, 334:22,
367:9, 397:2
**New** [15] - 241:4,
268:20, 270:4,
274:13, 291:14,
384:4, 387:15,
387:22, 390:8,
394:1, 394:2,
402:14, 472:24,
474:6
**next** [51] - 250:17,
261:12, 261:13,
266:18, 274:2,
274:7, 287:1,
290:16, 291:2,
292:15, 293:18,
294:12, 295:15,
297:4, 297:21,
298:8, 300:5,
301:21, 304:9,
307:12, 307:18,
310:22, 312:5,
316:4, 316:13,
316:14, 328:25,
329:24, 332:11,
332:15, 337:1,
337:18, 352:6,
358:25, 363:3,
376:24, 381:7,
387:17, 388:2,
395:6, 409:8, 410:2,
411:1, 413:9,
413:11, 429:21,
439:9, 439:10,
459:4, 469:6, 473:1
**nexus** [3] - 470:1,
470:8, 491:7
**Nick** [2] - 367:16,
367:18
**night** [2] - 246:15,
469:24
**nine** [2] - 459:22,
459:23
**nobility** [2] - 313:12,
313:17
**nobody** [1] - 347:10

**noise** [1] - 322:14
**non** [3] - 290:9,
294:22, 434:6
**non-lawyer** [1] - 434:6
**none** [3] - 264:4,
298:18, 395:4
**nonprofit** [1] - 425:1
**normally** [11] - 248:10,
257:7, 317:22,
317:24, 329:14,
336:12, 484:3,
484:5, 484:8, 497:9,
497:11
**norms** [1] - 297:17
**northern** [1] - 331:9
**northwestern** [1] -
331:11
**not-so-average** [1] -
447:21
**note** [5] - 286:15,
292:20, 310:3,
418:19, 453:10
**noted** [1] - 249:13
**notes** [1] - 404:18
**nothing** [8] - 324:9,
326:5, 326:10,
365:24, 366:19,
428:18, 447:2,
458:15
**notice** [14] - 304:10,
307:5, 307:6, 370:9,
371:12, 371:14,
371:15, 371:18,
414:2, 429:3,
430:19, 430:21,
435:9, 469:25
**noticed** [6] - 304:2,
429:5, 469:17,
472:8, 472:15,
472:22
**notified** [3] - 273:3,
276:18, 276:20
**notify** [3] - 252:20,
272:8, 431:3
**novelist** [1] - 413:10
**Number** [5] - 270:4,
289:10, 375:1,
383:17, 384:3
**number** [66] - 243:1,
253:1, 254:15,
273:14, 276:15,
277:23, 287:20,
291:1, 298:17,
298:24, 299:4,
310:4, 310:7,
310:10, 328:1,
328:5, 328:21,
338:10, 339:1,
346:15, 354:6,
366:21, 367:21,

381:22, 381:24,
382:1, 384:20,
385:11, 387:2,
399:2, 401:12,
402:14, 405:10,
406:21, 412:21,
417:9, 436:7,
436:10, 436:19,
449:8, 453:9,
461:18, 462:20,
463:7, 468:15,
468:19, 469:8,
470:14, 470:15,
470:19, 470:25,
476:7, 478:17,
478:20, 479:2,
479:4, 479:11,
479:15, 482:25,
486:5, 491:19
**numbers** [3] - 276:22,
384:22, 403:2
**numerous** [1] - 349:23

## O

**oath** [2] - 304:24,
343:19
**object** [10] - 244:6,
248:4, 248:8,
249:21, 249:24,
249:25, 250:2,
332:23, 478:19,
492:1
**objecting** [3] - 247:23,
355:21, 479:25
**objection** [43] - 244:9,
251:2, 255:21,
255:23, 270:15,
270:16, 310:17,
318:11, 318:13,
319:11, 319:13,
322:11, 327:1,
330:25, 340:8,
343:12, 358:9,
358:23, 359:9,
360:19, 360:22,
369:2, 369:11,
369:23, 371:9,
371:21, 372:2,
374:19, 393:7,
408:12, 423:19,
431:24, 432:2,
436:1, 437:9, 444:5,
447:12, 449:5,
450:3, 450:20,
450:21, 469:3,
469:13
**objections** [3] -
249:20, 366:9,
417:13

**objective** [10] -
242:20, 242:21,
242:22, 243:2,
243:3, 476:11,
476:20, 479:13,
481:16, 482:5
**objectively** [2] -
479:16, 482:9
**obligated** [1] - 284:18
**obscure** [1] - 419:6
**observation** [2] -
288:24, 334:1
**obstacle** [1] - 430:11
**obtain** [8] - 321:4,
382:19, 384:18,
389:2, 392:5,
397:23, 446:14,
446:17
**obtained** [3] - 391:18,
397:25, 446:18
**obtaining** [1] - 391:15
**obviously** [14] - 242:7,
244:4, 284:22,
285:1, 285:3,
286:15, 298:3,
298:6, 310:11,
352:13, 363:5,
384:1, 464:17,
474:16
**occasionally** [1] -
379:17
**occasions** [2] -
345:24, 461:18
**occupation** [1] - 267:8
**occurred** [4] - 246:17,
247:14, 278:24,
356:23
**occurrence** [1] -
449:16
**occurring** [1] - 392:21
**October** [1] - 254:18
**odd** [1] - 304:16
**offense** [2] - 486:9,
487:8
**offenses** [1] - 461:13
**offer** [2] - 284:22,
349:11
**offered** [2] - 244:24,
284:23
**offering** [1] - 466:9
**Office** [2] - 282:1,
448:25
**office** [55] - 241:7,
241:17, 243:7,
245:11, 246:23,
251:15, 252:7,
252:13, 263:6,
263:12, 263:13,
264:20, 278:25,
279:14, 284:2,

305:16, 310:10,
330:17, 337:9,
337:16, 347:5,
382:10, 382:20,
384:8, 387:10,
387:13, 387:15,
387:20, 388:4,
388:6, 388:9,
388:23, 388:24,
389:16, 390:4,
390:8, 393:25,
403:8, 403:12,
420:15, 444:15,
452:5, 453:20,
453:21, 453:22,
454:4, 454:7,
454:10, 456:10,
456:12, 456:20,
457:3, 457:16
**officer** [17] - 272:13,
278:2, 284:19,
288:1, 340:15,
341:11, 361:21,
364:25, 377:15,
378:16, 395:22,
396:10, 397:16,
428:7, 428:18,
428:22, 488:2
**officers** [8] - 263:16,
272:5, 273:9, 278:1,
288:8, 298:1,
361:22, 378:4
**offices** [5] - 387:7,
387:8, 389:16,
390:23, 398:2
**official** [3] - 287:25,
486:9
**officials** [1] - 273:4
**offset** [2] - 390:24,
393:13
**often** [2] - 268:7,
473:8
**older** [2] - 326:2,
391:22
**ominous** [1] - 370:10
**omitted** [1] - 423:19
**ON** [1] - 439:20
**on-board** [1] - 396:25
**once** [27] - 247:10,
303:4, 307:6,
307:20, 307:21,
313:5, 325:4,
329:25, 330:13,
337:5, 337:23,
345:8, 345:18,
357:21, 362:13,
365:9, 387:16,
388:8, 418:4, 418:5,
434:25, 438:6,
454:13, 465:12,

465:18, 490:23
**Once** [1] - 344:5
**one** [148] - 242:14,
246:11, 247:13,
250:20, 251:6,
252:15, 253:18,
254:22, 257:18,
259:10, 263:18,
264:3, 264:15,
268:11, 268:13,
269:1, 270:6, 272:7,
276:18, 278:12,
279:16, 280:7,
288:24, 291:9,
293:24, 293:25,
295:6, 296:6, 297:5,
299:10, 302:7,
304:20, 305:19,
305:20, 312:4,
314:3, 317:1,
318:14, 318:16,
321:14, 323:21,
324:11, 328:1,
328:7, 331:7,
331:22, 331:23,
332:6, 333:8, 334:5,
336:18, 337:2,
339:1, 340:7,
340:11, 341:16,
346:8, 347:22,
348:8, 348:15,
348:19, 349:3,
354:6, 355:24,
357:17, 360:13,
367:23, 375:18,
376:7, 376:8,
378:20, 379:11,
380:19, 380:22,
380:23, 381:5,
381:20, 382:13,
382:14, 382:23,
383:17, 385:3,
388:8, 388:15,
388:18, 389:11,
389:12, 389:13,
389:14, 393:2,
393:11, 394:23,
398:6, 399:7,
399:17, 403:3,
404:7, 406:11,
406:17, 410:17,
410:19, 411:14,
411:20, 416:17,
417:8, 423:14,
423:16, 426:15,
427:25, 433:6,
434:16, 438:23,
443:2, 443:21,
443:23, 445:8,
449:8, 450:11,
451:25, 453:10,

455:9, 456:3,
457:21, 460:13,
462:19, 463:3,
463:16, 464:5,
467:7, 467:19,
468:25, 471:6,
472:5, 472:7, 474:5,
476:7, 488:15,
490:15, 492:11,
493:24, 496:18,
496:20, 498:4,
498:11, 498:13
**one's** [1] - 311:6
**one-page** [1] - 462:19
**ones** [4] - 306:4,
364:7, 401:8, 470:16
**ongoing** [4] - 265:6,
397:2, 435:10,
435:15
**online** [1] - 442:12
**onset** [1] - 445:25
**open** [6] - 241:8,
265:3, 402:2,
411:18, 427:20,
465:18
**opened** [2] - 287:14,
380:21
**opening** [3] - 410:5,
424:11, 424:15
**opens** [1] - 269:1
**operandi** [2] - 495:17,
495:25
**operate** [2] - 338:6,
371:8
**operating** [1] - 379:7
**operations** [1] -
430:12
**opinion** [15] - 288:14,
293:9, 312:15,
317:11, 330:15,
345:2, 360:5, 371:1,
461:25, 474:18,
479:10, 483:7,
486:22, 486:25,
495:24
**opinions** [2] - 360:7,
486:20
**opponents** [1] -
337:12
**opportunity** [8] -
285:6, 285:8, 315:2,
317:5, 366:13,
397:9, 415:21, 466:5
**opposed** [7] - 242:6,
330:8, 345:12,
368:3, 369:19,
372:18, 376:5
**opposite** [1] - 298:3
**option** [2] - 302:6,
362:6

**options** [5] - 284:13, 303:7, 341:3, 418:11, 438:12
**order** [29] - 272:12, 277:15, 278:14, 298:4, 300:19, 301:9, 302:6, 302:8, 302:9, 302:12, 334:22, 362:14, 362:23, 363:25, 364:1, 366:10, 384:13, 401:6, 401:15, 408:1, 410:7, 479:24, 481:23, 482:2, 482:6, 492:5, 496:6, 498:6
**Order** [1] - 369:6
**ordered** [8] - 252:2, 261:3, 261:9, 302:22, 341:19, 348:25, 462:24, 464:5
**ordering** [2] - 344:13, 418:24
**orders** [12] - 287:3, 287:8, 287:10, 288:15, 289:2, 303:9, 303:13, 303:16, 307:7, 344:5, 348:18, 372:25
**organizations** [1] - 319:2
**organized** [4] - 260:21, 260:22, 301:5, 375:17
**organizing** [2] - 372:10, 375:22
**original** [9] - 312:3, 334:23, 334:24, 380:16, 380:20, 380:21, 420:25, 449:14, 464:6
**originally** [4] - 255:8, 256:19, 327:20, 329:9
**originated** [2] - 388:4, 406:15
**otherwise** [3] - 256:16, 322:6, 411:17
**Otherwise** [1] - 410:6
**ourselves** [1] - 315:15
**out-of-Circuit** [1] - 282:1
**out-of-District** [1] - 281:15
**outbreak** [1] - 329:20
**outcome** [1] - 326:2

**outcomes** [1] - 347:17
**outlined** [1] - 391:14
**Outlook** [1] - 448:5
**outrageous** [1] - 341:9
**outs** [1] - 436:17
**outset** [1] - 301:3
**outside** [1] - 373:9
**outweighed** [1] - 326:25
**overheard** [1] - 248:19
**overnight** [2] - 251:14, 494:8
**overrule** [3] - 280:21, 283:9, 360:21
**overstep** [1] - 256:6
**owe** [1] - 432:16
**owed** [1] - 414:20
**owes** [3] - 414:9, 432:8, 433:4
**own** [9] - 244:5, 264:24, 301:6, 343:10, 382:15, 403:12, 411:21, 482:1
**owned** [1] - 396:20
**owners** [1] - 373:4
**owns** [1] - 383:9

## P

**P-A-T-R-I-C-K** [1] - 439:18
**p.m** [11] - 351:20, 353:10, 353:11, 356:7, 393:14, 421:14, 421:25, 422:1, 422:14, 460:2, 498:24
**P.O** [1] - 402:12
**PA** [16] - 255:8, 304:21, 305:21, 312:9, 316:24, 384:21, 386:9, 409:5, 412:6, 412:16, 424:17, 424:22, 452:8, 453:7, 456:20, 457:11
**PA's** [2] - 418:1, 437:23
**package** [2] - 251:14, 379:18
**page** [108] - 250:18, 250:20, 252:4, 261:12, 261:13, 261:15, 261:25, 264:15, 264:16, 273:13, 285:17,

285:23, 287:19, 288:23, 290:15, 291:2, 292:15, 293:4, 293:6, 293:7, 293:14, 293:18, 293:21, 294:12, 294:15, 294:16, 295:15, 297:3, 299:12, 299:13, 299:22, 300:5, 300:16, 300:17, 302:14, 303:10, 303:11, 303:19, 304:18, 304:19, 307:1, 307:12, 309:7, 309:10, 309:21, 310:20, 310:22, 312:12, 314:10, 314:14, 315:5, 316:4, 316:7, 316:13, 316:14, 316:21, 317:14, 319:18, 322:25, 344:20, 350:10, 360:15, 362:17, 367:1, 370:14, 372:9, 401:9, 408:6, 409:1, 411:13, 412:24, 413:9, 413:11, 413:12, 413:17, 413:18, 414:1, 414:2, 417:12, 417:18, 428:11, 429:1, 429:2, 429:7, 429:21, 430:18, 436:5, 436:19, 436:22, 437:1, 437:17, 448:4, 451:2, 451:4, 451:6, 451:15, 451:17, 451:20, 462:19, 464:7, 483:3
**pages** [5] - 250:10, 297:1, 310:23, 398:8, 450:11
**paid** [3] - 255:22, 364:21, 382:15
**panel** [7] - 299:10, 319:22, 319:24, 320:5, 320:21, 400:9, 425:23
**papers** [1] - 482:9
**paperwork** [4] - 300:18, 301:4, 347:15, 362:18
**paragraph** [68] - 251:6, 251:7, 251:20, 251:21, 252:5, 252:9,

252:23, 254:14, 254:15, 266:1, 287:20, 289:11, 290:18, 291:1, 297:4, 297:12, 297:22, 298:8, 299:6, 300:10, 300:17, 301:21, 304:9, 305:18, 305:20, 307:2, 307:18, 312:13, 315:6, 315:8, 315:10, 315:11, 316:7, 322:24, 344:4, 350:12, 350:17, 360:15, 362:18, 363:3, 375:1, 409:2, 409:8, 410:2, 411:2, 412:3, 413:8, 417:24, 418:4, 424:11, 424:15, 424:20, 425:6, 425:13, 425:22, 427:25, 428:1, 430:16, 433:11, 437:19, 437:21, 438:5, 469:7, 491:19
**paragraphs** [1] - 349:1
**paraphrase** [1] - 282:17
**parcel** [2] - 357:3, 475:22
**pardon** [6] - 295:21, 314:6, 353:4, 363:16, 424:7, 436:24
**pari** [1] - 300:24
**part** [41] - 247:17, 248:21, 262:12, 272:18, 272:19, 273:15, 293:16, 293:23, 294:7, 294:16, 294:19, 301:25, 305:15, 305:16, 319:10, 319:20, 319:22, 333:19, 335:10, 357:3, 357:4, 358:21, 364:20, 364:24, 366:2, 385:16, 388:10, 394:15, 395:17, 396:23, 396:24, 403:22, 404:6, 404:7, 404:8, 424:24, 427:21, 431:11, 438:2, 475:22, 496:2
**parte** [3] - 296:10,

337:15, 344:19
**partial** [1] - 331:14
**participants** [1] - 257:7
**participated** [1] - 462:8
**participation** [1] - 327:17
**particular** [50] - 253:6, 257:8, 272:25, 274:4, 276:12, 278:4, 280:10, 280:19, 287:9, 290:6, 290:8, 308:23, 312:17, 314:2, 314:22, 318:7, 318:20, 319:5, 319:9, 323:12, 325:1, 332:6, 336:3, 336:22, 338:14, 338:16, 341:20, 342:24, 347:18, 349:2, 357:23, 357:24, 358:4, 360:8, 363:24, 365:16, 369:2, 376:12, 372:22, 376:14, 379:22, 380:3, 381:5, 387:14, 388:16, 388:24, 408:3, 413:4, 428:16
**particularly** [2] - 293:7, 400:12
**parties** [8] - 249:7, 249:18, 313:24, 329:8, 330:11, 337:3, 337:17, 491:23
**partner** [2] - 423:8, 423:9
**parts** [3] - 251:1, 263:11, 283:14
**party** [6] - 248:21, 249:21, 249:24, 250:1, 316:17, 343:1
**party's** [1] - 316:18
**pass** [2] - 435:10, 435:15
**passage** [4] - 291:13, 291:18, 292:8, 310:24
**passages** [5] - 293:1, 400:12, 401:4, 401:12
**passed** [2] - 274:13, 298:15
**past** [4] - 277:1, 370:3, 418:22, 418:23

**paste** [2] - 293:23, 429:2
**pasted** [1] - 293:20
**Pat** [1] - 439:12
**PAT** [1] - 439:14
**patience** [2] - 247:10, 498:21
**patient** [6] - 317:8, 317:9, 322:15, 324:12, 327:7, 421:12
**Patrick** [1] - 439:17
**patrol** [1] - 396:16
**pause** [3] - 385:20, 431:8, 469:1
**Pause** [14] - 257:5, 265:24, 309:19, 311:19, 394:25, 448:10, 457:23, 468:6, 470:21, 472:3, 481:12, 486:2, 486:23, 489:9
**pay** [6] - 256:22, 379:7, 382:11, 382:12, 384:9, 384:11
**paying** [1] - 471:4
**payments** [1] - 256:16
**peasy** [1] - 306:6
**pending** [10] - 267:25, 287:4, 289:2, 294:17, 303:13, 303:17, 329:13, 348:18, 401:15
**Pennsylvania** [46] - 255:12, 255:20, 262:24, 274:8, 280:25, 281:4, 286:1, 286:20, 298:24, 310:1, 311:3, 312:6, 316:10, 317:3, 317:15, 319:21, 319:23, 320:8, 320:10, 331:8, 333:22, 339:10, 348:4, 366:17, 367:15, 368:16, 368:25, 371:7, 371:18, 371:22, 371:25, 377:12, 389:15, 395:16, 402:15, 409:25, 413:6, 436:8, 436:13, 439:4, 439:5, 440:13, 452:9, 456:10, 456:15, 467:11
**people** [16] - 286:11, 290:22, 296:9,

306:25, 324:10, 355:20, 377:20, 377:25, 379:17, 388:13, 397:5, 410:19, 412:1, 422:7, 492:19, 492:22
**per** [1] - 381:12
**perceive** [1] - 311:7
**perceived** [3] - 288:8, 401:15, 412:15
**perceives** [1] - 296:17
**percent** [1] - 429:12
**perception** [9] - 242:1, 297:25, 307:6, 324:3, 335:9, 344:16, 362:10, 373:1, 496:12
**perceptions** [1] - 256:8
**perfect** [1] - 391:24
**perfectly** [3] - 254:5, 256:8, 321:12
**performed** [2] - 313:6
**performing** [1] - 318:24
**perhaps** [4] - 270:8, 288:7, 334:4, 398:12
**period** [2] - 281:10, 299:1
**permanent** [1] - 336:15
**permissible** [2] - 367:6, 467:13
**permit** [4] - 333:8, 369:12, 372:4, 480:11
**permitted** [2] - 352:2, 371:13
**Perri** [18] - 248:18, 248:20, 249:4, 249:6, 249:13, 256:2, 285:14, 322:21, 325:7, 352:5, 368:12, 417:13, 461:17, 461:20, 468:8, 468:9, 484:13, 493:10
**PERRI** [147] - 241:19, 242:1, 242:11, 242:13, 242:24, 243:4, 243:12, 243:17, 243:21, 245:8, 245:15, 245:17, 247:19, 248:6, 248:11, 248:15, 250:2, 250:23, 255:21, 257:4, 257:10,

258:7, 258:9, 258:11, 258:18, 258:20, 265:22, 265:25, 266:12, 266:20, 267:3, 269:9, 269:11, 270:11, 270:17, 285:16, 309:2, 309:4, 310:15, 310:19, 311:17, 311:20, 314:14, 314:17, 318:11, 319:11, 322:11, 322:22, 325:9, 325:20, 325:22, 326:9, 326:14, 330:25, 332:23, 340:8, 341:23, 342:11, 342:13, 342:15, 342:18, 343:12, 352:7, 352:10, 353:1, 358:9, 359:9, 360:19, 368:9, 369:21, 371:9, 374:19, 376:21, 395:7, 395:14, 398:16, 398:18, 400:18, 400:21, 401:1, 406:25, 407:2, 408:9, 408:14, 408:17, 413:25, 416:11, 416:13, 417:15, 417:16, 421:4, 421:7, 422:11, 425:10, 429:22, 431:24, 435:18, 436:1, 437:9, 438:23, 439:1, 439:7, 462:2, 463:1, 463:14, 463:23, 463:25, 464:3, 468:12, 468:14, 468:18, 469:7, 469:12, 469:17, 469:21, 469:23, 471:10, 471:16, 471:25, 472:2, 472:5, 472:7, 473:22, 481:24, 483:17, 483:23, 484:15, 484:18, 485:2, 485:5, 485:18, 485:22, 486:13, 491:1, 491:3, 491:10, 491:12, 491:15, 494:6, 494:13, 494:20, 495:4, 495:14, 496:9,

496:13, 496:18, 497:1
**Perri's** [1] - 334:8
**person** [46] - 242:7, 242:10, 242:13, 242:17, 243:9, 243:10, 243:19, 245:12, 249:12, 252:18, 254:21, 262:17, 262:21, 291:22, 304:11, 330:8, 340:23, 346:25, 364:1, 379:15, 385:13, 386:21, 388:11, 393:3, 401:24, 447:19, 447:21, 453:18, 475:17, 476:10, 477:3, 477:20, 479:18, 480:20, 480:21, 480:22, 482:11, 484:19, 488:16, 488:17, 489:1, 489:2, 489:3, 489:12, 489:13, 489:24
**person's** [2] - 256:20, 402:17
**personal** [19] - 265:13, 276:1, 278:21, 316:16, 326:10, 346:4, 368:3, 374:10, 374:13, 374:14, 402:17, 406:3, 411:24, 429:17, 430:1, 430:25, 434:23, 434:24, 442:14
**personally** [8] - 275:24, 278:19, 316:6, 406:19, 408:7, 415:24, 430:10, 456:8
**personnel** [3] - 266:10, 280:16, 338:16
**persons** [2] - 333:12, 449:17
**perspective** [1] - 334:1
**pertain** [1] - 258:3
**pertained** [2] - 253:8, 470:7
**pertaining** [1] - 252:25
**pertains** [2] - 253:2, 470:2
**Peter** [7] - 338:15, 404:19, 404:22, 409:17, 411:3,

411:6, 415:16
**petition** [8] - 254:18, 289:15, 289:20, 289:21, 345:12, 361:12, 368:23, 369:19
**Petitioner** [2] - 289:12, 289:19
**Philadelphia** [3] - 387:18, 389:15, 444:15
**Philly** [1] - 389:1
**phone** [13] - 252:18, 257:13, 259:3, 259:5, 259:17, 261:5, 262:3, 262:16, 273:16, 275:13, 337:17, 379:21, 403:2
**phones** [2] - 322:16, 327:9
**photo** [1] - 393:20
**photocopy** [1] - 269:25
**photograph** [2] - 380:17, 394:4
**photographs** [2] - 391:6, 394:20
**phrase** [4] - 289:22, 297:6, 307:13, 478:2
**phrased** [1] - 495:1
**physical** [4] - 266:5, 384:20, 451:18, 451:21
**physically** [3] - 279:13, 396:5, 497:6
**pick** [2] - 391:1, 391:23
**picked** [1] - 385:6
**picking** [1] - 295:11
**picture** [1] - 381:19
**piece** [7] - 379:25, 380:18, 380:21, 381:3, 387:14, 388:17
**pieces** [4] - 381:12, 388:18, 388:20, 389:9
**pike** [1] - 462:13
**Pike** [3] - 270:4, 383:17, 384:3
**Piphus** [1] - 358:7
**Pittsburgh** [1] - 281:5
**place** [13] - 272:21, 272:24, 277:20, 301:20, 322:11, 338:25, 400:6, 405:24, 407:20, 412:17, 413:24, 420:25, 467:18

**placed** [2] - 259:5, 390:1

**plain** [1] - 304:8

**plainly** [1] - 418:17

**plan** [2] - 349:4, 466:2

**planning** [1] - 495:17

**plastering** [1] - 419:6

**plate** [1] - 276:22

**play** [2] - 357:4, 484:18

**played** [1] - 294:24

**playing** [1] - 312:17

**plea** [2] - 284:22, 490:10

**plead** [1] - 490:7

**pleading** [1] - 491:16

**Pleas** [6] - 275:1, 275:4, 286:22, 294:2, 294:18, 299:25

**pleasure** [1] - 311:25

**plug** [1] - 383:8

**plugging** [1] - 286:6

**plus** [1] - 268:10

**Poconos** [1] - 316:23

**point** [39] - 243:17, 244:5, 256:8, 283:12, 291:23, 314:3, 320:19, 324:2, 331:4, 332:24, 335:5, 335:19, 339:18, 353:23, 357:16, 364:22, 379:11, 381:17, 381:19, 387:6, 391:4, 394:14, 400:8, 401:2, 401:4, 408:9, 428:20, 429:19, 433:6, 440:2, 443:25, 466:23, 471:11, 474:4, 483:25, 484:24, 485:14, 490:5, 495:5

**pointed** [2] - 405:10, 486:14

**points** [2] - 385:8, 486:24

**poke** [1] - 465:20

**Police** [6] - 276:8, 395:16, 395:20, 395:21, 396:15, 396:16

**police** [2] - 276:11, 488:2

**policy** [5] - 280:16, 280:18, 332:4, 338:18, 492:25

**political** [1] - 344:23

**poorly** [1] - 350:16

**porch** [1] - 370:15

**Porteous** [1] - 350:13

**portion** [4] - 314:23, 379:9, 383:2, 437:18

**portions** [4] - 248:20, 293:1, 331:25, 350:9

**portrait** [1] - 298:14

**posed** [1] - 242:1

**position** [11] - 248:10, 275:12, 279:6, 350:6, 356:15, 461:4, 484:14, 485:5, 486:11, 493:8, 497:6

**positions** [1] - 441:25

**possibility** [2] - 361:14, 363:8

**possible** [10] - 306:9, 307:9, 316:15, 344:7, 352:10, 359:5, 363:14, 483:18, 483:19

**possibly** [1] - 276:10

**post** [29] - 335:17, 335:20, 382:10, 384:8, 387:7, 387:8, 387:9, 387:13, 387:15, 387:20, 388:4, 388:6, 388:9, 388:22, 388:24, 390:4, 390:8, 390:23, 393:25, 431:9, 453:20, 453:21, 453:22, 454:4, 454:7, 454:10, 457:3

**post-decision** [1] - 335:20

**post-judgment** [2] - 335:17, 335:20

**postage** [7] - 382:5, 382:15, 382:19, 386:19, 386:22, 388:21, 389:20

**postal** [18] - 260:9, 378:2, 378:6, 379:5, 379:7, 379:8, 379:9, 380:19, 381:9, 384:14, 384:18, 387:4, 388:15, 390:3, 390:19, 391:14

**Postal** [19] - 252:24, 377:5, 377:11, 377:13, 377:16, 377:18, 377:21, 377:23, 377:24, 378:1, 381:1, 381:25, 382:4, 383:22, 384:15,

384:23, 386:24, 387:7, 402:1

**potential** [5] - 271:16, 284:24, 305:2, 325:5, 347:17

**potentially** [2] - 376:2, 394:16

**powders** [1] - 388:13

**power** [4] - 280:11, 280:12, 302:18, 319:23

**Pp** [1] - 313:7

**practically** [1] - 268:12

**practice** [14] - 257:7, 267:14, 284:3, 284:4, 324:20, 325:4, 325:6, 375:5, 375:9, 375:13, 375:21, 376:2, 441:14, 449:20

**pre** [4] - 290:16, 311:13, 371:3, 377:25

**pre-condition** [1] - 290:16

**pre-dated** [1] - 371:3

**pre-dates** [1] - 311:13

**pre-Revolutionary** [1] - 377:25

**precautions** [2] - 275:24, 276:14

**precedes** [1] - 311:13

**preceding** [2] - 299:6, 362:18

**precise** [1] - 466:20

**precisely** [2] - 283:6, 473:10

**precluded** [1] - 480:16

**predecessor** [2] - 278:6, 317:2

**predicate** [1] - 318:15

**predisposed** [1] - 339:25

**predisposition** [1] - 340:9

**preempt** [1] - 462:5

**preemptive** [1] - 462:12

**prefer** [1] - 478:22

**preference** [4] - 248:14, 351:2, 459:12, 498:5

**prejudice** [1] - 340:14

**preliminary** [6] - 295:24, 302:6, 336:13, 346:1, 362:15, 363:25

**prelude** [2] - 297:6, 297:23

**premise** [5] - 340:13, 345:23, 347:2, 366:3, 491:8

**preparation** [2] - 391:18, 392:5

**prepare** [4] - 302:21, 303:2, 348:24, 467:8

**prepared** [4] - 352:5, 361:5, 463:25, 470:3

**preparing** [1] - 464:11

**present** [11] - 279:13, 382:10, 386:24, 387:9, 409:11, 417:23, 423:14, 426:4, 426:21, 428:20, 465:1

**presentation** [1] - 461:23

**presented** [4] - 269:7, 283:15, 294:14, 446:18

**presenting** [1] - 394:6

**preserved** [1] - 373:4

**preserving** [3] - 409:4, 424:16, 424:21

**preside** [1] - 418:23

**President** [4] - 294:1, 294:3, 306:4

**presiding** [2] - 334:2, 366:23

**presumption** [1] - 316:9

**presumptuously** [1] - 292:16

**pretenses** [1] - 488:4

**pretrial** [3] - 336:23, 336:25, 366:12

**pretty** [9] - 311:8, 347:6, 352:24, 366:7, 388:14, 422:19, 441:24, 470:1, 497:16

**prevent** [1] - 362:8

**previous** [5] - 265:1, 412:3, 415:10, 429:2, 429:7

**previously** [15] - 345:4, 380:9, 380:12, 385:6, 397:19, 401:21, 402:4, 402:5, 402:11, 402:19, 422:25, 423:13, 436:16, 444:23, 455:15

**PREVIOUSLY** [2] - 247:6, 356:9

**primarily** [1] - 397:5

**primary** [1] - 337:7

**principles** [1] - 292:12

**print** [2] - 382:19, 386:22

**printed** [3] - 382:24, 386:20, 498:19

**printing** [1] - 241:9

**printout** [1] - 424:5

**Priority** [4] - 270:8, 381:5, 381:21, 381:23

**priority** [3] - 382:1, 394:17

**prison** [2] - 329:20, 346:8

**prisoner** [2] - 290:3, 329:19

**prisoners** [1] - 276:4

**Prisons** [1] - 290:5

**privacy** [2] - 431:1, 480:15

**private** [9] - 267:14, 318:21, 440:17, 440:23, 440:24, 441:14, 441:15, 441:16, 441:19

**privilege** [1] - 460:20

**privileged** [1] - 430:23

**pro** [9] - 277:23, 283:3, 337:20, 340:4, 340:5, 343:1, 365:5, 462:1, 464:14

**probable** [1] - 266:8

**probative** [5] - 326:22, 326:24, 495:16, 495:25, 496:5

**problem** [8] - 305:8, 315:12, 326:4, 390:22, 429:15, 471:2, 473:10, 475:3

**problematic** [2] - 268:6, 297:20

**problems** [3] - 295:8, 299:15, 299:16

**procedurally** [1] - 312:3

**procedure** [6] - 260:4, 272:21, 272:24, 287:23, 369:8, 434:1

**proceed** [3] - 285:11, 318:23, 326:19

**proceeded** [1] - 466:6

**Proceeding** [1] - 498:24

**proceeding** [4] - 284:16, 391:18, 421:25, 464:14

**Proceedings** [1] - 241:1

**proceedings** [4] - 280:17, 312:17, 353:10, 359:1

**process** [38] - 256:15, 271:14, 278:7, 282:19, 287:23, 290:6, 290:17, 308:15, 312:11, 327:16, 327:21, 327:25, 328:3, 329:6, 331:21, 333:6, 333:20, 333:24, 334:15, 334:21, 335:1, 335:7, 339:4, 339:13, 351:4, 357:7, 358:2, 358:3, 358:7, 358:21, 366:16, 367:3, 368:22, 397:18, 402:16, 448:2, 467:5
**processed** [2] - 381:10, 381:20
**processes** [2] - 381:1, 448:4
**processing** [9] - 373:20, 373:21, 381:12, 387:11, 387:12, 387:17, 387:19, 442:2, 442:3
**produce** [2] - 392:6, 462:24
**produced** [1] - 247:16
**product** [3] - 282:25, 387:3, 391:15
**profanity** [4] - 292:21, 295:18, 296:2, 361:18
**professional** [1] - 247:12
**professionally** [1] - 311:5
**professionals** [1] - 442:23
**proffer** [4] - 322:13, 368:10, 369:14, 374:3
**proffered** [1] - 480:3
**program** [1] - 338:20
**progressive** [1] - 282:18
**prohibit** [2] - 313:14, 337:15
**prohibits** [1] - 313:19
**prong** [5] - 242:20, 243:2, 243:3, 368:6, 479:13
**pronoun** [1] - 304:13
**proof** [1] - 355:11
**proper** [6] - 317:23, 323:18, 340:25, 344:8, 369:8, 466:24
**properly** [7] - 327:14,

333:21, 337:23, 339:11, 423:5, 479:12, 481:16
**property** [8] - 247:15, 368:3, 368:6, 374:10, 374:13, 374:14, 374:15
**proposal** [1] - 241:6
**propose** [2] - 241:12, 470:13
**Proposed** [1] - 491:17
**proposed** [14] - 241:9, 462:18, 462:19, 463:25, 468:11, 470:3, 470:10, 472:22, 474:1, 474:7, 476:3, 476:6, 479:6, 491:20
**proposition** [1] - 492:7
**prosecution** [2] - 324:21, 360:14
**prosecutor** [1] - 312:1
**prosecutors** [1] - 313:2
**protect** [5] - 289:21, 304:25, 378:1, 378:5, 378:7
**protected** [5] - 303:23, 360:16, 361:22, 370:4
**protectee** [1] - 266:5
**protecting** [1] - 276:5
**protection** [2] - 369:18, 374:10
**protections** [5] - 345:10, 361:8, 369:25, 418:7, 438:8
**protective** [1] - 266:11
**protects** [2] - 374:17, 480:13
**prothonotaries** [1] - 389:11
**prothonotaries'** [1] - 398:2
**prove** [5] - 355:9, 355:15, 464:24, 486:10, 492:8
**proven** [1] - 475:8
**provide** [6] - 317:5, 322:6, 436:10, 463:21, 468:2, 470:10
**provided** [12] - 248:1, 252:19, 253:1, 352:17, 352:18, 393:1, 405:6, 406:10, 406:11, 407:11, 423:2, 446:19

**provides** [2] - 315:17, 488:23
**proving** [1] - 464:20
**provision** [1] - 316:10
**provisions** [2] - 288:16, 467:11
**prudent** [1] - 278:6
**Psalm** [2] - 306:21
**PTR** [3] - 387:4, 391:15
**public** [4] - 305:11, 431:9, 435:17, 490:3
**publish** [3] - 270:18, 393:10, 408:14
**published** [1] - 408:16
**Pugh** [24] - 247:17, 250:15, 251:19, 252:2, 252:6, 252:7, 252:12, 252:19, 252:20, 252:24, 253:1, 259:5, 259:6, 259:15, 259:19, 260:7, 260:24, 261:3, 261:8, 262:4, 262:10, 262:12
**pull** [11] - 303:17, 380:19, 381:15, 384:2, 389:8, 390:9, 390:10, 390:17, 447:15, 455:9, 489:8
**pulled** [4] - 328:6, 328:7, 380:16, 486:13
**Pulliam** [1] - 313:4
**punishable** [2] - 296:18, 346:8
**punked** [2] - 298:20, 299:2
**purchased** [1] - 388:20
**pure** [1] - 297:18
**purges** [1] - 381:15
**purported** [1] - 434:13, 491:24
**purports** [1] - 408:5
**purpose** [19] - 241:16, 241:21, 241:23, 243:7, 244:25, 245:4, 245:11, 246:15, 246:21, 246:25, 247:1, 249:23, 332:4, 358:19, 359:20, 462:19, 473:15, 478:5
**purposes** [12] - 269:13, 309:6, 329:22, 342:20, 343:11, 375:17, 407:4, 414:11,

414:21, 432:10, 446:22, 495:20
**pursuant** [4] - 448:21, 449:2, 449:25, 450:17
**pursue** [3] - 347:3, 409:16, 409:17
**put** [36] - 244:4, 258:17, 272:15, 285:3, 285:4, 314:14, 322:14, 361:10, 367:10, 371:15, 405:19, 417:6, 424:6, 424:8, 434:18, 451:3, 452:12, 454:8, 465:9, 465:10, 465:12, 465:19, 465:21, 466:8, 467:10, 470:18, 471:2, 479:14, 479:24, 482:8, 485:11, 485:16, 485:18, 494:21, 497:5, 498:11
**puts** [1] - 488:7
**putting** [3] - 422:2, 466:2, 466:11

**QUALIFICATIONS** [1] - 439:20
**qualified** [7] - 300:25, 306:3, 306:12, 306:15, 307:21, 308:1, 480:25
**quarterly** [1] - 397:2
**quashed** [2] - 418:9, 438:10
**queries** [1] - 254:17
**questioned** [1] - 360:14
**questioning** [4] - 253:5, 332:25, 368:13, 369:12
**questions** [31] - 256:4, 257:11, 266:13, 269:24, 285:20, 311:20, 315:3, 315:23, 317:4, 323:5, 334:8, 340:20, 342:7, 344:23, 347:11, 347:16, 348:1, 359:11, 367:9, 395:1, 406:18, 408:3, 421:8, 430:3, 430:13, 433:23, 434:9, 434:23,

438:20, 458:9, 459:1
**quick** [6] - 241:4, 246:3, 347:16, 385:9, 421:9, 436:6
**quicker** [1] - 321:15
**quickly** [2] - 251:6, 374:25
**quieter** [1] - 323:22
**quietly** [1] - 326:21
**quite** [5] - 276:25, 297:17, 299:17, 300:1, 303:14
**quotation** [4] - 282:13, 287:3, 292:4, 295:25
**quotations** [1] - 292:7
**quote** [13] - 282:17, 290:20, 290:24, 291:6, 291:8, 291:20, 295:21, 306:20, 415:5, 473:13, 481:15, 487:2, 492:19
**quotes** [4] - 292:5, 292:6, 360:13, 361:4

# R

**races** [1] - 404:16
**racketeering** [1] - 319:1
**Ragonese** [1] - 275:5
**raise** [1] - 268:6
**raised** [5] - 263:15, 292:22, 333:7, 354:12, 359:4
**raises** [1] - 430:12
**raisin** [1] - 374:11
**raising** [1] - 278:5
**ran** [1] - 282:19
**ranch** [1] - 410:15
**random** [12] - 327:23, 327:24, 327:25, 328:8, 328:10, 329:4, 329:5, 330:2, 331:3, 331:21, 332:13, 332:17
**randomization** [2] - 328:11, 330:7
**randomized** [1] - 328:22
**randomly** [4] - 281:20, 329:9, 330:4, 331:16
**rare** [1] - 359:3
**rarely** [3] - 268:8, 272:25, 445:22
**rather** [5] - 314:1, 378:17, 418:15, 480:7, 492:9
**rational** [3] - 418:6,

438:7, 461:12
**raw** [1] - 445:22
**rayed** [1] - 271:15
**Re** [2] - 287:3, 303:12
**re** [1] - 333:17
**re-ask** [1] - 333:17
**rea** [4] - 470:8, 472:15,
473:11, 474:11
**reached** [1] - 388:25
**reaches** [1] - 454:17
**reaction** [4] - 271:20,
272:7, 298:13, 417:8
**read** [59] - 241:5,
251:21, 252:5,
252:19, 252:22,
254:16, 266:1,
266:3, 269:3, 269:4,
269:6, 271:1,
271:18, 282:8,
283:3, 286:8, 287:6,
287:14, 289:11,
291:3, 292:14,
296:6, 300:16,
303:12, 303:15,
303:20, 304:20,
305:20, 311:1,
312:25, 316:7,
316:14, 322:3,
367:19, 372:22,
375:2, 409:3, 409:8,
411:2, 411:14,
412:4, 414:7,
424:11, 426:9,
426:17, 428:2,
430:6, 430:19,
432:6, 432:24,
433:16, 437:7,
437:19, 438:5,
485:7, 490:16,
491:19
**reader** [2] - 269:4,
283:3
**readily** [1] - 279:19
**reading** [20] - 242:14,
279:2, 287:10,
288:25, 297:16,
315:6, 370:14,
373:2, 399:1,
399:19, 399:22,
400:21, 415:14,
424:17, 426:22,
471:20, 490:3,
490:5, 492:15
**reads** [1] - 489:10
**ready** [3] - 303:17,
353:12, 483:3
**real** [5] - 241:3, 251:6,
368:3, 374:14, 385:9
**realization** [3] - 261:6,
261:7, 262:3

**realize** [4] - 256:21,
409:10, 463:8,
488:12
**realized** [3] - 391:20,
471:6, 495:9
**really** [24] - 272:24,
279:8, 281:18,
292:4, 293:7,
293:14, 316:21,
318:8, 351:5, 366:2,
382:8, 401:8, 401:9,
427:1, 432:22,
435:12, 462:5,
465:18, 466:23,
467:18, 472:17,
477:25, 482:1
**reason** [13] - 241:20,
256:13, 279:5,
281:8, 320:13,
320:14, 339:7,
341:6, 359:17,
400:23, 479:8,
492:25, 495:24
**reasonable** [23] -
242:7, 242:9,
242:17, 243:8,
243:9, 243:10,
243:19, 245:12,
254:5, 355:10,
355:16, 458:4,
464:22, 464:25,
475:8, 476:9, 477:3,
477:20, 479:17,
480:20, 480:21,
480:22, 482:11
**reasonably** [1] - 308:9
**reasoning** [1] - 491:8
**reasons** [2] - 289:8,
484:12
**reassigned** [2] -
277:12, 329:16
**reassigning** [1] -
333:25
**reassignments** [1] -
333:6
**recap** [1] - 264:23
**recast** [1] - 482:7
**receipt** [1] - 445:15
**receive** [13] - 268:5,
273:11, 283:2,
283:4, 335:13,
363:5, 379:6,
379:22, 384:13,
384:16, 406:19,
440:10, 455:20
**received** [60] - 256:9,
267:11, 268:8,
269:2, 269:19,
269:22, 272:14,
273:7, 273:20,

274:5, 274:6, 274:7,
276:1, 276:2,
276:15, 276:18,
276:19, 276:23,
280:21, 287:15,
287:17, 302:10,
308:6, 308:12,
308:16, 308:22,
308:25, 310:2,
311:14, 325:24,
328:9, 345:9,
378:15, 378:21,
380:2, 380:18,
385:2, 385:7,
387:22, 387:23,
390:4, 393:16,
397:20, 399:18,
406:22, 408:7,
419:19, 431:3,
439:3, 446:23,
446:25, 447:8,
448:1, 448:24,
455:12, 455:19,
457:5, 458:7, 492:4
**receiving** [6] - 268:3,
340:25, 345:20,
384:6, 384:12, 385:1
**recent** [2] - 367:15,
463:19
**recess** [4] - 283:25,
351:20, 353:10,
421:14
**Recess** [2] - 284:16,
421:25
**recipient** [11] - 431:2,
451:8, 451:24,
453:16, 454:6,
456:2, 476:9,
487:24, 487:25,
481:1, 492:23
**recipient's** [1] -
453:23
**recipients** [1] - 451:25
**recitation** [2] - 294:20,
299:14
**reckless** [1] - 480:8
**recklessly** [2] - 480:7,
481:3
**recklessness** [16] -
473:19, 477:25,
480:5, 480:11,
480:12, 480:15,
480:17, 480:19,
480:25, 481:18,
483:9, 483:10,
483:11, 483:16,
483:19, 487:19
**recognition** [1] -
312:10
**recognize** [15] -

269:18, 275:5,
275:6, 277:6, 291:7,
293:10, 309:8,
392:14, 398:20,
407:5, 407:7,
407:16, 446:10,
446:12, 448:11
**recollection** [8] -
258:21, 261:12,
261:25, 275:16,
287:16, 339:15,
370:14, 371:14
**reconsider** [1] -
335:22
**reconsideration** [3] -
335:18, 335:21,
335:23
**reconvened** [3] -
284:17, 353:11,
422:1
**record** [15] - 250:4,
264:15, 266:25,
267:6, 292:13,
364:17, 365:3,
365:6, 367:6, 377:4,
395:11, 422:5,
439:16, 449:14,
450:12
**recording** [1] - 390:23
**records** [12] - 379:9,
379:11, 380:19,
381:13, 388:15,
390:3, 390:19,
391:14, 401:22,
402:1, 448:21,
451:20
**recounting** [1] - 300:6
**recovered** [1] - 452:11
**recruited** [1] - 299:4
**rectified** [1] - 400:1
**rectify** [1] - 405:22
**recurring** [1] - 419:4
**redirect** [6] - 257:3,
266:18, 352:5,
376:20, 438:22,
459:2
**REDIRECT** [2] - 257:9,
438:25
**redistricting** [5] -
320:7, 323:12,
324:5, 325:14, 326:7
**redraw** [3] - 319:21,
319:24, 322:10
**redrawn** [1] - 320:9
**redress** [4] - 345:12,
361:12, 368:24,
369:19
**redressing** [1] -
400:10
**redundant** [1] -

356:14
**refer** [7] - 287:22,
312:4, 314:10,
324:18, 346:25,
486:18, 493:25
**reference** [73] -
251:18, 253:25,
259:6, 274:16,
274:21, 274:24,
275:2, 275:8,
275:11, 286:24,
287:11, 288:7,
288:10, 290:10,
290:19, 291:10,
291:12, 291:15,
293:8, 293:12,
293:21, 294:17,
294:19, 297:13,
298:22, 298:25,
299:3, 299:5, 299:8,
299:22, 300:1,
300:4, 306:7, 307:8,
307:13, 307:15,
307:16, 311:8,
314:22, 315:25,
316:2, 316:6,
317:14, 317:17,
318:8, 318:9, 324:6,
325:3, 325:7,
326:17, 333:14,
341:15, 342:2,
343:7, 343:25,
344:1, 344:4,
347:15, 360:14,
370:10, 371:12,
371:14, 371:17,
371:21, 401:2,
410:10, 425:22,
427:12, 433:7,
436:6, 451:16,
481:18
**referenced** [9] - 263:8,
312:11, 323:5,
324:20, 337:2,
370:12, 370:25,
413:2, 437:2
**references** [13] -
247:17, 259:8,
291:13, 292:1,
292:9, 294:1, 300:9,
302:15, 314:3,
316:3, 317:7,
398:13, 415:5
**referencing** [12] -
251:10, 289:13,
294:11, 295:3,
312:7, 312:14,
313:16, 314:3,
318:6, 407:8,
407:19, 424:18

**referral** [2] - 379:2,
379:21
**referred** [9] - 286:21,
301:7, 308:22,
324:21, 412:18,
436:6, 438:18,
440:19, 486:17
**referring** [22] - 292:14,
310:24, 319:3,
325:7, 349:6,
353:21, 354:2,
363:3, 363:24,
364:4, 365:18,
366:24, 367:1,
373:6, 373:7, 383:4,
410:12, 416:17,
432:13, 436:20,
438:14, 480:21
**refers** [6] - 263:3,
297:14, 298:12,
304:11, 304:12,
347:17
**refresh** [3] - 258:21,
261:12, 261:24
**refuge** [1] - 306:25
**refusal** [2] - 338:1,
479:25
**refuse** [3] - 296:19,
414:10, 432:9
**refused** [3] - 263:18,
414:21, 480:19
**refuses** [5] - 346:7,
411:17, 412:6,
412:14, 426:13
**regard** [9] - 315:25,
323:2, 338:2,
367:16, 412:2,
419:8, 442:4,
458:14, 496:7
**regarded** [1] - 322:6
**regarding** [6] -
352:20, 358:21,
379:10, 445:13,
445:14, 458:19
**regional** [2] - 387:11,
387:12
**registration** [1] -
409:6
**regular** [1] - 449:20
**regularly** [3] - 442:22,
449:18, 449:19
**regulated** [6] - 290:21,
300:19, 372:9,
401:7, 409:6, 411:15
**rehashing** [1] - 299:20
**reject** [2] - 361:7,
362:9
**rejected** [3] - 352:2,
479:5, 479:7
**rejecting** [1] - 477:17

**related** [30] - 251:13,
253:6, 255:8,
300:24, 322:25,
323:19, 329:6,
329:11, 330:3,
330:10, 330:11,
330:16, 330:19,
330:22, 337:1,
340:7, 341:17,
341:20, 364:1,
364:2, 369:18,
379:11, 396:18,
427:2, 428:16,
445:12, 449:10,
450:9, 462:20
**relates** [2] - 255:2,
463:7
**relating** [4] - 302:6,
323:12, 437:2, 451:1
**relation** [3] - 452:13,
452:24
**relationship** [6] -
329:15, 330:24,
403:18, 403:21,
411:25, 453:4
**relative** [9] - 255:16,
336:4, 342:25,
343:8, 345:11,
346:23, 368:1,
374:1, 480:14
**relatively** [2] - 286:13,
287:13
**relatives** [1] - 404:3
**relevance** [11] - 320:3,
326:16, 332:24,
358:10, 358:13,
358:15, 359:10,
368:10, 371:9,
374:19, 495:6
**relevant** [26] - 242:4,
242:8, 294:21,
322:23, 323:1,
323:7, 323:8,
323:13, 323:14,
323:15, 324:13,
325:13, 326:3,
326:21, 333:2,
340:20, 368:13,
368:20, 368:23,
369:15, 370:5,
373:25, 383:21,
442:24, 495:20
**relief** [7] - 313:3,
322:25, 356:15,
362:15, 414:10,
432:9, 433:5
**religion** [1] - 315:16
**religious** [2] - 291:22,
291:23
**relitigate** [1] - 325:23

**reluctant** [1] - 337:24
**remand** [3] - 478:15,
481:10, 481:13
**remedies** [7] - 289:13,
289:23, 290:1,
290:2, 290:4, 290:8,
290:11
**remedy** [2] - 305:8,
415:11
**remember** [20] -
249:19, 297:16,
310:12, 320:2,
320:3, 320:13,
343:20, 351:17,
358:4, 360:7,
367:20, 367:23,
378:24, 390:14,
390:17, 412:21,
473:6
**remind** [2] - 434:8,
434:24
**reminds** [1] - 295:1
**remove** [1] - 263:17
**removed** [1] - 253:19
**removing** [1] - 286:5
**Rendell** [2] - 274:10,
274:14
**rendered** [2] - 336:4,
341:5
**rendering** [1] - 376:3
**rent** [1] - 382:18
**renumbered** [1] -
479:3
**repeat** [4] - 343:15,
357:6, 414:15,
464:17
**repeatedly** [2] - 346:9,
348:4
**repeating** [1] - 422:5
**repercussions** [2] -
284:22, 284:25
**repetitive** [1] - 367:8
**repetitiveness** [1] -
462:6
**rephrase** [3] - 256:17,
340:17, 340:18
**report** [35] - 247:16,
249:12, 249:13,
250:14, 250:19,
251:1, 251:22,
252:4, 257:12,
258:3, 259:8,
259:12, 259:17,
260:1, 260:2,
260:13, 261:3,
261:7, 262:9, 263:1,
264:16, 264:17,
265:16, 265:18,
391:7, 391:9,
391:13, 391:14,

391:21, 392:7,
392:8, 392:9,
392:10, 392:18,
393:1
**reporter** [1] - 416:20
**reporting** [2] - 338:8,
387:3
**reports** [8] - 247:20,
247:24, 248:15,
249:4, 250:4, 263:7,
391:11, 426:13
**represent** [3] - 280:17,
295:6, 428:23
**representation** [2] -
340:7, 392:21
**representatives** [1] -
384:24
**representing** [4] -
295:8, 326:19,
436:8, 436:12
**Republican** [1] -
320:21
**request** [4] - 302:7,
335:6, 357:21,
452:14
**requested** [3] -
252:25, 357:14,
452:14
**requesting** [1] -
281:12
**requests** [1] - 281:14
**require** [7] - 287:23,
287:25, 288:8,
322:6, 466:20,
483:1, 484:24
**required** [15] - 290:4,
335:22, 363:11,
363:18, 368:10,
373:18, 408:1,
411:4, 411:6, 411:8,
411:10, 426:14,
434:2, 477:10,
477:12
**requirement** [7] -
473:14, 476:13,
476:20, 477:18,
478:4, 478:9, 480:9
**requirements** [3] -
318:22, 338:9,
476:24
**requires** [10] - 281:24,
281:25, 282:2,
291:4, 291:16,
411:16, 477:14,
478:11, 483:13,
486:9
**requiring** [1] - 426:22
**research** [3] - 246:1,
457:1, 459:15
**reserve** [1] - 461:15

**residence** [1] - 383:23
**residences** [1] -
383:24
**resolution** [2] - 305:6,
329:23
**resolve** [3] - 485:4,
494:9, 494:10
**resources** [1] - 329:22
**respect** [32] - 382:2,
386:16, 388:7,
389:4, 389:18,
389:25, 391:11,
391:12, 412:3,
412:23, 419:19,
419:20, 440:14,
441:11, 442:25,
443:15, 443:17,
447:3, 447:8,
448:13, 449:9,
451:12, 452:11,
453:12, 455:23,
456:2, 456:19,
462:7, 470:8,
486:10, 493:4
**respond** [3] - 335:23,
337:11, 337:13
**response** [4] - 334:8,
360:18, 448:24,
449:12
**Response** [1] - 491:16
**responsibilities** [7] -
288:2, 316:19,
320:25, 321:3,
344:17, 373:16,
398:24
**responsibility** [4] -
320:6, 334:20,
364:24, 365:16
**responsible** [6] -
305:21, 308:1,
336:24, 338:8,
384:24, 430:10
**rest** [5] - 293:6, 299:7,
303:15, 316:15,
459:5
**resting** [1] - 352:8
**restricted** [1] - 430:25
**restroom** [2] - 283:19,
421:15
**rests** [1] - 464:23
**restudy** [1] - 467:9
**result** [11] - 253:15,
275:22, 276:2,
283:7, 302:10,
305:17, 334:12,
356:20, 403:6,
420:2, 420:14
**results** [2] - 259:25,
299:21
**resumed** [1] - 285:12

**RESUMED** [2] - 247:7, 356:9

**retail** [2] - 394:6, 394:7

**retaining** [2] - 373:8, 401:25

**retention** [1] - 381:14

**retired** [3] - 255:13, 273:24, 275:3

**return** [10] - 268:23, 321:8, 384:2, 384:3, 389:18, 389:21, 389:23, 402:13, 448:14, 452:23

**returned** [1] - 321:9

**returning** [1] - 385:5

**revenue** [2] - 379:7, 379:8

**reversed** [6] - 368:2, 368:16, 368:17, 368:18, 470:6, 470:7

**review** [18] - 288:13, 288:15, 290:6, 353:13, 360:8, 366:10, 368:19, 390:12, 392:9, 394:19, 397:24, 407:5, 447:6, 448:9, 449:23, 458:18, 496:15

**reviewed** [8] - 241:4, 269:22, 352:16, 391:19, 392:6, 398:22, 444:18, 462:14

**reviewing** [4] - 297:20, 320:6, 391:5, 471:3

**revolution** [1] - 306:2

**Revolutionary** [1] - 377:25

**rewrite** [1] - 482:7

**rhetoric** [3] - 279:6, 334:9, 418:24

**rhetorical** [1] - 488:11

**Rhino** [2] - 359:16, 360:5

**RICO** [12] - 260:17, 260:18, 260:20, 261:17, 262:11, 318:21, 318:22, 318:25, 319:1, 319:2, 319:6, 319:9

**Ridge** [10] - 407:25, 410:6, 410:10, 410:14, 410:23, 412:19, 428:6, 428:8, 428:10

**right-hand** [4] - 382:4, 393:14, 426:9, 464:8

**Rights** [1] - 433:19

**rights** [13] - 296:17, 298:2, 316:10, 316:11, 317:15, 318:3, 318:4, 345:15, 361:3, 370:4, 375:23, 464:16, 465:4

**ring** [1] - 288:11

**rings** [1] - 473:7

**rise** [6] - 283:24, 353:9, 421:13, 460:1, 487:9, 498:23

**risk** [2] - 388:24, 466:7

**Robert** [2] - 275:2, 286:23

**Roberts** [2] - 484:23, 487:2

**Roberts'** [1] - 486:25

**rock** [2] - 306:21, 306:22

**role** [15] - 277:18, 280:2, 280:8, 280:15, 288:4, 298:3, 312:16, 377:18, 379:4, 396:15, 396:16, 441:2, 441:24, 443:15, 456:19

**roles** [2] - 276:4, 313:12

**room** [2] - 404:15, 423:11

**roughly** [1] - 387:16

**route** [6] - 454:1, 454:3, 454:4, 454:10, 454:24, 455:6

**routes** [2] - 455:5, 457:4

**routinely** [1] - 388:10

**Ruby** [10] - 407:25, 410:6, 410:10, 410:14, 410:23, 412:19, 428:5, 428:8, 428:10

**Rule** [11] - 317:25, 327:1, 369:4, 374:22, 418:8, 426:22, 426:25, 438:9, 444:1, 460:20

**rule** [12] - 248:20, 248:25, 249:4, 249:10, 249:22, 318:10, 335:24, 369:7, 373:9, 373:20, 480:19, 492:13

**ruled** [5] - 317:25, 327:15, 467:13,

479:4, 487:16

**Rules** [3] - 444:1, 448:21, 450:10

**rules** [13] - 249:23, 307:10, 322:7, 326:1, 337:22, 433:25, 434:1, 434:3, 434:8, 449:2, 449:25, 450:13, 450:18

**ruling** [3] - 280:11, 305:8, 324:10

**rulings** [5] - 278:18, 280:12, 325:24, 415:8, 467:9

**run** [2] - 296:21, 467:4

**Runk** [4] - 305:22, 337:4, 375:5

**runs** [1] - 357:17, 445:24

## S

**SA** [1] - 403:15

**sacrifice** [1] - 422:7

**sadly** [1] - 388:22

**safe** [1] - 454:13

**safety** [1] - 415:2

**sake** [1] - 491:20

**Sales** [2] - 407:12, 417:2

**salmonella** [1] - 329:20

**San** [1] - 457:6

**sanction** [2] - 280:22, 347:1

**sanctions** [1] - 373:17

**Sara** [4] - 293:13, 305:22, 315:14, 316:1

**sat** [1] - 320:5

**Satan** [1] - 286:6

**Satanopher** [11] - 285:25, 286:3, 286:4, 287:10, 305:23, 308:21, 309:1, 311:4, 363:25, 401:6

**satisfied** [2] - 473:14, 478:4

**satisfies** [2] - 478:14, 481:9

**satisfy** [2] - 332:25, 450:12

**save** [2] - 302:12, 422:18

**saw** [5] - 268:24, 316:23, 419:8, 424:5, 451:7

**Saw** [1] - 318:7

**scandal** [1] - 409:13

**scanning** [1] - 401:9

**science** [1] - 440:12

**Scirica** [2] - 274:19

**scoot** [1] - 284:5

**scope** [5] - 341:24, 342:1, 374:21, 396:11, 428:24

**Scott** [2] - 367:17, 367:18

**scramble** [1] - 498:19

**Scranton** [6] - 310:4, 310:5, 310:7, 310:9, 310:10, 331:10

**screen** [1] - 251:3, 254:14, 270:22, 283:13, 314:14, 371:15, 417:6, 424:18, 436:18, 452:12, 452:17

**screened** [1] - 271:15

**screening** [1] - 271:14

**scrutiny** [2] - 364:2, 364:3

**scumbag** [1] - 297:14

**se** [8] - 277:23, 283:3, 340:4, 340:5, 343:1, 365:5, 462:1, 464:14

**sealing** [2] - 394:16, 394:18

**search** [1] - 370:16

**season** [1] - 411:18

**seat** [2] - 399:12, 460:3

**seated** [1] - 285:14

**Sebelius** [1] - 293:8

**second** [27] - 247:15, 251:12, 252:3, 254:15, 261:15, 261:25, 289:14, 290:20, 290:24, 307:13, 315:6, 315:8, 315:10, 321:14, 323:21, 355:2, 355:24, 371:20, 385:18, 391:13, 392:6, 392:8, 392:18, 393:16, 400:16, 408:1, 410:7, 417:24, 429:1, 448:3, 468:5, 468:25, 471:24, 472:1, 473:1, 481:11, 495:5

**secondhand** [1] - 253:11

**secondly** [2] - 463:6, 487:2

**seconds** [2] - 385:24, 391:25

**Section** [5] - 313:13, 313:18, 313:19, 473:14

**securities** [1] - 390:10

**security** [7] - 263:16, 272:13, 290:22, 291:4, 291:16, 292:24, 389:1

**see** [67] - 243:17, 248:15, 251:7, 251:10, 251:19, 251:20, 254:16, 257:24, 261:16, 273:12, 284:8, 285:17, 288:23, 289:10, 290:15, 290:18, 291:1, 293:4, 293:18, 296:5, 297:3, 297:6, 299:12, 301:21, 303:10, 310:20, 317:4, 318:16, 326:22, 333:2, 342:14, 345:19, 350:13, 360:3, 382:25, 383:8, 386:8, 387:4, 388:10, 388:15, 389:23, 393:12, 394:3, 394:12, 409:1, 409:12, 411:13, 413:18, 414:1, 417:12, 422:23, 424:18, 429:2, 434:7, 444:24, 445:16, 448:1, 451:6, 453:4, 454:9, 459:17, 459:24, 462:12, 490:3, 493:11

**seeing** [3] - 287:10, 310:12, 447:6

**seek** [3] - 287:24, 315:22, 491:21

**seeking** [4] - 311:3, 336:5, 348:14, 356:16

**seized** [1] - 319:23

**self** [6] - 340:7, 359:2, 359:4, 386:5, 409:6, 467:12

**self-explanatory** [1] - 386:5

**self-representation** [1] - 340:7

**seminal** [1] - 288:12

**senators** [2] - 320:21, 323:20

**send** [12] - 278:6, 324:13, 378:22, 388:13, 406:5, 406:6, 448:2, 454:13, 454:25, 476:8, 488:21, 492:22
**sender** [12] - 270:2, 270:3, 270:25, 402:8, 402:10, 431:3, 451:8, 453:15, 454:13, 457:8, 457:14
**sending** [5] - 280:1, 350:15, 405:9, 445:23, 475:12
**sends** [3] - 406:17, 453:18, 457:9
**senior** [7] - 265:8, 274:15, 274:21, 275:3, 328:13, 331:18, 338:19
**sense** [22] - 242:8, 279:7, 279:23, 284:7, 299:13, 304:15, 324:7, 344:11, 351:21, 364:5, 373:10, 399:19, 409:15, 412:24, 413:12, 415:4, 451:5, 466:13, 466:20, 470:18, 470:25, 498:15
**sensitive** [1] - 400:24
**sent** [26] - 271:11, 309:18, 310:8, 310:9, 368:24, 369:19, 379:24, 390:11, 397:11, 401:24, 405:4, 405:6, 407:9, 415:22, 416:5, 416:19, 416:22, 416:25, 419:9, 419:18, 419:21, 420:18, 458:6, 490:20, 491:23
**sentence** [19] - 259:10, 291:3, 292:14, 294:9, 294:11, 295:16, 296:1, 296:5, 297:23, 301:22, 302:5, 302:20, 303:20, 304:19, 362:14, 363:24, 478:22, 486:8
**sentencing** [1] - 285:3
**separate** [2] - 312:10,

361:15
**separately** [4] - 250:11, 251:17, 263:20, 301:13
**September** [6] - 309:16, 335:5, 430:9, 486:6, 491:15
**sequitur** [1] - 290:10
**sequiturs** [1] - 294:22
**series** [7] - 294:22, 295:1, 329:17, 329:19, 382:25, 383:5, 383:6
**serious** [7] - 292:24, 414:24, 418:13, 419:12, 479:19, 482:13, 492:24
**seriously** [5] - 271:23, 341:12, 375:6, 399:7, 417:22
**seriousness** [2] - 242:2, 242:3
**server** [7] - 381:14, 441:10, 445:24, 453:20, 453:25, 454:7, 455:2
**servers** [9] - 441:23, 442:3, 448:2, 451:18, 451:21, 454:25, 455:4
**service** [19] - 253:6, 253:14, 253:18, 257:12, 260:10, 272:8, 272:11, 272:12, 273:2, 276:3, 276:6, 276:7, 276:24, 277:21, 287:17, 402:18, 453:7, 459:17
**Service** [24] - 250:15, 377:11, 377:14, 377:16, 377:19, 377:21, 377:23, 377:24, 378:1, 381:1, 381:25, 382:4, 383:22, 384:15, 384:23, 386:24, 387:7, 402:1, 402:4, 440:25, 441:3, 441:6, 441:11, 441:21
**services** [3] - 379:9, 382:13
**set** [8] - 330:7, 390:24, 393:16, 457:3, 469:17, 471:17, 476:24, 480:8
**sets** [2] - 468:1, 468:15

**seven** [1] - 280:4
**seven-year** [1] - 280:4
**seventh** [2] - 306:5, 306:8
**several** [5] - 263:8, 273:1, 287:9, 322:4, 345:23
**shall** [5] - 290:23, 292:18, 307:20, 322:6, 426:14
**Shanksville** [1] - 413:6
**share** [1] - 442:24
**shed** [1] - 352:13
**sheet** [7] - 309:11, 309:21, 310:20, 329:11, 330:18, 330:21
**shield** [1] - 306:24
**Shipoke** [1] - 276:9
**shirt** [1] - 498:2
**shoes** [2] - 243:19, 245:12
**shoot** [9] - 408:1, 410:8, 410:17, 411:16, 415:5, 415:11, 417:25, 437:23, 438:2
**shooting** [1] - 438:16
**shootout** [1] - 412:19
**shopping** [1] - 332:5
**short** [3] - 272:12, 371:5, 463:2
**shortly** [1] - 258:5
**shot** [6] - 410:19, 410:24, 412:18, 418:11, 428:5, 438:12
**show** [24] - 251:3, 258:16, 258:25, 264:13, 269:12, 271:5, 283:12, 287:19, 309:5, 310:22, 321:1, 342:8, 398:15, 407:3, 416:14, 436:17, 445:2, 445:25, 446:1, 451:14, 451:15, 451:20, 474:12, 475:4
**showing** [3] - 255:1, 436:14, 477:12
**shown** [3] - 247:21, 445:22, 446:24
**shows** [5] - 377:22, 382:20, 387:14, 445:23, 496:4
**shut** [5] - 408:2, 410:9, 415:5, 415:7,

415:10
**side** [6] - 248:22, 330:21, 382:25, 394:7, 404:18, 426:9
**sidebar** [5] - 322:14, 327:5, 400:15, 400:25, 462:8
**Sidebar** [2] - 322:17, 400:17
**sidekick** [1] - 295:23
**sides** [3] - 360:22, 422:8, 434:4
**siege** [1] - 428:8
**sign** [3] - 354:14, 354:18, 355:13
**signed** [1] - 251:15
**significance** [5] - 288:5, 382:6, 413:4, 414:13, 414:16
**significant** [1] - 431:16
**significantly** [1] - 334:10
**signify** [1] - 308:3
**silent** [1] - 464:24
**Simandle** [5] - 274:10, 274:12, 319:25, 320:5
**similar** [9] - 273:7, 273:11, 360:1, 367:21, 398:1, 419:10, 457:3, 462:10
**similarities** [2] - 418:19, 496:3
**similarity** [1] - 329:18
**simple** [2] - 254:6, 324:16
**simply** [16] - 280:15, 300:2, 302:18, 328:10, 331:22, 335:8, 335:11, 339:4, 345:12, 376:5, 458:16, 462:18, 475:12, 489:20, 490:17, 491:5
**single** [2] - 332:6, 490:12
**sit** [2] - 464:24, 472:25
**sitting** [2] - 444:22, 457:15
**situation** [19] - 263:16, 272:25, 279:15, 283:14, 294:14, 327:14, 338:16, 339:24, 340:23, 397:17, 403:13, 405:16, 412:22, 423:1, 427:14,

427:16, 427:22, 444:18, 490:7
**situations** [3] - 290:2, 290:3, 484:19
**six** [4] - 328:12, 328:13, 439:25, 440:6
**sixth** [4] - 306:4, 306:7, 418:6, 438:7
**Sixth** [1] - 490:6
**size** [2] - 414:5, 434:7
**skill** [2] - 316:16, 376:3
**skin** [1] - 286:13
**Skip** [1] - 274:24
**skip** [2] - 304:18, 307:1
**skipped** [1] - 288:24
**skulls** [1] - 300:20
**skyped** [1] - 437:20
**Slomsky** [8] - 255:11, 281:10, 298:24, 298:25, 332:22, 333:14, 333:21, 339:9
**slow** [1] - 404:16
**smack** [1] - 339:24
**small** [1] - 305:19
**Smith** [13] - 275:6, 275:8, 275:9, 275:12, 295:23, 308:11, 335:3, 335:4, 339:16, 339:22, 350:14, 357:14, 367:22
**sniff** [1] - 370:15
**sniffs** [1] - 370:21
**sniper** [6] - 408:1, 410:7, 410:21, 412:19, 412:20, 428:6
**snipers** [3] - 410:17, 412:5, 412:13
**social** [1] - 402:2
**society** [1] - 297:18
**society's** [1] - 298:4
**soften** [1] - 254:9
**softly** [1] - 322:20
**sole** [1] - 315:21
**solely** [2] - 365:4, 496:11
**solution** [1] - 336:15
**someone** [19] - 241:8, 254:2, 256:13, 279:8, 282:25, 287:24, 295:10, 297:17, 297:18, 304:17, 317:19, 345:11, 359:7, 374:18, 438:3,

475:12, 489:21,
489:22, 490:7
**sometimes** [7] -
249:15, 335:19,
355:20, 364:15,
385:23, 391:23
**somewhat** [1] - 427:1
**somewhere** [3] -
267:22, 470:18,
498:9
**son** [1] - 423:8
**soon** [1] - 300:17
**sorry** [18] - 291:8,
309:19, 315:9,
342:11, 343:18,
355:14, 367:1,
372:15, 382:14,
385:21, 410:23,
410:25, 414:15,
430:17, 434:14,
446:22, 452:24,
471:19
**sort** [39] - 254:3,
283:17, 286:10,
293:12, 293:20,
296:12, 296:16,
299:14, 299:19,
301:17, 303:3,
304:16, 306:10,
307:5, 308:22,
329:15, 331:7,
333:23, 336:1,
337:8, 347:4, 359:2,
360:17, 370:10,
375:22, 402:13,
403:21, 404:7,
408:20, 432:16,
438:3, 438:16,
443:8, 443:9,
453:19, 453:20,
468:9, 472:14, 494:7
**sorted** [3] - 381:8
**sought** [4] - 322:25,
356:16, 412:8,
466:10
**soul** [1] - 311:6
**sound** [2] - 282:15,
295:2
**sounds** [5] - 241:13,
306:11, 325:17,
373:8, 478:18
**source** [3] - 315:17,
379:7, 402:2
**South** [3] - 270:3,
383:16, 384:3
**southern** [1] - 331:7
**space** [2] - 396:8,
403:14
**speaking** [20] -
248:19, 268:12,

335:25, 378:12,
396:18, 398:21,
401:6, 402:18,
410:6, 413:3,
416:16, 423:21,
427:15, 427:23,
428:14, 432:14,
434:17, 462:4,
469:8, 490:24
**special** [1] - 396:22
**Special** [5] - 439:12,
439:22, 444:2,
455:16, 457:25
**specialist** [1] - 389:1,
390:10
**specialized** [1] -
442:16
**specialties** [1] -
443:21
**specific** [13] - 241:6,
242:21, 272:5,
275:16, 312:19,
327:13, 351:5,
359:4, 362:17,
372:21, 387:20,
440:1, 480:8
**specifically** [29] -
243:10, 272:4,
273:5, 276:20,
298:11, 360:6,
380:2, 380:16,
381:21, 397:11,
399:23, 410:25,
413:16, 415:7,
426:25, 427:16,
427:23, 440:23,
442:9, 444:20,
445:11, 445:20,
448:13, 456:3,
469:25, 470:23,
486:6, 489:17
**specifics** [3] - 360:12,
428:17, 434:22
**specifies** [1] - 372:9
**specify** [1] - 463:4
**speculate** [1] - 431:25
**speech** [6] - 292:21,
293:2, 297:11,
297:19, 299:6,
318:17
**speed** [1] - 251:21
**speedy** [1] - 300:23
**spell** [8] - 268:16,
294:6, 377:3, 377:6,
395:10, 416:19,
417:4, 439:15
**spelled** [1] - 418:15
**spelling** [1] - 375:7
**spend** [2] - 292:23,
359:19

**spent** [2] - 267:14,
388:12
**spiraling** [1] - 256:20
**spoken** [2] - 357:8,
467:23
**Sprint** [1] - 376:8
**Square** [1] - 456:17
**SRT** [1] - 410:17
**staccato** [2] - 295:1,
314:9
**staff** [1] - 338:7
**stage** [2] - 335:18,
388:14
**stamps.com** [3] -
382:13, 382:18,
382:21
**STAND** [2] - 247:7,
356:9
**stand** [6] - 285:12,
289:16, 385:23,
385:24, 488:22,
489:18
**Stand** [1] - 412:9
**standard** [15] -
242:17, 243:11,
256:5, 260:4,
323:18, 358:1,
411:4, 477:21,
477:25, 480:5,
481:18, 483:20,
484:9, 484:16,
487:19
**standby** [1] - 467:21
**standing** [8] - 320:17,
320:22, 323:4,
323:8, 323:9,
323:11, 323:19,
324:4
**standoff** [3] - 412:20,
412:22, 428:8
**stands** [1] - 292:17
**stark** [1] - 303:17
**start** [19] - 246:5,
246:6, 264:23,
272:22, 285:22,
346:12, 351:17,
379:25, 382:3,
421:10, 459:11,
459:12, 459:21,
459:24, 463:18,
465:19, 476:5, 498:7
**started** [9] - 278:7,
334:15, 335:7,
356:25, 357:7,
377:25, 380:7,
404:14, 422:10
**starting** [5] - 285:19,
295:16, 418:4,
428:1, 437:20
**starts** [8] - 251:19,

292:14, 296:6,
297:22, 312:24,
381:24, 417:24,
457:6
**state** [31] - 243:21,
266:24, 267:6,
273:19, 290:22,
291:4, 291:16,
300:20, 301:13,
320:11, 323:19,
347:17, 347:20,
347:22, 348:23,
350:2, 363:1,
363:24, 368:1,
377:3, 389:17,
396:20, 396:21,
399:12, 411:16,
419:7, 430:25,
439:15, 458:5,
473:14, 478:3
**State** [3] - 319:21,
395:10, 436:8
**statement** [19] - 249:9,
346:12, 350:20,
365:2, 410:5,
425:20, 426:14,
476:9, 479:15,
479:16, 479:18,
479:19, 482:9,
482:10, 482:12,
482:13, 491:7,
492:4, 492:10
**statements** [2] -
345:11, 362:4
**states** [6] - 289:16,
290:21, 322:4,
412:12, 457:14,
481:16
**States** [40] - 266:20,
269:13, 269:14,
269:25, 270:12,
270:13, 285:17,
305:1, 309:6,
310:16, 313:14,
313:18, 322:5,
322:8, 344:20,
349:14, 354:23,
355:2, 359:20,
377:11, 378:3,
378:5, 379:20,
387:8, 395:7,
398:15, 398:19,
407:4, 408:5,
408:10, 416:15,
426:11, 426:12,
428:6, 448:25,
463:10, 476:8,
476:18, 491:16,
492:1
**stating** [1] - 418:17

**station** [1] - 331:6
**stationed** [1] - 377:12
**status** [1] - 254:2
**statute** [23] - 320:6,
321:3, 321:5,
321:11, 324:22,
404:24, 423:4,
425:25, 426:18,
426:24, 427:1,
463:10, 467:10,
468:23, 471:20,
475:3, 475:4,
477:14, 485:22,
486:18, 488:15,
492:18, 493:2
**Statute** [1] - 320:24
**statutes** [5] - 288:17,
326:1, 373:16,
467:11, 486:13
**statutorily** [1] - 373:17
**statutory** [3] - 338:8,
373:15, 475:7
**stay** [2] - 483:24,
484:1
**stayed** [2] - 265:3,
471:19
**stealing** [1] - 377:25
**Stefanie** [1] - 268:14
**Stefanie's** [1] - 268:16
**step** [12] - 266:14,
290:16, 308:15,
339:4, 381:7, 395:5,
439:8, 448:1,
453:16, 466:15,
474:15, 476:3
**steps** [10] - 271:25,
288:1, 290:12,
307:22, 308:17,
397:17, 401:23,
454:11, 455:6,
456:21
**stick** [2] - 413:17,
430:2
**still** [17] - 294:16,
305:6, 309:21,
327:9, 328:8,
357:11, 391:6,
391:16, 392:15,
392:17, 392:22,
393:3, 393:12,
464:24, 483:23,
487:15, 493:6
**stipulate** [1] - 356:4
**stipulating** [3] -
354:19, 354:21,
355:10
**stipulation** [6] -
352:12, 352:15,
352:20, 352:23,
353:13, 354:14

**stood** [4] - 315:13, 315:25, 386:1, 401:8
**stop** [6] - 273:12, 340:19, 347:8, 404:15, 488:6, 488:14
**stopped** [2] - 385:4, 413:14
**store** [2] - 384:5, 384:9
**stores** [1] - 293:8
**straight** [5] - 352:24, 362:11, 387:11, 405:13, 405:17
**straight-up** [1] - 362:11
**Strawberry** [1] - 456:16
**stream** [5] - 283:10, 293:16, 382:9, 386:21, 387:5
**Street** [1] - 386:8
**street** [1] - 456:16
**strick** [1] - 364:2
**strict** [2] - 364:2, 364:3
**strike** [12] - 304:14, 364:17, 365:1, 365:2, 365:5, 367:5, 370:1, 370:6, 374:4, 425:20, 429:22, 433:22
**strikes** [1] - 474:10
**strong** [2] - 266:5, 497:16
**stronger** [1] - 261:1
**stronghold** [1] - 306:24
**strongly** [2] - 399:17, 401:10
**study** [3] - 311:9, 311:11, 366:5
**stuff** [5] - 262:17, 270:21, 402:2, 413:12, 495:21
**stupid** [1] - 409:10
**style** [5] - 282:7, 282:11, 300:21, 418:20, 496:3
**subdues** [1] - 306:25
**subject** [21] - 264:18, 289:1, 308:18, 317:18, 317:24, 329:7, 329:18, 349:3, 354:25, 355:4, 359:12, 362:8, 369:22, 371:10, 372:3, 374:16, 378:10, 407:13, 407:14,

437:6, 466:16
**subjective** [15] - 242:10, 242:11, 242:12, 242:22, 475:11, 475:23, 476:2, 476:13, 476:20, 481:18, 489:15, 490:18, 491:4, 492:20
**submit** [2] - 248:22, 483:2
**submits** [1] - 248:21
**submitted** [5] - 388:18, 461:12, 462:15, 472:23, 474:7
**subpoena** [6] - 448:14, 448:25, 449:9, 450:9, 452:13
**subscribed** [1] - 489:1
**subscriber** [1] - 453:5
**subsequent** [6] - 243:9, 245:5, 245:6, 245:13, 247:2, 496:1
**subsequently** [1] - 420:18
**substantially** [1] - 326:24
**substantive** [3] - 277:15, 278:14, 283:2
**substitute** [1] - 484:7
**successful** [3] - 253:12, 253:19, 429:16
**successfully** [1] - 490:13
**sudden** [2] - 256:12, 494:3
**sue** [2] - 295:23, 313:3
**sued** [1] - 278:3
**suffer** [2] - 296:25, 307:25
**suffered** [2] - 364:7, 402:22
**sufficient** [2] - 471:4, 480:23
**suggest** [5] - 291:21, 374:17, 412:10, 432:18, 472:13
**suggested** [4] - 309:1, 362:16, 372:13, 487:18
**suggesting** [5] - 319:7, 319:8, 431:13, 481:5, 490:2
**suggestion** [1] - 495:18
**suit** [2] - 312:22, 404:8
**suits** [1] - 404:7

**summarization** [1] - 264:19
**summarized** [1] - 461:17
**summarizes** [1] - 391:9
**summarizing** [1] - 468:9
**summary** [1] - 264:25
**summons** [1] - 252:16
**superfluous** [1] - 482:20
**Superior** [1] - 389:15
**superseding** [1] - 420:23
**supervision** [1] - 365:20
**supervisor** [1] - 444:16
**supervisory** [1] - 364:24
**Supplemental** [1] - 491:17
**support** [4] - 304:25, 307:19, 449:13, 492:7
**suppose** [1] - 413:14
**supposed** [6] - 304:25, 313:23, 314:25, 404:24, 405:1, 409:19
**supposedly** [3] - 332:13, 348:5, 350:7
**Supreme** [34] - 241:5, 281:25, 282:3, 288:12, 312:13, 312:15, 319:23, 320:10, 322:10, 344:20, 345:3, 359:20, 368:2, 368:16, 370:11, 373:23, 376:8, 411:20, 418:7, 438:8, 473:8, 473:13, 475:6, 477:5, 477:22, 478:14, 478:25, 480:19, 481:9, 484:23, 486:17, 489:15, 490:17, 491:4
**surmised** [1] - 252:1
**surplusage** [1] - 472:9
**surprise** [8] - 319:5, 320:20, 330:23, 331:1, 345:2, 345:5, 425:2, 425:3
**surveillance** [2] - 388:25, 389:2
**suspect** [1] - 391:17

**suspender** [1] - 474:8
**suspicious** [1] - 380:8
**sustain** [13] - 255:23, 319:13, 322:12, 327:1, 343:5, 369:2, 369:10, 369:23, 370:6, 371:21, 372:2, 374:20, 432:2
**sustained** [5] - 358:23, 359:10, 359:17, 400:11, 405:23
**swamped** [1] - 281:18
**switching** [1] - 373:14
**SWORN** [6] - 247:6, 266:23, 356:9, 377:2, 395:9, 439:14
**synonym** [1] - 480:5
**system** [14] - 258:15, 260:12, 313:20, 328:10, 368:19, 378:6, 383:7, 387:3, 387:4, 388:25, 389:7, 441:9, 445:25, 457:5
**systems** [2] - 441:5, 441:8

**T**

**table** [2] - 471:1, 476:1
**talks** [1] - 260:13, 302:3, 307:14, 413:6, 413:10, 413:13, 413:22, 414:21, 415:17, 459:15
**tangents** [1] - 405:14
**target** [1] - 350:8
**targets** [1] - 413:5
**Task** [1] - 396:4
**task** [16] - 296:20, 296:25, 378:5, 378:16, 395:18, 395:23, 395:25, 396:2, 396:10, 396:11, 396:13, 396:14, 396:23, 396:24, 397:15, 398:24, 399:13, 428:18, 428:22
**tasked** [2] - 395:17, 395:18
**Tax** [2] - 436:13, 437:3
**tax** [5] - 379:6, 402:21, 414:11, 414:21, 432:10
**teach** [1] - 305:23
**team** [2] - 410:17,

449:13
**tech** [1] - 442:10
**technical** [1] - 445:14
**technically** [1] - 375:19
**technological** [1] - 283:20
**technology** [7] - 257:8, 270:19, 440:18, 440:21, 441:7, 442:1, 442:23
**Ted** [7] - 275:11, 299:4, 335:3, 357:10, 357:11
**tedious** [1] - 385:23
**telephone** [6] - 251:24, 252:5, 252:10, 252:12, 378:15, 453:9
**tempo** [1] - 251:25
**tempted** [1] - 474:12
**ten** [2] - 300:15, 352:3
**tend** [3] - 293:17, 367:21, 407:20
**tender** [1] - 444:2
**tens** [1] - 367:19
**term** [14] - 275:9, 280:4, 296:14, 311:9, 337:20, 343:9, 343:25, 344:9, 344:19, 345:4, 345:6, 357:12, 492:2
**terminate** [1] - 338:17
**terminated** [1] - 262:16
**terms** [20] - 276:1, 282:10, 287:21, 296:12, 303:17, 311:11, 318:22, 320:25, 338:12, 338:18, 338:22, 350:9, 350:17, 350:22, 360:22, 400:13, 417:21, 418:19, 461:24, 466:9
**territory** [1] - 367:7
**terrorism** [10] - 395:18, 395:19, 396:12, 396:17, 397:1, 397:3, 397:4, 397:6, 399:13
**Terrorism** [1] - 396:4
**terrorist** [1] - 430:12
**Terry** [1] - 488:6
**testified** [9] - 307:3, 326:5, 326:6, 364:17, 401:21, 402:5, 402:11,

420:1, 435:21
**testify** [22] - 256:1,
317:10, 321:13,
346:14, 348:1,
365:4, 431:18,
432:22, 433:23,
434:9, 436:3,
464:19, 465:3,
465:7, 465:8,
465:18, 465:21,
466:1, 466:14,
466:16, 466:22
**testifying** [8] - 255:25,
257:15, 315:1,
340:19, 343:19,
362:10, 425:10,
466:13
**testimonial** [1] -
318:17
**testimony** [27] - 242:8,
244:24, 245:3,
245:9, 246:10,
246:13, 246:22,
246:24, 255:4,
265:1, 265:12,
317:5, 349:12,
364:14, 367:6,
418:21, 425:19,
427:8, 432:22,
433:23, 435:19,
466:3, 466:22,
467:2, 467:8, 497:20
**text** [1] - 479:9
**TFO** [1] - 401:19
**thankfully** [1] - 391:21
**Thanksgiving** [1] -
471:4
**THE** [380] - 241:3,
241:13, 241:21,
242:4, 242:12,
242:18, 242:25,
243:5, 243:14,
243:18, 243:22,
244:3, 244:8,
244:11, 244:16,
244:22, 245:9,
245:16, 245:18,
245:22, 245:25,
247:7, 247:23,
248:2, 248:4, 248:7,
248:13, 248:19,
248:24, 249:3,
249:7, 250:3, 250:6,
250:12, 250:16,
250:20, 250:24,
255:3, 255:23,
257:3, 257:6, 258:8,
258:10, 258:17,
258:19, 265:23,
266:14, 266:17,

266:22, 267:1,
269:10, 270:16,
283:18, 283:21,
284:1, 284:10,
284:14, 284:18,
285:10, 285:14,
309:3, 310:18,
311:18, 311:22,
314:16, 314:18,
314:24, 317:4,
317:8, 318:13,
319:13, 321:6,
321:10, 321:14,
321:17, 321:19,
321:21, 321:23,
321:25, 322:12,
322:18, 322:20,
322:23, 323:1,
323:7, 323:11,
323:21, 323:25,
324:7, 324:24,
325:6, 325:11,
325:17, 325:21,
326:6, 326:12,
326:15, 326:20,
327:4, 327:6, 327:9,
331:1, 333:4,
333:13, 333:17,
340:10, 340:12,
340:18, 341:22,
341:25, 342:4,
342:7, 342:12,
342:14, 342:17,
342:19, 342:21,
343:2, 343:4,
343:14, 346:11,
346:14, 346:18,
347:8, 347:25,
349:10, 350:21,
350:25, 351:6,
351:9, 351:14,
351:21, 351:25,
352:4, 352:8,
352:14, 352:17,
352:19, 352:23,
353:2, 353:5, 353:7,
353:12, 353:15,
353:21, 353:25,
354:2, 354:7,
354:12, 354:18,
355:8, 355:13,
355:17, 355:25,
356:2, 356:5, 356:9,
356:10, 358:10,
358:13, 358:17,
358:22, 359:10,
359:17, 359:24,
360:3, 360:21,
361:1, 362:21,
362:23, 364:14,
365:1, 367:5, 368:8,

368:11, 368:17,
369:1, 369:10,
369:14, 369:20,
369:23, 370:1,
371:11, 371:17,
371:20, 372:2,
373:24, 374:3,
374:20, 376:19,
376:22, 376:23,
376:24, 377:5,
385:18, 385:22,
386:2, 393:8,
394:24, 395:3,
395:5, 395:12,
398:17, 400:15,
400:20, 400:22,
407:1, 408:11,
408:13, 408:15,
413:19, 413:22,
416:12, 417:13,
421:6, 421:9,
421:15, 421:18,
421:22, 422:2,
422:12, 422:15,
425:11, 425:14,
425:16, 425:19,
426:5, 427:7,
429:24, 431:17,
432:1, 432:19,
433:13, 433:22,
435:19, 436:3,
437:12, 438:17,
438:21, 438:24,
439:8, 439:11,
439:13, 439:17,
444:4, 444:6, 446:7,
447:13, 449:6,
450:4, 450:20,
450:22, 457:22,
458:10, 459:2,
459:4, 459:6,
459:21, 459:22,
459:23, 460:3,
460:8, 460:11,
460:15, 460:17,
460:23, 460:25,
461:3, 461:8,
461:11, 462:4,
462:17, 462:23,
463:12, 463:17,
463:24, 464:2,
464:4, 465:6, 465:9,
465:12, 465:17,
466:1, 466:6,
466:19, 467:1,
467:7, 467:20,
467:25, 468:4,
468:7, 468:13,
468:17, 468:25,
469:2, 469:5,
469:11, 469:13,

469:16, 469:20,
469:22, 470:9,
470:13, 470:20,
471:1, 471:15,
471:24, 472:1,
472:4, 472:6,
472:19, 472:22,
473:4, 473:23,
474:10, 474:17,
474:22, 475:3,
475:9, 475:13,
475:16, 475:19,
475:25, 476:17,
476:23, 477:24,
478:8, 478:24,
479:23, 480:2,
480:10, 481:7,
481:13, 481:19,
481:22, 481:25,
483:5, 483:21,
483:25, 484:17,
484:22, 485:3,
485:11, 485:14,
485:20, 486:1,
486:3, 486:16,
486:24, 487:21,
488:14, 488:19,
489:6, 489:8,
489:10, 490:25,
491:2, 491:11,
492:12, 493:13,
493:20, 493:23,
494:7, 494:14,
494:17, 494:23,
495:1, 495:13,
495:23, 496:10,
496:14, 496:22,
497:2, 497:9,
497:17, 497:22,
497:25, 498:3,
498:7, 498:10
**theft** [1] - 442:14
**theme** [3] - 418:22,
419:4
**themselves** [1] -
315:19
**theoretical** [1] -
373:13
**theoretically** [1] -
457:14
**theory** [7] - 278:2,
413:13, 467:12,
482:24, 483:10,
487:21, 487:25
**therefore** [14] - 304:6,
304:7, 331:15,
341:19, 363:19,
371:22, 404:24,
411:9, 423:9, 425:7,
428:22, 428:25,

480:9, 480:16
**thereto** [1] - 489:1
**they've** [1] - 344:16
**thick** [1] - 286:13
**thinking** [9] - 243:5,
249:17, 256:19,
297:16, 351:9,
435:24, 473:4,
489:17, 489:21
**thinks** [2] - 304:7,
489:18
**third** [8] - 252:4,
350:12, 414:8,
432:7, 432:25,
478:11, 478:21,
491:23
**Third** [24] - 242:21,
261:21, 261:22,
262:5, 274:15,
274:17, 274:19,
275:10, 305:12,
326:18, 339:16,
409:9, 425:23,
433:18, 476:18,
477:17, 478:15,
479:9, 481:14,
482:2, 482:15,
482:22, 485:24,
492:14
**Thomas** [3] - 298:22,
366:6, 416:23
**Thomas's** [1] - 486:19
**thoughts** [2] - 284:21,
472:18
**thousands** [3] - 360:6,
367:19, 429:16
**threat** [84] - 242:20,
242:25, 243:11,
245:14, 246:18,
246:20, 247:3,
247:4, 265:9,
271:22, 274:6,
276:19, 279:20,
289:3, 291:19,
292:24, 293:3,
301:4, 301:25,
303:1, 306:9,
308:19, 345:6,
345:13, 345:15,
345:18, 349:6,
349:7, 349:15,
349:20, 350:2,
350:9, 356:16,
361:21, 362:11,
362:13, 362:17,
369:19, 370:10,
372:18, 372:19,
373:2, 378:21,
379:3, 463:8,
468:21, 473:16,

473:17, 474:1,
476:10, 476:12,
476:13, 477:1,
477:2, 477:20,
478:5, 478:9,
478:13, 478:22,
478:23, 479:6,
479:16, 482:7,
482:10, 483:14,
483:15, 486:11,
487:24, 488:16,
489:2, 489:12,
490:12, 491:6,
492:9, 495:5, 495:7,
495:21
**threaten** [4] - 461:6,
475:11, 475:17,
492:20
**threatened** [7] -
243:18, 243:20,
362:1, 399:25,
434:16, 491:23,
492:5
**threatening** [27] -
241:24, 252:19,
252:21, 256:14,
268:6, 268:9, 303:6,
323:14, 325:12,
348:17, 349:23,
372:11, 399:3,
399:4, 401:14,
406:23, 417:10,
418:24, 438:2,
468:16, 476:5,
477:11, 477:15,
486:9, 488:17,
492:4, 492:23
**threats** [20] - 245:6,
251:23, 262:20,
272:5, 276:15,
276:16, 276:18,
276:20, 282:12,
289:6, 293:1, 302:8,
334:11, 344:2,
344:14, 361:16,
361:17, 388:13,
396:17, 461:5
**three** [26] - 251:7,
300:20, 300:21,
300:22, 301:22,
319:22, 320:5,
320:21, 331:17,
339:14, 347:17,
347:20, 347:22,
348:7, 348:9,
348:15, 348:19,
349:4, 349:17,
354:5, 393:19,
408:6, 421:2,
448:11, 476:11

**three-judge** [3] -
319:22, 320:5,
320:21
**three-page** [1] - 408:6
**throughout** [4] -
292:20, 397:18,
419:5, 455:4
**Thursday** [1] - 430:8
**ties** [1] - 484:12
**timeliness** [1] -
368:22
**timing** [2] - 394:19,
419:14
**Tire** [1] - 327:18
**title** [4] - 274:7,
286:17, 312:10,
426:15
**titled** [2] - 425:1,
462:19
**today** [4] - 307:4,
352:8, 418:21,
456:22
**together** [6] - 284:20,
287:21, 292:8,
330:10, 375:17,
404:9
**token** [1] - 350:8
**Tomohisa** [1] - 428:4
**tomorrow** [7] - 246:5,
459:11, 459:12,
459:24, 466:2,
466:21, 496:16
**tone** [1] - 251:24
**tonight** [2] - 466:25,
498:18
**Tony** [1] - 274:19
**took** [16] - 265:7,
277:20, 285:18,
291:24, 302:5,
328:17, 339:10,
349:7, 356:23,
391:16, 392:15,
392:17, 392:20,
397:17, 480:6,
486:12
**tools** [2] - 378:23,
379:13
**top** [24] - 283:17,
285:22, 285:23,
295:17, 300:17,
303:10, 303:19,
304:19, 307:2,
307:15, 309:15,
330:20, 344:4,
380:25, 382:4,
383:1, 384:22,
413:11, 417:18,
428:25, 432:24,
433:10, 451:7,
455:10

**topic** [2] - 369:2,
372:8
**topics** [1] - 367:9
**total** [2] - 395:22,
441:15
**totality** [1] - 391:6
**totally** [1] - 330:12
**touch** [1] - 275:14
**touched** [2] - 281:3,
308:2
**touches** [1] - 455:5
**touching** [1] - 270:21
**tough** [1] - 399:23
**towards** [5] - 294:10,
295:17, 296:5,
365:13, 431:7
**town** [1] - 410:15
**Township** [2] -
367:16, 367:18
**trackable** [1] - 381:4
**tracked** [1] - 382:21
**tracking** [8] - 381:22,
381:23, 382:1,
383:7, 387:1, 387:3,
391:15, 391:16
**training** [3] - 396:22,
396:25, 397:2,
428:15, 442:5,
442:16, 443:16,
444:17
**trains** [1] - 306:22
**transaction** [1] - 255:7
**transactions** [6] -
255:14, 318:21,
458:15, 458:20,
458:22, 458:23
**transcript** [8] - 293:23,
294:7, 294:17,
295:5, 316:5,
324:21, 325:10,
325:11
**transfer** [7] - 264:2,
281:24, 356:24,
357:18, 357:21,
358:21, 366:2
**transferred** [25] -
255:9, 255:11,
255:12, 264:20,
264:21, 277:24,
278:11, 278:13,
278:16, 281:21,
298:23, 332:20,
333:2, 334:13,
334:17, 336:2,
336:11, 337:10,
339:9, 339:11,
339:14, 357:14,
365:15, 365:23,
366:16
**transferring** [1] -

357:4
**transfers** [3] - 263:22,
335:14, 335:17
**transmission** [2] -
309:11, 309:14
**transmits** [2] - 473:15,
489:11
**transmittal** [3] - 480:4,
491:21, 491:25
**transmitted** [10] -
354:25, 355:4,
430:22, 449:17,
454:14, 457:10,
461:6, 478:4, 481:3,
487:18
**transport** [1] - 276:4
**traveled** [1] - 458:5
**travels** [1] - 453:15
**treason** [12] - 296:9,
296:15, 296:18,
307:7, 307:8, 343:8,
343:24, 344:4,
344:6, 344:9,
344:14, 344:25
**treat** [1] - 313:23
**treated** [1] - 313:2
**treaties** [1] - 322:5
**treatment** [1] - 340:25
**trends** [1] - 397:3
**trespass** [2] - 297:24,
298:2
**trial** [8] - 274:24,
284:24, 285:1,
285:7, 286:25,
333:3, 341:5, 392:6
**trials** [1] - 422:3
**tribunal** [5] - 332:9,
339:24, 363:19,
364:23, 369:9
**tribunals** [3] - 289:14,
296:8, 306:3
**tried** [5] - 254:9,
263:16, 346:15,
483:24, 490:6
**trigger** [1] - 303:17
**trip** [1] - 457:19
**troubled** [2] - 286:7,
286:9, 286:14
**troubling** [3] - 400:13,
401:3, 417:21
**true** [29] - 242:20,
242:25, 245:14,
246:18, 246:20,
247:3, 247:4, 274:5,
278:4, 354:22,
360:18, 364:16,
366:25, 424:14,
447:7, 474:1,
476:10, 477:24,
479:6, 479:16,

481:21, 482:7,
482:9, 483:22,
487:5, 491:6, 495:5,
495:7, 495:21
**truly** [2] - 247:12,
427:17
**Trump** [2] - 254:7,
306:4
**trust** [1] - 316:16
**trustee** [1] - 255:20
**try** [13] - 263:13,
318:6, 324:25,
332:4, 351:1,
351:17, 391:1,
405:14, 405:16,
407:23, 422:18,
430:2, 462:1
**trying** [31] - 244:17,
247:24, 248:11,
292:23, 317:9,
323:12, 323:17,
323:23, 324:3,
324:8, 324:12,
332:24, 332:25,
346:4, 349:9, 350:5,
352:4, 355:17,
359:3, 361:10,
369:17, 402:3,
402:14, 419:7,
425:9, 427:14,
428:13, 435:4,
462:5, 462:10,
466:20
**turn** [4] - 255:19,
270:18, 480:22,
483:9
**turned** [1] - 336:16
**turning** [1] - 284:22
**TV** [1] - 377:22
**two** [34] - 246:10,
250:10, 251:7,
251:12, 257:15,
264:22, 272:16,
278:11, 296:24,
298:16, 303:7,
305:24, 309:7,
310:23, 331:18,
338:25, 339:4,
341:3, 359:11,
368:6, 370:3,
389:11, 390:18,
403:19, 419:8,
420:6, 420:14,
457:17, 464:4,
476:8, 476:24,
480:16, 497:13
**two-page** [1] - 309:7
**two-prong** [1] - 368:6
**two-step** [1] - 339:4
**two-week** [1] - 390:18

**Tymkovich** [1] - 293:10

**type** [10] - 270:6, 342:25, 378:8, 382:1, 389:19, 389:20, 389:21, 389:22, 412:19

**types** [4] - 378:9, 380:4, 399:9, 441:20

**typical** [1] - 459:8

**typically** [15] - 248:6, 248:7, 281:17, 283:5, 287:25, 290:1, 330:20, 331:5, 336:22, 337:17, 443:12, 445:21, 455:6, 484:16, 487:5

**typo** [1] - 311:7

## U

**U.S** [20] - 252:24, 264:17, 281:25, 282:2, 284:2, 313:4, 313:8, 344:3, 347:5, 367:21, 367:22, 389:13, 389:16, 402:1, 402:4, 416:1, 420:15, 477:6, 481:10

**U.S.C** [12] - 251:17, 320:24, 321:21, 321:22, 346:7, 363:8, 363:11, 364:2, 409:12, 426:1, 492:6

**ultimately** [8] - 255:12, 392:18, 397:22, 402:24, 403:1, 404:18, 458:6, 483:2

**um-hum** [6] - 244:10, 252:11, 255:17, 309:3, 410:11, 494:16

**unaccountable** [1] - 296:8

**unadulterated** [1] - 299:23

**unauthorized** [7] - 324:20, 325:4, 325:6, 375:5, 375:9, 375:21, 376:1

**unaware** [1] - 435:24

**unclear** [1] - 292:5

**unconstitutional** [1] - 358:20

**uncovered** [1] - 402:6

**under** [51] - 251:17, 304:6, 306:25, 316:11, 317:25, 320:6, 324:19, 339:6, 343:19, 345:10, 345:22, 346:7, 347:7, 364:2, 365:20, 369:7, 370:16, 374:22, 375:5, 375:12, 408:1, 411:4, 412:6, 412:15, 418:1, 418:11, 418:17, 422:23, 423:3, 426:15, 427:11, 427:13, 428:13, 431:14, 431:21, 437:18, 437:23, 438:4, 438:12, 438:16, 444:1, 464:18, 464:19, 466:4, 477:18, 479:17, 480:7, 480:24, 482:10, 488:4

**underlying** [2] - 326:9, 326:12

**understood** [6] - 248:25, 336:1, 346:22, 356:15, 417:15, 462:2

**undisputed** [1] - 473:12

**unenforceable** [1] - 306:2

**unfair** [1] - 326:23

**unfavorable** [1] - 325:24

**unfortunate** [1] - 297:13

**unfortunately** [2] - 274:13, 491:24

**unique** [1] - 382:3

**United** [40] - 266:20, 269:13, 269:25, 270:12, 270:13, 285:17, 305:1, 309:6, 310:16, 313:14, 313:18, 322:5, 322:7, 344:20, 349:14, 354:23, 355:2, 359:19, 377:11, 378:3, 378:5, 379:20, 387:8, 395:7, 398:15, 398:19, 407:4, 408:5, 408:10, 416:15, 426:11, 426:12, 428:6,

448:25, 463:10, 476:8, 476:18, 491:16, 492:1

**University** [1] - 440:13

**unless** [6] - 325:1, 325:12, 359:17, 367:23, 401:16, 474:15

**unnecessary** [1] - 474:9

**unquote** [2] - 415:5, 487:9

**unrelated** [1] - 330:12

**unsuccessful** [1] - 402:15

**unusual** [2] - 268:5, 464:13

**up** [85] - 241:9, 243:24, 243:25, 246:4, 249:12, 251:20, 252:6, 254:13, 256:2, 256:19, 256:21, 271:15, 281:15, 281:17, 282:4, 285:11, 290:3, 295:11, 296:14, 314:14, 319:19, 324:8, 333:20, 334:20, 335:4, 337:18, 337:23, 339:18, 341:21, 345:8, 351:1, 351:10, 357:24, 360:18, 361:2, 362:11, 367:3, 369:4, 371:15, 374:25, 380:7, 380:9, 380:19, 384:2, 385:6, 385:23, 385:24, 387:5, 389:8, 391:13, 402:2, 408:2, 410:9, 415:6, 415:7, 415:10, 421:21, 422:8, 424:18, 425:14, 426:5, 430:18, 432:5, 433:11, 436:11, 447:15, 451:3, 455:8, 455:9, 457:3, 465:18, 468:2, 470:10, 481:2, 483:23, 484:5, 484:6, 484:8, 486:13, 488:22, 489:8, 493:18, 496:14, 497:18

**updated** [1] - 392:9

**uploaded** [1] - 392:18

**upper** [1] - 464:8

**UPS** [4] - 379:19, 384:5, 384:9, 384:10

**upset** [4] - 286:11, 400:2, 400:3, 400:4

**urgent** [1] - 276:16

**user** [3] - 446:4, 453:9, 454:8

**user's** [1] - 454:10

**uses** [6] - 387:4, 471:13, 475:4, 493:17, 493:19

**USMS** [2] - 266:5, 266:10

## V

**valid** [1] - 369:8

**value** [5] - 296:16, 306:11, 326:22, 326:24, 471:13

**vantage** [1] - 460:4

**varied** [1] - 283:10

**variety** [2] - 273:3, 338:9

**various** [8] - 272:5, 281:18, 294:25, 295:25, 312:15, 332:3, 440:19

**verbal** [1] - 277:19

**verdict** [1] - 461:9

**versed** [1] - 265:9

**verses** [3] - 282:14, 294:25, 361:4

**version** [9] - 289:10, 291:14, 361:2, 454:19, 463:15, 463:19, 468:10, 476:4, 498:6

**versus** [21] - 252:16, 288:10, 327:18, 337:4, 342:3, 349:14, 358:2, 358:7, 359:16, 360:5, 364:21, 367:16, 367:18, 370:11, 370:13, 370:24, 372:20, 374:6, 376:8, 428:18, 433:17

**vertically** [1] - 382:25

**vexatious** [1] - 303:23

**via** [6] - 252:18, 302:1, 355:1, 355:5, 406:19, 415:22

**vice** [1] - 337:20

**vicinity** [1] - 276:12

**Vicki** [2] - 428:5, 428:9

**victim** [6] - 255:10,

348:16, 433:20, 434:13, 492:8, 492:10

**video** [16] - 389:2, 390:6, 390:9, 390:12, 390:15, 391:5, 391:6, 391:19, 391:23, 392:1, 392:6, 392:16, 392:20, 392:22, 393:11, 394:15

**View** [1] - 453:7

**view** [15] - 243:11, 245:13, 288:17, 289:1, 291:23, 362:11, 362:12, 373:10, 437:7, 465:14, 476:10, 477:20, 480:22, 483:15, 492:23

**viewed** [9] - 249:20, 289:18, 345:6, 473:17, 476:13, 477:2, 478:9, 478:13, 478:23

**vigilante** [1] - 373:9

**violated** [1] - 420:14

**violation** [2] - 296:16, 492:5

**violations** [3] - 409:12, 409:14, 409:16

**violence** [1] - 306:12

**Virginia** [2] - 418:9, 438:10

**virtue** [4] - 328:10, 340:6, 367:20, 379:14

**visit** [4] - 247:15, 258:4, 259:4, 259:13

**visiting** [1] - 334:25

**visits** [2] - 257:15, 265:2

**voice** [1] - 251:24

**voicemail** [1] - 403:4

**voices** [1] - 263:15

**void** [1] - 369:6

**voided** [1] - 289:15

**voluntary** [1] - 435:1

**vulgarity** [1] - 488:10

## W

**Waco** [1] - 428:8

**wait** [3] - 364:14, 494:2

**walk** [2] - 463:24, 468:8

**Walnut** [1] - 386:8
**wants** [23] - 241:6, 248:8, 249:24, 251:1, 260:8, 260:24, 289:8, 294:21, 301:19, 302:1, 314:17, 407:22, 409:16, 409:17, 409:20, 409:21, 411:6, 415:13, 415:15, 415:19, 460:14, 474:13, 474:15
**war** [1] - 306:23
**War** [1] - 377:25
**warning** [2] - 307:24, 441:9
**warrant** [1] - 370:22
**warriors** [1] - 315:20
**Washington** [3] - 430:5, 430:8, 430:15
**waste** [1] - 326:25
**watch** [3] - 305:25, 422:4, 441:9
**watched** [3] - 315:13, 316:1, 393:11
**watered** [1] - 454:19
**Watts** [1] - 349:14
**ways** [7] - 301:2, 338:25, 382:9, 399:14, 487:15, 493:21, 497:18
**weakest** [1] - 411:21
**Weather** [5] - 440:24, 441:2, 441:6, 441:11, 441:21
**Weaver** [2] - 428:5, 428:10
**web** [1] - 448:5
**website** [3] - 305:11, 305:13, 431:10
**week** [6] - 272:16, 287:17, 377:25, 390:18, 403:11, 471:4
**weekend** [1] - 386:22
**weigh** [1] - 247:1
**welcome** [1] - 470:5
**well-regulated** [5] - 290:21, 300:19, 372:9, 401:7, 409:6
**well-versed** [1] - 265:9
**Welsh** [12] - 338:15, 404:20, 404:22, 404:23, 409:18, 409:20, 411:4, 411:6, 415:17, 419:2, 423:2, 435:5
**Wendy** [1] - 284:15
**west** [2] - 306:1,

457:19
**West** [3] - 418:9, 438:9, 451:22
**Western** [2] - 280:24, 281:4
**whack** [1] - 331:21
**whatnot** [1] - 257:8
**Wheel** [1] - 327:18
**whereas** [5] - 296:6, 296:8, 368:25, 465:21, 473:10
**wherein** [2] - 479:17, 482:11
**whisper** [1] - 323:25
**White** [2] - 312:14, 313:8
**white** [3] - 312:20, 322:14, 391:22
**whole** [6] - 242:17, 244:5, 285:23, 287:19, 302:5, 332:4
**wide** [1] - 334:13
**widely** [1] - 413:7
**Wikipedia** [2] - 428:11, 429:1
**Wilkes** [1] - 310:5
**Wilkes-Barre** [1] - 310:5
**willful** [7] - 471:7, 474:8, 475:5, 484:6, 486:15, 486:22, 486:25
**willfully** [13] - 426:13, 471:19, 471:21, 472:9, 472:10, 472:12, 472:13, 474:25, 485:8, 485:9, 485:25, 486:10, 487:19
**willfulness** [34] - 471:9, 472:6, 472:24, 473:5, 473:8, 473:23, 474:2, 474:11, 474:13, 474:19, 474:24, 475:21, 476:1, 483:16, 484:2, 484:4, 484:5, 484:11, 484:14, 484:15, 485:15, 486:4, 486:7, 486:19, 486:20, 493:7, 493:12, 493:14, 493:23, 494:3, 494:4, 498:17
**William** [8] - 247:16, 250:15, 255:9, 273:23, 298:14, 298:19, 304:21, 327:21

**Williamsport** [5] - 310:5, 331:12, 331:24, 332:1
**willing** [10] - 256:18, 304:22, 304:23, 315:15, 339:23, 354:13, 356:3, 461:18, 478:16, 478:24
**willingly** [1] - 471:18
**Wilson** [1] - 321:9
**wind** [1] - 256:19
**window** [2] - 382:10, 390:18
**wish** [5] - 342:21, 342:22, 355:22, 367:10, 466:1
**wishes** [1] - 284:8
**WITNESS** [20] - 247:6, 258:19, 266:23, 267:1, 321:10, 321:17, 331:1, 340:12, 356:8, 361:1, 362:23, 371:17, 376:23, 377:2, 377:5, 395:9, 395:12, 413:22, 439:14, 439:17
**witness** [33] - 247:20, 266:19, 285:12, 317:10, 323:15, 326:4, 326:9, 333:15, 342:8, 342:17, 342:23, 343:17, 343:18, 346:19, 347:11, 352:6, 358:17, 359:18, 362:21, 367:10, 368:9, 376:24, 395:6, 426:21, 431:25, 435:18, 435:20, 437:10, 439:9, 439:10, 459:4, 462:7, 462:10
**witness's** [2] - 425:17, 435:19
**witnesses** [2] - 263:8, 435:20
**woes** [2] - 299:15, 300:7
**wondered** [1] - 460:11
**wonderful** [2] - 241:14, 246:2
**wondering** [5] - 243:6, 319:19, 333:19, 459:7, 471:20
**word** [17] - 249:8, 275:11, 287:8, 295:16, 325:1,

340:11, 341:13, 343:8, 418:4, 457:7, 471:14, 472:8, 475:4, 475:5, 480:1, 486:22, 486:25
**worded** [3] - 350:16, 399:18, 401:10
**wording** [1] - 285:20
**words** [35] - 242:4, 242:19, 244:20, 256:17, 288:16, 289:5, 298:10, 301:22, 307:9, 307:21, 307:24, 311:11, 315:10, 336:10, 343:3, 343:17, 343:18, 343:19, 344:16, 345:14, 361:10, 361:18, 414:22, 457:17, 463:19, 473:17, 475:23, 477:17, 480:5, 480:18, 482:15, 484:8, 485:7, 493:17, 493:19
**works** [3] - 387:7, 456:9, 457:2
**world** [8] - 284:25, 414:12, 414:17, 432:11, 432:12, 454:2, 454:14, 455:4
**worrisome** [1] - 268:3
**worse** [5] - 286:10, 411:18, 489:25
**worst** [2] - 302:22, 348:24
**worth** [3] - 255:18, 256:21, 443:9
**wound** [2] - 333:20, 337:22
**wrap** [1] - 351:1
**wrapping** [2] - 369:4, 455:8
**writ** [3] - 287:24, 289:12, 342:25
**write** [2] - 263:1, 482:6
**writing** [9] - 282:7, 282:10, 282:16, 282:19, 293:20, 295:9, 391:13, 398:10, 419:20
**writings** [4] - 293:16, 415:10, 419:5, 419:20
**written** [4] - 282:13, 360:6, 375:22, 378:21
**wrongdoing** [1] - 315:16

**wrongful** [4] - 244:13, 299:21, 315:18, 315:19
**wrongs** [3] - 364:6, 400:10, 405:22
**wrote** [3] - 249:12, 359:23, 482:8
**WRTL** [1] - 364:2
**Wyoming** [1] - 451:22

# X

**x-rayed** [1] - 271:15

# Y

**year** [5] - 267:12, 280:4, 346:8, 426:15, 444:14
**years** [14] - 267:14, 268:10, 298:16, 377:16, 388:12, 395:21, 395:22, 395:25, 439:25, 440:6, 440:20, 441:13, 441:15, 496:12
**yesterday** [12] - 241:8, 241:20, 243:25, 245:2, 247:13, 253:22, 253:23, 257:15, 265:12, 265:20, 321:6, 333:7
**York** [1] - 275:4
**you's** [1] - 251:12
**Young** [10] - 284:5, 284:21, 285:6, 296:10, 344:19, 353:20, 416:23, 466:8, 467:16, 472:20
**YOUNG** [20] - 241:7, 284:6, 284:11, 353:18, 355:23, 460:13, 460:16, 460:19, 460:24, 467:18, 467:22, 471:23, 472:21, 472:25, 474:4, 474:15, 497:13, 497:20, 497:23, 498:2
**young** [2] - 356:1, 460:18
**yourself** [7] - 269:3, 347:20, 401:23, 428:20, 465:18, 473:20, 488:21
**Yvette** [1] - 278:9

## Z

**zip** [1] - 382:23